UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GHAZI ABU NAHL and NEST INVESTMENTS
HOLDING LEBANON SAL, individually and on
behalf of LEBANESE CANADIAN BANK,

        Plaintiffs,

      v.

GEORGES ZARD ABOU JAOUDE, MOHAMED
HAMDOUN, AHMAD SAFA, OUSSAMA
SALHAB, CYBAMAR SWISS GMBH, LLC,
AYMAN SAIED JOUMAA, MAHMOUD
HASSAN AYASH, HASSAN AYASH
EXCHANGE COMPANY, and ELLISSA
HOLDING COMPANY,

        Defendants,

    and

LEBANESE CANADIAN BANK,

        Nominal Defendant.

---

15 Civ. 9755 (LGS)

**FIRST AMENDED
VERIFIED COMPLAINT**

DEMAND FOR JURY TRIAL

## NATURE OF ACTION

1.      This case involves an international money laundering scheme in which Defendants Georges Zard Abou Jaoude ("Abou Jaoude"), Mohamed Hamdoun ("Hamdoun"), Ahmad Safa ("Safa") and others used United States accounts and entities to aid and abet crimes against humanity and/or war crimes by laundering funds for international narcoterrorists, including Hezbollah, and to line their own pockets. Defendants' misconduct resulted in substantial damage to Lebanese Canadian Bank ("LCB" or the "Bank"), an entity controlled by Abou Jaoude, Hamdoun and Safa, as well as to Plaintiffs directly. Plaintiffs, LCB shareholders, sue derivatively to recover the damages suffered by the Bank and directly to obtain redress for the non-derivative injuries they suffered as a result of Defendants' scheme.

2.      Defendants aided and abetted Hezbollah's crimes against humanity and war crimes by laundering funds through the United States, including through banks in New York. Hezbollah has been designated by the United States Department of State as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act. *See* 62 Fed. Reg. 52,650 (Oct. 8, 1997). According to a White House national security official and the U.S. Treasury Department, among others, the group has planned and conducted repeated attacks on civilians in Israel, Syria and elsewhere. *See, e.g.*, Thomas Bossert, "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (Oct. 10, 2017), *available at* https://www.whitehouse.gov/ blog/2017/10/10/its-time-mobilize-global-response-terrorist-group-lebanese-hizballah; U.S. Department of Treasury, "Treasury Targets Hizballah for Supporting the Assad Regime" (Aug. 10, 2012), *available at* https://www.treasury.gov/press-center/press-releases/ Pages/tg1676.aspx. These attacks

constitute crimes against humanity and/or war crimes in violation of the law of nations. Defendants purposefully aided and abetted Hezbollah's crimes against humanity by means of the scheme at issue in this case.

3. Specifically, Defendants orchestrated a scheme by which LCB wired funds into and out of accounts in New York to support Hezbollah crimes. The details of the money laundering scheme were described in three separate enforcement actions by the U.S. Government: findings by the U.S. Treasury Department that LCB was engaged in money laundering activities ("Treasury Finding"); a civil forfeiture complaint filed by the U.S. Attorney's Office for the Southern District of New York ("Civil Forfeiture Complaint"); and a criminal indictment obtained by the U.S. Attorney's Office for the Eastern District of Virginia ("Criminal Indictment") (collectively, "the U.S. government actions"). These documents are annexed to this First Amended Verified Complaint as Exhibits A-C.

4. In brief, Defendants' money laundering scheme worked as follows. First, money flowing through LCB was routed through New York banks and used to purchase used cars in the United States. Second, the cars were then shipped to West Africa, where they were sold. Third, proceeds from narcotics sales in Europe and elsewhere were mixed with the money received from the sale of the cars, then the newly laundered drug money was reintroduced into the legitimate banking sector through LCB. Finally, some of the laundered funds were sent back to the United States to purchase more cars and continue the cycle, while other funds were siphoned from the Bank to support Hezbollah, including through an entity called the Yousser Company, which the U.S. Treasury Department Office of Foreign Assets Control has described as "Hizballah's

unofficial treasurer, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks." Hezbollah, in turn, used laundered monies to fund its terrorist agenda. *See generally* Civil Forfeiture Complaint.

5. The funds laundered by Defendants enabled Hezbollah to commit acts in violation of the law of nations, including attacks on civilians. Among other attacks, Hezbollah has, as recognized by the White House, engaged in rocket attacks on Israeli civilians, including families and children. *See*, *e.g.*, Remarks by President Bush on Foreign Policy (Aug. 14, 2006); "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (Oct. 10, 2017), *available at* https://www.whitehouse.gov/blog/2017/10/10/its-time-mobilize-global-response-terrorist -group-lebanese-hizballah. Defendants' operation of the money laundering scheme to aid and abet such crimes against humanity constitutes a violation of the law of nations.

6. LCB suffered a substantial loss as a direct result of Defendants' acts to aid and abet Hezbollah and its crimes against humanity through the money laundering scheme at issue in this case. In particular, in 2013 LCB was required to forfeit $102 million of Bank funds in settlement of the claims asserted in the Civil Forfeiture Complaint, effectively constituting the proceeds from a sale of LCB assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme. In announcing the settlement, Drug Enforcement Agency head Michele Leonhart stated that the settlement "addresses the role the Lebanese Canadian Bank played in facilitating illicit money movement from the United States to West Africa to Hizballah-controlled money laundering channels," while Manhattan U.S. Attorney Preet

Bharara stated that the settlement "shows that banks laundering money for terrorists and narco-traffickers will face consequences for their actions, wherever they may be located."

7.      In a decision last year, the Second Circuit held that aiding and abetting Hezbollah's crimes against humanity and war crimes by providing money transfer services, if proven, constitutes a violation of the law of nations that is actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350. *See Licci v. Lebanese Canadian Bank*, 834 F.3d 201 (2d Cir. 2016). This Court thus has jurisdiction to provide redress for losses suffered by LCB due to Defendants' violations of the law of nations.

8.      Defendants engaged in additional related wrongful conduct for which they are liable, as further described below, including by fraudulently inducing Plaintiffs to invest in LCB, breaching their fiduciary duties to LCB by, *inter alia*, wrongfully diverting Bank funds, including for their personal benefits, grossly mismanaging LCB, and wasting Bank assets. These actions resulted in substantial financial and reputational harm to Plaintiffs. They also resulted in substantial losses to, and the cessation of independent banking and business operations by, LCB.

## PARTIES

A.      Plaintiffs

9.      Plaintiff Ghazi Abu Nahl ("Abu Nahl") is a Jordanian businessman and Group Chairman of Nest Investments (Holdings) Ltd. ("Nest Investments"). Born in Barbara, Palestine and with only a basic high school education, Abu Nahl built his businesses from the ground up. He became one of the first entrepreneurs to sell insurance policies in the region. Nest Investments owns and operates a number of businesses, primarily in the insurance and reinsurance industries, in the Middle East and North Africa ("MENA") region. Abu Nahl directly acquired a 1.36% stake in LCB.

10. Plaintiff Nest Investments Holding Lebanon SAL is a corporate entity incorporated under the laws of Lebanon with its principal place of business in Beirut, Lebanon. Nest Investments Holding Lebanon SAL acquired a 12.5% stake in LCB. Nest Investments Holding Lebanon SAL, in turn, is principally (99%) owned by Abu Nahl. Nest Investments and Abu Nahl, together with other affiliates and associates (collectively, the "Nest Group"), owned a combined 24% stake in LCB.

**B.      Defendants**

11. Nominal Defendant LCB is a corporate entity based in Beirut, Lebanon. LCB previously operated as a bank, offering personal and corporate banking services with branches throughout Lebanon. At its peak, LCB was the eighth largest bank in Lebanon, with assets worth more than $5 billion. LCB is currently in liquidation. In 2011, when it was forced into liquidation because of the managers' unlawful money laundering activities, LCB was worth in the range of $800 million. As a result of the liquidation and subsequent sale of substantially all of the Bank's assets triggered by the money laundering scheme, the net proceeds from the sale of the Bank's assets will be less than $400 million. LCB remains an extant corporate entity in Lebanon, despite the sale of Bank assets.

12. Defendant Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He formerly served as the Chair of LCB's Anti-Money Laundering Committee. Abou Jaoude directed the affairs of the international money laundering scheme that ultimately resulted in multiple U.S. government investigations and the collapse of LCB. Through his interlocking board and management positions in LCB, Abou Jaoude directed both the money laundering operation and efforts to conceal the scheme from the Nest Group and from U.S. and other law enforcement officers and

regulators.  In spite of his participation in the money laundering scheme, Abou Jaoude remains active in the Lebanese banking sector and apparently in good standing with the Central Bank of Lebanon.  With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering scheme and further damage Plaintiffs.  Upon information and belief, Abou Jaoude, together with Hamdoun, is preparing to open a new bank in Lebanon, with the approval of the Central Bank of Lebanon.

13.     Defendant Mohamed Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board.  He served as the Vice Chair of LCB's Anti-Money Laundering Committee.  Together with Abou Jaoude, Hamdoun directed the money laundering scheme detailed in this Complaint.  Through his interlocking board and management positions in LCB, Hamdoun directed both the money laundering operation and efforts to conceal the scheme from Plaintiffs and from U.S. and other law enforcement and regulators.  In spite of his participation in the money laundering scheme, Hamdoun remains active in the Lebanese banking sector and is apparently in good standing with the Central Bank of Lebanon.  With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering activities and further damage the Plaintiffs.  Upon information and belief, Hamdoun, together with Abou Jaoude, is preparing to open a new bank in Lebanon, with the approval of the Central Bank of Lebanon.

14.     Defendant Ahmad Safa is the former Assistant General Manager responsible for overseeing all LCB branches.  He reported directly to Abou Jaoude and functioned as Hamdoun's operational enforcer at the Bank.  Through his managerial and operational roles at LCB, Safa organized and directed the day-to-day money laundering activities run through LCB.  In or around 2010, Safa left the Bank and assumed a position as a Member on the Banking Control Commission, an arm of the Central Bank of Lebanon responsible for supervising and auditing banks, brokerage houses, and other financial institutions.  In March 2015, Safa was reappointed to the Banking Control Commission.

15.     Defendant Oussama Salhab ("Salhab"), according to the U.S. government, is a Hezbollah operative who controls a network of money couriers based primarily in West Africa.  According to the U.S. Treasury Department and the Civil Forfeiture Complaint, Salhab helped coordinate the network that ran proceeds from, and money intended to benefit narcoterrorists through, LCB into the United States and back to Africa and the Middle East using companies under his control.  Salhab worked with Defendants Abou Jaoude, Hamdoun, and Safa to coordinate the flow of currency from drug trafficking and terrorist financing operations through the Bank.  Salhab also organized individual couriers who transported the proceeds of narcoterrorism into the United States.

16.     Defendant Cybamar Swiss Gmbh, LLC ("Cybamar Swiss") is a corporation headquartered in Redford, Michigan, with affiliated companies located in Europe.  Cybamar Swiss's registered address is 12130 Dixie Street, Redford, Michigan 48239.  Cybamar Swiss is owned, operated, or controlled by Defendant Salhab or his relatives and associates.  According to the Civil Forfeiture Complaint, Cybamar Swiss is a shipping company used by the U.S.-based network of money launderers to ship used cars

purchased with the proceeds of international drug trafficking to West Africa for sale. Defendant Salhab and his money couriers traveled to the United States to advance the money laundering scheme, ostensibly to conduct business on behalf of Cybamar Swiss.

17.     Defendant Ayman Saied Joumaa ("Joumaa") has been designated by the U.S. Department of Treasury as a Drug Kingpin under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901 – 08.  According to the Treasury Department, Joumaa controls and directs an international network of traffickers and launderers that transports, distributes, and sells multi-ton shipments of South American cocaine to West Africa.  In 2011, Joumaa was charged in the Eastern District of Virginia with conspiracy to distribute narcotics and conspiracy to launder money for his role in coordinating the shipment of tens of thousands of kilograms of cocaine, including to Mexican drug cartels, and laundering hundreds of millions of dollars in proceeds generated from narcotics sales in the United States, Europe, West Africa, and Mexico.

18.     Joumaa operated his network in substantial part for the benefit of Hezbollah.  According to Under Secretary for Terrorism and Financial Intelligence David S. Cohen, "[t]he Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."

19.     According to the U.S. Government, Defendant Mahmoud Hassan Ayash ("Hassan Ayash") is a Hezbollah operative who facilitates bulk cash transfers and money laundering for Defendant Joumaa and other narcoterrorists.  He has family ties to Secretary General Hassan Nasrallah, the leader of Hezbollah.  The U.S. government has asserted that Hassan Ayash (1) helped connect and facilitate the money laundering scheme

between Joumaa and Bank managers, including Defendants Abou Jaoude, Hamdoun, and Safa, and (2) helped coordinate wire transfers through the Bank to the United States for the purpose of laundering drug proceeds, by purchasing used cars in the United States and shipping them to West Africa.

20. Defendant Hassan Ayash Exchange Company ("Hassan Ayash Exchange") is a money exchange company in Beirut, Lebanon. It is owned and controlled by Defendant Hassan Ayash and his son Hassan Mahmoud Ayash. The U.S. government has found that the Hassan Ayash Exchange facilitates bulk cash transfers and launders money for Defendant Joumaa's narcoterrorism network. According to the U.S. Government, Defendants Abou Jaoude, Hamdoun, Safa, Joumaa, and Hassan Ayash used the Hassan Ayash Exchange to originate wire transfers to the United States to fund the purchase of used cars; the wire transfers and car purchases were part of the money laundering scheme run through the Bank and were intended to disguise and conceal the source, nature, ownership, and control of proceeds of narcotics trafficking.

21. Defendant Ellissa Holding Company owns and controls multiple companies based in Lebanon, Benin, and the Democratic Republic of the Congo, including the Ellissa Exchange Company ("Ellissa Exchange"), a money exchange in Sarafand, Lebanon. The U.S. government has asserted that the Ellissa Exchange facilitates bulk cash transfers and launders money for Defendant Joumaa's narcoterrorism network. Defendants Abou Jaoude, Hamdoun, Safa, Joumaa, and Hassan Ayash were reported to have used the Ellissa Exchange to originate wire transfers to the United States to fund the purchase of used cars. The wire transfers and car purchases reportedly were part of the money laundering scheme run through the Bank and were intended to disguise and conceal

the source, nature, ownership, and control of proceeds of narcotics trafficking. The Ellissa Holding Company also owns and controls Ellissa Group SA, which owns a car park in Benin used for receiving used cars shipped from the United States and Ellissa Shipping, which is alleged to have transported some of the cars involved in the money laundering scheme. The Ellissa Holding Company is reported to be controlled by Jamal Mohamad Kharoubi and Ali Mohammed Kharroubi, a self-proclaimed supporter of Hezbollah.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction pursuant to 28 U.S.C. § 1350 (the Alien Tort Claims Act).

23.     In addition, Plaintiffs invoke the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over their non-federal claims.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the actions and omissions giving rise to the claims herein complained of occurred in this District.

25.     This Court has personal jurisdiction over Defendants because Plaintiffs' claims are based, *inter alia*, on Defendants' purposeful acts to coordinate their money laundering scheme through banks in New York. In particular, Defendants Abou Jaoude, Hamdoun, and Safa, through their control of LCB, repeatedly caused funds to be transferred by wire through LCB correspondent accounts in New York; such transfers formed an essential part of Defendants' scheme; and such transfers were purposefully and deliberately routed through various banks in this district for the purpose of purchasing used cars in Michigan and otherwise advancing the laundering scheme described in this action. The Treasury Finding specifically states that Abou Jaoude, Hamdoun, and the managers of key LCB branches "are in frequent—in some cases even daily—communication with the

various members of the . . . drug trafficking and money laundering network, and they personally process transactions on the network's behalf."

26.     While the principal parties to this action are foreign, the very purpose of the Alien Tort Claims Act is to provide a federal forum to adjudicate claims by aliens to redress torts committed in violation of the law of nations, where, as here, such torts have a nexus to the United States.

27.     Adjudication of Plaintiffs' claims in the United States is especially appropriate here because the claims cannot be fairly adjudicated in Lebanon.  Hezbollah's strong influence over the Lebanese government is well-documented.  For example, *Newsweek* magazine reported earlier this year that "Hezbollah is seizing the [Lebanese] state's institutions one by one . . . Slowly but surely, [Hezbollah] is clearing its own path towards full control of Lebanon's government."  According to Faysal Itani, a senior fellow and counter-terrorism expert at the Atlantic Council in Washington, D.C., "I do not see [Hezbollah] as separate from the Lebanese government."  Lebanon's justice minister resigned in 2016, citing what he called Hezbollah's "domination" of the country's government.  According to a White House national security official, "[f]or decades, this terrorist organization [Hezbollah] has tried to disguise its murderous intentions under the guise of political legitimacy."  *See* "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah," (Oct. 10, 2017), *available at* https://www.whitehouse.gov/blog/2017/10/10/its-time-mobilize-global-response-terrorist -group-lebanese-hizballah.  The White House national security official further noted that "[t]oday, Hizballah and its political allies hold half of the seats in Lebanon's Cabinet and

nearly half of the seats in its National Assembly," while concluding that "[t]he same Hizballah officials responsible for its political apparatus oversee its terrorist planning. *Id*.

28. Lebanon's Ministry of Justice exercises significant control over the country's judiciary. As a result, the Lebanese judiciary lacks judicial independence from the political branches of government, which are, in turn, dominated by Hezbollah.

29. Due to Hezbollah's power in Lebanon, Lebanese courts do not provide an adequate forum to adjudicate Plaintiffs' claims, which are based on a money laundering scheme to benefit Hezbollah. Put simply, a system dominated by Hezbollah cannot be expected fairly to adjudicate claims based on a wide-ranging international scheme whose very purpose is to launder funds to support Hezbollah's terrorist activities.

30. Plaintiffs' inability to obtain relief in Lebanon is exacerbated by the fact that political corruption and bribery is notorious in that country. According to Transparency International's Corruption Perceptions Index, Lebanon is more corrupt than over 135 other countries, including Brazil, Russia, Iran, and Kazakhstan.

31. Corruption has specifically stood in the way of Plaintiffs obtaining redress in Lebanon for injuries resulting from Defendants' laundering scheme. As explained more fully below, the Governor of the Central Bank of Lebanon exerts substantial personal control over the banking sector in the country. For example, only at the Governor's direction may the Central Bank lift the country's Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing, including money laundering. Plaintiffs have repeatedly raised issues concerning LCB with the Central Bank of Lebanon, but the Central Bank has turned a blind eye to these issues. Because the Central Bank must authorize prosecutors to investigate and develop evidence of money laundering under

Lebanese rules, the Central Bank Governor's refusal to authorize such investigation has frustrated Plaintiffs' ability to obtain redress in Lebanon, despite good-faith efforts to do so beginning in or about February 2011. Hamdoun has claimed to have a close personal relationship with the Central Bank Governor and, on information and belief, has used this relationship to cause the Central Bank to turn a blind eye to Defendants' money laundering scheme.

## FACTUAL ALLEGATIONS

### A.      History of the Nest Group and Abu Nahl

32.      Nest Investments (Holdings) Ltd. is a group company established in 1989 by Abu Nahl, a Jordanian businessman with over 45 years' experience in the highly regulated insurance sector. Under Abu Nahl's leadership, Nest Investments (Holdings) Ltd. and its affiliated companies ("Nest Companies") expanded their operations to 23 countries in North America, Europe, Africa, the Middle East, Asia, and Australia.

33.      Abu Nahl was born in Palestine in 1946. In 1962, Abu Nahl's father borrowed money to send Abu Nahl to high school in Egypt. Worried about the toll this sacrifice would take on his father and the rest of his family, Abu Nahl returned to Palestine after 40 days and returned the money intended for his schooling to his father. Abu Nahl then moved to Qatar in 1964 to find work. Soon, he heard about a concept that, at the time, was foreign in the Persian Gulf region: insurance. He began selling insurance policies. After his initial success in the insurance industry, Abu Nahl arranged a meeting with the Emir of Qatar to discuss the importance of insurance. Soon, Qatar required all automobile owners to carry insurance on their cars. Abu Nahl was the founder of one of the first Persian Gulf insurance companies, now the Nest Companies.

34.     The Nest Companies own and operate a number of insurance and reinsurance companies.  The Nest Companies also own investments in real estate and other industries.  They employ around 2,000 people worldwide.

35.     The Nest Companies have a solid and hard-earned reputation in the insurance industry.  One of the leading insurance rating agencies, A.M. Best, has assigned Trust International Insurance and Reinsurance Company B.S.C. ("Trust Re"), the Nest Group's primary insurance and reinsurance company, an A- Rating – which A.M. Best classifies as "Excellent."  When A.M. Best most recently reaffirmed Trust Re's Excellent rating in August 2017, it wrote: "[t]he ratings reflect Trust Re's good risk-adjusted capitalisation, track record of strong operating performance and good business profile."  In particular, A.M. Best highlighted Trust Re's "disciplined risk selection" and "prudent reserving policy."  Another leading rating agency, Standard & Poor's, also gave Trust Re an A- rating in 2014, writing "[t]he rating reflect our view of the group's satisfactory business and strong financial risk profiles, built on an adequate competitive position, very strong capital and earning, and a moderate risk position."

36.     Abu Nahl also currently serves as Director of the World Trade Center Association, a non-profit organization that partners with commercial property developers, economic development agencies, and international businesses to promote trade and investment in more than 90 countries around the world.  Abu Nahl's involvement with the World Trade Center Association began around 1995.  When he was elected Chair of the organization in 2008, he quickly applied his corporate governance expertise to establish systems and proper controls throughout the organization to improve its functioning and services.  The Association is now more transparent and applies worldwide standards on

corporate governance, including risk management, internal auditing, transparency, high-level financial reporting, and independent board elections.

### B.     <u>Nest Group's Initial Involvement with LCB</u>

37.    In 2000, the Nest Group expanded its insurance operations into Algeria, establishing Trust Algeria Insurance and Reinsurance. Impressed with the Nest Group's successful establishment of insurance operations, the Algerian authorities asked the Company to establish a bank in the country. In 2002, Algeria granted the Nest Group a banking license and the Company founded Trust Bank Algeria ("TBA") in Algiers.

38.    The Algerian banking sector is highly regulated, with the Algerian Central Bank tightly controlling which banks may operate and who may own or control shares in banks in the country. The banking sector is heavily dominated by state-owned banking operations. Because private banks are rare in Algeria, the Nest Group's Algerian banking license and its control and operation of TBA are both unusual and highly coveted by other companies seeking access to the Algerian banking sector. When TBA was established by the Nest Group in 2002, other banking operations were actively seeking investment opportunities in entities with Algerian banking licenses because of the promise of substantial profits. Expansion into the Algerian banking sector was difficult, however, because of the scarcity of private enterprises with banking licenses.

39.    In 2005, three years after TBA's founding, the Algerian Central Bank required all banks in the country to increase their capital. In part because the Nest Group wanted to diversify its investment risk, it began looking for other investors in TBA. Abu Nahl and the Nest Group were particularly interested in partnering with an investor who could offer additional banking experience and expertise.

40.     During this search for a strategic banking partner, Abu Nahl and the Nest Group had discussions with several different banking organizations, including LCB. In 2005, Defendant Abou Jaoude approached Abu Nahl to discuss his interest in organizing an investment in TBA by LCB.

41.     At the time, Abou Jaoude was under considerable personal financial strain. He had accumulated at least $15 million in private debt with multiple banks in Lebanon and elsewhere. As a result, he lacked the necessary capital to simply purchase a stake in TBA. To help fund the acquisition of TBA, Abou Jaoude proposed a separate transaction under which he would sell the Nest Group a minority stake in LCB.

42.     At the time, Abou Jaoude's proposal seemed attractive to Abu Nahl and the Nest Group. Among other things, the Nest Group consulted banking almanacs, which listed LCB as one of the top ten banks in Lebanon. In addition, the Nest Group at the time believed that the banking expertise of Abou Jaoude and LCB would be beneficial to the operations of TBA.

43.     The Nest Group (including Plaintiffs) acquired a 24-percent stake in LCB through a series of transactions between late 2005 and late 2007. In exchange for its minority, non-controlling share of the Bank, the Nest Group, including Plaintiffs, paid LCB a total of more than $57 million. The last of these transactions was completed in 2007.

### C.     Defendants' Money Laundering Scheme

44.     When Abu Nahl was initially negotiating with Abou Jaoude to acquire a stake in LCB, he did not know that Abou Jaoude had an ulterior motive for wanting the deals to advance: Abou Jaoude and Hamdoun wanted control of TBA to further a money laundering scheme to benefit Hezbollah and to enrich themselves at LCB's

expense.  As discussed below, Abou Jaoude and Hamdoun had established secretive banking operations in Gambia and Congo which, upon information and belief, they used to advance their laundering scheme.  Adding operations in Algeria would further benefit the scheme.

45.     The port in Algiers, where TBA is headquartered, is one of the busiest in Algeria, with heavy cargo and tanker traffic to and from Europe and elsewhere, and frequent passenger ferry service to and from France and Spain.

46.     Moreover, a majority of the proceeds received by the drug trafficking ring operated by Defendant Joumaa from drug sales in Europe was generated in Spain, making Algeria a convenient access point for receiving and laundering those illicit proceeds.  Laundering of the drug proceeds was a key element in the overall scheme.

47.     Joumaa, sometimes identified by his alias "Junior," is a dual Lebanese and Colombian citizen.  According to the Criminal Indictment, Joumaa led a drug trafficking network that spanned from South America to Africa and stretched up into both the United States and Europe.  Operations in Lebanon, West Africa, Panama, and Colombia formed the backbone of Joumaa's trafficking network.

48.     According to the Criminal Indictment, Joumaa and his organization played a dual role in the drug trafficking operation.  First, Joumaa coordinated the shipment of narcotics, tens of thousands of kilograms of cocaine, from Colombia through Central America and Mexico, to the United States.  Second, beginning around 1997 through at least 2010, he helped coordinate the laundering of hundreds of millions of dollars in proceeds from drug sales in the United States, Europe (predominantly Spain), Mexico, and Central America.  Joumaa reportedly charged a fee of between 8 and 14

percent for laundering the proceeds of international drug sales. As noted above, according to Under Secretary for Terrorism and Financial Intelligence David S. Cohen, "[t]he Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."

49.     Defendant Salhab ran an international network of money couriers centered in West Africa, as described in both the Treasury Department Finding and the Civil Forfeiture Complaint. According to those documents, Salhab's couriers transport currency in bulk through West Africa to Lebanon, as well as into the United States. The money transported by Salhab's couriers included the proceeds of illegal drug sales in Europe, particularly Spain, destined for laundering by Joumaa's organization.

50.     Around the mid-2000s, much of Joumaa's drug trafficking operation and Salhab's money courier network in Africa was centered in Benin, Togo, and the Democratic Republic of the Congo. Upon information and belief, Joumaa and Salhab were interested in expanding their operations into Northern Africa because of its proximity to Europe and especially Spain, where many of the proceeds of illegal narcotics sales were generated. Algeria was a prime candidate into which Joumaa and Salhab wished to expand their narcoterrorism network.

51.     Additionally, and unbeknownst to Abu Nahl and the Nest Group when they were negotiating the LCB deal in 2005 and 2006, Abou Jaoude and Hamdoun also planned to use LCB and TBA to siphon off money for their personal use. With at least $15 million in private debt with multiple banks in Lebanon and elsewhere, Abou Jaoude had a pressing need to increase his own access to capital to satisfy his debts. In addition to

supporting Hezbollah, Abou Jaoude hoped through the money laundering scheme to increase the amount of capital flowing through banks under his control, making it easier to siphon off funds for personal use without detection.

52.     Abou Jaoude and Hamdoun actively concealed their scheme to use the banks to facilitate an international money laundering operation for the benefit of themselves and Hezbollah at (and after) the time that Abu Nahl and the Nest Group were induced to invest in LCB.

53.     The plan hatched by Abou Jaoude and Hamdoun was simple:  using their control over the banks, they would establish systems to allow money to be laundered efficiently and without detection.  Once those systems were in place, Joumaa would begin laundering drug proceeds from Europe and Africa and, as detailed in the Criminal Indictment, would take a percentage fee for laundering the money.  Salhab's operation, as described in the Civil Forfeiture Complaint, would provide transportation services for the goods and money involved in the scheme.  Hezbollah would benefit from the scheme through, *inter alia*, the ability to use laundered funds to finance its crimes against humanity.  Abou Jaoude, Hamdoun, and Safa in turn would profit from the increased flow of money through the banks which would, among other things, enable them to siphon off more money for their own personal use.

54.     On November 30, 2006, Joumaa opened a bank account at LCB to commence the money laundering operations.

55.     As part of the money laundering scheme, Abou Jaoude, Hamdoun, and Safa continuously and repeatedly used LCB to wire substantial amounts of U.S. currency to used car buyers throughout the United States.  These wire transfers passed

through correspondent banks in New York. To conduct these transfers, LCB maintained correspondent banking relationships with the Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank in New York. Defendants caused LCB to utilize these correspondent relationship to further the scheme.

56.    According to the Civil Forfeiture Complaint, Joumaa and the individuals and entities associated with his organization originated approximately $62 million in wire transfers through LCB between 2006 and 2011. Ayash and the individuals and entities associated with his organization originated at least $32 million in wire transfers through LCB between 2006 and 2011. Salhab and the individuals and entities associated with his organization originated at least $7.5 million in wire transfers through LCB between 2006 and 2011.

57.    As described in greater detail in the Civil Forfeiture Complaint, the wire transfers typically were for tens of thousands of dollars each, with some U.S. car buyers receiving a handful of wire transfers between 2007 and 2011, and others receiving hundreds of transfers. For example, during that time period, MGM Global Trading, LLC in South Windsor, Connecticut received 353 wire transfers totaling almost $33.5 million and World Auto Sales, LLC in Birmingham, Alabama received 490 wire transfers totaling over $24 million. Together, between 2007 and 2011, 30 used car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee received over 3,500 wire transfers totaling nearly $250 million.

58.     Among the used car purchasers that received wire transfers was United Auto Enterprize, Inc., which, according to corporate records maintained by the Michigan Department of Licensing and Regulatory Affairs was registered on March 21, 2007 by Rola Salhab.  Upon information and belief, Rola Salhab is related to Defendant Salhab.  United Auto Enterprize's registered address in Redford, Michigan is the same as Cybamar Swiss's registered address.

59.     On February 2, 2007, Fadi Salhab, who is a member of Defendant Salhab's family, registered Cybamar Swiss Gmbh, LLC with the Michigan Department of Licensing and Regulatory Affairs.  On January 28, 2008, another member of the Salhab family, Dina Salhab, registered another affiliated company, Cybamar USA, LLC, with the Michigan Department of Licensing and Regulatory Affairs.  Cybamar Swiss and Cybamar USA share the same registered address in Redford, Michigan.

60.     According to the Treasury Finding and the Civil Forfeiture Complaint, the car buyers in the United States would use the money wired through LCB and correspondent banks in New York to purchase used cars.  These used cars were then shipped to various ports in West Africa, including in Benin and Togo.  Cybamar Swiss, a shipping company, was frequently used to transport the cars to West Africa.

61.     According to the Treasury Finding and Civil Forfeiture Complaint, after the cars arrived in West Africa, Joumaa and Salhab's networks purchased them using, at least in part, bulk currency generated from narcotics sales in Europe (primarily Spain) and Africa.  For example, as detailed in the Civil Forfeiture Complaint, Salhab owned and controlled STE Nomeco SARL, which owned and operated used car lots in Benin.  The

used cars shipped from the United States were purchased in these and other used car lots using proceeds from Joumaa's international drug trafficking ring.

62.     According to the Civil Forfeiture Complaint, once the cars were sold, Salhab's money courier network transported the currency overland or by air from West Africa to Lebanon.  When the currency arrived in Lebanon, it was deposited either in LCB accounts, or with the Hassan Ayash Exchange or the Ellissa Exchange.

63.     LCB maintained substantial banking relationships with both the Hassan Ayash Exchange and the Ellissa Exchange.  LCB maintained these and other relationships at the direction of Abou Jaoude and Hamdoun and in spite of mounting evidence of the Ayash and Ellissa Exchanges' involvement in narcoterrorism and money laundering.  Indeed, given concerns about potential money laundering activity, at least one other Lebanese bank had refused to continue doing business with the Ellissa Exchange.

64.     According to the Civil Forfeiture Complaint, an internal LCB customer due diligence report found that the Ellissa Exchange and its principals were involved in smuggling bulk currency out of Africa, including through flights from Ghana to Beirut.  The report also noted that the Bank had limited and incomplete "Know Your Customer" files for the Ellissa Exchange.  In particular, the due diligence report highlighted large cash deposits into LCB accounts held by the Ellissa Exchange principals, transactions inconsistent with the nature and purpose of those accounts, and the Ellissa Exchange's failure to provide information about the nature and purpose of the suspicious transactions.  Upon information and belief, Abou Jaoude, Hamdoun, and Safa concealed the due diligence report and directed other Bank employees to ignore substantial violations of LCB's anti-money laundering and compliance policies.

65.     LCB policy required disclosure of the source of funds of any cash deposit greater than $10,000.  For each such cash deposit, this information was supposed to be recorded on a Cash Transaction Slip ("CTS").  LCB was then required to file each CTS with the Central Bank of Lebanon.

66.     As detailed in the Civil Forfeiture Complaint, Safa granted exceptions to certain LCB clients to allow them to deposit more than $10,000 in cash without filing a CTS.  A number of the clients Safa exempted from the CTS policy had ties to Hezbollah and had been named as money launderers and terrorists by the United States government.  As detailed in the Civil Forfeiture Complaint:

a.     Safa exempted the Yousser Company, an LCB client, from the CTS policy, allowing it to deposit up to $50,000 per week in cash at LCB's Nabatieh branch and up to $60,000 per day in cash at LCB's Airport Road branch without disclosing the source of the funds.

b.     Safa also exempted the Farah Company for Tourism, a subsidiary of the Yousser Company, from the CTS policy.  The Farah Company for Tourism was allowed to deposit around $33,000 per week at the Nabatieh branch without disclosing the source of the funds.

c.     Safa exempted two of the owners of the Yousser Company, Hussein Ali Mohamed Chami (sometimes called Husayn al-Shami) and Wahid Mahmoud Sbeity, from the CTS policy.  Al-Shami and Sbeity were allowed to deposit up to $30,000 per week in cash at the Nabatieh branch without disclosing the source of the funds.  Al-Shami and two other Yousser Company directors were also allowed to deposit a total of

$332,000 per day in cash at the Airport Road Branch without disclosing the source of the funds.

67.     The U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") is empowered under various Executive Orders to name individuals and organizations as Specially Designated Global Terrorists if it finds they have or are likely to commit terrorist acts, or they provide support or associate with terrorists or terrorist organizations.  Various U.S. sanctions apply to individuals and organizations that OFAC names Specially Designated Global Terrorists.  In 2006, OFAC named the Yousser Company a Specially Designated Global Terrorist organization.  OFAC has described the Yousser Company and another entity as "Hizballah's unofficial treasurer, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks."  OFAC has also named Al-Shami as a Specially Designated Global Terrorist.

68.     Defendant Safa's direction that LCB grant exemptions to the Yousser Company and affiliates facilitated their ability to conduct financial transactions on Hezbollah's behalf through LCB, despite the imposition of U.S. sanctions.

69.     Taken together, Safa, at the direction of Abou Jaoude and Hamdoun, permitted government-identified terrorists and terrorist organizations to deposit at least $200 million in cash per year without disclosing the source of the funds.  The money laundering operation, largely run through Joumaa and Salhab's organizations, used these exceptions to funnel the proceeds of illegal narcotics sales and other illicit operations into the legitimate banking sector.

70.     Abou Jaoude and Hamdoun used LCB operations in West Africa,

including Prime Bank Gambia, to help facilitate their money laundering scheme.  They

intentionally kept LCB operations in the region shrouded in secrecy to hide their illicit

activities.  They also intentionally did not implement proper compliance and control

measures in LCB West African operations in order to conceal their money laundering

scheme.

    **D.**    **Use of the Money Laundering Scheme to Advance
Hezbollah's Crimes Against Humanity and War Crimes.**

71.     Hezbollah was formed in Lebanon in around 1982.  It has been

designated as a terrorist organization under the U.S. Terrorism Sanctions Regulations, 60

Fed. Reg. 5079 (Jan. 23, 1997), the Foreign Terrorist Organizations Sanctions Regulations,

62 Fed. Reg. 52,650 (Oct. 8, 1997), the Global Terrorism Sanctions Regulations, 67 Fed.

Reg. 12,633 (Mar. 19, 2002), and the Iran and Syria Nonproliferation Act, 72 Fed. Reg.

20,158 (Apr. 23, 2007).

72.     As set forth in the Treasury Finding, Hezbollah "derived financial

support from the criminal activities" of the money laundering network at issue in this case

and LCB managers were "complicit in the network's money laundering activities."

73.     During the period relevant to this action, Hezbollah—directly or

through surrogates—maintained bank accounts at various LCB branches in Lebanon.

Defendants Abou Jaoude, Hamdoun, and Safa operated LCB in a manner to permit

Hezbollah to use these accounts for money transfers, including to fund its terrorist

activities.  Specifically, Defendants Abou Jaoude, Hamdoun, and Safa directed LCB to

ignore various requirements that would have prohibited LCB from conducting fund

transfers on behalf of Hezbollah.  Moreover, according to the Civil Forfeiture Complaint,

(1) Joumaa used Hezbollah couriers to transport currency in bulk and (2) Salhab routinely paid Hezbollah a fee to provide security for currency transport operations, particularly when the currency was transported through the Beirut International Airport.

74.     Between 2005 and 2011, Hezbollah plotted and/or committed numerous violations of the law of nations.  For instance, in July and August 2006, Hezbollah fired thousands of rockets at civilians in Israel, injuring or killing dozens.  *See* Remarks by President Bush on Foreign Policy (Aug. 14, 2006).  Hezbollah has also plotted multiple other attacks directed at Israeli civilians.  *See, e.g.*, *id.*  In addition to its targeting of Israeli civilians, the U.S. Department of Treasury has taken measures against Hezbollah based on its support of the Assad regime in the Syrian civil war beginning in early 2011, emphasizing the organization's "integral role in the continued violence the Assad regime is inflicting on the Syrian population."

75.     Hezbollah has required funds and financial services to plan, prepare for, and carry out its terrorist attacks and other crimes against humanity, in violation of the law of nations.  *See* Hizballah International Financing Prevention Act of 2015, Pub. L. 114-102, 129 Stat. 2205.  Defendants Abou Jaoude, Hamdoun and Safa knew that Hezbollah had this need and purposefully caused LCB to provide financial support to Hezbollah as described herein.  Hezbollah used such financial support in furtherance of its crimes against humanity and war crimes.  *Id.*

76.     Defendants' intent to support Hezbollah's activities in violation of the law of nation is further established by the fact that Hezbollah is subject to strict economic sanctions imposed by the United States.  Such sanctions are intended to prevent Hezbollah from conducting banking activities, and thereby limit its ability to carry out

terrorist attacks and other crimes against humanity. *Id.* During the period relevant hereto, however, LCB did not recognize or enforce the sanctions imposed by the United States, with Defendants Abou Jaoude, Hamdoun, and Safa directing LCB and its officers and employees not to enforce these sanctions. They did so to permit the conduct of transactions benefitting Hezbollah through the Bank and thus to facilitate the funding of Hezbollah's terrorist activities.

E.    **The Central Bank of Lebanon's Complicity in the Money Laundering Scheme**

77.    The Lebanese banking sector is one of the most financially active in the Middle East, and also one of the least transparent. Lebanon has a strict Bank Secrecy Act that allows account holders to conduct their affairs with essentially no scrutiny. In the Bureau of International Narcotics and Law Enforcement Affairs' 2014 International Narcotics Control Strategy Report, the U.S. Department of State stated that "Lebanon faces significant money laundering and terrorism financing challenges," particularly given the "substantial influx of remittances from expatriate[s]" into the country and the involvement of many Lebanese abroad in "underground finance and trade-based money laundering (TBML) activities," like the used car scheme operated through LCB.

78.    Other countries in the Middle East and North Africa region have raised similar concerns about money laundering and terrorism financing in Lebanon. A 2009 report by the Middle East and North Africa Financial Action Task Force ("MENAFATF"), a voluntary organization of nation states in the region, said Lebanon had a "special susceptibility" to money laundering and terrorism financing and had failed to issue "all legal instruments needed to comply with the main requirements stated in the 40

Recommendations and 9 Special Recommendations [from the Financial Action Task Force] for [Anti-Money Laundering and Combating Financing of Terrorism]."

79.     In particular, the MENAFATF report noted that Lebanon did not require financial institutions "to report any transaction suspected to be related to terrorism financing crimes," nor were such institutions required to report "suspicious transactions attempts."  The report concluded that "from the practical aspect, the competency and efficiency of [financial institutions] in reporting is not up to the level required or appropriate, in light of the numerous reporting cases by banks, and its low number or even absence on part of the remaining institutions."

80.     Ultimately, the MENAFATF report rated Lebanon on its compliance with 49 international recommendations to combat money laundering and terrorism financing.  In the report, Lebanon's regional neighbors found the country only partially compliant or not at all compliant with 26 of the 49 recommendations.

81.     The  Governor of the Central Bank of Lebanon exerts substantial personal control over the banking sector in the country.  For example, the Central Bank lifts the Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing only at his direction.  Hamdoun has claimed to have a close personal relationship with the Governor.

82.     Over the years, Abu Nahl and the Nest Group repeatedly attempted to raise the lack of internal controls at LCB with the Central Bank of Lebanon.  For example, in a letter dated February 7, 2011 to the Banking Control Commission of Lebanon, which is administered by the Central Bank, Abu Nahl emphasized Nest's

concerns about "the non-compliance of the Executive Management of [LCB] with the applicable laws, regulations and circulars . . . ."

83. Despite Nest's repeated efforts, the Central Bank of Lebanon turned a blind eye to the compliance problems at LCB. Upon information and belief, the Central Bank of Lebanon was aware that LCB was being used by Abou Jaoude and Hamdoun to launder funds derived from narcoterror operations, but took no action in part because of the Governor's relationship with Hamdoun.

84. The finding by the U.S. government that LCB was engaged in substantial money laundering activity, however, finally forced the Central Bank of Lebanon to act. In an effort to shield the broader Lebanese banking sector from further scrutiny by U.S. authorities, the Central Bank of Lebanon pressured LCB into a rapid liquidation and a sale of substantially all assets and liabilities to another Lebanese bank. As a result, the LCB issue was swept under the rug. According to a New York Times report in the aftermath of LCB's collapse, the Central Bank of Lebanon official responsible for overseeing the liquidation process has ties to Hezbollah.

85. Although the Central Bank of Lebanon forced LCB out of business, it has continued to turn a blind eye to the broader issues of money laundering and terrorist financing that are pervasive in the Lebanese banking sector. Tellingly, the Central Bank of Lebanon has failed to hold accountable even the very LCB managers whom the Treasury Finding stated were complicit in the money laundering operation run through LCB.

86. No apparent effort has been made by the Central Bank of Lebanon to pursue the serious issues raised in the U.S. government's filings or to address any of the failings in bank supervision that they imply.

87.     The Central Bank of Lebanon had the ability to veto the appointment of Abou Jaoude and Hamdoun as liquidators to oversee the dissolution of the Bank, but failed to do so, effectively accepting their appointment.  Serving as liquidators put Abou Jaoude and Hamdoun in a position to further cover up their illicit activity and to maximize their own personal gains.

88.     As referenced above, in or around 2010, Defendant Safa assumed a position in the Central Bank of Lebanon.  Despite the public disclosure of Safa's role in the money laundering scheme, he continues to serve as a Member of the Banking Control Commission.

89.     Upon information and belief, as also referenced above, Abou Jaoude and Hamdoun, with the approval of the Central Bank of Lebanon, are preparing to open a new bank in Lebanon.

**F.     U.S. Government Action on the Money Laundering Scheme**

90.     On February 10, 2011, the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") issued the Treasury Finding, which identified LCB as a financial institution of primary money laundering concern and Hezbollah's derivation of financial support from the operation of the criminal network described herein. Under authority granted by the USA PATRIOT Act, the Secretary of the Treasury can designate banks and other financial institutions as presenting primary money laundering concern if the Secretary concludes the bank meets a variety of factors that suggest it is involved in money laundering.  Once a bank is so designated, U.S. financial institutions must take certain measures against the designated bank in order to disrupt potential money laundering activity.  The Treasury Finding outlined the key components of the money laundering network run through LCB and the roles of various international drug traffickers

and Hezbollah operatives, including Defendants named in this action. It also, among other things, directed U.S. banks to sever their correspondent banking relationships with LCB.

91.     Abou Jaoude and Hamdoun are directly named as key players in the money laundering network run through LCB. The Treasury Finding states that "the [United States Government] has information indicating that a minority owner of the bank, who concurrently serves as General Manager [Abou Jaoude], his deputy [Hamdoun], and the managers of key branches are in frequent—in some cases even daily—communication with the various members of the . . . drug trafficking and money laundering network, and they personally process transactions on the network's behalf."

92.     In December 2011, the United States Attorney for the Southern District of New York filed the Civil Forfeiture Complaint, which it amended on October 26, 2012, against LCB and various other defendants. The Civil Forfeiture Complaint outlined in much greater detail the money laundering scheme initially described in the Treasury Finding.

93.     In addition to the Treasury Finding and Civil Forfeiture Complaint, the Office of the U.S. Attorney for the Eastern District of Virginia also investigated the criminal network and LCB's role in the scheme that laundered the illicit proceeds of that network. After the Treasury Finding, the U.S. Attorney for the Eastern District of Virginia obtained the Criminal Indictment of Defendant Joumaa in late 2011.

G.     **The Nest Group's Efforts to Introduce Principles of Corporate Responsibility and Compliance into LCB**

94.     Only as a result of the U.S. Government's investigations into LCB did Abu Nahl and the other members of the Nest Group come to realize that Abou Jaoude,

Hamdoun and Safa were surreptitiously using the Bank to further the international narcoterrorism operation described above and to line their own pockets.

95.     Prior to the Nest Group's acquisition of a minority interest in LCB, Abou Jaoude and Hamdoun actively misled the Nest Group about the state of compliance efforts at the Bank.  Based on Abou Jaoude and Hamdoun's representations, the Nest Group believed LCB had robust compliance programs in place that met international standards and industry best practices.  After acquiring a minority stake in LCB, however, Abu Nahl and the Nest Group realized that internal controls and compliance measures at the Bank were woefully inadequate and, in some cases, entirely non-existent.

96.     Having made their investment, the Nest Group decided to try to use their considerable expertise in good corporate governance and compliance to strengthen such programs at the Bank.  On June 28, 2007, Abu Nahl joined the LCB board of directors as representative of Nest Investments Holding Lebanon SAL.  Including Abu Nahl, Nest Group representatives held 3 of the 10 LCB board seats.  (The remaining board seats were under the control of Abou Jaoude and Hamdoun.)

97.     After joining the board, Abu Nahl quickly realized that LCB's compliance programs were not as strong as the Nest Group had been led to believe and were, in some cases, nonexistent.  Having already made its investment in LCB, the Nest Group set about trying to strengthen the Bank's compliance.  The Nest Group believed that its decades of experience developing and implementing good corporate governance and compliance programs in its many businesses would strengthen LCB's operations and position the Bank for strong, responsible growth.

98.     Almost immediately after the transaction closed, however, the Nest Group encountered difficulties extracting information from and strengthening compliance efforts in LCB.  On June 18, 2007, for example, the Bank's Chief Financial Officer, Charles Skaff, issued a cursory memorandum on the financial status of the Bank.  Given both its lack of substance and lack of sufficient information, the memorandum raised immediate red flags for the Nest Group.

99.     One day after receiving the financial memorandum, on June 19, 2007, the Nest Group sent Abou Jaoude a lengthy letter with a list of questions regarding the substance of the report and the financial status of the Bank.  In particular, the Nest Group asked for clarification on LCB's decision-making process and policies.  Abou Jaoude did not respond to the letter.

100.    On June 22, 2007, Abu Nahl followed up with a second letter to Abou Jaoude, copying Hamdoun, requesting additional information on LCB's budget. Among other things, Abu Nahl noted that LCB's budget lacked proper documentation, that many items were not included in the budget, and that funds were improperly reallocated without following the appropriate decision-making process or maintaining adequate documentation. Abou Jaoude did not respond to Abu Nahl's follow-up letter.

101.    On June 25, 2007, LCB's Internal Audit Division audited the compliance unit.  The audit noted that a number of accounts at the Bank were unusually active, with large incoming and outgoing transfers.  The audit also noted that many of these accounts had unusual movement of funds between accounts.

102.     On August 13, 2007, the Internal Audit Division sent a report

directly to Abou Jaoude raising direct and specific concerns about troubling account

activity.  The report stated, in part:

> "Upon our review and general monitoring over some accounts, we [have]
> come across a group of customers showing continuous and considerable
> movements of funds, which according to our examination should be
> reviewed and be subject to further investigations by the compliance unit   .
> . . . [W]e therefore address to your attention as head of the [Anti-Money
> Laundering] committee our memo in which we reveal some deficiencies
> and banking concept breaching, together with a list of customers' names to
> which these transactions are related for your quick review.
>
> Types of deficiencies can be summarized by the following:
> 1. Many of these deficiencies have been traced over saving time
>    deposit accounts in which they are being used as current accounts.
> 2. The total amount of transactions between reviewed accounts has
>    reached within 18 months a total of <u>USD 5,000 Million.</u>
> 3. Large amounts are being withdrawn and paid cash to different
>    parties.
> 4. A clear link was noticed between 115 IDs existing and operating in
>    different branches.
> 5. Although the big volume of movement noticed over these accounts,
>    yet the accounts show [] very low balances (below USD 5,000)
>    reflecting the fact that accounts are being used [on a] transitory basis
>    for funds transfer[s].
> 6. Accounts are originally opened for Domicilated bills were used for
>    funds transfers with large amounts.
> 7. Commissions and bank profitability are limited comparing the
>    volume and number of transactions executed.
> 8. We noticed, some accounts were opened to be used as transitory
>    account[s] for a short period of time. (Vehicle Accounts)
> 9. Large amounts of cash withdrawal transactions were made to the
>    favor of different parties, to be paid later on cash to the same
>    beneficiary. Noticing that such transactions are being done from
>    different accounts to the order of one specific party which rises up
>    different question marks."

103.     In the August 2007 audit report sent to Abou Jaoude, the internal

auditors noted they had previously raised these concerns with and given a list of suspect

accounts to the compliance department, but the compliance department had failed to take

action. The internal auditors also recommended that Abou Jaoude take certain specific corrective actions, including implementing better monitoring software and installing compliance officers at all branches to monitor suspicious activity. Abou Jaoude sent a cursory reply on August 17, 2007 asking for more detail, but he never implemented the recommendations.

104.    Increasingly concerned about the financial performance and compliance of LCB, the Nest Group requested that LCB create an Audit Committee. As evidenced by the subsequent inaction of Abou Jaoude and Hamdoun, they had no intention of executing recommendations or responding to the concerns raised by the Audit Committee and the Nest Group. Indeed, the Audit Committee appeared to be created only as a means to mollify and distract the Nest Group. It was not even included on a list of Bank management committees prepared in 2009.

105.    In further effort to improve governance of the Bank, Nest Group member Sh. Nasser Bin Ali Bin Saud Al Thani ("Sh. Nasser") was appointed to the Audit Committee. Not knowing that Abou Jaoude and Hamdoun had no intention of following the recommendations of the Audit Committee, Sh. Nasser and other Nest Group representatives diligently set about trying to understand and improve internal controls and compliance measures at LCB. The Nest Group asked one of its best compliance experts, Loizos-Andreas Hajiloizos ("Hajiloizos"), to work with the LCB Audit Committee to evaluate and suggest improvements for Bank compliance operations. Hajiloizos was named the Committee's General Secretary, responsible for preparing Committee documents and reports and recording the minutes of Committee meetings.

106.     On June 9, 2008, the LCB Audit Committee held its first meeting in Beirut.  The four members of the Audit Committee—Sh. Nasser, Makarem Makari, Raymond Diab, and Albert Azar—attended. Hajiloizos was also present.

107.     At its first meeting, the Audit Committee agreed that LCB should host a meeting of all senior Bank staff to discuss the role of the Audit Committee and Internal Audits, and the importance of compliance.  As recorded in the minutes of the meeting, the Audit Committee hoped that "the top management of the Bank," including Abou Jaoude and Hamdoun, would "present the General Inspector and his team to show the support of the [Board of Directors] to the [Internal Audit Department]."  But Abou Jaoude and Hamdoun had no intention of supporting the Internal Audit Department.

108.     Abou Jaoude and Hamdoun refused to arrange a meeting with top LCB management to discuss the role and importance of the Internal Audit Department. At a meeting nearly six months after the first Audit Committee meeting, on December 5, 2008, the Audit Committee discussed Abou Jaoude and Hamdoun's refusal to permit such a meeting.  The Audit Committee minutes reflect this discussion: "The [Audit Committee] members cannot understand the reason behind the unwillingness of the top management of the bank [] to hold a meeting with all the managers of the Bank to discuss the Internal Audit Department Charter and any other Internal Audit issues that they may have. Sh. Nasser & [Hajiloizos] to discuss the above with the management of the Bank."

109.     At an LCB Board of Directors meeting on July 2, 2009, Sh. Nasser and Hajiloizos again asked Abou Jaoude and Hamdoun to arrange a meeting of all Bank managers to discuss the role of the Internal Audit Department.  According to Audit

Committee minutes, "the idea was not accepted in a positive manner; thus the meeting was never organised or held."

110.　At its July 2, 2009 meeting, the Audit Committee learned that LCB's Anti-Money Laundering Compliance Officer had resigned some eight months earlier—in October 2008—and had not been replaced. The Audit Committee found this lapse "to be unacceptable and in violation of corporate governance and best practices." In December 2009, the Compliance Manager had still not been replaced, prompting the Audit Committee to send a memorandum to the Human Resources Manager asking that a replacement be named immediately.

111.　The Nest Group representatives on the Audit Committee worked to implement other measures to improve compliance and ensure LCB adhered to industry best practices. For example, the Audit Committee recommended LCB's external auditors be rotated on a regular basis. The Bank had been using the same auditing firm for at least 15 years. But Abou Jaoude and Hamdoun did not agree to rotate the audit firm. The Audit Committee also recommended that the Internal Audit Department report directly to the Audit Committee, and not to Abou Jaoude, the General Manager. At Abou Jaoude and Hamdoun's direction, LCB did not implement this change to the reporting lines.

112.　As the years passed, the Nest Group, the Audit Committee, and the Internal Audit Department continued to sound alarms about inadequate internal controls. But their concerns continued to fall on deaf ears. In February 2010, the Internal Audit Division conducted another review of the Anti-Money Laundering compliance unit and found compliance efforts had not improved. In particular, the internal audit found "no evidence that proper and permanent control [was] being performed over some accounts

witnessing frequent flow of large funds transfers." The internal audit also noted that the "compliance unit [had] 5,775 pending alerts cases during a period of one month (December, 2009)" and that branch managers, upon information and belief at Abou Jaoude and Hamdoun's direction, were not prioritizing resolving the backlog of alerts.

113. The February 2010 internal audit also found LCB managers continued to ignore compliance and reporting requirements for large cash transactions. The report noted that "the Compliance Unit does not generate on a daily basis [a] consolidated physical cash report that aggregates all cash deposits done by a single client, [on] the same day, and in multiple accounts totaling more than $10,000." Abou Jaoude, Hamdoun, and Safa directed the Compliance Unit not to generate such daily cash reports.

114. Finally, the February 2010 internal audit noted that LCB managers were ignoring Know Your Customer monitoring and reporting requirements. Industry and international best practices, as well as laws and regulations in most countries, including Lebanon, require financial institutions to establish certain procedures to verify the identity of customers in order to combat money laundering and other financial crimes. These procedures are known as "Know Your Customer" requirements. The February 2010 audit found bank managers were turning a blind eye to cash and transfer activities that were inconsistent with certain clients' Know Your Customer forms. Abou Jaoude, Hamdoun, and Safa instructed branches to ignore the Know Your Customer form requirements for certain customers.

115. Abou Jaoude and Hamdoun both served on LCB's five-member Anti-Money Laundering ("AML") Committee. The committee existed essentially in name only. In 2007, when the Nest Group representatives on the Audit Committee were trying to

determine the extent of LCB's compliance shortcomings, they raised concerns about various suspicious accounts. In 2009, in a memorandum to the Human Resources Manager, the Nest Group noted that the AML Committee was dormant and recommended its activation.

116. Throughout this period, at every turn, Abou Jaoude and Hamdoun took steps designed to frustrate the efforts of the Audit Committee and the Nest Group to implement better corporate governance measures. For example, Abou Jaoude and Hamdoun consolidated control over hiring, firing, and promotion decisions, allowing them to place persons under their control in positions critical to operating and concealing the money laundering scheme. A 2010 Audit report on the Human Resources department highlighted this consolidation of control: "Theoretically, the Human Resources Department is fulfilling its responsibilities, as we noticed that job descriptions are documented, evaluation process is implemented, appraisal report is being filed on yearly basis and procedures are being handled; but practically, the department is superseded since a long time by the Senior Management Power and Directives."

**H. Tabadul, the Nest Group's Increasing Concern over Governance and Compliance, and Abou Jaoude and Hamdoun's Personal Slush Funds**

117. Over time, it became increasingly difficult for the Nest Group to extract information about LCB from Abou Jaoude and Hamdoun. Moreover, due to staunch resistance from Abou Jaoude and Hamdoun, the Nest Group's efforts to strengthen compliance and corporate governance at the Bank had largely failed to achieve positive results.

118. The Nest Group later uncovered one reason why Abou Jaoude and Hamdoun had stonewalled the Nest Group's compliance efforts: the Bank managers had

been directing illegal operations through a subsidiary of LCB in the United Arab Emirates called Tabadul Shares and Bonds LLC ("Tabadul"). As described below, Abou Jaoude and Hamdoun actively concealed Tabadul's operations from the Nest Group and used the subsidiary to engage in improper self-dealing. In addition to supporting Hezbollah, looting LCB assets through such self-dealing was a central objective of Abou Jaoude and Hamdoun for engaging in the scheme described herein.

119.     On October 18, 2006, shortly after the Nest Group's initial investment into LCB, Abou Jaoude founded Tabadul. Tabadul is a brokerage firm in the United Arab Emirates with offices in Dubai and Abu Dhabi. It began operations in 2007. Tabadul was owned and funded by LCB but controlled by Abou Jaoude. Over time, LCB continued to invest in Tabadul. LCB increased the capital of Tabadul several times, including in November 2006, January 2007, and January 2008.

120.     As with LCB, Abu Nahl sought to obtain detailed budgets regarding Tabadul. At a board meeting on July 14, 2010, Abu Nahl voiced his concerns over the lack of a detailed budget for Tabadul. Only later would the Nest Group learn their efforts had been unsuccessful because Abou Jaoude and Hamdoun were actively working to frustrate them.

121.     Abou Jaoude and Hamdoun intentionally hid information about Tabadul's operations from the Nest Group and from public disclosure. On June 6, 2010, Sh. Nasser sent Abou Jaoude a letter requesting, on behalf of the Audit Committee, more detailed information on the LCB investment in Tabadul. Abou Jaoude sent a cursory reply stating the Internal Audit Department had all the information on Tabadul that it needed. But, the Internal Audit Department had not been supplied with <u>any</u> information on the

Tabadul investment since it performed an audit in January 2008.  The UAE regulatory authority expressed these and other concerns, including deceit, failure to meet licensing conditions, and commingling of funds.  Its concerns were so pronounced that it imposed a cessation of business on Tabadul, which was extended multiple times because of Tabadul's failure to cure its violations.

122.    In 2009, at least five Tabadul employees resigned, including its Internal Auditor, who lamented Tabadul's lack of commitment to abide by licensing conditions.  Others remarked that "difficulties and problems faced by the administration were not new, but were present from the day the company began trading from the Lebanese Canadian Bank side, which acted somewhat irresponsibly."

123.    In addition to concealing information about Tabadul's operations and unlawful activities, Abou Jaoude and Hamdoun also concealed information regarding several suspicious LCB subsidiaries in West Africa.  In November 2009, the LCB Chief Risk Officer, who had only been appointed at the insistence of the Nest Group, raised concerns to the LCB Risk Committee about an LCB presence in Gambia called Prime Bank Gambia.  According to the minutes of that meeting, the Chief Risk Officer stated that "LCB has a presence in Gambia with thirty employees and until today there are no reporting lines, only the finance manager knows about it and nobody else receives any information on their business.  No fixed asset has been purchased as part of the investment.  Very soon they will need re-capitalisation since the currency fluctuations are eating up their initial capital."  The Chief Risk Officer further noted that "[t]he situation [with Prime Bank Gambia] is about to be repeated with the Kinshasa-Congo investment."

124. The head of LCB's Internal Audit Department further noted in June 2010 that the department continued to have no visibility into Prime Bank Gambia or other West African operations, including in Congo. The secrecy surrounding these operations persisted at Abou Jaoude and Hamdoun's direction, even though LCB's Chief Risk Officer had raised red flags about the operations nearly nine months prior.

125. Undeterred, the Nest Group continued to press Abou Jaoude and Hamdoun for information about the operations of LCB and its subsidiaries, including Tabadul. It also continued to try to implement compliance measures and internal controls.

126. The Nest Group eventually realized that Abou Jaoude and Hamdoun were using these subsidiaries to funnel assets from LCB to line their own pockets. For example, Abou Jaoude and Hamdoun used sham loans to funnel assets from LCB to Tabadul. On or about May 1, 2008, LCB and Tabadul entered into a Revolving Subordinated Loan Agreement under which LCB agreed to extend a $20 million line of revolving credit to Tabadul. Abou Jaoude signed the loan agreement on behalf of both LCB and Tabadul. Hamdoun also signed on behalf of LCB.

127. Abou Jaoude and Hamdoun also used Tabadul to make sham loans. Tabadul made numerous suspicious loans to various individuals in the United Arab Emirates. When the Nest Group began investigating these loans, many of the individuals who supposedly received loans said they had never even heard of Tabadul. They certainly had not opened accounts with or received loans from Tabadul. Upon information and belief, Abou Jaoude and Hamdoun directed or made these loans in the names of unsuspecting third parties and took the money for their own benefit.

128.     Abou Jaoude and Hamdoun's wrongdoing was not limited to siphoning off assets through Tabadul.  Expenses increased noticeably, and Abou Jaoude admitted this was partially because of bonuses that he paid to himself and his associates.  Additionally, in 2008, Abou Jaoude had an outstanding $12 million loan from LCB.  All banks in Lebanon are required to file what is known as a 152 Report with the Central Bank of Lebanon disclosing loans made to staff, directors, and shareholders.  At its meeting on December 5, 2008, the Audit Committee noted:

> "The loans to staff, directors and shareholders were not approved since it contained errors and was [not] transparent . . . The [Internal Audit Department] was requested to prepare a new transparent report with all the details and to compare this to the 152 report sen[t] to Central Bank of Lebanon since . . . the chairman of the bank [Abou Jaoude] has a $12 million loan with a $2 million collateral and it was not included in the 152 report to the central bank."

129.     Despite the fact that the Central Bank of Lebanon routinely had auditors on site at LCB who were ostensibly monitoring reporting and compliance, the Central Bank of Lebanon either failed to discover this egregious reporting failure or turned a blind eye to it.

130.     At Abou Jaoude and Hamdoun's direction, LCB also failed to follow proper procedures for credit approvals of investments.  At the November 2009 Risk Committee meeting, the Chief Risk Officer explained:

> "[T]here is no procedure followed for the credit approvals of investments taken by the Bank and this is considered as high risk. The Chairman [Abou Jaoude] ($900k) and the GM [Hamdoun] ($750k) of the Bank seem to have money limits but they have never been followed. There do not seem to be a proper investment policy in the following fields:
>
> a)  Affiliates
> b)  Subsidiaries
> c)  Bonds
> d)  Stocks

e) CD

f) Funds"

131.    In response to these concerns, the Risk Committee (at the insistence of Sh. Nasser and Hajiloizos) requested that the Bank's Chief Risk Officer prepare draft investment policies and procedures for the Bank to ensure accountability and compliance. Abou Jaoude and Hamdoun ultimately thwarted the implementation of investment policies and procedures.

## I.    Aftermath of the Money Laundering Scheme

132.    Plaintiffs' efforts to improve compliance at LCB were frustrated by continuing opposition led by Abou Jaoude and Hamdoun, who together own or control entities that own approximately 76% of the Bank. At the time they made these efforts, the Nest Group members believed that Abou Jaoude and Hamdoun's refusal to implement better compliance measures stemmed from incompetence or a nonchalant attitude toward good corporate governance, not rampant criminality.

133.    That all changed beginning in 2011, when the U.S. Government publicly exposed Defendants' international narcoterrorism and money laundering scheme. This exposure came as a shock to Abu Nahl and the Nest Group. Only then did Abu Nahl and the Nest Group begin to understand the real reason that Abou Jaoude and Hamdoun had frustrated their attempts to increase transparency and internal controls at the Bank: because their efforts posed a grave threat to the narcoterrorism and money laundering scheme to benefit Hezbollah that was exposed by the United States and, as part and parcel of that scheme, Abou Jaoude's and Hamdoun's efforts to loot LCB assets for their personal benefit. While their concerns with the lack of internal controls at LCB and with Abou Jaoude and Hamdoun's stonewalling had grown over time, it was not until the filing of the

Civil Forfeiture Complaint that Abu Nahl and the Nest Group began to realize the full extent of Abou Jaoude and Hamdoun's wrongdoing.

134.    On June 25, 2013, Abou Jaoude and Hamdoun, acting as trustees responsible for LCB's liquidation, settled the civil forfeiture suit with the Office of the U.S. Attorney for the Southern District of New York.  In order to quickly cast the spotlight off their own illicit conduct, Abou Jaoude and Hamdoun forfeited $102 million of LCB's money to settle the U.S. government action.

135.    Despite the Nest Group's lack of knowledge of or participation in the money laundering activities at LCB, and their repeated attempts to impose and improve money laundering controls following their minority investment in LCB, the U.S. government has denied entry visas to Abu Nahl, his family members and a number of employees of Nest Investments or other Nest Group companies.  The U.S. government did so because of the Nest Group's investment in, and affiliation with, LCB.  This constitutes additional injury suffered by Plaintiffs as a result of Defendants' scheme.

## DERIVATIVE STANDING

136.    Plaintiffs bring certain of their claims derivatively in the right and for the benefit of LCB to redress injuries suffered by LCB as a direct result of Defendants' misconduct.  LCB is named as a nominal defendant solely in a derivative capacity.

137.    Plaintiffs will adequately and fairly represent the interests of LCB and its shareholders in enforcing and prosecuting LCB's rights.

138.    Plaintiffs were owners of LCB shares at all times relevant to the Defendants' wrongful course of conduct in respect of derivative actions alleged herein. Plaintiffs maintain an interest in LCB through their status as beneficiaries of the corporation in liquidation.

139.     Under the Lebanese Commercial Code, where a corporation by its inertia has failed to bring an action against directors of the corporation, shareholders may bring the action.

140.     LCB has not brought any action against Defendants for the conduct alleged herein.  Therefore, Plaintiffs may bring this action on behalf of LCB.

141.     At the time that this action was commenced, LCB was in liquidation.  Abou Jaoude and Hamdoun were serving as the sole Trustees of LCB in liquidation.

142.     As a result of the facts set forth herein, Plaintiffs did not make a demand upon the Bank or its Trustees to institute this action against the Defendants.  Such a demand, to the extent required, would have been a futile and useless act because the Trustees are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### FIRST CAUSE OF ACTION (DERIVATIVE)
**Violation of the Law of Nations**
**(By Plaintiffs Abu Nahl & Nest Investments Holding Lebanon SAL**
**Against All Defendants)**

143.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

144.     During the time period relevant to this case, Hezbollah has sought to conduct and has conducted attacks targeting civilians.  These actions are prohibited under customary international law, and therefore constitute violations of "the law of nations" within the meaning of 28 U.S.C. § 1350.

145.     Defendants had actual knowledge that Hezbollah is a violent terrorist organization, which, as recognized by the U.S. government and others, had carried

out numerous attacks targeting civilians and which planned and intended to carry out additional such attacks.

146.     At all relevant times, Defendants had actual knowledge that Hezbollah required financial services in order to plan, prepare for and carry out crimes against humanity, and that providing financial services to Hezbollah would enable and enhance Hezbollah's ability to engage in such crimes.  Defendants were also aware that the United States had imposed sanctions intended to prevent Hezbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

147.     Despite this knowledge, Defendants Abou Jaoude, Hamdoun and Safa caused LCB to launder funds for and provide financial services to Hezbollah or its surrogates, for the purpose of enabling and enhancing Hezbollah's ability to engage in crimes against humanity.

148.     Defendants Salhab, Cybamar Swiss, Joumaa, Hassan Ayash, Hassan Ayash Exchange Company, and Ellissa Holding Company provided funds to LCB and/or received funds from LCB that were used to further the scheme to provide financial support to Hezbollah.

149.     Defendants knowingly and intentionally relied on the U.S. banking system to aid and abet Hezbollah's violations of the law of nations.  Such aiding and abetting itself constitutes a violation of the law of nations and has a clear nexus to the United States.

150. Defendants had actual knowledge that providing banking services to or on behalf of Hezbollah was not permitted under U.S. law and would subject LCB's assets to forfeiture by the U.S. government.

151. The United States filed the Civil Forfeiture Complaint based, *inter alia*, on LCB's actions to assist Hezbollah. LCB forfeited $102 million to the United States to settle the Civil Forfeiture Complaint. These funds were forfeited in satisfaction of claims by the U.S. government against LCB's property, claims against LCB arising from the money laundering scheme, and claims against Defendants Abou Jaoude, Hamdoun, and others based on their conduct as board members and managers of LCB. The $102 million effectively constituted the proceeds from a sale of Bank assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme.

152. As noted above, following the forfeiture, the U.S. Attorney for the Southern District of New York stated that the $102 million paid by LCB "shows that banks laundering money for terrorists and narco-traffickers will face consequences for their actions, wherever they may be located." The Administrator of the Drug Enforcement Administration stated that the $102 million paid by LCB "is significant and addresses the role the Lebanese Canadian Bank played in facilitating illicit money movement from the United States to West Africa to Hizballah-controlled money laundering channels."

153. LCB suffered $102-million loss as a proximate result of Defendants' misuse of the Bank to violate the law of nations.

154. Defendants are liable to LCB for the damages they inflicted on the Bank through their violations of the law of nations.

## SECOND CAUSE OF ACTION (DIRECT)
### Fraud in the Inducement
### (By Plaintiffs Abu Nahl & Nest Investments Holding Lebanon SAL Against Defendants Abou Jaoude & Hamdoun)

155.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

156.    Plaintiffs entered into an agreement to invest in LCB.

157.    Plaintiffs' willingness to assent to the terms of the agreement, and the agreement itself, was caused by the material fraudulent misrepresentations of Defendants Abou Jaoude and Hamdoun and their agents.

158.    Defendants Abou Jaoude and Hamdoun fraudulently misrepresented LCB's history of compliance with anti-money laundering and international banking laws and best practices to Plaintiffs.

159.    Defendants Abou Jaoude and Hamdoun fraudulently misrepresented their intentions to cause LCB to remain in compliance with anti-money laundering and international banking laws and best practices to Plaintiffs.

160.    Defendants Abou Jaoude and Hamdoun fraudulently misrepresented the legitimacy of LCB's business operations to Plaintiffs.

161.    Defendants Abou Jaoude and Hamdoun fraudulently misrepresented the reason they sought Plaintiffs' investment in LCB.

162.    Each of the misrepresentations described above was material to Plaintiffs' decision to invest in LCB.  Plaintiffs, believing them to be true, reasonably relied on each of these representations.

163.    These representations were false.  Defendants knew these representations to be false, and Defendants intended that Plaintiffs rely on these representations to induce Plaintiffs to enter into the agreement.

164.    Plaintiffs have been damaged by Defendants actions.

165.    Defendants' conduct was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of Plaintiffs' rights.

166.    Defendants' concealed their misconduct, which did not become known to Plaintiffs until long after they made their investment in LCB.  To the extent Plaintiffs' fraud in the inducement or other claims accrued outside any applicable statute of limitations, such statute of limitations is tolled by virtue of Defendants' concealment. Applicable statutes of limitation were also tolled during the pendency of Plaintiffs' good faith efforts to have claims against Defendants resolved in Lebanon beginning in or about February 2011.

**THIRD CAUSE OF ACTION (DERIVATIVE)**
**Breach of Fiduciary Duty**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

167.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

168.    Defendants Abou Jaoude and Hamdoun, as officers and/or directors of LCB, owed fiduciary duties to LCB and were required to use their ability to control and manage LCB in a fair, just, and equitable manner.  They were required to use their positions to ensure the Bank complied with applicable laws and contractual obligations, to refrain from abusing their positions of control, and not to favor their own interests at the

expense of LCB. They violated their fiduciary duties to LCB, including without limitation their duties of care, good faith, honesty, and loyalty.

169.     The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to Defendants' gross mismanagement, bad faith, reckless and/or willful disregard of the rights and interests of LCB and its shareholders, and for acting without the reasonable and ordinary care which they owed to LCB.

170.     Under the Lebanese Commercial Code, directors of a corporation are liable for management of the corporation.

171.     Based on the conduct set forth above, Defendants have breached fiduciary duties owed to LCB.

172.     LCB has been harmed as a result of Defendants' breaches.

**FOURTH CAUSE OF ACTION (DERIVATIVE)**
**Abuse of Control**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

173.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

174.     Defendants Abou Jaoude and Hamdoun, by virtue of their positions and financial holdings in LCB, exercised control over LCB and its operations, and owed duties as controlling persons to LCB not to use their positions of control for their own personal interests and contrary to the interest of LCB.

175.     Defendants' conduct amounts to an abuse of their control of LCB, in violation of their obligations to LCB.

176.     LCB was harmed as a result of Defendants' conduct.

**FIFTH CAUSE OF ACTION (DERIVATIVE)**
**Corporate Waste**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

177.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

178.    As alleged in detail, Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of LCB and in the use and preservation of its property and assets, and had the highest obligation of fair dealings.

179.    Defendants wasted LCB's corporate assets by diverting corporate assets for improper purposes, instead of using those assets for their intended purpose.

180.    LCB was harmed as a result of Defendants' conduct.

**SIXTH CAUSE OF ACTION (DERIVATIVE)**
**Unjust Enrichment**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

181.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

182.    Defendants derived compensation, fees, and other benefits from LCB and were otherwise unjustly enriched during the time in which the wrongful practices occurred, to the detriment of LCB.  Defendants profited by engaging in the wrongful conduct set forth herein.

183.    Defendants also wrongfully converted funds belonging to LCB.

184.    Defendants' enrichment is directly and causally related to the detriment of LCB.

185.    These benefits were accepted by Defendants under such circumstances that it would be inequitable for it to be retained without payment.  As

alleged above, Defendants breached their fiduciary duties to and/or abused their positions of control within LCB and therefore Defendants are not justified in retaining the benefits conferred upon them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award them such damages and compensation, including punitive damages, interest, attorneys' fees, costs and such other relief as this Court may deem just. An award of punitive damages is appropriate because Defendants' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, and malicious.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 6, 2017

COVINGTON & BURLING LLP


By:  /s/  Anthony Herman

Anthony Herman
Christian J. Pistilli
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Email: aherman@cov.com
        cpistilli@cov.com

*Attorneys for Plaintiffs*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Ghazi Abu Nahl, declare under penalty of perjury under the laws of the United States of America that the factual averments set forth in the foregoing Verified Complaint are true and correct, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true and correct.

Subscribed to by the Plaintiff on this _3rd_ day of November, 2017.

_____

Ghazi Abu Nahl