# Exhibit A

(BILLINGCODE: 4810-02P)

**DEPARTMENT OF THE TREASURY**

**Finding that the Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern**

**AGENCY:** Financial Crimes Enforcement Network, Treasury ("FinCEN"), Treasury.

**ACTION:** Notice of finding.

**SUMMARY:** Pursuant to the authority contained in 31 U.S.C. 5318A, the Secretary of the Treasury, through his delegate, the Director of FinCEN, finds that reasonable grounds exist for concluding that the Lebanese Canadian Bank SAL ("LCB") is a financial institution of primary money laundering concern.

**DATES:** The finding made in this notice is effective as of [INSERT DATE OF PUBLICATION OF THIS DOCUMENT IN THE FEDERAL REGISTER].

**FOR FURTHER INFORMATION CONTACT:** Regulatory Policy and Programs Division, FinCEN, (800) 949-2732.

**SUPPLMENTARY INFORMATION:**

## I. Background

### A. Statutory Provisions

On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), Public Law 107-56. Title III of the USA PATRIOT Act amended the anti-money laundering provisions of the Bank Secrecy Act ("BSA"), codified at 12 U.S.C. 1829b, 12 U.S.C 1951-1959, and 31 U.S.C. 5311-5314 and 5316-5332, to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism. Regulations implementing the BSA

appear at 31 CFR Part 103. The authority of the Secretary of the Treasury (the "Secretary") to administer the BSA and its implementing regulations has been delegated to the Director of FinCEN.[1]

Section 311 of the USA PATRIOT Act ("section 311") added section 5318A to the BSA, granting the Secretary the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction, institution, class of transaction, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take certain "special measures" against the primary money laundering concern. Section 311, as amended, identifies factors for the Secretary to consider and Federal agencies to consult before the Secretary may conclude that a jurisdiction, institution, class of transaction, or type of account is of primary money laundering concern. The statute also provides similar procedures, *i.e.,* factors and consultation requirements, for selecting the specific special measures to be imposed against the primary money laundering concern.

Taken as a whole, section 311 provides the Secretary with a range of options that can be adapted to target specific money laundering and terrorist financing concerns most effectively. These options give the Secretary the authority to bring additional pressure on those jurisdictions and institutions that pose money laundering threats. Through the imposition of various special measures, the Secretary can gain more information about the jurisdictions, institutions, transactions, or accounts of concern; can more effectively monitor the respective jurisdictions, institutions, transactions, or accounts; or can protect

[1] Therefore, references to the authority of the Secretary of the Treasury under section 311 of the USA PATRIOT Act apply equally to the Director of FinCEN.

U.S. financial institutions from involvement with jurisdictions, institutions, transactions, or accounts that are of money laundering concern.

Before making a finding that reasonable grounds exist for concluding that a foreign financial institution is of primary money laundering concern, the Secretary is required to consult with the both the Secretary of State and the Attorney General. The Secretary is also required by section 311 to consider ‘‘such information as the Secretary determines to be relevant, including the following potentially relevant factors”:

- The extent to which such financial institution is used to facilitate or promote money laundering in or through the jurisdiction;
- The extent to which such financial institution is used for legitimate business purposes in the jurisdiction; and
- The extent to which the finding that the institution is of primary money laundering concern is sufficient to ensure, with respect to transactions involving the institution operating in the jurisdiction, that the purposes of the BSA continue to be fulfilled, and to guard against international money laundering and other financial crimes.

If the Secretary determines that reasonable grounds exist for concluding that a foreign financial institution is of primary money laundering concern, the Secretary must determine the appropriate special measure(s) to address the specific money laundering risks. Section 311 provides a range of special measures that can be imposed individually, jointly, in any combination, and in any sequence.[2] The Secretary's imposition of special

[2] Available special measures include requiring: (1) recordkeeping and reporting of certain financial transactions; (2) collection of information relating to beneficial ownership; (3) collection of information relating to certain payable-through accounts; (4) collection of information relating to certain correspondent accounts; and (5) prohibition or conditions on the opening or maintaining of correspondent or payable

measures requires additional consultations to be made and factors to be considered. The statute requires the Secretary to consult with appropriate federal agencies and other interested parties[3] and to consider the following specific factors:

- Whether similar action has been or is being taken by other nations or multilateral groups;

- Whether the imposition of any particular special measures would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

- The extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular institution; and

- The effect of the action on the United States national security and foreign policy.[4]

---

through accounts. 31 U.S.C. 5318A(b)(l)-(5). For a complete discussion of the range of possible countermeasures, *see* 68 FR 18917 (April 17, 2003) (proposing special measures against Nauru).

[3] Section 5318A(a)(4)(A) requires the Secretary to consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, the Secretary of State, the Securities and Exchange Commission (SEC), the Commodity Futures Trading Commission (CFTC), the National Credit Union Administration (NCUA), and, in the sole discretion of the Secretary, "such other agencies and interested parties as the Secretary may find to be appropriate." The consultation process must also include the Attorney General if the Secretary is considering prohibiting or imposing conditions on domestic financial institutions opening or maintaining correspondent account relationships with the designated jurisdiction.

[4] Classified information used in support of a section 311 finding and measure(s) may be submitted by Treasury to a reviewing court ex parte and in camera. See section 376 of the Intelligence Authorization Act for fiscal year 2004, Pub. L. 108–177 (amending 31 U.S.C. 5318A by adding new paragraph (f)).

**B. The Lebanese Canadian Bank SAL**

The Lebanese Canadian Bank SAL ("LCB") is based in Beirut, Lebanon, and maintains a network of 35 branches in Lebanon and a representative office in Montreal, Canada. The bank is eighth largest among Lebanese banks in assets and has over 600 employees. Originally established in 1960 as Banque des Activities Economiques SAL, it operated as a subsidiary of the Royal Bank of Canada Middle East (1968-1988) and is now a privately owned bank. LCB offers a broad range of corporate, retail, and investment products, and maintains extensive correspondent accounts with banks worldwide, including several U.S. financial institutions. As of 2009 LCB's total assets were worth over $5 billion.[5]

LCB has a controlling financial interest in a number of subsidiaries, including LCB Investments (Holding) SAL, LCB Finance SAL, LCB Estates SAL, LCB Insurance Brokerage House SAL, and Dubai-based Tabadul for Shares and Bonds LLC. Additionally, LCB is the majority shareholder of Prime Bank Limited, a private commercial bank and the LCB subsidiary located in Serrekunda, Gambia.[6] LCB owns 51% of Prime Bank while the remaining shares are held by local and Lebanese partners. LCB apparently serves as the sole correspondent bank for Prime Bank.[7] For purposes of this document and unless expressly stated otherwise, references to LCB include the aforementioned subsidiaries.

[5] Lebanese Canadian Bank, 2009 Annual Report.
[6] Id.
[7] http://primebankgambia.gm/index

### C. Lebanon

Lebanon is a financial hub for banking activities in the Middle East and eastern Mediterranean and has one of the more sophisticated banking sectors in the region. There are 66 banks incorporated in Lebanon[8], and all major banks have correspondent relationships with U.S. financial institutions. The five largest commercial banks account for roughly 60% of total banking assets, estimated at $125 billion.[9] According to Treasury information, strong economic growth and a steady flow of diaspora deposits in recent years have helped the Lebanese banking system to maintain relatively robust lending, improve asset quality, and maintain adequate liquidity and capitalization positions. However, banks remain highly exposed to the heavily indebted sovereign, carry significant currency risk on their balance sheets, and operate in a volatile political security environment.

Lebanon also faces money laundering and terrorist financing vulnerabilities, according to the International Narcotics Control Strategy Report ("INCSR") published in March 2010 by the U.S. Department of State.[10] Of particular relevance is the possibility that a portion of the substantial flow of remittances from the Lebanese diaspora, estimated at $7 billion—21% of GDP—in 2009, according to the World Bank,[11] could be associated with underground finance and Trade-Based Money Laundering ("TBML") activities. Laundered criminal proceeds come primarily from Lebanese criminal activity and organized crime.[12]

---

[8] "Complete List of Operating Banks in Lebanon," Banque du Liban (www.bdl.gov.lb).
[9] *2010 Index of Economic Freedom*, The Heritage Foundation (www.heritage.org/index/country/lebanon).
[10] The 2010 International Narcotics Control Strategy Report ("INCSR"), Lebanon, pp 151-154 (www.state.gov/g/inl/rls/nrcrpt/2010/vol2/137212.htm).
[11] *The Daily Star*, "2009 Remittances to Lebanon Reach $7 Billion," November 10, 2009.
[12] 2010 INCSR.

Lebanon's Customs Authority ("Customs") supervises two free trade zones operating in the country. However, high levels of corruption within Customs create vulnerabilities for TBML and other threats. Moreover, Lebanon has no cross-border currency reporting requirements, resulting in a significant cash-smuggling vulnerability. Finally, Lebanon has not acceded to the UN Convention for the Suppression of the Financing of Terrorism, though it has adopted laws domestically criminalizing any funds resulting from the financing or contribution to the financing of terrorism.[13] However, such laws do not apply to Hizballah, which Lebanon considers to be a legitimate political party and resistance organization, and it is not subject to Lebanese anti-terrorist financing laws. The United States Government ("USG") designated Hizballah as a Foreign Terrorist Organization on October 8, 1997. Additionally, on October 31, 2001, Hizballah was designated by the USG as a Specially Designated Global Terrorist under Executive Order 13224.[14]

## II. Analysis of Factors

Based upon a review and analysis of the administrative record in this matter, consultations with relevant Federal agencies and departments, and after consideration of the factors enumerated in section 311, the Director of FinCEN has determined that LCB is a financial institution of primary money laundering concern. FinCEN has reason to believe that LCB has been routinely used by drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the

---

[13] For additional information about Lebanon's legal framework and special mechanisms for anti-money laundering and terrorist financing measures, see The Middle East and North Africa Financial Task Force (MENAFATF) *Mutual Evaluation Report, Lebanese Republic*, November 10, 2009 (www.menafatf.org).

[14] Hizballah is a Lebanon-based terrorist group. Until September 11, 2001, Hizballah was responsible for more American deaths than any other terrorist organization.

Middle East; that Hizballah derived financial support from the criminal activities of this network; and that LCB managers are complicit in the network's money laundering activities. A discussion of the factors relevant to this finding follows:

1. The Extent to Which LCB Has Been Used to Facilitate or Promote Money Laundering In or Through the Jurisdiction

The USG has information through law enforcement and other sources indicating that LCB—through management complicity, failure of internal controls, and lack of application of prudent banking standards—has been used extensively by persons associated with international drug trafficking and money laundering. According to this information, this international drug trafficking and money laundering network generally moves illegal drugs from South America to Europe and the Middle East via West Africa, with proceeds laundered through the Lebanese financial system, as well as through TBML involving used cars and consumer goods.[15] Specifically, individuals mentioned below[16] (with the assistance of close family members who are key participants in the global drug trafficking and money laundering network) are known to hold or utilize cash deposit accounts at LCB to move hundreds of millions of dollars monthly in cash proceeds from illicit drug sales into the formal financial system, as well as to coordinate the laundering of these funds through key foreign nodes of the network using LCB accounts. The bank's involvement in money laundering is attributable to failure to adequately control transactions that are highly vulnerable to criminal exploitation, including cash deposits and cross-border wire transfers, inadequate due diligence on

[15] For more information on Trade-Based Money Laundering, see "Advisory to Financial Institutions on Filing Suspicious Activity Reports regarding Trade-Based Money Laundering," Financial Crimes Enforcement Network, FIN02010-A001, February 18, 2010. www.fincen.gov/financial_institutions/advisory.html.

[16] These individuals are referred to by name and/or solely by letter reference (i.e., Individual A, B, C, etc.) depending on the sensitivity of the source.

high-risk customers like exchange houses, and, in some cases, complicity in the laundering activity by LCB managers.

For example, in this global narco-money laundering network, U.S.-designated Ayman Joumaa[17] has coordinated the transportation, distribution, and sale of multi-ton bulk shipments of cocaine from South America, and laundered the proceeds—as much as $200 million per month—from the sale of cocaine in Europe and the Middle East. In this criminal scheme, the proceeds have been laundered through various methods, including bulk cash smuggling operations and use of several Lebanese exchange houses that utilize accounts at LCB branches managed by family members of other participants in the global money laundering network. Specifically, Ayman Joumaa deposits bulk cash into multiple exchange houses, including the one that he owns, which then deposit the currency into their LCB accounts. He or the exchange houses then instruct LCB to perform wire transfers in furtherance of one of two TBML schemes. For example, some of the funds move to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple U.S.-based used car dealerships—some of which are operated by individuals who have been separately identified in drug-related investigations. The recipients use the funds to purchase vehicles in the United States, which are then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated back to Lebanon. Other funds are sent through LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods, which are

[17] On January 26, 2011, the U.S. Department of the Treasury's Office of Foreign Assets Control designated members and connected entities of the Ayman Joumaa drug trafficking and money laundering network, as Specially Designated Narcotics Traffickers due to their significant roles in international narcotics trafficking. This action, pursuant to the Foreign Narcotics Kingpin Designations Act (Kingpin Act), prohibits U.S. persons from conducting financial or commercial transactions with these entities and individuals and freezes any assets the designees may have under U.S. jurisdiction.

shipped to Latin America and sold and the proceeds are laundered through a scheme known as the Black Market Peso Exchange, in each case through other individuals referred to in this finding or via companies owned or controlled by them. According to USG information, Hizballah derived financial support from the criminal activities of Joumaa's network.

With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

Individual A, who owns a wide network of companies manufacturing or procuring consumer goods in Asia, Europe, and the Middle East, the Caribbean, and Lebanon, participates in this money laundering scheme by providing the consumer goods that are used for TBML, as described above. Despite his business being based in Asia, he is believed to have centralized his banking operations in Lebanon, particularly through the use of over 30 accounts at LCB. USG information shows Individual A receiving funds in his accounts from Ayman Joumaa, and exchanging funds with Latin American members

of the network discussed below. Individual A is known to be in near daily communication with the bank from his professional base in Southeast Asia.

Individual B, based in Latin America, is part of a Lebanese drug trafficking organization that moves large quantities of drugs from Latin America to destinations throughout Africa, Europe, and the Middle East. For over a decade, Individual B and his family have been involved in a variety of TBML schemes with Latin American drug traffickers and Lebanese money launderers. In the criminal schemes, the individuals deposit the local currency proceeds from the sale of imported consumer goods to the accounts of local banks and convert them to hard currency. This completes the Latin America-based Black Market Peso Exchange money laundering cycle, and allows for the repatriation of proceeds for the Latin American drug producers. Individual B then uses accounts at LCB to exchange the funds—usually in suspiciously structured amounts—with previously mentioned individuals and other suspected criminals as part of the global money laundering network. Information available to the USG suggests that Individual B and his family members are supporters of Hizballah.

Additionally, USG information indicates that Individual C, connected to both drug trafficking and money laundering, has established a money exchange house in the same building as a key LCB branch. This exchange uses its LCB accounts to deposit bulk cash proceeds of drug sales and then wires the proceeds to U.S.-based used car dealers. Individuals managing this and another LCB branch—each of which houses key accounts accepting bulk cash from exchange houses or wiring funds for the TBML schemes described above—are family members of one of the aforementioned individuals running Asia-based TBML activities.

At least one of these individuals has family relationships and personal contact with key LCB managers, in some cases working directly with those managers to conduct his transactions. The USG has information indicating that a minority owner of the bank, who concurrently serves as General Manager, his deputy, and the managers of key branches are in frequent—in some cases even daily—communication with various members of the aforementioned drug trafficking and money laundering network, and they personally process transactions on the network's behalf. Additionally, LCB managers are linked to Hizballah officials outside Lebanon. For example, Hizballah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services.

Finally, information available to the U.S. Government indicates that LCB's subsidiary, Gambia-based Prime Bank, is partially owned by a Lebanese individual known to be a supporter of Hizballah. In addition to Gambian nationals, Prime Bank serves Iranian and Lebanese clientele throughout West Africa.

2. The Extent to Which LCB is Used for Legitimate Business Purposes in the Jurisdiction

LCB is one of 49 mostly private Lebanese banks that make up Lebanon's financial sector. LCB has maintained modest but steady growth since 2000, with total assets of more than $5 billion in 2009.[18] LCB also appears to be aware of the risk posed by money laundering, as noted in its Anti-Money Laundering Policy Statement.[19] A publicly available source also indicates that U.S. financial institutions maintain correspondent relationships with LCB,[20] and it is likely that a high volume of those

---

[18] Lebanese Canadian Bank, 2009 Annual Report.
[19] Lebanese Canadian Bank, AML Policy Statement, www.lebcanbank.com
[20] Bankers Almanac, Lebanese Canadian Bank SAL, June 22, 2010 (http://www.bankersalmanac.com).

transactions through those accounts is legitimate. However, numerous instances have been identified where substantial volumes of illicit funds have passed through LCB. Thus, any legitimate use of LCB is significantly outweighed by the apparent use of LCB to promote or facilitate money laundering.

3. The Extent to Which Such Action is Sufficient to Ensure, With Respect to Transactions Involving LCB, that the Purposes of the BSA Continue To Be Fulfilled, and To Guard Against International Money Laundering and Other Financial Crimes

As detailed above, FinCEN has reasonable grounds to conclude that LCB is being used to promote or facilitate money laundering, and is, therefore, an institution of primary money laundering concern. Currently, there are no protective measures that specifically target LCB. Thus, finding LCB to be a financial institution of money laundering concern, which would allow consideration by the Secretary of special measures to be imposed on the institution under Section 311, is a necessary first step to prevent LCB from facilitating money laundering or other financial crime through the U.S. financial system. The finding of primary money laundering concern will bring criminal conduct occurring at or through LCB to the attention of the international financial community and further limit the bank's ability to be used for money laundering or other criminal purposes.

**III. Finding**

Based on the foregoing factors, the Director of FinCEN hereby finds that the Lebanese Canadian Bank SAL is a financial institution of primary money laundering concern.

Dated: _____________

_____________________

James H. Freis, Jr.
Director
Financial Crimes Enforcement Network