USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/14/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
GHAZI ABU NAHL, et al.,                     :
                               Plaintiff,   :
                                                            :     15 Civ. 9755 (LGS)
                  -against-                     :
                                                            :     **OPINION AND ORDER**
GEORGES ZARD ABOU JAOUDE, et al.,     :
                                     Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

        Plaintiffs Ghazi Abu Nahl and Nest Investments Holding Lebanon SAL ("Nest Investments") bring this action individually and on behalf of Lebanese Canadian Bank ("LCB"), which is based in Lebanon. Plaintiffs are shareholders of LCB. LCB participated in a money laundering scheme using U.S. correspondent banks to purchase used cars in the United States for resale abroad, the profits of which were used to finance Hizballah and crimes against humanity. The scheme resulted in LCB's forfeiture of $102 million to the United States in a civil forfeiture action, to the detriment of LCB and its shareholders. As relevant here, Defendants Georges Zard Abou Jaoude and Mohamed Hamdoun owned and controlled LCB. Defendant Ahmad Safa worked at LCB (these three defendants are hereafter referred to as "Defendants").[1]

        The First Amended Verified Complaint (the "Complaint") asserts a claim under the Alien Tort Statute ("ATS") for violations of international law, 28 U.S.C.A. § 1350; and state law claims for fraud in the inducement; breach of fiduciary duty; abuse of control; corporate waste and unjust enrichment. Defendants move to dismiss on numerous grounds, including failure to

---

[1] The other defendants have not appeared in this action. They are Oussama Salhab; Cybamar Swiss GMBH, LLC ("Cybamar Swiss"); Ayman Saied Joumaa; Mahmoud Hassan Ayash; Hassan Ayash Exchange Company ("Ayash Exchange"); Ellissa Holding Company ("Ellissa Holding") and Nominal Defendant LCB.

state a claim. For the reasons below, the motion is granted, and the Complaint is dismissed.

**I.    BACKGROUND**

The following facts are taken from the Complaint and documents attached to or integral to the Complaint. *See Tannerite Sports, L.L.C. v. NBCUniversal News Grp.*, 864 F.3d 236, 247-48 (2d Cir. 2017). As required, all factual allegations in the Complaint are assumed to be true only for purposes of these motions. *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016).

**A.    The Parties**

Plaintiff Abu Nahl is a Jordanian businessman and is the Chairman of Plaintiff Nest Investments. Abu Nahl owns a 99% stake in Nest Investments. Defendants Abou Jaoude and Hamdoun own or control entities that own approximately 76% of LCB, with the remainder now owned by Plaintiffs. Abou Jaoude and Hamdoun served in leadership roles on LCB's Anti-Money Laundering Committee. Defendant Safa was the Assistant General Manager of LCB, and now serves on the Banking Control Commission of the Central Bank of Lebanon ("Central Bank").

The following defendants have not appeared in this action. Salhab is a Hizballah operative who controls a network of money couriers based primarily in West Africa. Cybmar Swiss is a Michigan corporation with European affiliates; it is owned, operated or controlled by Salhab, or his relatives and associates, as part of his network. Defendant Joumaa controls an international network of drug traffickers that transports, distributes and sells multi-ton shipments of South American cocaine to West Africa. Defendant Ayash is a Hizballah operative who facilitates bulk cash transfers and money laundering for Joumaa and other narcoterrorists; he has family ties to Secretary General Hassan Nasrallah, the leader of Hizballah. Defendant Ayash

Exchange is a money exchange company in Beirut that Defendant Ayash uses to facilitate bulk cash transfers and money laundering for the Joumaa network. Ellissa Holding owns and controls companies in Lebanon, Benin and the Democratic Republic of Congo that facilitate bulk cash transfers and launder money on behalf of Joumaa.

B.   **Factual Background**

In 2002, the Algerian government granted Nest Investments a banking license to create Trust Bank Algeria ("TBA"). In 2005, TBA began looking for a strategic partner to increase TBA's capital. Around that time, Abu Nahl and Nest Investments entered into discussions with LCB; Abou Jaoude approached Abu Nahl about LCB investing in TBA. To help fund the acquisition of TBA, Abou Jaoude proposed a separate transaction in which he would sell a minority stake of LCB to Nest Investments. Between 2005 and 2007, Plaintiffs entered into a series of transactions in which they acquired a minority 24% stake in LCB for $57 million.

What Plaintiffs did not know during these negotiations is that Abou Jaoude and Hamdoun, who owned a majority stake in LCB, wanted control of Plaintiffs' bank, TBA, to further a money laundering scheme at LCB that was designed to benefit Hizballah, drug traffickers and enrich Abou Jaoude and Hamdoun. As part of the scheme, Abou Jaoude, Hamdoun and Safa used LCB to wire large amounts of United States currency to car buyers throughout the United States. The wire transfers passed through correspondent bank accounts in five New York banks: Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank and Mashreq Bank. Wire transfers were typically for tens of thousands of dollars; some car buyers received a few wire transfers between 2007 and 2011, but others received hundreds. In total, between 2007 and 2011, thirty used-car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina,

3

Ohio, Oklahoma and Tennessee received over 3,500 wire transfers equaling approximately $250 million.

The car buyers in the United States used the money wired from LCB to purchase used cars, which were then shipped to West Africa. Once the cars reached Africa, Joumaa and Salhab's networks purchased the cars, using bulk currency generated from narcotics, and subsequently sold the cars in Africa. One of Salhab's money couriers transported the proceeds from the sales from West Africa to Lebanon, where it was deposited in LCB accounts or given to Ayash Exchange or Ellissa Holding. To guarantee that the cash would reach its destination safely, Hizballah militants met the money couriers at the Beirut airport and escorted them to the cash's recipient. Hizballah used the laundered money to support numerous violations of international law, including rocket attacks on Israeli civilians in 2006 and aiding the Assad regime in the Syrian Civil war since 2011. Abou Jaoude and Hamdoun also siphoned off money from LCB in order to enrich themselves.

Although Plaintiffs did not know about the money laundering scheme before they invested in LCB, Plaintiffs eventually determined that something was amiss and attempted to raise LCB's lack of internal controls with the Central Bank. The Central Bank turned a blind eye to compliance problems at LCB, despite being aware that LCB was laundering money, because the Central Bank's Governor had a close relationship with Hamdoun. Plaintiffs also attempted to strengthen compliance programs by operating within LCB's governance structure, but were thwarted by Abou Jaoude and Hamdoun.

In September 2011, LCB sold certain of its assets and liabilities to a different Lebanese Bank, Societe Generale de Banque au Liban S.A.L. ("SGBL") in exchange for $580 million.

Another Lebanese financial institution (the "Escrow Institution") held $150 million of the purchase price.

      **C.**     **The Forfeiture Action**

In 2011, the U.S. Department of Treasury's Financial Crimes Enforcement Network issued a Treasury Finding that identified LCB as a financial institution of primary money laundering concern. The Treasury Finding identified Abou Jaoude and Hamdoun as key players in the money laundering scheme, who had "frequent -- in some cases even daily -- communication" with the drug trafficking and money laundering networks, and "personally process[ed] transactions on the network's behalf." Also in 2011, the United States Attorney for the Southern District of New York filed a civil forfeiture complaint against LCB and others, based on a "trade-based money laundering scheme involving the purchase of used cars and other vehicles in the United States for shipment and sale abroad, with funds provided by banks, currency exchanges, and individuals associated with, funded by, controlled by, or directed by the Lebanon-based terrorist organization known as Hizballah."

Per the forfeiture complaint, "Hizballah is responsible for some of the deadliest terrorist attacks against the United States," and "operates a network of social programs and political operations within Lebanon alongside its militia and terrorist operatives, and has been described as a 'state within a state.'"

In August 2012, the United States seized $150 million from U.S. correspondent account of the Escrow Institution (which held $150 million in proceeds paid to LCB in the sale to SGBL) as assets "traceable to the assets of LCB." In 2013, Abou Jaoude and Hamdoun, acting as trustees responsible for LCB's liquidation, settled the civil forfeiture action for $102 million.

5

## II.   DISCUSSION

For the reasons discussed below, the ATS claim is dismissed for failure to state a claim, which also deprives the Court of subject matter jurisdiction. *See Licci by Licci v. Lebanese Can. Bank, SAL*, 834 F.3d 201, 212 (2d Cir. 2016) ("the ATS is a 'jurisdictional' statute in the sense that it 'address[es] the power of the courts to entertain cases concerned with a certain subject.'") (citations omitted)). The remaining state law claims are also dismissed, as the Court declines to exercise supplemental jurisdiction.[2]

### A.   Failure to State a Claim Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex*, 823 F.3d at 59 (citation omitted); *accord Kao v. British Airways, P.L.C.*, No. 17 Civ. 0232, 2018 WL 501609, at *1 (S.D.N.Y. Jan. 19, 2018).

Because assessing the adequacy of an ATS claim implicates the Court's subject matter jurisdiction, a court may look beyond the pleadings on a motion to dismiss an ATS claim. *Licci*, 834 F.3d at 211 (looking to external evidence of Hizballah's wire transfers through LCB for "context" and stating that, "[a]lthough courts are generally limited to examining the sufficiency

---

[2] None of the other arguments for dismissal advanced by Defendants appear meritorious. However, since those arguments depend to a greater or lesser extent on the precise claim that is alleged, and because the claim alleged is inadequate, those other arguments are not addressed here.

of the pleadings on a motion to dismiss, on a challenge to a district court's subject matter jurisdiction, the court may also resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings.").

### B. Alien Tort Statute

The ATS confers district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C.A. § 1350. A defendant may be liable under the ATS for conduct that is "either a direct violation of the law of nations or the aiding and abetting of another's violation of the law of nations." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 166 (2d Cir. 2015); *accord Licci*, 834 F.3d at 213.

To state a claim under the ATS, a plaintiff must satisfy four requirements: "(1) the complaint pleads a violation of the law of nations; (2) the presumption against the extraterritorial application of the ATS, announced by the Supreme Court in *Kiobel II* [*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013)], does not bar the claim; (3) customary international law recognizes the asserted liability of a defendant; and (4) the theory of liability alleged by plaintiffs (i.e., aiding and abetting, conspiracy) is recognized by customary international law or the 'law of nations.'" *Balintulo*, 796 F.3d at 165-66. As applied to an aiding and abetting claim, the second requirement looks to the aiding and abetting conduct and its nexus to the United States. *Licci*, 834 F.3d at 215.

A claim under an aiding and abetting theory also must allege (1) that the defendant gave practical assistance to the principal "which has a substantial effect on the perpetration of the crime," and (2) that the defendant acted "with the purpose of facilitating the commission of that crime." *Balintulo*, 796 F.3d at 167 (dismissing claims of South African victims of apartheid

7

because the defendants did not have the requisite state of mind for aiding and abetting); *accord Licci*, 834 F.3d at 215 (stating that the Court must determine whether the alleged aiding and abetting conduct actually "states a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations").

The Complaint fails to state an ATS claim because it does not fit within the plain language of the statute; it does not claim that Plaintiffs are victims of the "tort . . . committed in violation of the law of nations" that it identifies. The Complaint alleges aiding and abetting as its only theory of ATS liability -- that "Defendants knowingly and intentionally relied on the U.S. Banking system to aid and abet Hizballah's violations of the law of nations." Am. Compl. ¶ 149. Plaintiffs thereby mimic the plaintiffs' arguments in *Licci*, where the Second Circuit held that a complaint "state[d] a claim for aiding and abetting [Hizballah's] violation of the law of nations." *Licci*, 834 F.3d at 219. But in *Licci*, the plaintiffs were Israeli civilians who had been harmed in rocket attacks launched by Hizballah. *Id.* Unlike the *Licci* plaintiffs, Plaintiffs here are not the victims of Hizballah's violations of customary international law. Instead, Plaintiffs' losses were the product of LCB's aiding Hizballah's violations.

A fundamental precept of tort law is that a plaintiff may recover for an injury caused by a tort, not only from the primary tortfeasor, but also those who aided and abetted the tortfeasor. An implicit requirement is that the plaintiff suffered injury caused by the primary tortfeasor. "[F]or harm resulting to a third person *from the tortious conduct of another*, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876 (Am. Law Inst. 1979) (emphasis added); *see generally Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 287 (2d Cir. 2007) (Hall, J. joining the per curiam

opinion) (describing the nature of aiding and abetting liability); *cf.* Model Penal Code § 2.06 (Am. Law Inst., Proposed Official Draft 1962) ("A person is an accomplice of another person in the commission of *an offense* if . . .") (emphasis added).

The Complaint does not plead a sufficient ATS claim because Plaintiffs were not injured by the tort in violation of international law -- which they identify as Hizballah's "attacks targeting civilians . . . prohibited under customary international law" -- but rather by Defendants' money laundering in aid of Hizballah's violation.

Plaintiffs maintain that their injury is sufficient to confer standing under Article III of the Constitution. The cases they cite are consistent with that argument. *See, e.g.*, *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 324-5 (D. Mass. 2013) (applying the familiar Article III standing requirement that the injury be "fairly traceable to the defendant's misconduct" to ATS claims); *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 341-2 (C.D. Cal. 1997) (applying the constitutional standing requirement of "injury in fact" to hold that a labor union had standing to assert an ATS claim in its own right). However, their problem is not one of constitutional standing, but rather whether Plaintiffs allege an injury from an underlying violation of international law.

Plaintiffs argue that liability for aiding and abetting under the ATS requires only (1) that the defendant gave practical assistance to the principal "which has a substantial effect on the perpetration of the crime," and (2) that the defendant acted "with the purpose of facilitation the commission of that crime." *Balintulo*, 796 F.3d at 167. Plaintiffs' argument is incorrect as this formulation describes only what action and intent are required, but does not address causation and injury, which are also necessary predicates to any tort liability.

9

In effect, Plaintiffs advocate extending ATS liability to money laundering -- conduct that was tortious and injurious, but not itself alleged to be in violation of international law. The Supreme Court has warned that the ATS covers only a "modest number of international law violations . . ." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004); *accord Jesner v. Arab Bank, P.L.C.*, 138 S. Ct. 1386, 1403 (2018) ("federal courts must exercise 'great caution' before recognizing new forms of liability under the ATS"). Plaintiffs have not shown any basis to extend the ATS beyond "tort[s] only, committed in violation of the law of nations" as the ATS requires.[3] 28 U.S.C.A. § 1350.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim is GRANTED. Plaintiffs' motions to file a sur-reply and for oral argument are DENIED as moot. If Plaintiffs wish to replead, by July 3, 2018, they shall file (i) a motion, (ii) a memorandum of law, not to exceed ten pages, explaining how the proposed amendments cure the deficiencies identified in this Opinion, and (iii) a proposed Second Amended Complaint, blacklined to show changes from the Amended Complaint (Dkt. 59). In response to any such submission, by July 20, 2018, Defendants shall file an opposing memorandum of law, not to exceed ten pages, and limited to addressing the sufficiency of the ATS claim as discussed in this Opinion.[4] Plaintiff shall not file a reply unless requested.

---

[3] This Opinion expresses no view as to whether money laundering to aid terrorism is itself a tort in violation of international law that is actionable by those injured by the money laundering and not by the terrorism; the theory of liability put forward in the Complaint is secondary and based only on aiding and abetting.

[4] Such limited opposition shall not include, and shall be without prejudice to, Defendants' arguments (forum non conveniens, res judicata, etc.) that are not addressed in this opinion.

The Clerk of Court is respectfully directed to close the motion at Docket Nos. 63, 82 and 84.

Dated: June 14, 2018
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**