UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GHAZI ABU NAHL,
    *et al.*,

           Plaintiffs,

      v.

GEORGES ZARD ABOU JAOUDE,
    *et al.*,

           Defendants,

    and

LEBANESE CANADIAN BANK,

           Nominal Defendant.

15 Civ. 9755 (LGS)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................................................................... ii

Introduction .................................................................................................................................. 1

I.     The Proposed SAC ........................................................................................................ 2

II.    Argument ....................................................................................................................... 3

       A.     Financing Terror Attacks on Civilians Violates the Law of Nations ..................... 3

       B.     The Norm Prohibiting Terror Attacks on Civilians Is Sufficiently Specific. ......... 5

       C.     The SAC Satisfies the Remaining Requirements for the Exercise of ATS Jurisdiction. ............................................................................................................ 7

       D.     Plaintiffs Have ATS Standing Because LCB and Its Shareholders Suffered a Financial Injury That Directly Resulted from Defendants' Torts in Violation of the Law of Nations. ............................................................................ 8

       E.     Plaintiffs Do Not Allege Any "New Forms of Liability," Nor Do Their Claims Raise Foreign-Policy Concerns. ................................................................ 9

Conclusion ................................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdullahi v. Pfizer, Inc.*,
  562 F.3d 163 (2d Cir. 2009) ..................................................................................... *passim*

*Almog v. Arab Bank, PLC*,
  471 F. Supp. 2d 257 (E.D.N.Y. 2007) ..................................................................... *passim*

*Barboza v. Drummond Co., Inc.*,
  2007 WL 8025825 (S.D. Fla. July 17, 2007) ...................................................................6

*Filartiga v. Pena-Irala*,
  630 F.2d 876 (2d Cir. 1980) ..........................................................................................3, 5

*Flores v. S. Peru Copper Corp.*,
  414 F.3d 233 (2d Cir. 2003) ................................................................................1, 3, 5, 7

*Jesner v. Arab Bank, PLC*,
  138 S. Ct. 1386 (2018) ..................................................................................................9, 10

*Kadic v. Karadzic*,
  70 F.3d 232 (2d Cir. 1995) ..................................................................................................3

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ..........................................................................................................8, 9

*Licci v. Lebanese Canadian Bank, SAL*,
  834 F.3d 201 (2d Cir. 2016) ...........................................................................................7, 8

*Sexual Minorities Uganda v. Lively*,
  960 F. Supp. 2d 304 (D. Mass. 2013) ............................................................................8, 9

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) ..................................................................................................... *passim*

*Strauss v. Credit Lyonnais, S.A.*,
  242 F.R.D. 199 (E.D.N.Y. 2007) ........................................................................................1

*In re Terrorist Attacks of September 11, 2001*,
  714 F.3d 118 (2d Cir. 2013) ................................................................................................7

*United States v. Ahmed*,
  94 F. Supp. 3d 394 (E.D.N.Y. 2015) ................................................................................4

*United States v. Hasan*,
   747 F. Supp. 2d 599 (E.D. Va. 2010), *aff'd sub nom.*, *United States v. Dire*,
   680 F.3d 446 (4th Cir. 2012) ................................................................................................4

*Velez v. Sanchez*,
   693 F.3d 308 (2d Cir. 2012)........................................................................................1, 3, 7

*Viet. Ass'n for Victims of Agent Orange v. Dow Chem. Co.*,
   517 F.3d 104 (2d Cir. 2008)...................................................................................................3

**Statutes**

Alien Tort Statute, 28 U.S.C. § 1350................................................................................. *passim*

Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq.* .............................................................................10

Suppression of the Financing of Terrorism Convention Implementation Act of
   2002, Pub. L. No. 107-197, tit. II, § 202(a) ................................................................................4

**Other Authorities**

Anthony Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction:
   Terrorism and the Intersection of National and International Law*, 48 Harv.
   Int'l L.J. 121, 179-86 (2007)..................................................................................................5

*Creation of Counter Terrorism Committee*, U.N. Doc. S/Res/1373, ¶ 1 (Sept. 28,
   2001) ....................................................................................................................................5

International Convention for the Suppression of the Financing of Terrorism.
   G.A. Res. 54/109, 1, U.N. Doc. A/RES/54/109 (Dec. 9, 1999)..................................... *passim*

International Monetary Fund, *Suppressing the Financing of Terrorism: A
   Handbook for Legislative Drafting* 1 (2003), https://www.imf.org/
   external/pubs/nft/2003/SFTH/pdf/SFTH.pdf..............................................................................5

U.N. Treaty Collection, Status of Treaties, *Int'l Convention for the Suppression of
   the Financing of Terrorism*, https://treaties.un.org/Pages/ViewDetails.aspx?
   src=IND&mtdsg_no=XVIII-11&chapter=18&lang=en#top...............................................3, 4

U.S. Dep't of State, *Indep. States in the World* (May 30, 2018),
   https://www.state.gov/s/inr/rls/4250.htm..................................................................................4

**Introduction**

The Court recognized in its June 14, 2018 Decision (ECF No. 94) that money laundering to support Hezbollah terrorism is "tortious and injurious." Op. at 10. The Court ruled, however, that Plaintiffs had not stated a viable claim under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), because the First Amended Complaint did not allege that such tortious money laundering (as distinct from physical acts of terrorism) violates the law of nations. *Id*. The Court expressed "no view as to whether money laundering to aid terrorism is itself a tort in violation of international law that is actionable by those injured by the money laundering and not by the terrorism." *Id*. n.3.

Plaintiffs now seek leave to file a Second Amended Complaint ("SAC") (Ex. 1 to Declaration of Dennis B. Auerbach ("Auerbach Decl.")), to remedy the issue raised by the Court. Plaintiffs' proposed SAC alleges that money laundering to support Hezbollah attacks on civilians *is* a tort that violates the law of nations, and that they were injured by *that* very tort.

Specifically, in 1999, the United Nations General Assembly adopted the International Convention for the Suppression of the Financing of Terrorism. G.A. Res. 54/109, 1, U.N. Doc. A/RES/54/109 (Dec. 9, 1999) ("Terrorist Financing Convention"). The Convention took effect in April 2002, *see Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 217 n.10 (E.D.N.Y. 2007), and reflects an international-law norm prohibiting the financing of terror attacks on civilians. The Convention recognizes that those who *fund* terror attacks on civilians are just as culpable as those who launch the attacks, and that their conduct thus also offends the law of nations. More than 96% of the world's nations (including the United States) are parties to the Terrorist Financing Convention. Such adoption by the "overwhelming majority of states" is "sufficient proof of a norm of customary international law under the ATS. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256 (2d Cir. 2003); *Velez v. Sanchez*, 693 F.3d 308, 319 (2d Cir. 2012).

Defendants violated the international-law norm reflected in the Terrorist Financing Convention.  As alleged in the proposed SAC, Defendants abused their control of the Lebanese Canadian Bank ("LCB") to launder funds for Hezbollah, knowing and intending that such funds would be used to finance terror attacks on civilians.  Based on Defendants' misconduct, LCB was forced to forfeit $102 million in the Civil Forfeiture Action discussed in the June 14 Decision.  SAC ¶¶ 1-10.  This financial injury to LCB and its shareholders directly resulted from Defendants' "tort[s] . . . committed in violation of the law of nations."  28 U.S.C. § 1350.  The proposed SAC seeks recovery of these tort damages and thus states a viable ATS claim.

## I.      THE PROPOSED SAC

In the Civil Forfeiture Action, the Government detailed an intricate scheme to use LCB to launder money for Hezbollah through New York banks, Michigan car dealers and international drug traffickers between 2007 and early 2011.  SAC Ex. B.  A related Treasury Department Finding described the money-laundering network and determined that "LCB managers [*i.e.*, Defendants] are complicit in the network's money laundering activities."  SAC Ex. A at 8.

As set forth in the Civil Forfeiture Action, a key purpose of Defendants' scheme was to finance Hezbollah terrorism, including crimes against humanity.  According to experts, such crimes have included terror attacks on civilians, and were conducted in order to intimidate civilian populations and/or compel government action.  SAC ¶¶ 73-74, 82, 154.

The money laundering scheme alleged in the SAC is the same as the scheme alleged in the First Amended Complaint.  The SAC, however, does not rely on Hezbollah terror attacks on civilians as the underlying tort that violates the law of nations under the ATS.  As the Court's June 14 Decision states, LCB and its shareholders were not victims of *that* tort.  Rather, the SAC alleges that laundering funds to *finance* Hezbollah terrorism is *itself* a tort committed in violation of the

law of nations.  SAC ¶¶ 2-5, 77-83.  LCB and its shareholders were victims of that independent tort, and Plaintiffs sue derivatively on behalf of the Bank to recover damages.  *Id*. ¶¶ 160-61.

## II.   ARGUMENT

A.   <u>Financing Terror Attacks on Civilians Violates the Law of Nations.</u>

Conduct violates "the present-day law of nations" within the meaning of the ATS if it contravenes a "norm of international character accepted by the civilized world."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004); *see also Kadic v. Karadzic*, 70 F.3d 232, 239 (2d Cir. 1995) (conduct violates law of nations if it "violates well-established, universally recognized norms of international law" (internal quotations omitted)).  Such norms must have been recognized "at the time of the events giving rise to the injuries alleged."  *Viet. Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 123 (2d Cir. 2008).

International conventions may reflect "universally recognized norms of international law" for ATS purposes.  *See Velez*, 693 F.3d at 319.  Even "[a]greements that are not self-executing or that have not been executed by federal legislation . . . are appropriately considered evidence of the current state of customary international law."  *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176 (2d Cir. 2009).  A treaty or convention "constitute[s] sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles."  *Flores*, 414 F.3d at 256 (emphasis omitted); *accord Velez*, 693 F.3d at 319.  "The question is not one of whether the rule is often violated, but whether virtually all States recognize its validity."  *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 271 (E.D.N.Y. 2007) (citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980)).

The Terrorist Financing Convention reflects norms of international law under this standard.  As noted, 188 countries (including the U.S.) are parties. *See* U.N. Treaty Collection, Status of Treaties, *Int'l Convention for the Suppression of the Financing of Terrorism*,

*https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter=18& lang=en#top* (last visited July 2, 2018).  As of December 31, 2010, when Defendants' scheme was still in progress, 173 countries were parties.  *Id*.  That is the "overwhelming majority" of the world's 195 independent states.  *See* U.S. Dep't of State, *Indep. States in the World* (May 30, 2018), https://www.state.gov/s/inr/rls/4250.htm.[1]  The Convention thus reflects established norms of customary international law.  *See, e.g.*, *Abdullahi*, 562 F.3d at 180 (ratification of human rights convention by "more than 160 States" sufficient evidence of established international-law norm); *United States v. Hasan*, 747 F. Supp. 2d 599, 633-34 (E.D. Va. 2010) (161 parties to Law of the Sea Convention satisfied "overwhelming majority" requirement for norm of customary international law), *aff'd sub nom.*, *United States v. Dire*, 680 F.3d 446 (4th Cir. 2012).[2]

In *Almog*, the court specifically held that the Terrorist Financing Convention "articulate[s] a universal standard" of international law for purposes of the ATS.  *Almog*, 471 F. Supp. 2d at 281.  It did so at a time when "over 130 countries" had ratified the Convention (*see id*. at 277)—far fewer than the 173 that were parties as of December 31, 2010.  In *United States v. Ahmed*, 94 F. Supp. 3d 394 (E.D.N.Y. 2015), the court likewise recognized that providing material assistance to terrorists "is against the law of nations."  *Id*. at 415.

---

[1] While some parties to the Terrorist Financing Convention have submitted reservations to certain of its provisions (mainly those concerning arbitration), the reservations of only two countries concern the core norm, set forth in Article 2.1(b), prohibiting the financing of terror attacks on civilians.  *See* U.N. Treaty Collection, Status of Treaties, *Int'l Convention for the Suppression of the Financing of Terrorism*, https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter=18&lang=en#top (last visited July 2, 2018).

[2] This broad condemnation of terror financing is based on a recognition that international terrorism "depend[s] on the financing that terrorists may obtain," thus mandating that terror financiers be punished and deterred to the same extent as terrorists themselves.  Terrorist Financing Convention, Preamble.  The Convention requires that states enact implementing laws consistent with this goal.  *Id*. art. 4.  The United States, among other nations, has done so.  *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. No. 107-197, tit. II, § 202(a).

International organizations agree that the Convention reflects established international-law norms.  The International Monetary Fund has referred to "legally binding international norms" prohibiting terror financing, "such as those contained in . . . the International Convention for the Suppression of the Financing of Terrorism." International Monetary Fund, *Suppressing the Financing of Terrorism: A Handbook for Legislative Drafting* 1 (2003), https://www.imf.org/external/pubs/nft/2003/SFTH/pdf/SFTH.pdf.  Terror financing is specifically proscribed by a U.N. Security Council resolution, further showing that the Convention's terror-financing ban constitutes an established norm of international law.  *Creation of Counter Terrorism Committee*, U.N. Doc. S/Res/1373, ¶ 1 (Sept. 28, 2001); *see also Filartiga*, 630 F.2d at 882-83 (U.N. resolution reflected law of nations).  International-law scholars concur that terror financing violates the law of nations.  *See*, *e.g.*, Anthony Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law*, 48 Harv. Int'l L.J. 121, 179-86 (2007).

B.     <u>The Norm Prohibiting Terror Attacks on Civilians Is Sufficiently Specific.</u>

To be actionable under the ATS, a norm of international law must also be "sufficiently definite to support a cause of action."  *Sosa*, 542 U.S. at 733; *see also id*. at 725 (for norm to be actionable under ATS, it must be "defined with a specificity comparable" to paradigms of international-law violations recognized at time ATS was enacted).  A mere vague, aspirational statement of principle set forth in a treaty or convention (such as a general prohibition of "arbitrary" or "prolonged" detention) does not meet this standard.  *Id*. at 733-37; *see also Flores*, 414 F.3d at 254-55 ("right to life" and "right to health" too "vague and amorphous" to constitute binding norms of international law).  The standard is met, however, when a treaty, convention or other recognized source of international law prohibits specific, well-defined conduct—that is, when the norm has "concrete content." *Abdullahi*, 562 F.3d at 184.

The Terrorist Financing Convention contains the requisite "concrete content."  It provides:

5

> Any Person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides . . . funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part . . . to carry out . . . [an] act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.  Terrorist Financing Convention, art. 2.1(b).

The Convention thus clearly defines the type of conduct that it proscribes:  *i.e.*, providing funds that are to be used to fund attacks on civilians, in order to intimidate the civilian population or compel government action.  It also specifies the state of mind that must accompany such conduct:  a party must have provided funds "wilfully," with the "intention" or "knowledge" that they will be used to finance crimes against humanity or other terrorist acts.  *Id.*

Based on this specificity, the court in *Almog* correctly held that the norms set forth in the Terrorist Financing Convention have "sufficiently definite content" under *Sosa* and that plaintiffs accordingly state a valid ATS claim when their allegations "track the conduct specifically condemned" by the Convention.  *Almog*, 471 F. Supp. 2d at 284-85.  As in *Almog*, the SAC here "track[s] the conduct specifically condemned" by the Convention.  *See* SAC ¶¶ 1-10, 152-55.

To be sure, some courts have ruled that "terrorism in general" is too indefinite a concept to give rise to a specific norm of international law, *see, e.g., Barboza v. Drummond Co., Inc.*, 2007 WL 8025825, at *11 (S.D. Fla. July 17, 2007).  But this case—like *Almog*—does not involve "terrorism in general."  Rather, it concerns the willful financing of Hezbollah attacks on civilians in order to intimidate civilian populations and/or to compel government action—conduct expressly proscribed by the Terrorist Financing Convention.  *See Almog*, 471 F. Supp. 2d at 281 (conduct "specifically condemned" by Terrorist Financing Convention violates law of nations "regardless

of whether there is universal agreement as to the precise scope of the word 'terrorism'").[3]

Indeed, in *Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016), the Second Circuit held—in the specific context of LCB and Hezbollah—that alleged Hezbollah terror attacks on civilians constitute "crimes against humanity" that go beyond ordinary terrorism, and thus violate the law of nations for purposes of the ATS. *Id*. at 213. The financing of the Hezbollah attacks on civilians at issue here likewise included crimes against humanity and thus violate the law of nations— regardless of whether the financing of "terrorism in general" would do so.

C.  <u>The SAC Satisfies the Remaining Requirements for the Exercise of ATS Jurisdiction.</u>

Plaintiffs easily meet the remaining requirements for ATS jurisdiction.

First, for a norm to be actionable under the ATS, nations must abide by it "out of a sense of legal obligation." *Velez*, 693 F.3d at 319. "[R]atification of a treaty that embodies specific norms of conduct evidences a State's acceptance of the norms as legal obligations." *Almog*, 471 F. Supp. 2d at 281; *accord Flores*, 414 F.3d at 256 (treaties "create *legal obligations* . . . on the States parties to them"). As noted, the Terrorist Financing Convention has been ratified by the U.S. and almost every other country, thus mandating that parties comply as a matter of legal obligation. The Convention (art. 4) also requires states to criminalize the conduct that it prohibits, further establishing that compliance is a matter of legal obligation. *Abdullahi*, 562 F.3d at 180.

Second, a governing norm under the ATS must be "of mutual concern" to nations; it cannot just be a norm that nations may independently adopt based on their "several" interests. *Flores*, 414 F.3d at 249. The "mutual" interest requirement is satisfied where states have "acted in concert" by entering into an "express and binding international agreement[]" prohibiting the

---

[3] While the court in *In re Terrorist Attacks of September 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013), stated that no well-defined norm against terrorism existed "as of September 11, 2001," that date obviously preceded the April 2002 effective date of the Terrorist Financing Convention.

7

conduct in question. *Abdullahi*, 562 F.3d at 185. The Terrorist Financing Convention is such an "express and binding international agreement." Indeed, it specifically states that "the financing of terrorism is a matter of grave concern to the international community *as a whole*," requiring collective action for the "maintenance of international peace and security." Terrorist Financing Convention, Preamble (emphasis added); *see also Almog*, 471 F. Supp. 2d at 283 (relying on Preamble to hold that Terrorist Financing Convention establishes norms of "mutual" concern).

Finally, a law-of-nations violation must "touch and concern" the United States. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124-25 (2013). That is the case here. Defendants laundered funds for Hezbollah through New York banks and Michigan car dealers. SAC ¶¶ 7, 54. Their tortious acts thus occurred, in substantial part, within the United States (and in violation of U.S. criminal laws). *See*, *e.g.*, *Licci*, 834 F.3d at 217 ("touch and concern" requirement met when defendant carried out "banking services [to finance Hezbollah terror attacks on civilians] which harmed the plaintiffs . . . in and through the State of New York" (emphasis omitted)).

The SAC thus fully comports with the requirements for a valid ATS claim.

D. <u>Plaintiffs Have ATS Standing Because LCB and Its Shareholders Suffered a Financial Injury That Directly Resulted from Defendants' Torts in Violation of the Law of Nations.</u>

As discussed in Plaintiffs' opposition to Defendants' motion to dismiss the First Amended Complaint, financial injury is sufficient to support ATS jurisdiction. *See* ECF No. 73 at 5-6. For example, in *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013), an organization sued under the ATS based on persecution of LGBTI people in Uganda, alleging that it "had to retain the services of security personnel, take additional security measures for its premises, and relocate its offices and operations," all of which had "obviously cost money." *Id*. at 324. The organization was not itself persecuted, nor did it otherwise suffer any physical injury. Nonetheless, the court held that its financial loss constituted injury in fact traceable to defendant's

8

misconduct, and that the organization thus had standing to sue under the ATS. *Id*. at 324-25. The fact that LCB and Plaintiffs suffered only a financial injury here is likewise sufficient to support their ATS claim. *See* June 14 Op. at 9 (recognizing that *Sexual Minorities Uganda* and other cases cited by Plaintiffs reflect that financial injury alone can support claim under ATS).

The financial injury suffered by LCB and its shareholders directly resulted from Defendants' "tort . . . committed in violation of the law of nations"—*i.e.*, their financing of Hezbollah attacks on civilians. Based on Defendants' abuse of LCB to launder funds for Hezbollah, the Bank was required to forfeit $102 million to the United States in the Civil Forfeiture Action. SAC ¶¶ 10, 158. Plaintiffs are suing derivatively on the Bank's behalf to recover these damages. Because LCB (and its shareholders) were victims of torts committed by Defendants in violation of the law of nations, Plaintiffs have established ATS jurisdiction.

E. <u>Plaintiffs Do Not Allege Any "New Forms of Liability," Nor Do Their Claims Raise Foreign-Policy Concerns.</u>

The Court's June 14 Decision noted that "federal courts must exercise 'great caution' before recognizing new forms of liability under the ATS." June 14 Op. at 10 (quoting *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018)). That is not an impediment to the exercise of ATS jurisdiction here. Plaintiffs do not ask the Court to recognize any "new forms of liability," but simply to apply the specific, well-established criteria set forth in *Sosa* and other controlling cases to assess whether ATS jurisdiction exists. As demonstrated above, Plaintiffs satisfy those criteria.

Nor does this case implicate the foreign policy concerns that sometimes counsel against the exercise of ATS jurisdiction. *See, e.g., Kiobel*, 569 U.S. at 124. As noted, the United States Government initiated the Civil Forfeiture Action against LCB based on its money laundering for Hezbollah. It obviously did not believe that doing so would have adverse foreign-policy implications. This lawsuit is simply part II of the Civil Forfeiture case: LCB was forced to forfeit

$102 million in the Civil Forfeiture Action, and Plaintiffs, on the Bank's behalf, now seek to recover that same $102 million from the individuals who abused their control of LCB to perpetrate the laundering scheme. The Civil Forfeiture Action was fully consistent with the foreign policy goals of the United States and so, too, is this follow-on proceeding. Indeed, allowing this case to proceed would significantly *advance* the U.S. foreign-policy interest (and the Terrorist Financing Convention interest) of punishing and deterring terrorist financing.

Moreover, the U.S. Government concluded in the Treasury Finding that LCB "is a financial institution of primary money laundering concern" and that "LCB managers [*i.e.*, Defendants] are complicit in the . . . money laundering activities." SAC Ex. A at 1, 8. Because a ruling in Plaintiffs' favor in this case would simply confirm what the United States has already determined, there is no basis to find that adjudicating the action could somehow undermine U.S. foreign policy.[4]

## Conclusion

Defendants laundered funds to finance Hezbollah terror attacks on civilians. The "overwhelming majority" of countries are parties to a convention that contains concrete norms prohibiting such conduct. Defendants' laundering of funds for Hezbollah is thus a tort that violates the law of nations. Because LCB and its shareholders were victims of that tort, Plaintiffs have stated a valid ATS claim. Accordingly, leave to file the SAC should be granted.

---

[4] Plaintiffs' claims also are not preempted by the Anti-Terrorism Act, 18 U.S.C. § 2331, *et seq*. In *Jesner*, three justices opined that the Anti-Terrorism Act might preclude ATS common-law suits against *banks* for financing terrorism. 138 S. Ct. at 1405 (plurality op.). This case, however, involves claims against *individuals*. Indeed, the three justices expressly recognized in their plurality opinion that, while a bank or other corporation is not subject to ATS liability based, *inter alia*, on the Anti-Terrorism Act, a plaintiff "*still can sue the individual corporate employees* responsible for a violation of international law under the ATS." *Id*. (emphasis added).

Relatedly, it is irrelevant that Congress, in ratifying the Terrorist Financing Convention, created no statutory private right of action allowing aliens to sue for violations of its provisions. The ATS establishes federal jurisdiction over suits by aliens at *common law* alleging violations of the law of nations; no further "legislation conferring a right of action is needed." *Sosa*, 542 U.S. at 723; *see also Almog*, 471 F. Supp. 2d at 285 (exercising ATS jurisdiction based in part on Terrorist Financing Convention, despite absence of statutory private right of action).

Dated:  July 3, 2018                               Respectfully submitted,


                                                    s/ Dennis Auerbach
                                                   Dennis B. Auerbach
                                                   Anthony Herman
                                                   Andrew E. Siegel
                                                   COVINGTON & BURLING LLP
                                                   One CityCenter, 850 Tenth Street
                                                   Washington, DC 20001
                                                   (202) 662-5226


                                                   *Counsel for Plaintiffs*