UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GHAZI ABU NAHL and NEST INVESTMENTS
HOLDING LEBANON SAL, ~~individually and~~ on
behalf of LEBANESE CANADIAN BANK,

                Plaintiffs,

        v.

GEORGES ZARD ABOU JAOUDE, MOHAMED
HAMDOUN, AHMAD SAFA, OUSSAMA
SALHAB, ~~CYBAMAR SWISS GMBH, LLC,~~
AYMAN SAIED JOUMAA, **and** MAHMOUD
HASSAN AYASH~~, HASSAN AYASH~~
~~EXCHANGE COMPANY, and ELLISSA~~
~~HOLDING COMPANY~~,

              Defendants,

      and

LEBANESE CANADIAN BANK,

              Nominal Defendant.

15 Civ. 9755 (LGS)

**~~FIRST~~SECOND AMENDED
VERIFIED COMPLAINT**

DEMAND FOR JURY TRIAL

## NATURE OF ACTION

1. This case involves an international money laundering scheme ~~in which~~**perpetrated by** Defendants Georges Zard Abou Jaoude ("Abou Jaoude"), Mohamed Hamdoun ("Hamdoun"), Ahmad Safa ("Safa") and others. **As the United States Government has determined, Defendants** used United States accounts and entities to ~~aid and abet crimes against humanity and/or war crimes by laundering~~**launder** funds for international narcoterrorists, including Hezbollah~~, and to line their own pockets~~. **A central purpose of the scheme was to finance Hezbollah terror attacks on civilians and other acts of terrorism and crimes against humanity—attacks that have been documented by recognized Hezbollah experts**. Defendants' misconduct resulted in substantial damage to Lebanese Canadian Bank ("LCB" or the "Bank"), an entity controlled by Abou Jaoude, Hamdoun and Safa~~, as well as to Plaintiffs directly~~. Plaintiffs~~,~~ LCB shareholders~~,~~ sue derivatively to recover the damages suffered by the Bank ~~and directly to obtain redress for the non-derivative injuries they suffered~~**(and by themselves as shareholders)** as a result of Defendants' scheme.

2. **Willfully financing terror attacks on civilians contravenes established, well-defined norms of international law and thus violates the law of nations within the meaning of the Alien Tort Statute, 28 U.S.C. § 1350.**

3. **In 1999, the United Nations General Assembly promulgated the International Convention for the Suppression of the Financing of Terrorism ("Terrorist Financing Convention"). The Convention went into effect on April 10, 2002. An overwhelming majority of countries are parties to the Terrorist Financing Convention (188 out of 195), and the overwhelming majority of states also were**

**parties at the time of the misconduct at issue in this case (*e.g.*, 173 out of 195 as of December 31, 2010). Under the Terrorist Financing Convention, it is an offense to provide funds to a group with the knowledge and/or intent that such funds will be used, in whole or in part, to engage in terror attacks on civilians.**

        **4. International organizations agree that the Terrorist Financing Convention reflects established international-law norms. For example, the International Monetary Fund has referred to "legally binding international norms" prohibiting terrorist financing, "such as those contained in . . . the International Convention for the Suppression of the Financing of Terrorism." International Monetary Fund, *Suppressing the Financing of Terrorism: A Handbook for Legislative Drafting*, at 1 (2003), https://www.imf.org/external/pubs/nft/2003/SFTH/pdf/SFTH.pdf. Terror financing is specifically proscribed by a U.N. Security Council resolution, further showing that the Convention's prohibition of terrorist financing constitutes an established norm of international law. *Creation of Counter Terrorism Committee*, U.N. Doc. S/Res/1373, ¶ 1 (Sept. 28, 2001).**

        **5.** ~~2.~~ Defendants ~~aided and abetted Hezbollah's crimes against humanity and war crimes~~**have violated the law of nations. As recognized by the U.S. Government, they have financed Hezbollah terror attacks on civilians** by laundering funds through the United States, including through banks in New York. Hezbollah has been designated by the United States Department of State as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act. *See* 62 Fed. Reg. 52,650 (Oct. 8, 1997). According to a White House national security

official ~~and the U.S. Treasury Department, among others, the group has planned and conducted repeated attacks on civilians in Israel, Syria and elsewhere. *See, e.g.,*~~ <u>*"Hizballah, originally formed as a violent union of Iranian-backed extremists in Lebanon, has terrorized the Middle East and the world since its inception thirty-five years ago." See*</u> Thomas Bossert, "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (Oct. 10, 2017), *available at* https://www.whitehouse.gov/~~blog/2017/10/10/its~~<u>articles/</u>time-mobilize-global-response-terrorist-group-lebanese-hizballah; <u>*see also*</u> U.S. ~~Department of~~<u>Dep't</u> Treasury, "Treasury Targets Hizballah for Supporting the Assad Regime" (Aug. 10, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1616.aspx. ~~These attacks constitute crimes against humanity and/or war crimes in violation of the law of nations.~~ Defendants <u>have knowingly and</u> purposefully ~~aided and abetted Hezbollah's crimes against humanity~~<u>financed Hezbollah terror attacks on civilians documented by the U.S. Government and others</u> by means of the scheme at issue in this case.

<u>6.</u> ~~3.~~ Specifically, Defendants orchestrated a scheme by which LCB wired funds into and out of accounts in New York to support Hezbollah ~~crimes~~<u>attacks</u>. The details of the money laundering scheme were described in three separate enforcement actions by the U.S. Government: findings by the U.S. Treasury Department that LCB was engaged in money laundering activities ("Treasury Finding"); a civil forfeiture complaint filed by the U.S. Attorney's Office for the Southern District of New York ("Civil Forfeiture Complaint"); and a criminal indictment obtained by the U.S. Attorney's Office for the Eastern District of Virginia ("Criminal Indictment")

(collectively, "the U.S. government actions"). These documents are annexed to this ~~First~~Second Amended Verified Complaint as Exhibits A-C.

7. 4. In brief, Defendants' money laundering scheme worked as follows. First, money flowing through LCB was routed through New York banks and used to purchase used cars in the United States. Second, the cars were then shipped to West Africa, where they were sold. Third, proceeds from narcotics sales in Europe and elsewhere were mixed with the money received from the sale of the cars, then the newly laundered drug money was reintroduced into the legitimate banking sector through LCB. Finally, some of the laundered funds were sent back to the United States to purchase more cars and continue the cycle, while other funds were siphoned from the Bank to support Hezbollah, including through an entity called the Yousser Company, which the U.S. Treasury Department Office of Foreign Assets Control has described as "Hizballah's unofficial treasurer, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks." Hezbollah, in turn, used laundered monies to fund its terrorist agenda. *See generally* Civil Forfeiture Complaint.

### 5.    The funds laundered by Defendants

8. Hezbollah's terror attacks on civilians are notorious and well-documented, including in declarations filed in this case by recognized Hezbollah experts Dr. Michael Rubin and Dr. Matthew Levitt that provide specifics concerning some of those attacks. *See, e.g.*, Declaration of Michael Rubin in Opposition to Defendants' Motion to Dismiss First Amended Complaint ¶ 7 (ECF No. 76); Declaration of Matthew Levitt in Opposition to Defendants' Motion to

**Dismiss First Amended Complaint ¶ 7 (ECF No. 75). Hezbollah's terror attacks on civilians have included widespread, systematic attacks that constitute crimes against humanity.**

**9.** **As recognized by the U.S. Government and Hezbollah experts, the funds laundered by Defendants have** enabled Hezbollah to commit ~~acts in violation of the law of nations, including attacks on civilians. Among other attacks, Hezbollah has, as recognized by the White House, engaged in rocket attacks on Israeli civilians, including families and children. *See, e.g.*, Remarks by President Bush on Foreign Policy (Aug. 14, 2006); "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (Oct. 10, 2017), *available at* https://www.whitehouse.gov/blog/2017/10/10/its-time-mobilize-global-response-terrorist-group-lebanese-hizballah. Defendants' operation of the money laundering scheme to aid and abet such crimes against humanity constitutes a violation of the law of nations.~~**terror attacks on civilians. Defendants operated the money laundering scheme with the knowledge and intent that the laundered funds provided to Hezbollah would enable it to carry out such attacks. Defendants' scheme thus violates the law of nations.**

**10.** ~~6.~~ LCB suffered a substantial loss as a direct result of Defendants' acts to ~~aid and abet~~**finance** Hezbollah~~'s terror attacks on civilians~~ and ~~its~~**other** crimes against humanity **and terrorist acts** through the money laundering scheme ~~at issue in this case~~**documented by the U.S. Government and others**. In particular, in 2013 LCB was required to forfeit $102 million of Bank funds in settlement of the claims asserted in the Civil Forfeiture Complaint, effectively constituting the proceeds from a sale of LCB

assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme. In announcing the settlement, Drug Enforcement Agency head Michele Leonhart stated that the settlement "addresses the role the Lebanese Canadian Bank played in facilitating illicit money movement from the United States to West Africa to Hizballah-controlled money laundering channels," while Manhattan U.S. Attorney Preet Bharara stated that the settlement "shows that banks laundering money for terrorists and narco-traffickers will face consequences for their actions, wherever they may be located."

7. ~~In a decision last year, the Second Circuit held that aiding and abetting Hezbollah's crimes against humanity and war crimes by providing money transfer services, if proven, constitutes a violation of the law of nations that is actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350. *See Licci v. Lebanese Canadian Bank*, 834 F.3d 201 (2d Cir. 2016). This Court thus has jurisdiction to provide redress for losses suffered by LCB due to Defendants' violations of the law of nations.~~

8. ~~Defendants engaged in additional related wrongful conduct for which they are liable, as further described below, including by fraudulently inducing Plaintiffs to invest in LCB, breaching their fiduciary duties to LCB by, *inter alia*, wrongfully diverting Bank funds, including for their personal benefits, grossly mismanaging LCB, and wasting Bank assets. These actions resulted in substantial financial and reputational harm to Plaintiffs. They also resulted in substantial losses to, and the cessation of independent banking and business operations by, LCB.~~

<center>**PARTIES**</center>

A.    <u>Plaintiffs</u>

**11.**    9. Plaintiff Ghazi Abu Nahl ("Abu Nahl") is a Jordanian businessman and Group Chairman of Nest Investments (Holdings) Ltd. ("Nest Investments"). Born in Barbara, Palestine and with only a basic high school education, Abu Nahl built his businesses from the ground up. He became one of the first entrepreneurs to sell insurance policies in the region. Nest Investments owns and operates a number of businesses, primarily in the insurance and reinsurance industries, in the Middle East and North Africa ("MENA") region. Abu Nahl directly acquired a 1.36% stake in LCB.

**12.**    10. Plaintiff Nest Investments Holding Lebanon SAL is a corporate entity incorporated under the laws of Lebanon with its principal place of business in Beirut, Lebanon. Nest Investments Holding Lebanon SAL acquired a 12.5% stake in LCB. Nest Investments Holding Lebanon SAL, in turn, is principally (99%) owned by Abu Nahl. Nest Investments and Abu Nahl, together with other affiliates and associates (collectively, the "Nest Group"), owned a combined 24% stake in LCB.

B.    **Defendants**

**13.**    11. Nominal Defendant LCB is a corporate entity based in Beirut, Lebanon. LCB previously operated as a bank, offering personal and corporate banking services with branches throughout Lebanon. At its peak, LCB was the eighth largest bank in Lebanon, with assets worth more than $5 billion. LCB is currently in liquidation. In 2011, when it was forced into liquidation because of the managers' unlawful money laundering activities, LCB was worth in the range of $800 million. As a result of the liquidation and subsequent sale of substantially all of the Bank's assets triggered by the

<center>8</center>

money laundering scheme, the net proceeds from the sale of the Bank's assets will be less than $400 million. LCB remains an extant corporate entity in Lebanon, despite the sale of Bank assets.

**14.** ~~12.~~ Defendant Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He formerly served as the Chair of LCB's Anti-Money Laundering Committee. Abou Jaoude directed the affairs of the international money laundering scheme that ultimately resulted in multiple U.S. government investigations and the collapse of LCB. Through his interlocking board and management positions in LCB, Abou Jaoude directed both the money laundering operation and efforts to conceal the scheme from the Nest Group and from U.S. and other law enforcement officers and regulators. In spite of his participation in the money laundering scheme, Abou Jaoude remains active in the Lebanese banking sector and apparently in good standing with the Central Bank of Lebanon. With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering scheme and further damage Plaintiffs. Upon information and belief, Abou Jaoude, together with Hamdoun, is preparing to open a new bank in Lebanon, with the approval of the Central Bank of Lebanon.

**15.** ~~13.~~ Defendant Mohamed Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board. He served as the Vice Chair of LCB's Anti-Money Laundering Committee. Together with Abou Jaoude, Hamdoun directed the money laundering scheme detailed in this Complaint. Through his interlocking board and management positions in LCB, Hamdoun directed both the money

9

laundering operation and efforts to conceal the scheme from Plaintiffs and from U.S. and other law enforcement and regulators. In spite of his participation in the money laundering scheme, Hamdoun remains active in the Lebanese banking sector and is apparently in good standing with the Central Bank of Lebanon. With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering activities and further damage the Plaintiffs. Upon information and belief, Hamdoun, together with Abou Jaoude, is preparing to open a new bank in Lebanon, with the approval of the Central Bank of Lebanon.

**16.** ~~14.~~Defendant Ahmad Safa is the former Assistant General Manager responsible for overseeing all LCB branches. He reported directly to Abou Jaoude and functioned as Hamdoun's operational enforcer at the Bank. Through his managerial and operational roles at LCB, Safa organized and directed the day-to-day money laundering activities run through LCB. In or around 2010, Safa left the Bank and assumed a position as a Member on the Banking Control Commission, an arm of the Central Bank of Lebanon responsible for supervising and auditing banks, brokerage houses, and other financial institutions. In March 2015, Safa was reappointed to the Banking Control Commission.

**17.** ~~15.~~Defendant Oussama Salhab ("Salhab"), according to the U.S. government, is a Hezbollah operative who controls a network of money couriers based primarily in West Africa. According to the U.S. Treasury Department and the Civil Forfeiture Complaint, Salhab helped coordinate the network that ran proceeds from, and money intended to benefit narcoterrorists through, LCB into the United States and back

to Africa and the Middle East using companies under his control. Salhab worked with Defendants Abou Jaoude, Hamdoun, and Safa to coordinate the flow of currency from drug trafficking and terrorist financing operations through the Bank. Salhab also organized individual couriers who transported the proceeds of narcoterrorism into the United States.

16.    Defendant Cybamar Swiss Gmbh, LLC ("Cybamar Swiss") is a corporation headquartered in Redford, Michigan, with affiliated companies located in Europe. Cybamar Swiss's registered address is 12130 Dixie Street, Redford, Michigan 48239. Cybamar Swiss is owned, operated, or controlled by Defendant Salhab or his relatives and associates. According to the Civil Forfeiture Complaint, Cybamar Swiss is a shipping company used by the U.S.-based network of money launderers to ship used cars purchased with the proceeds of international drug trafficking to West Africa for sale. Defendant Salhab and his money couriers traveled to the United States to advance the money laundering scheme, ostensibly to conduct business on behalf of Cybamar Swiss.

**18.**    17. Defendant Ayman Saied Joumaa ("Joumaa") has been designated by the U.S. Department of Treasury as a Drug Kingpin under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901—08.-**1908.** According to the Treasury Department, Joumaa controls and directs an international network of traffickers and launderers that transports, distributes, and sells multi-ton shipments of South American cocaine to West Africa. In 2011, Joumaa was charged in the Eastern District of Virginia with conspiracy to distribute narcotics and conspiracy to launder money for his role in coordinating the shipment of tens of thousands of kilograms of cocaine,

including to Mexican drug cartels, and laundering hundreds of millions of dollars in proceeds generated from narcotics sales in the United States, Europe, West Africa, and Mexico.

**19.** ~~18.~~ Joumaa operated his network in substantial part for the benefit of Hezbollah.  According to **the** Under Secretary for Terrorism and Financial Intelligence ~~David S. Cohen~~, "[t]he Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."

**20.** ~~19.~~ According to the U.S. Government, Defendant Mahmoud Hassan Ayash ("Hassan Ayash") is a Hezbollah operative who facilitates bulk cash transfers and money laundering for Defendant Joumaa and other narcoterrorists.  He has family ties to Secretary General Hassan Nasrallah, the leader of Hezbollah.  The U.S. government has asserted that Hassan Ayash (1) helped connect and facilitate the money laundering scheme between Joumaa and Bank managers, including Defendants Abou Jaoude, Hamdoun, and Safa, and (2) helped coordinate wire transfers through the Bank to the United States for the purpose of laundering drug proceeds, by purchasing used cars in the United States and shipping them to West Africa.

~~20.     Defendant Hassan Ayash Exchange Company ("Hassan Ayash Exchange") is a money exchange company in Beirut, Lebanon.  It is owned and controlled by Defendant Hassan Ayash and his son Hassan Mahmoud Ayash.  The U.S. government has found that the Hassan Ayash Exchange facilitates bulk cash transfers and launders money for Defendant Joumaa's narcoterrorism network.  According to the U.S. Government, Defendants Abou Jaoude, Hamdoun, Safa,~~

12

Joumaa, and Hassan Ayash used the Hassan Ayash Exchange to originate wire transfers to the United States to fund the purchase of used cars; the wire transfers and car purchases were part of the money laundering scheme run through the Bank and were intended to disguise and conceal the source, nature, ownership, and control of proceeds of narcotics trafficking.

21. Defendant Ellissa Holding Company owns and controls multiple companies based in Lebanon, Benin, and the Democratic Republic of the Congo, including the Ellissa Exchange Company ("Ellissa Exchange"), a money exchange in Sarafand, Lebanon. The U.S. government has asserted that the Ellissa Exchange facilitates bulk cash transfers and launders money for Defendant Joumaa's narcoterrorism network. Defendants Abou Jaoude, Hamdoun, Safa, Joumaa, and Hassan Ayash were reported to have used the Ellissa Exchange to originate wire transfers to the United States to fund the purchase of used cars. The wire transfers and car purchases reportedly were part of the money laundering scheme run through the Bank and were intended to disguise and conceal the source, nature, ownership, and control of proceeds of narcotics trafficking. The Ellissa Holding Company also owns and controls Ellissa Group SA, which owns a car park in Benin used for receiving used cars shipped from the United States and Ellissa Shipping, which is alleged to have transported some of the cars involved in the money laundering scheme. The Ellissa Holding Company is reported to be controlled by Jamal Mohamad Kharoubi and Ali Mohammed Kharroubi, a self-proclaimed supporter of Hezbollah.

## JURISDICTION AND VENUE

21. 22. This Court has jurisdiction pursuant to 28 U.S.C. § 1350 (the Alien Tort ~~Claims Act~~**Statute**).

22. 23. In addition, Plaintiffs invoke the supplemental jurisdiction of this Court, 28 U.S.C. § 1367, over their non-federal claims.

23. 24. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the actions and omissions giving rise to the claims herein complained of occurred in this District.

24. 25. This Court has personal jurisdiction over Defendants because Plaintiffs' claims are based, *inter alia*, on Defendants' purposeful acts to coordinate their money laundering scheme through banks in New York. In particular, Defendants Abou Jaoude, Hamdoun, and Safa, through their control of LCB, repeatedly caused funds to be transferred by wire through LCB correspondent accounts in New York; such transfers formed an essential part of Defendants' scheme; and such transfers were purposefully and deliberately routed through various banks in this district for the purpose of purchasing used cars in Michigan and otherwise advancing the laundering scheme described in this action. The Treasury Finding specifically states that Abou Jaoude, Hamdoun, and the managers of key LCB branches "are in frequent—in some cases even daily—communication with the various members of the . . . drug trafficking and money laundering network, and they personally process transactions on the network's behalf."

25. 26. While the principal parties to this action are foreign, the very purpose of the Alien Tort ~~Claims Act~~**Statute** is to provide a federal forum to adjudicate claims by aliens to redress torts committed in violation of the law of nations, where, as here, such torts have a nexus to the United States. **Defendants' torts here—the U.S.**

**Government-documented laundering of funds to finance Hezbollah terror attacks on civilians—were conducted through the use of New York banks and Michigan used car dealers, and those torts thus touch and concern the United States.**

**26.** ~~27.~~Adjudication of Plaintiffs' claims in the United States is especially appropriate here because the claims cannot be fairly adjudicated in Lebanon. Hezbollah's strong influence over the Lebanese government is well-documented. For example, *Newsweek* magazine reported ~~earlier this~~last year that "Hezbollah is seizing the [Lebanese] state's institutions one by one . . . Slowly but surely, [Hezbollah] is clearing its own path towards full control of Lebanon's government." According to Faysal Itani, a senior fellow and counter-terrorism expert at the Atlantic Council in Washington, D.C., "I do not see [Hezbollah] as separate from the Lebanese government." Lebanon's justice minister resigned in 2016, citing what he called Hezbollah's "domination" of the country's government. According to a White House national security official, "[f]or decades, this terrorist organization [Hezbollah] has tried to disguise its murderous intentions under the guise of political legitimacy." *See* "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah," (Oct. 10, 2017), *available at* https://www.whitehouse.gov/blog/2017/10/10/its-time-mobilize-global-response-terrorist-group-lebanese-hizballah. The White House national security official further noted that "[t]oday, Hizballah and its political allies hold half of the seats in Lebanon's Cabinet and nearly half of the seats in its National Assembly," while concluding that "[t]he same Hizballah officials responsible for its political apparatus oversee its terrorist planning." *Id.*; *accord* **Tony Badran,** *Lebanon Is Another Name for Hezbollah***, Found. Def. Democracy (July 26, 2017),**

**http://www.defenddemocracy.org/media-hit/lebanon-is-another-name-for-hezbollah** ("Hezbollah, of course, controls the Lebanese government . . . The Lebanese state, in other words, is worse than a joke. It's a front . . . ."); *see also* Rubin Decl. ¶ 21 ("Hezbollah, a U.S.-designated terrorist group, dominates the political infrastructure of Lebanon. This includes the Lebanese judiciary. The group has significant influence over judicial decisions and has demonstrated an ability to derail open judicial inquiry into itself and its members. At present, it is impossible for allegations against Hezbollah to be decided impartially in Lebanon."); Levitt Decl. ¶ 17 ("Hezbollah's influence in the Lebanese government extends well into the country's judicial system").

27. ~~28.~~ The State Department has specifically recognized that the Lebanese judiciary has long been subject to Hezbollah pressure, finding that "[t]he Constitution provides for an independent judiciary; however, in practice, it was subject to political pressure . . . Lebanese and Palestinian militias, particularly Hizballah, retained significant influence over much of the country." *2004 Country Reports on Human Rights Practices: Lebanon,* U.S. Dep't State (Feb. 28, 2005). Lebanon's Ministry of Justice exercises significant control over the country's judiciary. As a result, the Lebanese judiciary lacks judicial independence from the political branches of government, which are, in turn, dominated by Hezbollah.

28. ~~29.~~ Due to Hezbollah's power in Lebanon, Lebanese courts do not provide an adequate forum to adjudicate Plaintiffs' claims, which are based on a money laundering scheme to benefit Hezbollah. Put simply, a system dominated by Hezbollah

cannot be expected fairly to adjudicate claims based on a wide-ranging international scheme whose very purpose is to launder funds to support Hezbollah's terrorist activities.

      **29.**    ~~30.~~ Plaintiffs' inability to obtain relief in Lebanon is exacerbated by the fact that political corruption and bribery is notorious in that country. According to Transparency International's Corruption Perceptions Index, Lebanon is more corrupt than over 135 other countries, including Brazil, Russia, Iran, and Kazakhstan.

      **30.**    ~~31.~~ Corruption has specifically stood in the way of Plaintiffs obtaining redress in Lebanon for injuries resulting from Defendants' laundering scheme. As explained more fully below, the Governor of the Central Bank of Lebanon exerts substantial personal control over the banking sector in the country. For example, only at the Governor's direction may the Central Bank lift the country's Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing, including money laundering. Plaintiffs have repeatedly raised issues concerning LCB with the Central Bank of Lebanon, but the Central Bank has turned a blind eye to these issues. Because the Central Bank must authorize prosecutors to investigate and develop evidence of money laundering under Lebanese rules, the Central Bank Governor's refusal to authorize such investigation has frustrated Plaintiffs' ability to obtain redress in Lebanon, despite good-faith efforts to do so beginning in or about February 2011. Hamdoun has claimed to have a close personal relationship with the Central Bank Governor and, on information and belief, has used this relationship to cause the Central Bank to turn a blind eye to Defendants' money laundering scheme.

## FACTUAL ALLEGATIONS

A.  **History of the Nest Group and Abu Nahl**

**31.** ~~32.~~ Nest Investments (Holdings) Ltd. is a group company established in 1989 by Abu Nahl, a Jordanian businessman with over 45 years' experience in the highly regulated insurance sector.  Under Abu Nahl's leadership, Nest Investments (Holdings) Ltd. and its affiliated companies ("Nest Companies") expanded their operations to 23 countries in North America, Europe, Africa, the Middle East, Asia, and Australia.

**32.** ~~33.~~ Abu Nahl was born in Palestine in 1946.  In 1962, Abu Nahl's father borrowed money to send Abu Nahl to high school in Egypt.  Worried about the toll this sacrifice would take on his father and the rest of his family, Abu Nahl returned to Palestine after 40 days and returned the money intended for his schooling to his father.  Abu Nahl then moved to Qatar in 1964 to find work.  Soon, he heard about a concept that, at the time, was foreign in the Persian Gulf region:  insurance.  He began selling insurance policies.  After his initial success in the insurance industry, Abu Nahl arranged a meeting with the Emir of Qatar to discuss the importance of insurance.  Soon, Qatar required all automobile owners to carry insurance on their cars.  Abu Nahl was the founder of one of the first Persian Gulf insurance companies, now the Nest Companies.

**33.** ~~34.~~ The Nest Companies own and operate a number of insurance and reinsurance companies.  The Nest Companies also own investments in real estate and other industries.  They employ around 2,000 people worldwide.

**34.** ~~35.~~ The Nest Companies have a solid and hard-earned reputation in the insurance industry.  One of the leading insurance rating agencies, A.M. Best, has assigned Trust International Insurance and Reinsurance Company B.S.C. ("Trust Re"),

the Nest Group's primary insurance and reinsurance company, an A- Rating – which A.M. Best classifies as "Excellent." When A.M. Best most recently reaffirmed Trust Re's Excellent rating in August 2017, it wrote: "[t]he ratings reflect Trust Re's good risk-adjusted capitalisation, track record of strong operating performance and good business profile." In particular, A.M. Best highlighted Trust Re's "disciplined risk selection" and "prudent reserving policy." Another leading rating agency, Standard & Poor's, also gave Trust Re an A- rating in 2014, writing "[t]he rating reflect our view of the group's satisfactory business and strong financial risk profiles, built on an adequate competitive position, very strong capital and earning, and a moderate risk position."

**35.** ~~36.~~ Abu Nahl also currently serves as Director of the World Trade ~~Center~~**Centers** Association, a non-profit organization that partners with commercial property developers, economic development agencies, and international businesses to promote trade and investment in more than 90 countries around the world. Abu Nahl's involvement with the World Trade ~~Center~~**Centers** Association began around 1995. When he was elected Chair of the organization in 2008, he quickly applied his corporate governance expertise to establish systems and proper controls throughout the organization to improve its functioning and services. The Association is now more transparent and applies worldwide standards on corporate governance, including risk management, internal auditing, transparency, high-level financial reporting, and independent board elections.

**B.** **Nest Group's Initial Involvement with LCB**

**36.** ~~37.~~ In 2000, the Nest Group expanded its insurance operations into Algeria, establishing Trust Algeria Insurance and Reinsurance. Impressed with the Nest Group's successful establishment of insurance operations, the Algerian authorities asked

the Company to establish a bank in the country. In 2002, Algeria granted the Nest Group a banking license and the Company founded Trust Bank Algeria ("TBA") in Algiers.

**37.** ~~38.~~ The Algerian banking sector is highly regulated, with the Algerian Central Bank tightly controlling which banks may operate and who may own or control shares in banks in the country. The banking sector is heavily dominated by state-owned banking operations. Because private banks are rare in Algeria, the Nest Group's Algerian banking license and its control and operation of TBA are both unusual and highly coveted by other companies seeking access to the Algerian banking sector. When TBA was established by the Nest Group in 2002, other banking operations were actively seeking investment opportunities in entities with Algerian banking licenses because of the promise of substantial profits. Expansion into the Algerian banking sector was difficult, however, because of the scarcity of private enterprises with banking licenses.

**38.** ~~39.~~ In 2005, three years after TBA's founding, the Algerian Central Bank required all banks in the country to increase their capital. In part because the Nest Group wanted to diversify its investment risk, it began looking for other investors in TBA. Abu Nahl and the Nest Group were particularly interested in partnering with an investor who could offer additional banking experience and expertise.

**39.** ~~40.~~ During this search for a strategic banking partner, Abu Nahl and the Nest Group had discussions with several different banking organizations, including LCB. In 2005, Defendant Abou Jaoude approached Abu Nahl to discuss his interest in organizing an investment in TBA by LCB.

**40.** ~~41.~~ At the time, Abou Jaoude was under considerable personal financial strain. He had accumulated at least $15 million in private debt with multiple

banks in Lebanon and elsewhere. As a result, he lacked the necessary capital to simply purchase a stake in TBA. To help fund the acquisition of TBA, Abou Jaoude proposed a separate transaction under which he would sell the Nest Group a minority stake in LCB.

**41.** ~~42.~~ At the time, Abou Jaoude's proposal seemed attractive to Abu Nahl and the Nest Group. Among other things, the Nest Group consulted banking almanacs, which listed LCB as one of the top ten banks in Lebanon. In addition, the Nest Group at the time believed that the banking expertise of Abou Jaoude and LCB would be beneficial to the operations of TBA.

**42.** ~~43.~~ The Nest Group (including Plaintiffs) acquired a 24-percent stake in LCB through a series of transactions between late 2005 and late 2007. In exchange for its minority, non-controlling share of the Bank, the Nest Group, including Plaintiffs, paid LCB a total of more than $57 million. The last of these transactions was completed in 2007.

### C.     Defendants' Money Laundering Scheme

**43.** ~~44.~~ When Abu Nahl was initially negotiating with Abou Jaoude to acquire a stake in LCB, he did not know that Abou Jaoude had an ulterior motive for wanting the deals to advance: Abou Jaoude and Hamdoun wanted control of TBA to further a money laundering scheme to benefit Hezbollah and to enrich themselves at LCB's expense. As discussed below, Abou Jaoude and Hamdoun had established secretive banking operations in Gambia and Congo which, upon information and belief, they used to advance their laundering scheme. Adding operations in Algeria would further benefit the scheme.

**44.** ~~45.~~The port in Algiers, where TBA is headquartered, is one of the busiest in Algeria, with heavy cargo and tanker traffic to and from Europe and elsewhere, and frequent passenger ferry service to and from France and Spain.

**45.** ~~46.~~Moreover, a majority of the proceeds received by the drug trafficking ring operated by Defendant Joumaa from drug sales in Europe was generated in Spain, making Algeria a convenient access point for receiving and laundering those illicit proceeds. Laundering of the drug proceeds was a key element in the overall scheme.

**46.** ~~47.~~Joumaa, sometimes identified by his alias "Junior," is a dual Lebanese and Colombian citizen. According to the Criminal Indictment, Joumaa led a drug trafficking network that spanned from South America to Africa and stretched up into both the United States and Europe. Operations in Lebanon, West Africa, Panama, and Colombia formed the backbone of Joumaa's trafficking network.

**47.** ~~48.~~According to the Criminal Indictment, Joumaa and his organization played a dual role in the drug trafficking operation. First, Joumaa coordinated the shipment of narcotics, tens of thousands of kilograms of cocaine, from Colombia through Central America and Mexico, to the United States. Second, beginning around 1997 through at least 2010, he helped coordinate the laundering of hundreds of millions of dollars in proceeds from drug sales in the United States, Europe (predominantly Spain), Mexico, and Central America. Joumaa reportedly charged a fee of between 8 and 14 percent for laundering the proceeds of international drug sales. As noted above, according to **the** Under Secretary for Terrorism and Financial Intelligence ~~David S. Cohen~~, "[t]he Joumaa network is a sophisticated multi-national money

laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."

48. 49. Defendant Salhab ran an international network of money couriers centered in West Africa, as described in both the Treasury Department Finding and the Civil Forfeiture Complaint. According to those documents, Salhab's couriers transport currency in bulk through West Africa to Lebanon, as well as into the United States. The money transported by Salhab's couriers included the proceeds of illegal drug sales in Europe, particularly Spain, destined for laundering by Joumaa's organization.

49. 50. Around the mid-2000s, much of Joumaa's drug trafficking operation and Salhab's money courier network in Africa was centered in Benin, Togo, and the Democratic Republic of the Congo. Upon information and belief, Joumaa and Salhab were interested in expanding their operations into Northern Africa because of its proximity to Europe and especially Spain, where many of the proceeds of illegal narcotics sales were generated. Algeria was a prime candidate into which Joumaa and Salhab wished to expand their narcoterrorism network.

50. 51. Additionally, and unbeknownst to Abu Nahl and the Nest Group when they were negotiating the LCB deal in 2005 and 2006, Abou Jaoude and Hamdoun also planned to use LCB and TBA to siphon off money for their personal use. With at least $15 million in private debt with multiple banks in Lebanon and elsewhere, Abou Jaoude had a pressing need to increase his own access to capital to satisfy his debts. In addition to supporting Hezbollah, Abou Jaoude hoped through the money laundering scheme to increase the amount of capital flowing through banks under his control, making it easier to siphon off funds for personal use without detection.

**51.** ~~52.~~ Abou Jaoude and Hamdoun actively concealed their scheme to use the banks to facilitate an international money laundering operation for the benefit of themselves and Hezbollah at (and after) the time that Abu Nahl and the Nest Group were induced to invest in LCB.

**52.** ~~53.~~ The plan hatched by Abou Jaoude and Hamdoun was simple: using their control over the banks, they would establish systems to allow money to be laundered efficiently and without detection. Once those systems were in place, Joumaa would begin laundering drug proceeds from Europe and Africa and, as detailed in the Criminal Indictment, would take a percentage fee for laundering the money. Salhab's operation, as described in the Civil Forfeiture Complaint, would provide transportation services for the goods and money involved in the scheme. Hezbollah would benefit from the scheme through, *inter alia*, the ability to use laundered funds to finance its **terror attacks on civilians and other acts of terrorism and** crimes against humanity. Abou Jaoude, Hamdoun, and Safa in turn would profit from the increased flow of money through the banks which would, among other things, enable them to siphon off more money for their own personal use.

**53.** ~~54.~~ On November 30, 2006, Joumaa opened a bank account at LCB to commence the money laundering operations.

**54.** ~~55.~~ As part of the money laundering scheme, Abou Jaoude, Hamdoun, and Safa continuously and repeatedly used LCB to wire substantial amounts of U.S. currency to used car buyers throughout the United States. These wire transfers passed through correspondent banks in New York. To conduct these transfers, LCB maintained correspondent banking relationships with the Bank of New York Mellon,

Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank in New York. Defendants caused LCB to utilize these correspondent relationship to further the scheme.

**55.** ~~56.~~ According to the Civil Forfeiture Complaint, Joumaa and the individuals and entities associated with his organization originated approximately $62 million in wire transfers through LCB between 2006 and 2011. Ayash and the individuals and entities associated with his organization originated at least $32 million in wire transfers through LCB between 2006 and 2011. Salhab and the individuals and entities associated with his organization originated at least $7.5 million in wire transfers through LCB between 2006 and 2011.

**56.** ~~57.~~ As described in greater detail in the Civil Forfeiture Complaint, the wire transfers typically were for tens of thousands of dollars each, with some U.S. car buyers receiving a handful of wire transfers between 2007 and 2011, and others receiving hundreds of transfers. For example, during that time period, MGM Global Trading, LLC in South Windsor, Connecticut received 353 wire transfers totaling almost $33.5 million and World Auto Sales, LLC in Birmingham, Alabama received 490 wire transfers totaling over $24 million. Together, between 2007 and 2011, 30 used car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee received over 3,500 wire transfers totaling nearly $250 million.

**57.** ~~58.~~ Among the used car purchasers that received wire transfers was United Auto Enterprize, Inc., which, according to corporate records maintained by the Michigan Department of Licensing and Regulatory Affairs was registered on March 21,

2007 by Rola Salhab.  Upon information and belief, Rola Salhab is related to Defendant Salhab.  ~~United Auto Enterprize's registered address in Redford, Michigan is the same as Cybamar Swiss's registered address.~~

**58.**  ~~59.~~ On February 2, 2007, Fadi Salhab, who is a member of Defendant Salhab's family, registered **an entity called** Cybamar Swiss Gmbh, LLC with the Michigan Department of Licensing and Regulatory Affairs.  On January 28, 2008, another member of the Salhab family, Dina Salhab, registered another affiliated company, Cybamar USA, LLC, with the Michigan Department of Licensing and Regulatory Affairs.  Cybamar Swiss and Cybamar USA share the same registered address in Redford, Michigan.

**59.**  ~~60.~~ According to the Treasury Finding and the Civil Forfeiture Complaint, the car buyers in the United States would use the money wired through LCB and correspondent banks in New York to purchase used cars.  These used cars were then shipped to various ports in West Africa, including in Benin and Togo.  Cybamar Swiss, a shipping company, was frequently used to transport the cars to West Africa.

**60.**  ~~61.~~ According to the Treasury Finding and Civil Forfeiture Complaint, after the cars arrived in West Africa, Joumaa and Salhab's networks purchased them using, at least in part, bulk currency generated from narcotics sales in Europe (primarily Spain) and Africa.  For example, as detailed in the Civil Forfeiture Complaint, Salhab owned and controlled STE Nomeco SARL, which owned and operated used car lots in Benin.  The used cars shipped from the United States were purchased in these and other used car lots using proceeds from Joumaa's international drug trafficking ring.

**61.** ~~62.~~ According to the Civil Forfeiture Complaint, once the cars were sold, Salhab's money courier network transported the currency overland or by air from West Africa to Lebanon. When the currency arrived in Lebanon, it was deposited either in LCB accounts, or with the Hassan Ayash Exchange or the Ellissa Exchange, **entities controlled by defendants**.

**62.** ~~63.~~ LCB maintained substantial banking relationships with both the Hassan Ayash Exchange and the Ellissa Exchange. LCB maintained these and other relationships at the direction of Abou Jaoude and Hamdoun and in spite of mounting evidence of the Ayash and Ellissa Exchanges' involvement in narcoterrorism and money laundering. Indeed, given concerns about potential money laundering activity, at least one other Lebanese bank had refused to continue doing business with the Ellissa Exchange.

**63.** ~~64.~~ According to the Civil Forfeiture Complaint, an internal LCB customer due diligence report found that the Ellissa Exchange and its principals were involved in smuggling bulk currency out of Africa, including through flights from Ghana to Beirut. The report also noted that the Bank had limited and incomplete "Know Your Customer" files for the Ellissa Exchange. In particular, the due diligence report highlighted large cash deposits into LCB accounts held by the Ellissa Exchange principals, transactions inconsistent with the nature and purpose of those accounts, and the Ellissa Exchange's failure to provide information about the nature and purpose of the suspicious transactions. Upon information and belief, Abou Jaoude, Hamdoun, and Safa concealed the due diligence report and directed other Bank employees to ignore substantial violations of LCB's anti-money laundering and compliance policies.

**64.** ~~65.~~ LCB policy required disclosure of the source of funds of any cash deposit greater than $10,000. For each such cash deposit, this information was supposed to be recorded on a Cash Transaction Slip ("CTS"). LCB was then required to file each CTS with the Central Bank of Lebanon.

**65.** ~~66.~~ As detailed in the Civil Forfeiture Complaint, Safa granted exceptions to certain LCB clients to allow them to deposit more than $10,000 in cash without filing a CTS. A number of the clients Safa exempted from the CTS policy had ties to Hezbollah and had been named as money launderers and terrorists by the United States government. As detailed in the Civil Forfeiture Complaint:

      a. Safa exempted the Yousser Company, an LCB client, from the CTS policy, allowing it to deposit up to $50,000 per week in cash at LCB's Nabatieh branch and up to $60,000 per day in cash at LCB's Airport Road branch without disclosing the source of the funds.

      b. Safa also exempted the Farah Company for Tourism, a subsidiary of the Yousser Company, from the CTS policy. The Farah Company for Tourism was allowed to deposit around $33,000 per week at the Nabatieh branch without disclosing the source of the funds.

      c. Safa exempted two of the owners of the Yousser Company, Hussein Ali Mohamed Chami (sometimes called Husayn al-Shami) and Wahid Mahmoud Sbeity, from the CTS policy. Al-Shami and Sbeity were allowed to deposit up to $30,000 per week in cash at the Nabatieh branch without disclosing the source of the funds. Al-Shami and two other Yousser Company directors were also allowed to deposit a total of

$332,000 per day in cash at the Airport Road Branch without disclosing the source of the funds.

66. 67. The U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") is empowered under various Executive Orders to name individuals and organizations as Specially Designated Global Terrorists if it finds they have or are likely to commit terrorist acts, or they provide support or associate with terrorists or terrorist organizations. Various U.S. sanctions apply to individuals and organizations that OFAC names Specially Designated Global Terrorists. In 2006, OFAC named the Yousser Company a Specially Designated Global Terrorist organization. OFAC has described the Yousser Company and another entity as "Hizballah's unofficial treasurer, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks." OFAC has also named Al-Shami as a Specially Designated Global Terrorist.

67. 68. Defendant Safa's direction that LCB grant exemptions to the Yousser Company and affiliates facilitated their ability to conduct financial transactions on Hezbollah's behalf through LCB, despite the imposition of U.S. sanctions.

68. 69. Taken together, Safa, at the direction of Abou Jaoude and Hamdoun, permitted government-identified terrorists and terrorist organizations to deposit at least $200 million in cash per year without disclosing the source of the funds. The money laundering operation, largely run through Joumaa and Salhab's organizations, used these exceptions to funnel the proceeds of illegal narcotics sales and other illicit operations into the legitimate banking sector.

**69.** ~~70.~~Abou Jaoude and Hamdoun used LCB operations in West Africa, including Prime Bank Gambia, to help facilitate their money laundering scheme. They intentionally kept LCB operations in the region shrouded in secrecy to hide their illicit activities. They also intentionally did not implement proper compliance and control measures in LCB West African operations in order to conceal their money laundering scheme.

**D. Use of the Money Laundering Scheme to Advance Hezbollah's ~~Crimes Against Humanity and War Crimes~~Terror Attacks on Civilians.**

**70.** ~~71.~~Hezbollah was formed in Lebanon in around 1982. It has been designated as a terrorist organization under the U.S. Terrorism Sanctions Regulations, 60 Fed. Reg. 5079 (Jan. 23, 1997), the Foreign Terrorist Organizations Sanctions Regulations, 62 Fed. Reg. 52,650 (Oct. 8, 1997), the Global Terrorism Sanctions Regulations, 67 Fed. Reg. 12,633 (Mar. 19, 2002), and the Iran and Syria Nonproliferation Act, 72 Fed. Reg. 20,158 (Apr. 23, 2007).

**71.** ~~72.~~As set forth in the Treasury Finding, Hezbollah "derived financial support from the criminal activities" of the money laundering network at issue in this case and LCB managers were "complicit in the network's money laundering activities."

**72.** ~~73.~~During the period relevant to this action, Hezbollah—directly or through surrogates—maintained bank accounts at various LCB branches in Lebanon. Defendants Abou Jaoude, Hamdoun, and Safa operated LCB in a manner to permit Hezbollah to use these accounts for money transfers, including to fund its terrorist activities. Specifically, Defendants Abou Jaoude, Hamdoun, and Safa directed LCB to

ignore various requirements that would have prohibited LCB from conducting fund transfers on behalf of Hezbollah. Moreover, according to the Civil Forfeiture Complaint, (1) Joumaa used Hezbollah couriers to transport currency in bulk and (2) Salhab routinely paid Hezbollah a fee to provide security for currency transport operations, particularly when the currency was transported through the Beirut International Airport.

73. ~~74. Between 2005 and 2011,~~According to Hezbollah **experts, including Dr. Matthew Levitt and Dr. Michael Rubin, Hezbollah has** plotted and/or committed numerous ~~violations of the law of nations. For instance, in July and August 2006, Hezbollah fired thousands of rockets at civilians in Israel, injuring or killing dozens. *See* Remarks by President Bush on Foreign Policy (Aug. 14, 2006). Hezbollah has also plotted multiple other attacks directed at Israeli civilians. *See, e.g., id.* In addition to its targeting of Israeli civilians,~~**terror attacks on civilians in multiple countries during the period relevant to this action. *See, e.g.*, Rubin Decl. ¶ 7; Levitt Decl. ¶ 7. As just one example among others, Dr. Levitt and Dr. Rubin explain that Hezbollah has been actively involved in the Syrian civil war, which began in early 2011, serving as a mercenary force for both Syrian President Bashar al-Assad and Iran's Islamic Revolutionary Guard Corps. Hezbollah has acted as "muscle" for Syrian President Bashar al-Assad's regime and has repeatedly engaged in terror attacks on civilians, including, for example, by conducting summary executions of civilians. *See* Rubin Decl. ¶ 7; *see also* Levitt Decl. ¶ 7.**

74. **In August 2012,** the U.S. **Treasury** Department ~~of Treasury has taken measures against Hezbollah based on its~~**blacklisted Hezbollah, already on the Department's terrorism list, for providing** support ~~of~~**to** the Assad regime ~~in~~**during** the

Syrian civil war ~~beginning in early 2011, emphasizing,~~ **where civilians have been repeatedly targeted. Treasury emphasized** the organization's "integral role in the continued violence the Assad regime is inflicting on the Syrian population."

**75.** **According to the U.S. Government and Hezbollah experts Dr. Matthew Levitt and Dr. Michael Rubin,** Hezbollah has required funds and financial services to plan, prepare for, and carry out its **attacks on civilians and other** terrorist attacks and ~~other~~ crimes against humanity~~, in violation of the law of nations~~. *See***,** *e.g.,* **Levitt Decl. ¶¶ 8-13;** *see also* Hizballah International Financing Prevention Act of 2015, Pub. L. **No.** 114-102, 129 Stat. 2205. **Indeed, according to Dr. Levitt, Hezbollah relies heavily on international money laundering and drug trafficking to support such terror attacks. Levitt Decl. ¶¶ 8-13.** Defendants Abou Jaoude, Hamdoun and Safa knew that Hezbollah had this need and purposefully caused LCB to provide financial support to Hezbollah as described herein. Hezbollah **has** used such financial support ~~in furtherance of its~~**to further its terror attacks on civilians and other acts of terrorism and** crimes against humanity ~~and war crimes~~. *Id.*

**76.** Defendants' intent to support Hezbollah~~'s activities in violation of the law of nation~~ **terror attacks** is further established by the fact that Hezbollah is subject to strict economic sanctions imposed by the United States. Such sanctions are intended to prevent Hezbollah from conducting banking activities, and thereby limit its ability to carry out terrorist attacks and other crimes against humanity. *Id.* During the period relevant hereto, however, LCB did not recognize or enforce the sanctions imposed by the United States, with Defendants Abou Jaoude, Hamdoun, and Safa directing LCB and its officers and employees not to enforce these sanctions. They did so to permit the

conduct of transactions benefitting Hezbollah through the Bank and thus to facilitate the

funding of Hezbollah's terrorist activities.

E.     The ~~Central Bank of Lebanon's Complicity in the Money Laundering Scheme~~Terrorist Financing Convention

77.     The United Nations adopted the Terrorist Financing Convention in 1999 and it took effect in April 2002.  The Terrorist Financing Convention recognizes international norms prohibiting the financing of attacks on civilian populations.  As a consequence of the well-recognized nature of these norms, adoption has been rapid.  As of December 31, 2010, 173 countries were parties to the Convention; and as of the date of this Second Amended Complaint, 188 countries — more than 96% of the independent states in today's world — are parties.  The Terrorist Financing Convention thus sets forth norms of international law that are recognized by the overwhelming majority of nations.

78.     International organizations agree that the Convention reflects established international-law norms.  For example, the International Monetary Fund has referred to "legally binding international norms" prohibiting terrorist financing, "such as those contained in . . . the International Convention for the Suppression of the Financing of Terrorism."  International Monetary Fund, *Suppressing the Financing of Terrorism: A Handbook for Legislative Drafting*, at 1 (2003), https://www.imf.org/external/pubs/nft/ 2003/SFTH/pdf/SFTH.pdf.  Terror financing is also specifically proscribed by a U.N. Security Council resolution addressing the issue, further showing that the Convention's prohibition of terrorist financing constitutes an established norm of international law.  *See Creation of Counter Terrorism Committee*, U.N. Doc. S/Res/1373, ¶ 1 (Sept. 28, 2001).  The

Security Council resolution provides, *inter alia*, that States "shall (a) Prevent and suppress the financing of terrorist acts; [and] (b) Criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist acts." International law scholars concur that terror financing violates the law of nations. *See, e.g.,* Anthony Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law,* 48 Harv. Int'l L.J. 121, 179-86 (2007).

79. The Terrorist Financing Convention imposes legal obligations on parties to enact implementing laws and regulations. *See* art. 4. The United States, among other nations, has done so. *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. No. 107-197, tit. II, § 202(a).

80. The Terrorist Financing Convention sets forth specific, well-defined proscriptions against providing financial assistance to groups with the knowledge and/or intent that such funds will be used, *inter alia,* to carry out terror attacks on civilians. Article 2.1(b) provides that:

> "Any Person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part . . . to carry out . . . [an] act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

**81.** **The norms contained in the Terrorist Financing Convention are matters of mutual concern among nations. Indeed, the Preamble to the Convention specifically states that "the financing of terrorism is a matter of grave concern to the international community *as a whole*," requiring collective action for the "maintenance of international peace and security." (Emphasis added.)**

**82.** **Defendants have violated norms of international law recognized by the Terrorist Financing Convention by laundering funds for Hezbollah, with the knowledge and intent that such funds would be used, in whole or in part, to perpetrate terror attacks on civilians. As recognized by Hezbollah experts, such attacks have included attacks in multiple countries (*see, e.g.,* Rubin Decl. ¶ 7; Levitt Decl. ¶ 7), and the purpose of such attacks has been to intimidate civilian populations (*e.g.,* by acting as muscle against civilians in Syrian regions that have opposed the Assad regime, *see* Rubin Decl. ¶ 7), and/or to compel government action.**

**83.** **Defendants' laundering of funds to finance the Hezbollah terror attacks on civilians documented by the U.S. Government and by Hezbollah experts were tortious acts that violated the law of nations. LCB and its shareholders were injured by those tortious acts.**

**F.      The Lebanese Central Bank's Complicity in Defendants' Scheme**

**84.**     ~~77.~~ The Lebanese banking sector is one of the most financially active in the Middle East, and also one of the least transparent. Lebanon has a strict Bank Secrecy Act that allows account holders to conduct their affairs with essentially no scrutiny. In the Bureau of International Narcotics and Law Enforcement Affairs' 2014

International Narcotics Control Strategy Report, the U.S. Department of State stated that "Lebanon faces significant money laundering and terrorism financing challenges," particularly given the "substantial influx of remittances from expatriate[s]" into the country and the involvement of many Lebanese abroad in "underground finance and trade-based money laundering (TBML) activities," like the used car scheme operated through LCB.

85. 78. Other countries in the Middle East and North Africa region have raised similar concerns about money laundering and terrorism financing in Lebanon. A 2009 report by the Middle East and North Africa Financial Action Task Force ("MENAFATF"), a voluntary organization of nation states in the region, said Lebanon had a "special susceptibility" to money laundering and terrorism financing and had failed to issue "all legal instruments needed to comply with the main requirements stated in the 40 Recommendations and 9 Special Recommendations [from the Financial Action Task Force] for [Anti-Money Laundering and Combating Financing of Terrorism]."

86. 79. In particular, the MENAFATF report noted that Lebanon did not require financial institutions "to report any transaction suspected to be related to terrorism financing crimes," nor were such institutions required to report "suspicious transactions attempts." The report concluded that "from the practical aspect, the competency and efficiency of [financial institutions] in reporting is not up to the level required or appropriate, in light of the numerous reporting cases by banks, and its low number or even absence on part of the remaining institutions."

87. 80. Ultimately, the MENAFATF report rated Lebanon on its compliance with 49 international recommendations to combat money laundering and

terrorism financing. In the report, Lebanon's regional neighbors found the country only partially compliant or not at all compliant with 26 of the 49 recommendations.

**88.** ~~81.~~ The Governor of the Central Bank of Lebanon exerts substantial personal control over the banking sector in the country. For example, the Central Bank lifts the Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing only at his direction. Hamdoun has claimed to have a close personal relationship with the Governor.

**89.** ~~82.~~ Over the years, Abu Nahl and the Nest Group repeatedly attempted to raise the lack of internal controls at LCB with the Central Bank of Lebanon. For example, in a letter dated February 7, 2011 to the Banking Control Commission of Lebanon, which is administered by the Central Bank, Abu Nahl emphasized Nest's concerns about "the non-compliance of the Executive Management of [LCB] with the applicable laws, regulations and circulars . . . ."

**90.** ~~83.~~ Despite Nest's repeated efforts, the Central Bank of Lebanon turned a blind eye to the compliance problems at LCB. Upon information and belief, the Central Bank of Lebanon was aware that LCB was being used by Abou Jaoude and Hamdoun to launder funds derived from narcoterror operations, but took no action in part because of the Governor's relationship with Hamdoun.

**91.** ~~84.~~ The finding by the U.S. government that LCB was engaged in substantial money laundering activity, however, finally forced the Central Bank of Lebanon to act. In an effort to shield the broader Lebanese banking sector from further scrutiny by U.S. authorities, the Central Bank of Lebanon pressured LCB into a rapid liquidation and a sale of substantially all assets and liabilities to another Lebanese bank.

As a result, the LCB issue was swept under the rug. According to a New York Times report in the aftermath of LCB's collapse, the Central Bank of Lebanon official responsible for overseeing the liquidation process has ties to Hezbollah.

**92.** **85.** Although the Central Bank of Lebanon forced LCB out of business, it has continued to turn a blind eye to the broader issues of money laundering and terrorist financing that are pervasive in the Lebanese banking sector. Tellingly, the Central Bank of Lebanon has failed to hold accountable even the very LCB managers whom the Treasury Finding stated were complicit in the money laundering operation run through LCB.

**93.** **86.** No apparent effort has been made by the Central Bank of Lebanon to pursue the serious issues raised in the U.S. government's filings or to address any of the failings in bank supervision that they imply.

**94.** **87.** The Central Bank of Lebanon had the ability to veto the appointment of Abou Jaoude and Hamdoun as liquidators to oversee the dissolution of the Bank, but failed to do so, effectively accepting their appointment. Serving as liquidators put Abou Jaoude and Hamdoun in a position to further cover up their illicit activity and to maximize their own personal gains.

**95.** **88.** As referenced above, in or around 2010, Defendant Safa assumed a position in the Central Bank of Lebanon. Despite the public disclosure of Safa's role in the money laundering scheme, he continues to serve as a Member of the Banking Control Commission.

**96.** **89.** Upon information and belief, as also referenced above, Abou Jaoude and Hamdoun, with the approval of the Central Bank of Lebanon, are preparing to open a new bank in Lebanon.

### ~~F~~G. U.S. Government Action on the Money Laundering Scheme

**97.** **90.** On February 10, 2011, the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") issued the Treasury Finding, which identified LCB as a financial institution of primary money laundering concern and Hezbollah's derivation of financial support from the operation of the criminal network described herein. Under authority granted by the USA PATRIOT Act, the Secretary of the Treasury can designate banks and other financial institutions as presenting primary money laundering concern if the Secretary concludes the bank meets a variety of factors that suggest it is involved in money laundering. Once a bank is so designated, U.S. financial institutions must take certain measures against the designated bank in order to disrupt potential money laundering activity. The Treasury Finding outlined the key components of the money laundering network run through LCB and the roles of various international drug traffickers and Hezbollah operatives, including Defendants named in this action. It also, among other things, directed U.S. banks to sever their correspondent banking relationships with LCB.

**98.** **91.** Abou Jaoude and Hamdoun are directly ~~named~~__identified__ as key players in the money laundering network run through LCB. The Treasury Finding states that "the [United States Government] has information indicating that a minority owner of the bank, who concurrently serves as General Manager [Abou Jaoude], his deputy [Hamdoun], and the managers of key branches are in frequent—in some cases even daily—communication with the various members of the . . . drug trafficking and

39

money laundering network, and they personally process transactions on the network's behalf."

**99.** ~~92.~~ In December 2011, the United States Attorney for the Southern District of New York filed the Civil Forfeiture Complaint, which it amended on October 26, 2012, against LCB and various other defendants. The Civil Forfeiture Complaint outlined in much greater detail the money laundering scheme initially described in the Treasury Finding.

**100.** ~~93.~~ In addition to the Treasury Finding and Civil Forfeiture Complaint, the Office of the U.S. Attorney for the Eastern District of Virginia also investigated the criminal network and LCB's role in the scheme that laundered the illicit proceeds of that network. After the Treasury Finding, the U.S. Attorney for the Eastern District of Virginia obtained the Criminal Indictment of Defendant Joumaa in late 2011.

### ~~G~~H. The Nest Group's Efforts to Introduce Principles of Corporate Responsibility and Compliance into LCB

**101.** ~~94.~~ Only as a result of the U.S. Government's investigations into LCB did Abu Nahl and the other members of the Nest Group come to realize that Abou Jaoude, Hamdoun and Safa were surreptitiously using the Bank to further the international narcoterrorism operation described above and to line their own pockets.

**102.** ~~95.~~ Prior to the Nest Group's acquisition of a minority interest in LCB, Abou Jaoude and Hamdoun actively misled the Nest Group about the state of compliance efforts at the Bank. Based on Abou Jaoude and Hamdoun's representations, the Nest Group believed LCB had robust compliance programs in place that met international standards and industry best practices. After acquiring a minority stake in LCB, however, Abu Nahl and the Nest Group realized that internal controls and

40

compliance measures at the Bank were woefully inadequate and, in some cases, entirely non-existent.

**103.** ~~96.~~ Having made their investment, the Nest Group decided to try to use their considerable expertise in good corporate governance and compliance to strengthen such programs at the Bank. On June 28, 2007, Abu Nahl joined the LCB board of directors as representative of Nest Investments Holding Lebanon SAL. Including Abu Nahl, Nest Group representatives held 3 of the 10 LCB board seats. (The remaining board seats were under the control of Abou Jaoude and Hamdoun.)

**104.** ~~97.~~ After joining the board, Abu Nahl quickly realized that LCB's compliance programs were not as strong as the Nest Group had been led to believe and were, in some cases, nonexistent. Having already made its investment in LCB, the Nest Group set about trying to strengthen the Bank's compliance. The Nest Group believed that its decades of experience developing and implementing good corporate governance and compliance programs in its many businesses would strengthen LCB's operations and position the Bank for strong, responsible growth.

**105.** ~~98.~~ Almost immediately after the transaction closed, however, the Nest Group encountered difficulties extracting information from and strengthening compliance efforts in LCB. On June 18, 2007, for example, the Bank's Chief Financial Officer, Charles Skaff, issued a cursory memorandum on the financial status of the Bank. Given both its lack of substance and lack of sufficient information, the memorandum raised immediate red flags for the Nest Group.

**106.** ~~99.~~ One day after receiving the financial memorandum, on June 19, 2007, the Nest Group sent Abou Jaoude a lengthy letter with a list of questions

41

regarding the substance of the report and the financial status of the Bank. In particular, the Nest Group asked for clarification on LCB's decision-making process and policies. Abou Jaoude did not respond to the letter.

**107.** ~~100.~~ On June 22, 2007, Abu Nahl followed up with a second letter to Abou Jaoude, copying Hamdoun, requesting additional information on LCB's budget. Among other things, Abu Nahl noted that LCB's budget lacked proper documentation, that many items were not included in the budget, and that funds were improperly reallocated without following the appropriate decision-making process or maintaining adequate documentation. Abou Jaoude did not respond to Abu Nahl's follow-up letter.

**108.** ~~101.~~ On June 25, 2007, LCB's Internal Audit Division audited the compliance unit. The audit noted that a number of accounts at the Bank were unusually active, with large incoming and outgoing transfers. The audit also noted that many of these accounts had unusual movement of funds between accounts.

**109.** ~~102.~~ On August 13, 2007, the Internal Audit Division sent a report directly to Abou Jaoude raising direct and specific concerns about troubling account activity. The report stated, in part:

> "Upon our review and general monitoring over some accounts, we [have] come across a group of customers showing continuous and considerable movements of funds, which according to our examination should be reviewed and be subject to further investigations by the compliance unit . . . . [W]e therefore address to your attention as head of the [Anti-Money Laundering] committee our memo in which we reveal some deficiencies and banking concept breaching, together with a list of customers' names to which these transactions are related for your quick review.

> Types of deficiencies can be summarized by the following:

> 1. Many of these deficiencies have been traced over saving time deposit accounts in which they are being used as current accounts.

2. The total amount of transactions between reviewed accounts has reached within 18 months a total of <u>USD 5,000 Million.</u>
3. Large amounts are being withdrawn and paid cash to different parties.
4. A clear link was noticed between 115 IDs existing and operating in different branches.
5. Although the big volume of movement noticed over these accounts, yet the accounts show [] very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s].
6. Accounts are originally opened for Domicilated bills were used for funds transfers with large amounts.
7. Commissions and bank profitability are limited comparing the volume and number of transactions executed.
8. We noticed, some accounts were opened to be used as transitory account[s] for a short period of time. (Vehicle Accounts)
9. Large amounts of cash withdrawal transactions were made to the favor of different parties, to be paid later on cash to the same beneficiary. Noticing that such transactions are being done from different accounts to the order of one specific party which rises up different question marks."

**110.** ~~103.~~ In the August 2007 audit report sent to Abou Jaoude, the internal auditors noted they had previously raised these concerns with and given a list of suspect accounts to the compliance department, but the compliance department had failed to take action. The internal auditors also recommended that Abou Jaoude take certain specific corrective actions, including implementing better monitoring software and installing compliance officers at all branches to monitor suspicious activity. Abou Jaoude sent a cursory reply on August 17, 2007 asking for more detail, but he never implemented the recommendations.

**111.** ~~104.~~ Increasingly concerned about the financial performance and compliance of LCB, the Nest Group requested that LCB create an Audit Committee. As evidenced by the subsequent inaction of Abou Jaoude and Hamdoun, they had no intention of executing recommendations or responding to the concerns raised by the

Audit Committee and the Nest Group.  Indeed, the Audit Committee appeared to be created only as a means to mollify and distract the Nest Group.  It was not even included on a list of Bank management committees prepared in 2009.

**112.**    ~~105.~~ In further effort to improve governance of the Bank, Nest Group member Sh. Nasser Bin Ali Bin Saud Al Thani ("Sh. Nasser") was appointed to the Audit Committee.  Not knowing that Abou Jaoude and Hamdoun had no intention of following the recommendations of the Audit Committee, Sh. Nasser and other Nest Group representatives diligently set about trying to understand and improve internal controls and compliance measures at LCB.  The Nest Group asked one of its best compliance experts, Loizos-Andreas Hajiloizos ("Hajiloizos"), to work with the LCB Audit Committee to evaluate and suggest improvements for Bank compliance operations.  Hajiloizos was named the Committee's General Secretary, responsible for preparing Committee documents and reports and recording the minutes of Committee meetings.

**113.**    ~~106.~~ On June 9, 2008, the LCB Audit Committee held its first meeting in Beirut.  The four members of the Audit Committee—Sh. Nasser, Makarem Makari, Raymond Diab, and Albert Azar—attended.  Hajiloizos was also present.

**114.**    ~~107.~~ At its first meeting, the Audit Committee agreed that LCB should host a meeting of all senior Bank staff to discuss the role of the Audit Committee and Internal Audits, and the importance of compliance.  As recorded in the minutes of the meeting, the Audit Committee hoped that "the top management of the Bank," including Abou Jaoude and Hamdoun, would "present the General Inspector and his team to show the support of the [Board of Directors] to the [Internal Audit Department]."  But Abou Jaoude and Hamdoun had no intention of supporting the Internal Audit Department.

44

**115.** ~~108.~~ Abou Jaoude and Hamdoun refused to arrange a meeting with top LCB management to discuss the role and importance of the Internal Audit Department. At a meeting nearly six months after the first Audit Committee meeting, on December 5, 2008, the Audit Committee discussed Abou Jaoude and Hamdoun's refusal to permit such a meeting. The Audit Committee minutes reflect this discussion: "The [Audit Committee] members cannot understand the reason behind the unwillingness of the top management of the bank [] to hold a meeting with all the managers of the Bank to discuss the Internal Audit Department Charter and any other Internal Audit issues that they may have. Sh. Nasser & [Hajiloizos] to discuss the above with the management of the Bank."

**116.** ~~109.~~ At an LCB Board of Directors meeting on July 2, 2009, Sh. Nasser and Hajiloizos again asked Abou Jaoude and Hamdoun to arrange a meeting of all Bank managers to discuss the role of the Internal Audit Department. According to Audit Committee minutes, "the idea was not accepted in a positive manner; thus the meeting was never organised or held."

**117.** ~~110.~~ At its July 2, 2009 meeting, the Audit Committee learned that LCB's Anti-Money Laundering Compliance Officer had resigned some eight months earlier—in October 2008—and had not been replaced. The Audit Committee found this lapse "to be unacceptable and in violation of corporate governance and best practices." In December 2009, the Compliance Manager had still not been replaced, prompting the Audit Committee to send a memorandum to the Human Resources Manager asking that a replacement be named immediately.

**118.** ~~111.~~ The Nest Group representatives on the Audit Committee worked to implement other measures to improve compliance and ensure LCB adhered to industry best practices. For example, the Audit Committee recommended LCB's external auditors be rotated on a regular basis. The Bank had been using the same auditing firm for at least 15 years. But Abou Jaoude and Hamdoun did not agree to rotate the audit firm. The Audit Committee also recommended that the Internal Audit Department report directly to the Audit Committee, and not to Abou Jaoude, the General Manager. At Abou Jaoude and Hamdoun's direction, LCB did not implement this change to the reporting lines.

**119.** ~~112.~~ As the years passed, the Nest Group, the Audit Committee, and the Internal Audit Department continued to sound alarms about inadequate internal controls. But their concerns continued to fall on deaf ears. In February 2010, the Internal Audit Division conducted another review of the Anti-Money Laundering compliance unit and found compliance efforts had not improved. In particular, the internal audit found "no evidence that proper and permanent control [was] being performed over some accounts witnessing frequent flow of large funds transfers." The internal audit also noted that the "compliance unit [had] 5,775 pending alerts cases during a period of one month (December, 2009)" and that branch managers, upon information and belief at Abou Jaoude and Hamdoun's direction, were not prioritizing resolving the backlog of alerts.

**120.** ~~113.~~ The February 2010 internal audit also found **that** LCB managers continued to ignore compliance and reporting requirements for large cash transactions. The report noted that "the Compliance Unit does not generate on a daily basis [a] consolidated physical cash report that aggregates all cash deposits done by a

single client, [on] the same day, and in multiple accounts totaling more than $10,000." Abou Jaoude, Hamdoun, and Safa directed the Compliance Unit not to generate such daily cash reports.

**121.** ~~114.~~ Finally, the February 2010 internal audit noted that LCB managers were ignoring Know Your Customer monitoring and reporting requirements. Industry and international best practices, as well as laws and regulations in most countries, including Lebanon, require financial institutions to establish certain procedures to verify the identity of customers in order to combat money laundering and other financial crimes. These procedures are known as "Know Your Customer" requirements. The February 2010 audit found bank managers were turning a blind eye to cash and transfer activities that were inconsistent with certain clients' Know Your Customer forms. Abou Jaoude, Hamdoun, and Safa instructed branches to ignore the Know Your Customer form requirements for certain customers.

**122.** ~~115.~~ Abou Jaoude and Hamdoun both served on LCB's five-member Anti-Money Laundering ("AML") Committee. The committee existed essentially in name only. In 2007, when the Nest Group representatives on the Audit Committee were trying to determine the extent of LCB's compliance shortcomings, they raised concerns about various suspicious accounts. In 2009, in a memorandum to the Human Resources Manager, the Nest Group noted that the AML Committee was dormant and recommended its activation.

**123.** ~~116.~~ Throughout this period, at every turn, Abou Jaoude and Hamdoun took steps designed to frustrate the efforts of the Audit Committee and the Nest Group to implement better corporate governance measures. For example, Abou Jaoude

and Hamdoun consolidated control over hiring, firing, and promotion decisions, allowing them to place persons under their control in positions critical to operating and concealing the money laundering scheme. A 2010 Audit report on the Human Resources department highlighted this consolidation of control: "Theoretically, the Human Resources Department is fulfilling its responsibilities, as we noticed that job descriptions are documented, evaluation process is implemented, appraisal report is being filed on yearly basis and procedures are being handled; but practically, the department is superseded since a long time by the Senior Management Power and Directives."

### HI. Tabadul, the Nest Group's Increasing Concern over Governance and Compliance, and Abou Jaoude and Hamdoun's Personal Slush Funds

**124.** ~~117.~~Over time, it became increasingly difficult for the Nest Group to extract information about LCB from Abou Jaoude and Hamdoun. Moreover, due to staunch resistance from Abou Jaoude and Hamdoun, the Nest Group's efforts to strengthen compliance and corporate governance at the Bank had largely failed to achieve positive results.

**125.** ~~118.~~The Nest Group later uncovered one reason why Abou Jaoude and Hamdoun had stonewalled the Nest Group's compliance efforts: the Bank managers had been directing illegal operations through a subsidiary of LCB in the United Arab Emirates called Tabadul Shares and Bonds LLC ("Tabadul"). As described below, Abou Jaoude and Hamdoun actively concealed Tabadul's operations from the Nest Group and used the subsidiary to engage in improper self-dealing. In addition to supporting Hezbollah, looting LCB assets through such self-dealing was a central objective of Abou Jaoude and Hamdoun for engaging in the scheme described herein.

**126.** ~~119.~~ On October 18, 2006, shortly after the Nest Group's initial investment into LCB, Abou Jaoude founded Tabadul. Tabadul is a brokerage firm in the United Arab Emirates with offices in Dubai and Abu Dhabi. It began operations in 2007. Tabadul was owned and funded by LCB but controlled by Abou Jaoude. Over time, LCB continued to invest in Tabadul. LCB increased the capital of Tabadul several times, including in November 2006, January 2007, and January 2008.

**127.** ~~120.~~ As with LCB, Abu Nahl sought to obtain detailed budgets regarding Tabadul. At a board meeting on July 14, 2010, Abu Nahl voiced his concerns over the lack of a detailed budget for Tabadul. Only later would the Nest Group learn their efforts had been unsuccessful because Abou Jaoude and Hamdoun were actively working to frustrate them.

**128.** ~~121.~~ Abou Jaoude and Hamdoun intentionally hid information about Tabadul's operations from the Nest Group and from public disclosure. On June 6, 2010, Sh. Nasser sent Abou Jaoude a letter requesting, on behalf of the Audit Committee, more detailed information on the LCB investment in Tabadul. Abou Jaoude sent a cursory reply stating the Internal Audit Department had all the information on Tabadul that it needed. But, the Internal Audit Department had not been supplied with <u>any</u> information on the Tabadul investment since it performed an audit in January 2008. The UAE regulatory authority expressed these and other concerns, including deceit, failure to meet licensing conditions, and commingling of funds. Its concerns were so pronounced that it imposed a cessation of business on Tabadul, which was extended multiple times because of Tabadul's failure to cure its violations.

**129.** ~~122.~~ In 2009, at least five Tabadul employees resigned, including its Internal Auditor, who lamented Tabadul's lack of commitment to abide by licensing conditions. Others remarked that "difficulties and problems faced by the administration were not new, but were present from the day the company began trading from the Lebanese Canadian Bank side, which acted somewhat irresponsibly."

**130.** ~~123.~~ In addition to concealing information about Tabadul's operations and unlawful activities, Abou Jaoude and Hamdoun also concealed information regarding several suspicious LCB subsidiaries in West Africa. In November 2009, the LCB Chief Risk Officer, who had only been appointed at the insistence of the Nest Group, raised concerns to the LCB Risk Committee about an LCB presence in Gambia called Prime Bank Gambia. According to the minutes of that meeting, the Chief Risk Officer stated that "LCB has a presence in Gambia with thirty employees and until today there are no reporting lines, only the finance manager knows about it and nobody else receives any information on their business. No fixed asset has been purchased as part of the investment. Very soon they will need re-capitalisation since the currency fluctuations are eating up their initial capital." The Chief Risk Officer further noted that "[t]he situation [with Prime Bank Gambia] is about to be repeated with the Kinshasa-Congo investment."

**131.** ~~124.~~ The head of LCB's Internal Audit Department further noted in June 2010 that the department continued to have no visibility into Prime Bank Gambia or other West African operations, including in Congo. The secrecy surrounding these operations persisted at Abou Jaoude and Hamdoun's direction, even though LCB's Chief Risk Officer had raised red flags about the operations nearly nine months prior.

**132.** ~~125.~~ Undeterred, the Nest Group continued to press Abou Jaoude and Hamdoun for information about the operations of LCB and its subsidiaries, including Tabadul. It also continued to try to implement compliance measures and internal controls.

**133.** ~~126.~~ The Nest Group eventually realized that Abou Jaoude and Hamdoun were using these subsidiaries to funnel assets from LCB to line their own pockets. For example, Abou Jaoude and Hamdoun used sham loans to funnel assets from LCB to Tabadul. On or about May 1, 2008, LCB and Tabadul entered into a Revolving Subordinated Loan Agreement under which LCB agreed to extend a $20 million line of revolving credit to Tabadul. Abou Jaoude signed the loan agreement on behalf of <u>both</u> LCB <u>and</u> Tabadul. Hamdoun also signed on behalf of LCB.

**134.** ~~127.~~ Abou Jaoude and Hamdoun also used Tabadul to make sham loans. Tabadul made numerous suspicious loans to various individuals in the United Arab Emirates. When the Nest Group began investigating these loans, many of the individuals who supposedly received loans said they had never even heard of Tabadul. They certainly had not opened accounts with or received loans from Tabadul. Upon information and belief, Abou Jaoude and Hamdoun directed or made these loans in the names of unsuspecting third parties and took the money for their own benefit.

**135.** ~~128.~~ Abou Jaoude and Hamdoun's wrongdoing was not limited to siphoning off assets through Tabadul. Expenses increased noticeably, and Abou Jaoude admitted this was partially because of bonuses that he paid to himself and his associates. Additionally, in 2008, Abou Jaoude had an outstanding $12 million loan from LCB. All banks in Lebanon are required to file what is known as a 152 Report with the Central

Bank of Lebanon disclosing loans made to staff, directors, and shareholders. At its meeting on December 5, 2008, the Audit Committee noted:

> "The loans to staff, directors and shareholders were not approved since it contained errors and was [not] transparent . . . The [Internal Audit Department] was requested to prepare a new transparent report with all the details and to compare this to the 152 report sen[t] to Central Bank of Lebanon since . . . the chairman of the bank [Abou Jaoude] has a $12 million loan with a $2 million collateral and it was not included in the 152 report to the central bank."

**136.** ~~129.~~ Despite the fact that the Central Bank of Lebanon routinely had auditors on site at LCB who were ostensibly monitoring reporting and compliance, the Central Bank of Lebanon either failed to discover this egregious reporting failure or turned a blind eye to it.

**137.** ~~130.~~ At Abou Jaoude and Hamdoun's direction, LCB also failed to follow proper procedures for credit approvals of investments. At the November 2009 Risk Committee meeting, the Chief Risk Officer explained:

> "[T]here is no procedure followed for the credit approvals of investments taken by the Bank and this is considered as high risk. The Chairman [Abou Jaoude] ($900k) and the GM [Hamdoun] ($750k) of the Bank seem to have money limits but they have never been followed. There do not seem to be a proper investment policy in the following fields:
>
> a) Affiliates
> b) Subsidiaries
> c) Bonds
> d) Stocks
> e) CD
> f) Funds"

**138.** ~~131.~~ In response to these concerns, the Risk Committee (at the insistence of Sh. Nasser and Hajiloizos) requested that the Bank's Chief Risk Officer prepare draft investment policies and procedures for the Bank to ensure accountability

and compliance. Abou Jaoude and Hamdoun ultimately thwarted the implementation of investment policies and procedures.

### I.J. **Aftermath of the Money Laundering Scheme**

**139.** ~~132.~~ Plaintiffs' efforts to improve compliance at LCB were frustrated by continuing opposition led by Abou Jaoude and Hamdoun, who together own or control entities that own approximately 76% of the Bank. At the time they made these efforts, the Nest Group members believed that Abou Jaoude and Hamdoun's refusal to implement better compliance measures stemmed from incompetence or a nonchalant attitude toward good corporate governance, not rampant criminality.

**140.** ~~133.~~ That all changed beginning in 2011, when the U.S. Government publicly exposed Defendants' international narcoterrorism and money laundering scheme. This exposure came as a shock to Abu Nahl and the Nest Group. Only then did Abu Nahl and the Nest Group begin to understand the real reason that Abou Jaoude and Hamdoun had frustrated their attempts to increase transparency and internal controls at the Bank: because their efforts posed a grave threat to the narcoterrorism and money laundering scheme to benefit Hezbollah that was exposed by the United States and, as part and parcel of that scheme, Abou Jaoude's and Hamdoun's efforts to loot LCB assets for their personal benefit. While their concerns with the lack of internal controls at LCB and with Abou Jaoude and Hamdoun's stonewalling had grown over time, it was not until the filing of the Civil Forfeiture Complaint that Abu Nahl and the Nest Group began to realize the full extent of Abou Jaoude and Hamdoun's wrongdoing.

**141.** ~~134.~~ On June 25, 2013, Abou Jaoude and Hamdoun, acting as trustees responsible for LCB's liquidation, settled the civil forfeiture suit with the Office of the U.S. Attorney for the Southern District of New York. In order to quickly cast the spotlight off their own illicit conduct, Abou Jaoude and Hamdoun forfeited $102 million of LCB's money to settle the U.S. government action.

**142.** ~~135.~~ Despite the Nest Group's lack of knowledge of or participation in the money laundering activities at LCB, and their repeated attempts to impose and improve money laundering controls following their minority investment in LCB, the U.S. government has denied entry visas to Abu Nahl, his family members and a number of employees of Nest Investments or other Nest Group companies. The U.S. government did so because of the Nest Group's investment in, and affiliation with, LCB. This constitutes additional injury suffered by Plaintiffs as a result of Defendants' scheme.

## DERIVATIVE STANDING

**143.** ~~136.~~ Plaintiffs bring certain of their claims derivatively in the right and for the benefit of LCB to redress injuries suffered by LCB as a direct result of Defendants' misconduct. LCB is named as a nominal defendant solely in a derivative capacity.

**144.** ~~137.~~ Plaintiffs will adequately and fairly represent the interests of LCB and its shareholders in enforcing and prosecuting LCB's rights.

**145.** ~~138.~~ Plaintiffs were owners of LCB shares at all times relevant to the Defendants' wrongful course of conduct in respect of derivative actions alleged herein. Plaintiffs maintain an interest in LCB through their status as beneficiaries of the corporation in liquidation.

**146.** ~~139.~~ Under the Lebanese Commercial Code, where a corporation by its inertia has failed to bring an action against directors of the corporation, shareholders may bring the action.

**147.** ~~140.~~ LCB has not brought any action against Defendants for the conduct alleged herein. Therefore, Plaintiffs may bring this action on behalf of LCB.

**148.** ~~141.~~ At the time that this action was commenced, LCB was in liquidation. Abou Jaoude and Hamdoun were serving as the sole Trustees of LCB in liquidation.

**149.** ~~142.~~ As a result of the facts set forth herein, Plaintiffs did not make a demand upon the Bank or its Trustees to institute this action against the Defendants. Such a demand, to the extent required, would have been a futile and useless act because the Trustees are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**150.** **To the extent Lebanese law applies, it authorizes a shareholder to assert a derivative action seeking damages on a corporation's behalf to the extent of that shareholder's ownership interest in the corporation.**

## FIRST CAUSE OF ACTION (DERIVATIVE)
### Violation of the Law of Nations
### (By ~~Plaintiffs Abu Nahl & Nest Investments Holding Lebanon SAL~~ Plaintiff LCB Against All Defendants)

**151.** ~~143.~~ Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

**152.** ~~144.~~ During the time period relevant to this case, Hezbollah has sought to conduct and has conducted **terror** attacks targeting civilians. ~~These actions are prohibited under customary international law, and therefore constitute~~

~~violations of "the law of nations" within the meaning of 28 U.S.C. § 1350.145.~~

———Defendants had actual knowledge that Hezbollah is a violent terrorist organization, which, as recognized by the U.S. government and others, had carried out numerous attacks targeting civilians and which planned and intended to carry out additional such attacks.

**153.** ~~146.~~At all relevant times, Defendants had actual knowledge that Hezbollah required **funds and** financial services in order to plan, prepare for and carry out ~~crimes against humanity~~**terror attacks on civilians**, and that providing **funds and** financial services to Hezbollah would enable and enhance Hezbollah's ability to engage in such ~~crimes~~**attacks**.  Defendants were also aware that the United States had imposed sanctions intended to prevent Hezbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

**154.** ~~147.~~Despite this knowledge, Defendants Abou Jaoude, Hamdoun and Safa **willfully and unlawfully** caused LCB to launder funds for and **to** provide **funds and** financial services to Hezbollah or its surrogates, ~~for the purpose of enabling and enhancing Hezbollah's ability to engage in crimes against humanity~~**knowing and intending that these acts would enable and enhance Hezbollah's ability to kill or seriously injure civilians by engaging in terror attacks to intimidate civilian populations, including widespread, systematic attacks that constitute crimes against humanity.  Hezbollah has engaged in terror attacks on civilians not only to intimidate the civilian populations, but also, in some cases, in an effort to compel government action**.

**155.** ~~148.~~ Defendants Salhab, ~~Cybamar Swiss,~~ Joumaa, Hassan Ayash, ~~Hassan Ayash Exchange Company, and Ellissa Holding Company~~ **either directly or through entities they controlled,** provided funds to LCB and/or received funds from LCB that were used ~~to further the scheme~~ to provide financial support to Hezbollah.

**156.** ~~149.~~ Defendants knowingly and intentionally relied on the U.S. banking system to ~~aid and abet~~ **finance** Hezbollah's violations of the law of nations. Such ~~aiding and abetting itself~~ **financing of Hezbollah terror attacks on civilians** constitutes a violation of the law of nations **as reflected by the Terrorist Financing Convention** and has a clear nexus to the United States.

**157.** ~~150.~~ Defendants had actual knowledge that providing banking services to or on behalf of Hezbollah was not permitted under U.S. law and would subject LCB's assets to forfeiture by the U.S. government.

**158.** ~~151.~~ The United States filed the Civil Forfeiture Complaint based, *inter alia*, on LCB's actions to assist Hezbollah. LCB forfeited $102 million to the United States to settle the Civil Forfeiture Complaint. These funds were forfeited in satisfaction of claims by the U.S. government against LCB's property, claims against LCB arising from the money laundering scheme, and claims against Defendants Abou Jaoude, Hamdoun, and others based on their conduct as board members and managers of LCB. The $102 million effectively constituted the proceeds from a sale of Bank assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme.

**159.** ~~152.~~ As noted above, following the forfeiture, the U.S. Attorney for the Southern District of New York stated that the $102 million paid by LCB "shows

that banks laundering money for terrorists and narco-traffickers will face consequences for their actions, wherever they may be located." The Administrator of the Drug Enforcement Administration stated that the $102 million paid by LCB "is significant and addresses the role the Lebanese Canadian Bank played in facilitating illicit money movement from the United States to West Africa to Hizballah-controlled money laundering channels."

**160.** ~~153.~~LCB suffered $102-million loss as a proximate result of Defendants' misuse of the Bank to violate the law of nations.

**161.** ~~154.~~Defendants are liable to LCB for the damages they inflicted on the Bank through their violations of the law of nations.

~~**SECOND CAUSE OF ACTION (DIRECT)**~~
~~**Fraud in the Inducement**~~
~~**(By Plaintiffs Abu Nahl & Nest Investments Holding Lebanon SAL Against**~~
~~**Defendants Abou Jaoude & Hamdoun)**~~

~~**155.** Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.~~

~~**156.** Plaintiffs entered into an agreement to invest in LCB.~~

~~**157.** Plaintiffs' willingness to assent to the terms of the agreement, and the agreement itself, was caused by the material fraudulent misrepresentations of Defendants Abou Jaoude and Hamdoun and their agents.~~

~~**158.** Defendants Abou Jaoude and Hamdoun fraudulently misrepresented LCB's history of compliance with anti-money laundering and international banking laws and best practices to Plaintiffs.~~

159. Defendants Abou Jaoude and Hamdoun fraudulently misrepresented their intentions to cause LCB to remain in compliance with anti-money laundering and international banking laws and best practices to Plaintiffs.

160. Defendants Abou Jaoude and Hamdoun fraudulently misrepresented the legitimacy of LCB's business operations to Plaintiffs.

161. Defendants Abou Jaoude and Hamdoun fraudulently misrepresented the reason they sought Plaintiffs' investment in LCB.

162. Each of the misrepresentations described above was material to Plaintiffs' decision to invest in LCB. Plaintiffs, believing them to be true, reasonably relied on each of these representations.

163. These representations were false. Defendants knew these representations to be false, and Defendants intended that Plaintiffs rely on these representations to induce Plaintiffs to enter into the agreement.

164. Plaintiffs have been damaged by Defendants actions.

165. Defendants' conduct was malicious, fraudulent, oppressive and/or recklessly committed, with wanton disregard of Plaintiffs' rights.

166. Defendants' concealed their misconduct, which did not become known to Plaintiffs until long after they made their investment in LCB. To the extent Plaintiffs' fraud in the inducement or other claims accrued outside any applicable statute of limitations, such statute of limitations is tolled by virtue of Defendants' concealment. Applicable statutes of limitation were also tolled during the pendency of Plaintiffs' good faith efforts to have claims against Defendants

~~resolved in Lebanon beginning in or about February 2011.~~**THIRD CAUSE OF**

**ACTION (DERIVATIVE)**

**Breach of Fiduciary Duty**
**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**

**162.** ~~167.~~ Plaintiff incorporates by reference the allegations set forth

above as though fully restated herein.

**163.** ~~168.~~ Defendants Abou Jaoude and Hamdoun, as officers and/or

directors of LCB, owed fiduciary duties to LCB and were required to use their ability to

control and manage LCB in a fair, just, and equitable manner. They were required to use

their positions to ensure the Bank complied with applicable laws and contractual

obligations, to refrain from abusing their positions of control, and not to favor their own

interests at the expense of LCB. They violated their fiduciary duties to LCB, including

without limitation their duties of care, good faith, honesty, and loyalty**, by causing LCB**

**to participate in the scheme described in this Second Amended Complaint**.

**164.** ~~169.~~ The wrongful conduct particularized herein was not due to an

honest error in judgment, but rather to Defendants' gross mismanagement, bad faith,

reckless and/or willful disregard of the rights and interests of LCB and its shareholders,

and for acting without the reasonable and ordinary care which they owed to LCB.

**165.** ~~170.~~ Under the Lebanese Commercial Code, directors of a

corporation are liable for management of the corporation.

**166.** ~~171.~~ Based on the conduct set forth above, Defendants have

breached fiduciary duties owed to LCB.

**167.** ~~172.~~ **As set forth above,** LCB has been harmed as a result of

Defendants' breaches.

## ~~FOURTH~~THIRD CAUSE OF ACTION (DERIVATIVE)
### Abuse of Control
### (By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)

**168.** ~~173.~~Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

**169.** ~~174.~~Defendants Abou Jaoude and Hamdoun, by virtue of their positions and financial holdings in LCB, exercised control over LCB and its operations, and owed duties as controlling persons to LCB not to use their positions of control for their own personal interests and contrary to the interest of LCB.

**170.** ~~175.~~Defendants' ~~conduct~~**abuse of LCB by causing the Bank to participate in the scheme described in this Second Amended Complaint** amounts to an abuse of their control of LCB, in violation of their obligations to LCB.

**171.** ~~176.~~**As set forth above,** LCB was harmed as a result of Defendants' conduct.

## ~~FIFTH CAUSE OF ACTION (DERIVATIVE)~~
### ~~Corporate Waste~~
### ~~(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)~~

~~177.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.~~

~~178.     As alleged in detail, Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of LCB and in the use and preservation of its property and assets, and had the highest obligation of fair dealings.~~

179. ~~Defendants wasted LCB's corporate assets by diverting~~ ~~corporate assets for improper purposes, instead of using those assets for their~~ ~~intended purpose.~~

180. ~~LCB was harmed as a result of Defendants' conduct.~~

~~**SIXTH CAUSE OF ACTION (DERIVATIVE)**~~
~~**Unjust Enrichment**~~
~~**(By Plaintiff LCB Against Defendants Abou Jaoude & Hamdoun)**~~

181. ~~Plaintiff incorporates by reference the allegations set forth~~ ~~above as though fully restated herein.~~

182. ~~Defendants derived compensation, fees, and other benefits~~ ~~from LCB and were otherwise unjustly enriched during the time in which the~~ ~~wrongful practices occurred, to the detriment of LCB. Defendants profited by~~ ~~engaging in the wrongful conduct set forth herein.~~

183. ~~Defendants also wrongfully converted funds belonging to LCB.~~

184. ~~Defendants' enrichment is directly and causally related to the~~ ~~detriment of LCB.~~

185. ~~These benefits were accepted by Defendants under such~~ ~~circumstances that it would be inequitable for it to be retained without payment. As~~ ~~alleged above, Defendants breached their fiduciary duties to and/or abused their~~ ~~positions of control within LCB and therefore Defendants are not justified in~~ ~~retaining the benefits conferred upon them.~~

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award them such damages and compensation, including punitive damages,

interest, attorneys' fees, costs and such other relief as this Court may deem just. An

award of punitive damages is appropriate because Defendants' conduct was criminal in

nature, dangerous to human life, outrageous, extreme, wanton, willful, and malicious.

### JURY DEMAND

Plaintiffs demand a trial by jury.

~~Dated: November 6, 2017~~

**Dated: _____**

COVINGTON & BURLING LLP

~~By:~~ _____

Anthony Herman
~~Christian J. Pistilli~~
**Dennis Auerbach**
**Andrew Siegel**
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Email: aherman@cov.com
~~epistilli~~**dauerbach**@cov.com

**asiegel@cov.com**
*Attorneys for Plaintiffs*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Ghazi Abu Nahl, declare under penalty of perjury under the laws of the United States of America that the factual averments set forth in the foregoing Verified **Second Amended** Complaint are true and correct, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true and correct.

Subscribed to by the Plaintiff on this _____ day of ~~November~~ _____, ~~2017.~~**2018.**

_____

Ghazi Abu Nahl

Exhibit A

(BILLINGCODE: 4810-02P)

**DEPARTMENT OF THE TREASURY**

**Finding that the Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern**

**AGENCY:** Financial Crimes Enforcement Network, Treasury ("FinCEN"), Treasury.

**ACTION:** Notice of finding.

**SUMMARY:** Pursuant to the authority contained in 31 U.S.C. 5318A, the Secretary of the Treasury, through his delegate, the Director of FinCEN, finds that reasonable grounds exist for concluding that the Lebanese Canadian Bank SAL ("LCB") is a financial institution of primary money laundering concern.

**DATES:** The finding made in this notice is effective as of [INSERT DATE OF PUBLICATION OF THIS DOCUMENT IN THE FEDERAL REGISTER].

**FOR FURTHER INFORMATION CONTACT:** Regulatory Policy and Programs Division, FinCEN, (800) 949-2732.

**SUPPLMENTARY INFORMATION:**

I.    **Background**

   A.    **Statutory Provisions**

   On October 26, 2001, the President signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act"), Public Law 107-56.  Title III of the USA PATRIOT Act amended the anti-money laundering provisions of the Bank Secrecy Act ("BSA"), codified at 12 U.S.C. 1829b, 12 U.S.C 1951-1959, and 31 U.S.C. 5311-5314 and 5316-5332, to promote the prevention, detection, and prosecution of international money laundering and the financing of terrorism.  Regulations implementing the BSA

appear at 31 CFR Part 103. The authority of the Secretary of the Treasury (the "Secretary") to administer the BSA and its implementing regulations has been delegated to the Director of FinCEN.[1]

Section 311 of the USA PATRIOT Act ("section 311") added section 5318A to the BSA, granting the Secretary the authority, upon finding that reasonable grounds exist for concluding that a foreign jurisdiction, institution, class of transaction, or type of account is of "primary money laundering concern," to require domestic financial institutions and financial agencies to take certain "special measures" against the primary money laundering concern. Section 311, as amended, identifies factors for the Secretary to consider and Federal agencies to consult before the Secretary may conclude that a jurisdiction, institution, class of transaction, or type of account is of primary money laundering concern. The statute also provides similar procedures, *i.e.*, factors and consultation requirements, for selecting the specific special measures to be imposed against the primary money laundering concern.

Taken as a whole, section 311 provides the Secretary with a range of options that can be adapted to target specific money laundering and terrorist financing concerns most effectively. These options give the Secretary the authority to bring additional pressure on those jurisdictions and institutions that pose money laundering threats. Through the imposition of various special measures, the Secretary can gain more information about the jurisdictions, institutions, transactions, or accounts of concern; can more effectively monitor the respective jurisdictions, institutions, transactions, or accounts; or can protect

---

[1] Therefore, references to the authority of the Secretary of the Treasury under section 311 of the USA PATRIOT Act apply equally to the Director of FinCEN.

U.S. financial institutions from involvement with jurisdictions, institutions, transactions, or accounts that are of money laundering concern.

Before making a finding that reasonable grounds exist for concluding that a foreign financial institution is of primary money laundering concern, the Secretary is required to consult with the both the Secretary of State and the Attorney General. The Secretary is also required by section 311 to consider "such information as the Secretary determines to be relevant, including the following potentially relevant factors":

- The extent to which such financial institution is used to facilitate or promote money laundering in or through the jurisdiction;

- The extent to which such financial institution is used for legitimate business purposes in the jurisdiction; and

- The extent to which the finding that the institution is of primary money laundering concern is sufficient to ensure, with respect to transactions involving the institution operating in the jurisdiction, that the purposes of the BSA continue to be fulfilled, and to guard against international money laundering and other financial crimes.

If the Secretary determines that reasonable grounds exist for concluding that a foreign financial institution is of primary money laundering concern, the Secretary must determine the appropriate special measure(s) to address the specific money laundering risks. Section 311 provides a range of special measures that can be imposed individually, jointly, in any combination, and in any sequence.[2] The Secretary's imposition of special

---

[2] Available special measures include requiring: (1) recordkeeping and reporting of certain financial transactions; (2) collection of information relating to beneficial ownership; (3) collection of information relating to certain payable-through accounts; (4) collection of information relating to certain correspondent accounts; and (5) prohibition or conditions on the opening or maintaining of correspondent or payable

measures requires additional consultations to be made and factors to be considered. The statute requires the Secretary to consult with appropriate federal agencies and other interested parties[3] and to consider the following specific factors:

- Whether similar action has been or is being taken by other nations or multilateral groups;

- Whether the imposition of any particular special measures would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

- The extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular institution; and

- The effect of the action on the United States national security and foreign policy.[4]

---

through accounts. 31 U.S.C. 5318A(b)(l)-(5). For a complete discussion of the range of possible countermeasures, *see* 68 FR 18917 (April 17, 2003) (proposing special measures against Nauru).

[3] Section 5318A(a)(4)(A) requires the Secretary to consult with the Chairman of the Board of Governors of the Federal Reserve System, any other appropriate Federal banking agency, the Secretary of State, the Securities and Exchange Commission (SEC), the Commodity Futures Trading Commission (CFTC), the National Credit Union Administration (NCUA), and, in the sole discretion of the Secretary, "such other agencies and interested parties as the Secretary may find to be appropriate." The consultation process must also include the Attorney General if the Secretary is considering prohibiting or imposing conditions on domestic financial institutions opening or maintaining correspondent account relationships with the designated jurisdiction.

[4] Classified information used in support of a section 311 finding and measure(s) may be submitted by Treasury to a reviewing court ex parte and in camera. See section 376 of the Intelligence Authorization Act for fiscal year 2004, Pub. L. 108–177 (amending 31 U.S.C. 5318A by adding new paragraph (f)).

## B.  The Lebanese Canadian Bank SAL

The Lebanese Canadian Bank SAL ("LCB") is based in Beirut, Lebanon, and maintains a network of 35 branches in Lebanon and a representative office in Montreal, Canada.  The bank is eighth largest among Lebanese banks in assets and has over 600 employees.  Originally established in 1960 as Banque des Activities Economiques SAL, it operated as a subsidiary of the Royal Bank of Canada Middle East (1968-1988) and is now a privately owned bank.  LCB offers a broad range of corporate, retail, and investment products, and maintains extensive correspondent accounts with banks worldwide, including several U.S. financial institutions.  As of 2009 LCB's total assets were worth over $5 billion.[5]

LCB has a controlling financial interest in a number of subsidiaries, including LCB Investments (Holding) SAL, LCB Finance SAL, LCB Estates SAL, LCB Insurance Brokerage House SAL, and Dubai-based Tabadul for Shares and Bonds LLC.  Additionally, LCB is the majority shareholder of Prime Bank Limited, a private commercial bank and the LCB subsidiary located in Serrekunda, Gambia.[6]  LCB owns 51% of Prime Bank while the remaining shares are held by local and Lebanese partners.  LCB apparently serves as the sole correspondent bank for Prime Bank.[7]  For purposes of this document and unless expressly stated otherwise, references to LCB include the aforementioned subsidiaries.

---

[5] Lebanese Canadian Bank, 2009 Annual Report.
[6] Id.
[7] http://primebankgambia.gm/index

## C. __Lebanon__

Lebanon is a financial hub for banking activities in the Middle East and eastern Mediterranean and has one of the more sophisticated banking sectors in the region. There are 66 banks incorporated in Lebanon[8], and all major banks have correspondent relationships with U.S. financial institutions. The five largest commercial banks account for roughly 60% of total banking assets, estimated at $125 billion.[9] According to Treasury information, strong economic growth and a steady flow of diaspora deposits in recent years have helped the Lebanese banking system to maintain relatively robust lending, improve asset quality, and maintain adequate liquidity and capitalization positions. However, banks remain highly exposed to the heavily indebted sovereign, carry significant currency risk on their balance sheets, and operate in a volatile political security environment.

Lebanon also faces money laundering and terrorist financing vulnerabilities, according to the International Narcotics Control Strategy Report ("INCSR") published in March 2010 by the U.S. Department of State.[10] Of particular relevance is the possibility that a portion of the substantial flow of remittances from the Lebanese diaspora, estimated at $7 billion—21% of GDP—in 2009, according to the World Bank,[11] could be associated with underground finance and Trade-Based Money Laundering ("TBML") activities. Laundered criminal proceeds come primarily from Lebanese criminal activity and organized crime.[12]

---

[8] "Complete List of Operating Banks in Lebanon," Banque du Liban (www.bdl.gov.lb).
[9] *2010 Index of Economic Freedom*, The Heritage Foundation (www.heritage.org/index/country/lebanon).
[10] The 2010 International Narcotics Control Strategy Report ("INCSR"), Lebanon, pp 151-154 (www.state.gov/g/inl/rls/nrcrpt/2010/vol2/137212.htm).
[11] *The Daily Star*, "2009 Remittances to Lebanon Reach $7 Billion," November 10, 2009.
[12] 2010 INCSR.

Lebanon's Customs Authority ("Customs") supervises two free trade zones operating in the country. However, high levels of corruption within Customs create vulnerabilities for TBML and other threats. Moreover, Lebanon has no cross-border currency reporting requirements, resulting in a significant cash-smuggling vulnerability. Finally, Lebanon has not acceded to the UN Convention for the Suppression of the Financing of Terrorism, though it has adopted laws domestically criminalizing any funds resulting from the financing or contribution to the financing of terrorism.[13] However, such laws do not apply to Hizballah, which Lebanon considers to be a legitimate political party and resistance organization, and it is not subject to Lebanese anti-terrorist financing laws. The United States Government ("USG") designated Hizballah as a Foreign Terrorist Organization on October 8, 1997. Additionally, on October 31, 2001, Hizballah was designated by the USG as a Specially Designated Global Terrorist under Executive Order 13224.[14]

## II.     Analysis of Factors

Based upon a review and analysis of the administrative record in this matter, consultations with relevant Federal agencies and departments, and after consideration of the factors enumerated in section 311, the Director of FinCEN has determined that LCB is a financial institution of primary money laundering concern. FinCEN has reason to believe that LCB has been routinely used by drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the

---

[13] For additional information about Lebanon's legal framework and special mechanisms for anti-money laundering and terrorist financing measures, see The Middle East and North Africa Financial Task Force (MENAFATF) *Mutual Evaluation Report, Lebanese Republic*, November 10, 2009 (www.menafatf.org).
[14] Hizballah is a Lebanon-based terrorist group. Until September 11, 2001, Hizballah was responsible for more American deaths than any other terrorist organization.

Middle East; that Hizballah derived financial support from the criminal activities of this network; and that LCB managers are complicit in the network's money laundering activities. A discussion of the factors relevant to this finding follows:

    1.    The Extent to Which LCB Has Been Used to Facilitate or Promote Money Laundering In or Through the Jurisdiction

The USG has information through law enforcement and other sources indicating that LCB—through management complicity, failure of internal controls, and lack of application of prudent banking standards—has been used extensively by persons associated with international drug trafficking and money laundering. According to this information, this international drug trafficking and money laundering network generally moves illegal drugs from South America to Europe and the Middle East via West Africa, with proceeds laundered through the Lebanese financial system, as well as through TBML involving used cars and consumer goods.[15] Specifically, individuals mentioned below[16] (with the assistance of close family members who are key participants in the global drug trafficking and money laundering network) are known to hold or utilize cash deposit accounts at LCB to move hundreds of millions of dollars monthly in cash proceeds from illicit drug sales into the formal financial system, as well as to coordinate the laundering of these funds through key foreign nodes of the network using LCB accounts. The bank's involvement in money laundering is attributable to failure to adequately control transactions that are highly vulnerable to criminal exploitation, including cash deposits and cross-border wire transfers, inadequate due diligence on

---

[15] For more information on Trade-Based Money Laundering, see "Advisory to Financial Institutions on Filing Suspicious Activity Reports regarding Trade-Based Money Laundering," Financial Crimes Enforcement Network, FIN02010-A001, February 18, 2010. www.fincen.gov/financial_institutions/advisory.html.
[16] These individuals are referred to by name and/or solely by letter reference (i.e., Individual A, B, C, etc.) depending on the sensitivity of the source.

high-risk customers like exchange houses, and, in some cases, complicity in the laundering activity by LCB managers.

For example, in this global narco-money laundering network, U.S.-designated Ayman Joumaa[17] has coordinated the transportation, distribution, and sale of multi-ton bulk shipments of cocaine from South America, and laundered the proceeds—as much as $200 million per month—from the sale of cocaine in Europe and the Middle East. In this criminal scheme, the proceeds have been laundered through various methods, including bulk cash smuggling operations and use of several Lebanese exchange houses that utilize accounts at LCB branches managed by family members of other participants in the global money laundering network. Specifically, Ayman Joumaa deposits bulk cash into multiple exchange houses, including the one that he owns, which then deposit the currency into their LCB accounts. He or the exchange houses then instruct LCB to perform wire transfers in furtherance of one of two TBML schemes. For example, some of the funds move to LCB's U.S. correspondent accounts via suspiciously structured electronic wire transfers to multiple U.S.-based used car dealerships—some of which are operated by individuals who have been separately identified in drug-related investigations. The recipients use the funds to purchase vehicles in the United States, which are then shipped to West Africa and/or other overseas destinations, with the proceeds ultimately repatriated back to Lebanon. Other funds are sent through LCB's U.S. correspondent accounts to pay Asian suppliers of consumer goods, which are

---

[17] On January 26, 2011, the U.S. Department of the Treasury's Office of Foreign Assets Control designated members and connected entities of the Ayman Joumaa drug trafficking and money laundering network, as Specially Designated Narcotics Traffickers due to their significant roles in international narcotics trafficking. This action, pursuant to the Foreign Narcotics Kingpin Designations Act (Kingpin Act), prohibits U.S. persons from conducting financial or commercial transactions with these entities and individuals and freezes any assets the designees may have under U.S. jurisdiction.

shipped to Latin America and sold and the proceeds are laundered through a scheme known as the Black Market Peso Exchange, in each case through other individuals referred to in this finding or via companies owned or controlled by them. According to USG information, Hizballah derived financial support from the criminal activities of Joumaa's network.

With respect to the exchanges and companies related to Ayman Joumaa, numerous instances indicate that substantial amounts of illicit funds may have passed through LCB. Since January 2006, hundreds of records with a cumulative equivalent value of $66.4 million identified a Lebanese bank that originated the transfer; approximately half of those were originated by LCB, for a cumulative equivalent value of $66.2 million, or 94%, thus, indicating that LCB probably is the favored bank for these exchange houses, particularly in the context of illicit banking activity. Similarly, a review of all dollar-denominated wire transfers with the two primary exchange houses either as sender or receiver between January 2004 and December 2008 showed 72% originated by one of the exchange houses through LCB.

Individual A, who owns a wide network of companies manufacturing or procuring consumer goods in Asia, Europe, and the Middle East, the Caribbean, and Lebanon, participates in this money laundering scheme by providing the consumer goods that are used for TBML, as described above. Despite his business being based in Asia, he is believed to have centralized his banking operations in Lebanon, particularly through the use of over 30 accounts at LCB. USG information shows Individual A receiving funds in his accounts from Ayman Joumaa, and exchanging funds with Latin American members

of the network discussed below. Individual A is known to be in near daily communication with the bank from his professional base in Southeast Asia.

Individual B, based in Latin America, is part of a Lebanese drug trafficking organization that moves large quantities of drugs from Latin America to destinations throughout Africa, Europe, and the Middle East. For over a decade, Individual B and his family have been involved in a variety of TBML schemes with Latin American drug traffickers and Lebanese money launderers. In the criminal schemes, the individuals deposit the local currency proceeds from the sale of imported consumer goods to the accounts of local banks and convert them to hard currency. This completes the Latin America-based Black Market Peso Exchange money laundering cycle, and allows for the repatriation of proceeds for the Latin American drug producers. Individual B then uses accounts at LCB to exchange the funds—usually in suspiciously structured amounts— with previously mentioned individuals and other suspected criminals as part of the global money laundering network. Information available to the USG suggests that Individual B and his family members are supporters of Hizballah.

Additionally, USG information indicates that Individual C, connected to both drug trafficking and money laundering, has established a money exchange house in the same building as a key LCB branch. This exchange uses its LCB accounts to deposit bulk cash proceeds of drug sales and then wires the proceeds to U.S.-based used car dealers. Individuals managing this and another LCB branch—each of which houses key accounts accepting bulk cash from exchange houses or wiring funds for the TBML schemes described above—are family members of one of the aforementioned individuals running Asia-based TBML activities.

At least one of these individuals has family relationships and personal contact with key LCB managers, in some cases working directly with those managers to conduct his transactions. The USG has information indicating that a minority owner of the bank, who concurrently serves as General Manager, his deputy, and the managers of key branches are in frequent—in some cases even daily—communication with various members of the aforementioned drug trafficking and money laundering network, and they personally process transactions on the network's behalf. Additionally, LCB managers are linked to Hizballah officials outside Lebanon. For example, Hizballah's Tehran-based envoy Abdallah Safieddine is involved in Iranian officials' access to LCB and key LCB managers, who provide them banking services.

Finally, information available to the U.S. Government indicates that LCB's subsidiary, Gambia-based Prime Bank, is partially owned by a Lebanese individual known to be a supporter of Hizballah. In addition to Gambian nationals, Prime Bank serves Iranian and Lebanese clientele throughout West Africa.

2.    The Extent to Which LCB is Used for Legitimate Business Purposes in the Jurisdiction

LCB is one of 49 mostly private Lebanese banks that make up Lebanon's financial sector. LCB has maintained modest but steady growth since 2000, with total assets of more than $5 billion in 2009.[18] LCB also appears to be aware of the risk posed by money laundering, as noted in its Anti-Money Laundering Policy Statement.[19] A publicly available source also indicates that U.S. financial institutions maintain correspondent relationships with LCB,[20] and it is likely that a high volume of those

---

[18] Lebanese Canadian Bank, 2009 Annual Report.
[19] Lebanese Canadian Bank, AML Policy Statement, www.lebcanbank.com
[20] Bankers Almanac, Lebanese Canadian Bank SAL, June 22, 2010 (http://www.bankersalmanac.com).

transactions through those accounts is legitimate. However, numerous instances have been identified where substantial volumes of illicit funds have passed through LCB. Thus, any legitimate use of LCB is significantly outweighed by the apparent use of LCB to promote or facilitate money laundering.

> 3. The Extent to Which Such Action is Sufficient to Ensure, With Respect to Transactions Involving LCB, that the Purposes of the BSA Continue To Be Fulfilled, and To Guard Against International Money Laundering and Other Financial Crimes

As detailed above, FinCEN has reasonable grounds to conclude that LCB is being used to promote or facilitate money laundering, and is, therefore, an institution of primary money laundering concern. Currently, there are no protective measures that specifically target LCB. Thus, finding LCB to be a financial institution of money laundering concern, which would allow consideration by the Secretary of special measures to be imposed on the institution under Section 311, is a necessary first step to prevent LCB from facilitating money laundering or other financial crime through the U.S. financial system. The finding of primary money laundering concern will bring criminal conduct occurring at or through LCB to the attention of the international financial community and further limit the bank's ability to be used for money laundering or other criminal purposes.

**III.    Finding**

Based on the foregoing factors, the Director of FinCEN hereby finds that the

Lebanese Canadian Bank SAL is a financial institution of primary money laundering

concern.


Dated: _____


_____

James H. Freis, Jr.
Director
Financial Crimes Enforcement Network

Exhibit B

PREET BHARARA
United States Attorney for the
Southern District of New York
By:   SHARON COHEN LEVIN
      MICHAEL D. LOCKARD
      JASON H. COWLEY
      ALEXANDER J. WILSON
One St. Andrew's Plaza
New York, New York 10007

RECEIVED

2012 OCT 26 P 8:01

U S DISTRICT COURT SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA,                          :

                    Plaintiff,                     :      **VERIFIED AMENDED
                                                          COMPLAINT**
            - v. -                                 :
                                                          11 Civ. 9186 (PAE)
LEBANESE CANADIAN BANK SAL, ELLISSA                :
HOLDING COMPANY, HASSAN AYASH EXCHANGE
COMPANY, CYBAMAR SWISS GMBH, LLC, STE              :
NOMECO SARL, STE MARCO SARL, and THE
SALHAB TRAVEL AGENCY,                              :

                    Defendants;                    :

ALL ASSETS OF LEBANESE CANADIAN BANK               :
SAL OR ASSETS TRACEABLE THERETO; ALL
ASSETS OF ELLISSA HOLDING COMPANY; ALL             :
ASSETS OF HASSAN AYASH EXCHANGE
COMPANY; ALL ASSETS OF STE MARCO SARL,             :
STE NOMECO SARL, THE SALHAB TRAVEL
AGENCY, AND CYBAMAR SWISS GMBH, LLC,               :
INCLUDING BUT NOT LIMITED TO ALL FUNDS
ON DEPOSIT IN THE BANK ACCOUNTS AS                 :
PARTICULARLY DESCRIBED IN SCHEDULE A;
and ALL ASSETS OF FOUR USED CAR BUYERS             :
IN THE UNITED STATES LISTED IN
SCHEDULE A; AND ALL PROPERTY TRACEABLE             :
THERETO,
                                                   :
                    Defendants in rem.
                                                   :
- - - - - - - - - - - - - - - - - - -x

TABLE OF CONTENTS

I.   NATURE OF THE ACTION . . . . . . . . . . . . . . . . . 3

II.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . 8

III. STATUTORY AUTHORITIES . . . . . . . . . . . . . . . . 9

     The International Emergency Economic Powers Act . . . . . 9

     The Terrorism Sanctions Regulations . . . . . . . . . . 10

     The Foreign Terrorist Organizations
          Sanctions Regulations . . . . . . . . . . . . . . 12

     The Global Terrorism Sanctions Regulations . . . . . . 13

     Iran and Syria Nonproliferation Act . . . . . . . . . 15

IV.  PROBABLE CAUSE FOR FORFEITURE . . . . . . . . . . . . 16

     A.   Overview . . . . . . . . . . . . . . . . . . . . 16

     B.   Hizballah . . . . . . . . . . . . . . . . . . . 18

     C.   Narcotics Trafficking in West Africa . . . . . . 21

     D.   Lebanese Canadian Bank . . . . . . . . . . . . 27

     E.   Hassan Ayash Exchange Company . . . . . . . . . 37

     F.   The Ellissa Exchange, Ellissa Shipping Company,
          and Ellissa Car Parc in Cotonou . . . . . . . . 38

     G.   Transfers from Ayash, Ellissa and Others to the
          United States to Buy and Ship Used Cars . . . . . 39

     H.   Salhab Family of Companies . . . . . . . . . . 40

     I.   The Link Between U.S. Car Buyers and the Salhab
          West African Bulk Money Courier Network . . . . . 42

     J.   Movement of Hundreds of Millions of Dollars from
          West Africa to Lebanon . . . . . . . . . . . . 44

     K.   Used Car Buyers in the U.S. Receive Wire Transfers
          for Buying and Shipping Used Cars as Part of the
          Money Laundering Scheme . . . . . . . . . . . . 49

V.   CLAIMS FOR FORFEITURE . . . . . . . . . . . . . . . . 62

VI.  CIVIL MONEY LAUNDERING PENALTIES . . . . . . . . . . 72

Plaintiff United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, for its verified amended complaint alleges, upon information and belief, as follows:

## I.   NATURE OF THE ACTION

1.    This _in rem_ forfeiture action and civil money laundering complaint arises out of an investigation by the Drug Enforcement Administration ("DEA") and other federal law enforcement agencies of a scheme to launder money through the United States financial system and the United States used car market. As part of the scheme, funds are transferred from Lebanon to the United States in order to purchase used cars, which are then shipped to West Africa and sold for cash. Cash proceeds of these car sales are then transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon. The cash is often moved through bulk cash smuggling.

2.    Hizballah members and supporters are involved at various points in the money laundering scheme. Hizballah members and supporters facilitate the smuggling of cash, including proceeds from the sale of used cars exported from the United States and narcotics proceeds, from West Africa to Lebanon; and finance and facilitate the purchase of some of the used cars in the United States. Because Hizballah is a designated Foreign

Terrorist Organization, a Specially Designated Terrorist, and a Specially Designated Global Terrorist (discussed more fully below), the money laundering scheme also involves violations of the International Emergency Economic Powers Act of 1977 ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1705.

3.    Lebanese financial institutions and exchange houses play a key role in these money laundering channels.  For example, on January 26, 2011, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated Ayman Joumaa, a Lebanese narcotics trafficker and money launderer, under the Foreign Narcotics Kingpin Designation Act, codified at Title 21, United States Code, Sections 1901 to 1908 (the "Kingpin Act").  The same day, OFAC designated, among others, the Hassan Ayash Exchange Company and the Ellissa Exchange Company (the "Ellissa Exchange") -- two Lebanese exchanges houses -- for their roles in Joumaa's laundering of narcotics proceeds.  In addition, Ellissa Group SA, Ellissa Holding, Ellissa Megastore, Ellissa Parc Cotonou, and Ellissa Shipping, the latter three of which are located in Benin, were designated (the Ellissa companies collectively, "Ellissa Holding").  OFAC also designated Phenicia Shipping Offshore SARL

for being owned or controlled by members of Ayman Joumaa's organization.

4.     Moreover, on June 27, 2012, OFAC announced its designation of four additional individuals and three entities involved in laundering the proceeds of narcotics trafficking for Ayman Joumaa.  Announcing the designations, Under Secretary for Terrorism and Financial Intelligence David S. Cohen described Joumaa's network as "a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."

5.     As a result of the OFAC action, certain assets of the Hassan Ayash Exchange Company and the Ellissa Exchange Company remain as blocked assets in the United States. Approximately $700,000 in funds are presently being held by J.P. Morgan Chase.  These funds were in the process of being wired through an account in Manhattan, New York to an account held in the name of the Hassan Ayash Exchange Company at Lebanese Canadian Bank SAL in Lebanon.  Additionally, approximately 350 vehicles that were consigned to Ellissa and scheduled to be shipped to West Africa remain at various ports in the United States.

6.     On February 10, 2011, the U.S. Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN") issued

a finding and a proposed rule, pursuant to Section 311 of the USA PATRIOT Act, Title 31, United States Code, 5318A, that the Lebanese Canadian Bank SAL ("LCB") is a financial institution of primary money laundering concern (the "311 Action"). The proposed rule would prohibit U.S. financial institutions from opening or maintaining correspondent or payable-through accounts for LCB. The 311 Action was based, inter alia, on FinCEN's determination that there was reason to believe that LCB has been routinely used by drug traffickers and money launderers operating in various countries in Central and South America, Europe, Africa, and the Middle East, including by at least one narco-trafficker who is a supporter of Hizballah and another who provides financial support to Hizballah. FinCEN also determined that there was reason to believe that LCB managers are complicit in the network's money laundering activities.

7.    As a result of its identification as a financial institution of primary money laundering concern, LCB was no longer able to operate in the United States. Although the proposed rule prohibiting U.S. financial institutions from opening or maintaining correspondent or payable-through accounts for LCB was not yet in effect, financial institutions in the United States nonetheless terminated their correspondent banking relationships with LCB, cutting off LCB's access to the United

States financial system. Prior to its identification as a financial institution of primary money laundering concern, LCB maintained correspondent accounts with financial institutions in the Southern District of New York.

8. In or about September 2011, another Lebanese financial institution, Société Générale de Banque au Liban ("SGBL"), completed the acquisition of certain assets and liabilities of LCB.

9. Between approximately January 2007 and early 2011, at least $329 million was transferred by wire from accounts held in Lebanon at LCB, Federal Bank of Lebanon ("Federal Bank"), Middle East and Africa Bank ("MEAB"), and BLOM Bank ("BLOM") to the United States through their correspondent bank accounts with U.S. financial institutions located in the Southern District of New York and elsewhere for the purchase of used cars. Of that amount, $141,522,091 was transferred from accounts held by Hassan Ayash Exchange Company and $61,747,524 was transferred from accounts held by the Ellissa Exchange, with the remaining $126,281,969 transferred from accounts held by others.

10. For the reasons set forth in more detail below, the United States seeks civil money laundering penalties against LCB, Hassan Ayash Exchange Company, Ellissa Holding, STE Marco SARL, STE Nomeco SARL, the Salhab Travel Agency, and Cybamar

Swiss GMBH, LLC ("Cybamar Swiss") (collectively, the "Defendant
Entities"), in the amount of at least $446 million, representing
the sum of the funds laundered by each of those entities.

11. In addition, as set forth in more detail below,
the United States seeks the forfeiture, pursuant to Title 18,
United States Code, Sections 981(a)(1)(A) and (a)(1)(C), of
property involved in or traceable to the money laundering
offenses and property traceable to the IEEPA offenses alleged in
this Amended Complaint. Those assets include all assets of LCB,
Hassan Ayash Exchange, Ellissa Holding, STE Marco SARL, STE
Nomeco SARL, the Salhab Travel Agency, Cybamar Swiss, and the
used car buyers described in Schedule A to this Amended
Complaint, including, but not limited to, the specific assets
described in Schedule A, all funds transferred to the bank
accounts described in Schedule A, and all property traceable
thereto (collectively, the "Defendant Properties").

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction pursuant to Title 28,
United States Code, Sections 1345 and 1355. As set forth in
Schedule A, at least some of the Defendant Properties are within
the actual or constructive in rem jurisdiction of this Court.

13. Venue is proper pursuant to Title 28, United
States Code, Section 1355(b)(1)(A) because acts and omissions

giving rise to the forfeiture took place in the Southern District of New York.

### III.   STATUTORY AUTHORITIES

### The International Emergency Economic Powers Act

14.   This _in_ _rem_ forfeiture and civil money laundering penalty action relates to violations of regulations and Executive Orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701-1705.   IEEPA gives the President certain powers, defined in Section 1702, to respond to threats with respect to which the President has declared a national emergency.   Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."   50 U.S.C. § 1705(a).

15.   As described below, the President has issued executive orders, and the Department of State and the Department of the Treasury have promulgated regulations, pursuant to the IEEPA that prohibit a broad range of conduct with respect to Hizballah, including providing goods or services to Hizballah or any transactions or dealings in property in which Hizballah has an interest.

## The Terrorism Sanctions Regulations

16. On January 23, 1997, President William Jefferson Clinton issued Executive Order 12947, declaring a national emergency pursuant to the IEEPA and other statutes with respect to the threat to the national security, foreign policy, and economy of the United States posed by grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process. Executive Order 12947 blocked all property subject to U.S. jurisdiction in which any of 12 designated terrorist organizations, including Hizballah, had an interest. See 60 Fed. Reg. 5079 (Jan. 23, 1997).

17. To implement Executive Order 12947, OFAC issued the Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 595. The Terrorism Sanctions Regulations ("TSR") generally block the property of "Specially Designated Terrorists" ("SDTs"), consisting of the 12 organizations designated in Executive Order 12947 and any persons designated by the Secretary of State that are found to have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process or that assist in, sponsor, or provide financial, material, or technological support for, or services in support of, such acts of violence.

18.   Subpart 595.201(a) of the TSR provides, in relevant part:

> [N]o property or interests in property of a
> specially designated terrorist, that are in
> the United States, that hereafter come within
> the United States, or that are or hereafter
> come within the possession or control of U.S.
> persons, including their overseas branches,
> may be transferred, paid, exported, withdrawn
> or otherwise dealt in.

19.   Subpart 595.204 of the TSR prohibits transactions with, or for the benefit of, an SDT:

> Except as otherwise authorized, no U.S.
> person may deal in property or interests in
> property of a specially designated terrorist,
> including the making or receiving of any
> contribution of funds, goods, or services to
> or for the benefit of a specially designated
> terrorist.

20.   Subpart 595.205 of the TSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the TSR:

> Any transaction for the purpose of, or which
> has the effect of, evading or avoiding, or
> which facilitates the evasion or avoidance
> of, any of the prohibitions set forth in this
> part, is hereby prohibited. Any attempt to
> violate the prohibitions set forth in this
> part is hereby prohibited. Any conspiracy
> formed for the purpose of engaging in a
> transaction prohibited by this part is hereby
> prohibited.

## The Foreign Terrorist Organizations Sanctions Regulations

21. On October 8, 1997, the U.S. Department of State further designated Hizballah as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act, codified at Title 8, United States Code, Section 1189. See 62 Fed. Reg. 52650 (Oct. 8, 1997). Section 219 of the Immigration and Nationality Act authorizes the Secretary of State to designate as an FTO foreign organizations that engage in terrorist activity, or retain the capability and intent to engage in terrorist activity or terrorism, and whose terrorist activity or terrorism threatens the security of U.S. nationals or the national security of the United States.

22. To implement Section 219 of the Immigration and Nationality Act, OFAC issued the Foreign Terrorist Organizations Sanctions Regulations, Title 31, Code of Federal Regulations, Part 597. The Foreign Terrorist Organizations Sanctions Regulations ("FTOSR") generally block the property of FTOs and prohibit certain transactions with, or for the benefit of, FTOs by U.S. persons.

23. Subpart 597.201(a) of the FTOSR provides, in relevant part:

> Upon notification to Congress of the
> Secretary of State's intent to designate an
> organization as [an FTO] . . . any U.S.

12

> financial institution receiving notice from
> the Secretary of the Treasury . . . shall,
> except as otherwise provided in such notice,
> block all financial transactions involving
> any assets of such organization within the
> possession or control of such U.S. financial
> institution until further directive from the
> Secretary of the Treasury, Act of Congress,
> or order of court.

24.    Subpart 597.204 further prohibits attempts and

conspiracies to violate or to evade the prohibitions of the

FTOSR.

### The Global Terrorism Sanctions Regulations

25.    On September 23, 2001, in the wake of the

September 11, 2001, terrorist attacks, President George W. Bush

issued Executive Order 13224, declaring a national emergency

pursuant to IEEPA and other statutes with respect to the threat

to the national security, foreign policy, and economy of the

United States posed by grave acts of terrorism and threats of

terrorism committed by foreign terrorists, including the

terrorist attacks in New York, Pennsylvania, and at the Pentagon,

and the continuing and immediate threat of further attacks on

United States nationals or the United States.   Executive Order

13224 identified 12 individuals and 15 entities whose assets were

blocked.   See 66 Fed. Reg. 49079 (Sept. 23, 2001).

26.    On October 31, 2001, the Secretary of State

identified Hizballah, among others, as a specially designated

global terrorist ("SDGT") pursuant to Executive Order 13224 because it had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States. See 67 Fed. Reg. 12633 (Mar. 19, 2002).

27. To implement Executive Order 13224, OFAC issued the Global Terrorism Sanctions Regulations, Title 31, Code of Federal Regulations, Part 594 ("GTSR").

28. Subpart 594.201 of the GTSR provides, in relevant part:

> [P]roperty and interests in property of the
> following persons [including SDGT's] that are
> in the United States, that hereafter come
> within the United States, or that hereafter
> come within the possession or control of U.S.
> persons, including their overseas branches,
> are blocked and may not be transferred, paid,
> exported, withdrawn or otherwise dealt
> in . . . .

29. Subpart 594.204 of the SDGT further prohibits certain transactions with, or for the benefit of, an SDGT:

> Except as otherwise authorized, no U.S.
> person may engage in any transaction or
> dealing in property or interests in property
> of persons whose property or interests in
> property are blocked pursuant to
> § 594.201(a), including but not limited to
> the making or receiving of any contribution
> of funds, goods, or services to or for the
> benefit of persons whose property or
> interests in property are blocked pursuant to
> § 594.201(a).

14

30. Subpart 594.205 of the SDGT further prohibits attempts and conspiracies to violate or to evade the prohibitions of the SDGT:

> (a) Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any transaction by any U.S. person or within the United States on or after the effective date that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this part is prohibited.
>
> (b) Except as otherwise authorized, and notwithstanding any contract entered into or any license or permit granted prior to the effective date, any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is prohibited.

### Iran and Syria Nonproliferation Act

31. On November 22, 2005, President George W. Bush signed into law the Iran Nonproliferation Amendments Act of 2005, which, in part, expanded the scope of the Iran Nonproliferation Act of 2000. Accordingly, the Iran Nonproliferation Act of 2000 was renamed the Iran and Syria Nonproliferation Act. On April 23, 2007, the U.S. Department of State issued a determination that, inter alia, Hizballah and any successor, sub-unit, or subsidiary, had engaged in activities warranting the imposition of measures pursuant to the Iran and Syria Nonproliferation Act (currently the Iran, North Korea, and Syria Nonproliferation Act,

codified as amended at 50 U.S.C. § 1701 note), which provides for penalties on foreign persons and entities for the transfer to or acquisition from Iran since January 1, 1999, or the transfer to or acquisition from Syria since January 1, 2005, of equipment and technology controlled under multilateral export control lists or otherwise having the potential to make a material contribution to the development of weapons of mass destruction or cruise or ballistic missile systems.  See 72 Fed. Reg. 20158 (Apr. 23, 2007).  This State Department determination regarding Hizballah expired on April 17, 2009.

## IV.  PROBABLE CAUSE FOR FORFEITURE

### A.  Overview of Money Laundering Scheme

32.  This civil forfeiture action relates to a trade-based money laundering scheme involving the purchase of used cars and other vehicles in the United States for shipment and sale abroad, with funds provided by banks, currency exchanges, and individuals associated with, funded by, controlled by, or directed by the Lebanon-based terrorist organization known as Hizballah.

33.  Among the documents reviewed by law enforcement agencies in their investigation of this matter are wire transfer records from approximately January 1, 2007, through early 2011 (the "Wire Transfer Period").  In the United States, the Federal

Reserve Banks operate a major wire transfer system (the Fedwire Funds Service); the Clearing House Payments Company L.L.C. operates another, called CHIPS. Both systems are used to make large-value or time-critical domestic and international payments in U.S. dollars. Wire transfers can also be accomplished through other means, including book transfers or proprietary networks, and may be facilitated by communication systems such as SWIFTNet. The wire transfer information obtained in the investigation reveals the date, amount, beneficiary, originator, and various other details about the transfers. Analysis of the comment section data contained within the wire transfer records also reveals, in some cases, the purpose for the transactions and the names of the individuals or entities responsible for initiating the transactions, or on whose behalf the transactions were ordered other than the originating account holder.

34. As described more fully below, the key participants and facilitators of the money laundering scheme include Hizballah members and supporters, the Lebanese Canadian Bank, the Hassan Ayash Exchange Company, Ellissa Holding and its subsidiaries and affiliates, Ayman Saied Joumaa, the Salhab group of companies, and their principals, members of the Salhab family, used car lots in West Africa, money couriers operating in West

Africa and the Middle East, and used car buyers in the United States.

35. Through this scheme, and as described more fully below, the key participants and facilitators, including the Lebanese Canadian Bank, the Hassan Ayash Exchange Company, and Ellissa Holding and its subsidiaries and affiliates, provided funds, goods, and services to or for the benefit of Hizballah and conspired to violate and to evade and avoid the prohibitions of the TSR, the FTOSR, and the GTSR by causing funds to be wired from Lebanon to U.S. persons in the United States for the purchase of used cars to be shipped by U.S. persons to West Africa in order to create a channel for laundering proceeds of narcotics trafficking and other unlawful activities, to generate fees and commissions to be paid to Hizballah members and supporters who were involved at various points in the money laundering scheme, and to finance and facilitate the purchase of some of the used cars from the United States.

B. Hizballah

36. Hizballah is a Lebanon-based terrorist organization formed in approximately 1982. Hizballah is responsible for some of the deadliest terrorist attacks against the United States, including the suicide truck bombings of the

U.S. Embassy and U.S. Marine barracks in Beirut in 1983 and the U.S. Embassy Annex in Beirut in 1984.

37. According to the U.S. Department of State, Hizballah receives training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid from Iran; training, weapons, diplomatic, and political support from Syria; and funding from private donations and profits from legal and illegal businesses.

38. Hizballah operates a network of social programs and political operations within Lebanon alongside its militia and terrorist operatives, and has been described as a "state within a state." As discussed above, Hizballah has been identified as a terrorist organization by the U.S. Government under numerous sanctions regulations.

39. In testimony before the Subcommittee on Near Eastern and South Central Asian Affairs of the Senate Committee on Foreign Relations in June 2010, the U.S. Department of State Coordinator for Counterterrorism described Hizballah as follows:

> Hizballah's persistence as a well-armed
> terrorist group within Lebanon, as well as
> its robust relationships with Iran and Syria,
> and the transfer of increasingly
> sophisticated missiles and rockets to
> Hizballah, threaten the interests of the
> United States, Lebanon, and our partners in
> the region, especially Israel.

\* \* \*

Hizballah remains the most technically-capable terrorist group in the world and a continued security threat to the United States. Hizballah is responsible for some of the deadliest terrorist attacks against Americans in history, and the United States has designated it as a Foreign Terrorist Organization since 1997.

* * *

There has been much debate over the political identity of Hizballah, as well as the prospects for Hizballah to become a legitimate political party within Lebanon. Following Lebanon's bloody civil war, other militias disbanded or were integrated into Lebanon's legitimate defense force, the Lebanese Armed Forces (LAF). However, despite the group's rhetoric and political campaigning, there remains today no meaningful distinction between the military and political wings of Hizballah, as Hizballah's own leaders regularly acknowledge publicly. . . . Hizballah is the lone militia that refused to disarm following the signing of the Taif Accord, which marked the end of Lebanon's tragic civil war.

* * *

Despite the devastating effects of its 2006 war with Israel and the 2008 domestic conflict in Lebanon, which Hizballah initiated, Hizballah remains today one of the best armed and most dangerous militias in the world. Its capabilities exceed those of the legitimate Lebanese security services and the United Nations Interim Force in Lebanon (UNIFIL). . . .

Hizballah also claims publicly to have reconstituted and improved its arsenal since the 2006 war. As Lebanon has no domestic arms industry, this would have undoubtedly been accomplished by means of smuggling activity

via Syria and Iran. In 2008 alone, Iran
provided hundreds of millions of dollars to
Hizballah and trained thousands of Hizballah
fighters at camps in Iran. Iran continues to
assist Hizballah in rearming, violating
Security Council resolution 1701. . . .

While Iran continues to provide a significant
portion of Hizballah's funding, Hizballah has
also broadened its sources of financial
support in recent years. Hizballah is now
heavily involved in a wide range of criminal
activity, including the drug trade and
smuggling. It also receives funds from both
legitimate and illicit businesses that its
members operate, from NGOs under its control,
and from donations from its supporters
throughout the world. Hizballah also has
established its own commercial and
communications networks outside the Lebanese
legal system that in essence rob the Lebanese
treasury of the tax revenues that would come
via legitimate licensing, registration, and
tax reporting.

40. Hizballah has developed links to money laundering

and narcotics trafficking. Since in or around 2006, such

narcotics trafficking has been condoned through the issuance of

fatwas by radical Islamic clerics. The narcotics trade has

become a source of revenue for Hizballah.

C. **Narcotics Trafficking in West Africa**

41. During the last decade, drug trafficking

organizations have increasingly used countries along or near the

West African coast as trans-shipment hubs for importing massive

quantities of narcotics, particularly cocaine from South America,

to be later distributed in Europe or elsewhere within Africa.

Through a combination of privately owned aircraft and maritime vessels, these organizations, predominantly based in Venezuela and Colombia, have transported hundreds of tons of cocaine, worth billions of dollars, to West African nations such as Benin, Sierra Leone, and Togo.

42. According to a 2010 report by the U.S. Congressional Research Service, law enforcement officials seized at least 46 metric tons of cocaine bound for Europe via West Africa between 2005 and 2008. As much as 300 metric tons of cocaine, worth approximately $13.5 billion, is estimated to be trafficked through West Africa to Europe each year. The wholesale profits reaped by narco-traffickers during this period are estimated to be approximately $3.5 billion per year.

43. Narco-traffickers connected to the money laundering scheme are heavily involved in this West African narcotics trade. For example:

a. Ayman Joumaa's drug-trafficking organization transports, distributes and sells multi-ton bulk shipments of South American cocaine through West Africa. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million per month, through various channels, including bulk cash smuggling operations and Lebanese exchange

houses.  Joumaa's organization uses, among other things, Hizballah couriers to transport and launder narcotics proceeds. Joumaa's organization pays fees to Hizballah to facilitate the transportation and laundering of narcotics proceeds.  For example, Joumaa's organization sends bulk cash shipments through the Beirut International Airport, and pays Hizballah security to safeguard and transport the cash to its recipient.

b.  As described above, these activities led OFAC to designate Joumaa as a Specially Designated Narcotics Trafficker, pursuant to the Foreign Narcotics Kingpin Designation Act.  On November 23, 2011, Joumaa was charged in an indictment, United States v. Ayman Joumaa, 11 Cr. 560 (TSE), filed in the Eastern District of Virginia, with conspiracy to distribute narcotics and conspiracy to commit money laundering.  The indictment alleges that Joumaa and his co-conspirators coordinated the shipment of tens of thousands of kilograms of cocaine, including at least 85,000 kilograms of cocaine sold to Los Zetas, a Mexican drug cartel, between in or around 2005 to in or around 2007.  The indictment also alleges that Joumaa laundered hundreds of millions of dollars in drug proceeds from West Africa, Europe, Mexico and the United States, largely for cocaine suppliers in Colombia and Venezuela, who paid Joumaa's

organization a fee of between 8% and 14% of the laundered proceeds.

c.    Another drug trafficking organization, led by Maroun Saade, was also involved in the transportation and distribution of large quantities of cocaine and other narcotics in West Africa.  On February 8, 2011, Saade, along with other defendants, was charged in an indictment, United States v. Maroun Saade, et al., 11 Cr. 111 (NRB), filed in the Southern District of New York with offenses arising from an agreement to sell approximately one thousand kilograms of cocaine or more to individuals he believed to be affiliated with the Taliban and to transport and distribute Taliban-owned heroin in West Africa.[1] Saade is a member of the Free Patriotic Movement, a Lebanese Christian organization allied with Hizballah, and has provided services to Hizballah members engaged in narcotics trafficking and bulk cash smuggling in West Africa.  Saade is a close

_____

[1]    Saade is charged with conspiracy to commit narcoterrorism, in violation of Title 21, United States Code, Section 960a and Title 18, United States Code, Section 3238; conspiracy to import cocaine, in violation of Title 21, United States Code, Section 963; conspiracy to import heroin, in violation of Title 21, United States Code, Section 963; conspiracy to provide material support to terrorists, in violation of Title 18, United States Code, Sections 2339A and 3238; conspiracy to acquire and transfer anti-aircraft missiles, in violation of Title 18, United States Code, Sections 2332g and 3238.

associate of Oussama Salhab, a Hizballah operative who, among other things, controls a network of money couriers who have transported millions of dollars in cash from West Africa to Lebanon. As described more fully below, see ¶¶ 72-73, Saade has paid bribes to obtain the release of money couriers working for Salhab who were detained by Togolese authorities. For example, after Salhab's and an employee's arrest by Togolese law enforcement on July 21, 2010, for smuggling bulk currency across the Togo/Ghana border, Saade secured Salhab's release. Saade has also bribed government officials to terminate certain investigations, most notably an investigation into narcotics trafficking by Imad Zbib, a prominent Hizballah representative in Togo. Saade has also facilitated the operations of Hizballah operative Oussama Salhab (discussed below, see ¶¶ 56-59, 68-73). See ¶¶ 72-73.

d.     Zbib is a close associate of Salhab and a West African narco-trafficker. Zbib's organization has, for example, transported loads of two to three metric tons of cocaine from South America to Togo via maritime shipping. Zbib distributes this cocaine in Europe, transporting it concealed in used cars nominally purchased for several used car lots he owns in Togo. Zbib personally transported bulk United States and Euro

currency in the amount of at least approximately $2,068,520 and €974,490 across the Togo/Ghana border in 2007 and 2008.

e. Between at least 2007 and 2009, a Colombia-based drug trafficking organization connected to this conspiracy shipped thousands of kilograms of cocaine from South America to West Africa. In July 2008, a plane carrying 600 kilograms of cocaine was seized in Sierra Leone, leading to the arrest of several members of the organization. On July 7, 2009, several of these members and other co-conspirators were charged in an indictment, United States v. Geraldo Quintana-Perez, et al., 08 Cr. 977 (RPP), filed in the Southern District of New York with conspiracy to distribute narcotics in violation of Title 21, United States Code, Section 846, and other charges.

44. Hizballah as an organization has also been involved in narcotics trafficking. For example, in approximately 2009, an individual ("Individual-1") met with Hizballah members in the Dahiya neighborhood of Beirut, Lebanon, where the Hizballah members discussed Hizballah's trafficking of cocaine in Europe and its interest in developing additional transportation routes for cocaine to Europe through Africa. The Hizballah members explained, among other things, that Hizballah used cocaine as part of a drugs-for-information program to buy intelligence, particularly about Israel.

D. **Lebanese Canadian Bank**

45. Prior to being identified by FinCEN as a financial institution of primary money laundering concern in the 311 Action, LCB was Lebanon's eighth-largest bank, headquartered in Beirut and having approximately 35 branches throughout Lebanon. As of 2009, LCB's total assets were worth more than $5 billion. LCB had a controlling financial interest in a number of subsidiaries, including LCB Investments (Holding) SAL, LCB Finance SAL, LCB Estates SAL, LCB Insurance Brokerage House SAL, Dubai-based Tabadul for Shares and Bonds LLC, and Prime Bank Limited of Gambia. LCB owned 51 percent of Prime Bank, with remaining shares held by local and Lebanese partners. LCB served as the sole correspondent bank for Prime Bank.

46. Following FinCEN's identification of LCB as a financial institution of primary money laundering concern in the 311 Action, LCB entered into an agreement with SGBL for SGBL to acquire certain assets and liabilities of LCB. SBGL completed this acquisition in or about September 2011.

47. Prior to being identified as an entity of primary money laundering concern by FinCEN in the 311 Action, LCB had poor anti-money laundering controls and, indeed, knowingly conducted business with Hizballah-controlled entities and

individuals and entities linked to, among other things, African diamond smuggling, money laundering, and narcotics trafficking.

       a.    For example, LCB maintained a banking relationship with the Yousser Company for Finance and Investment (the "Yousser Company") and Bayt al-Mal. These relationships were managed by LCB's branch on Airport Road in Beirut. Loans to the Yousser Company were guaranteed by, among others, "Hussain Shami," a director of the company. On September 7, 2006, OFAC designated the Yousser Company, Bayt al-Mal, and an individual named Husayn al-Shami as SDGTs pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations. OFAC described the Yousser Company and Bayt al-Mal as "Hizballah's unofficial treasury, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks. . . . Institutions considering dealing with these two entities are now on notice as to their true character." Al-Shami was described as the head of Bayt al-Mal and:

> a senior Hizballah leader who has served as a member of Hizballah's Shura Council and as the head of several Hizballah-controlled organizations, including the Islamic Resistance Support Organization. Shami is also responsible for foreign donations to Hizballah fundraising organizations.

       b.    LCB also maintained a banking relationship with Farah Company, a subsidiary of "Yousser Finance & Investment

Company, Limited Liability Company." This banking relationship was also managed by the LCB Airport Road branch in Beirut.

        c.    LCB maintained a banking relationship with Lebanese Arab Company for Touristic Services SARL, a company owned by the Al Mabarat Association, or "Mabarat Khairiah," Hamzeh Safieddine, Mohammed Fadlallah, Kamal Makki, and Ali Fadlallah. The relationship was managed by LCB's branch on Airport Road in Beirut. On January 25, 1995, Mohammad Hussein Fadlallah was designated by the U.S. Department of the Treasury as a Specially Designated Terrorist pursuant to Executive Order 12947, see 60 Fed. Reg. 5084 (Jan. 24, 1995) and the Terrorism Sanctions Regulations, and had been called Hizballah's spiritual leader by OFAC.[2] Fadlallah was the founder of the Al Mabarat Association.

        d.    LCB maintained a banking relationship with Rayan (Offshore) LLC. Rayan was owned by, among others, Colonel Rida el-Moussaoui, the brother-in-law of LCB Executive Board Member and Deputy General Manager Mohammed Hamdoun and a former officer in the Lebanese security forces; and Nawaf Moussaoui, a Hizballah public spokesperson and presently a member of the Lebanese Parliament for the Loyalty to the Resistance Bloc, Hizballah's political party.

---

[2]   Fadlallah died on July 3, 2010.

e.     LCB maintained a banking relationship with Matrix SAL Off-shore, a company controlled by Kassem Mohamad Ajami and Mohamad Ali Ezzedine.  Ajami and Ezzedine also owned Babylon Enterprises Nigeria Limited.  Ajami and Ezzedine are business associates of Ali Tajideen's company, Tajco.  On December 9, 2010, OFAC designated Ali Tajideen, his brother Husayn Tajideen, and their company, Tajco SARL -- along with a network of businesses owned or controlled by them in Gambia, Sierra Leone, the Democratic Republic of Congo, Angola, and the British Virgin Islands -- as SDGTs pursuant to Executive Order 13224 and the Global Terrorism Sanctions Regulations.  OFAC described Ali Tajideen as a former Hizballah commander and the Tajideen brothers as Hizballah fundraisers.  Their company, Tajco, was described as an international trade and real-estate company that purchased and developed properties in Lebanon on behalf of Hizballah and that generated millions of dollars in proceeds used to provide financial support to Hizballah.  Ali and Husayn Tajideen's brother, Kassim Tajideen, was designated a SDGT on May 27, 2009, and described by OFAC as an important financial contributor to Hizballah who runs a network of businesses in Lebanon and Africa.

f.     LCB maintained a banking relationship with individuals and entities involved in the African diamond

smuggling trade. For example, LCB maintained a banking relationship with Nazem Ibrahim Ahmad, a Belgian of Lebanese origin trading in rough diamonds. On October 8, 2002, the United Nations Security Council's Panel of Experts on the Illegal Exportation of Natural Resources and Other Forms of Wealth of the Democratic Republic of Congo ("DRC") issued a report, S/2002/1146, addressing possible actions to help bring an end to the plundering of the natural resources of the DRC and the effect of those actions on the humanitarian and economic situation of the DRC. The report described the Sierra Gem Diamonds Company, whose principals were Nazem Ahmad, Hassan Ahmad, and Said Ali Ahmad, as associated with one of three Lebanese clans that purchased $150 million in diamonds from the DRC in 2001. The report alleged that the three clans, including the Ahmad clan, had ties to Hizballah and also were involved in counterfeiting, money-laundering and diamond smuggling. In response to an LCB customer due diligence report on Ahmad and the UN report S/2002/1146, the LCB credit department stated that "we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon," and authorized an increase in credit limits for Ahmad.

g. In or about September 2003, Ahmad Safa, the Associate General Manager for Branches and Operations, granted

exceptions for certain LCB clients from LCB's policy of requiring cash transaction slips ("CTS") for cash transactions greater than $10,000. CTSs required disclosure of the source of funds deposited and were filed with the Central Bank of Lebanon. The clients granted exceptions by Safa included individuals and entities related to Hizballah.

(1)    For example, the Yousser Company, which has been designated as a SDGT by OFAC as discussed above, was exempted from signing CTSs for cash transactions up to $50,000 per week at the Nabatieh branch and up to $60,000 per day at the Airport Road branch.

(2)    The Farah Company for Tourism, a subsidiary of the Yousser Company, was exempted from signing CTSs for cash transactions up to 50,000,000 Lebanese pounds[3] per week at the Nabatieh branch.

(3)    Hussein Ali Mohamed Chami (Husayn al-Shami), who has been designated as a SDGT by OFAC as discussed above, and Wahid Mahmoud Sbeity, another owner of the Yousser Company, were exempted from signing CTSs for cash transactions up to $30,000 per week at the Nabatieh branch. Al-Shami, along with two other directors of the company, were exempted from signing

---

[3]    As of September 1, 2003, the exchange rate was approximately $1.00 per 1,515 Lebanese pounds, or approximately $33,000 per 50 million Lebanese pounds.

32

CTSs for cash transactions up to $200,000 per day and up to 200,000,000 Lebanese pounds[4] per day at the Airport Road Branch.

(4) In other words, the Yousser Company, its subsidiary the Farah Company, and its owners and directors collectively were granted exemptions from signing CTSs disclosing the source of funds for cash transactions totaling up to $80,000 and 50,000,000 Lebanese pounds per week at the Nabatieh branch and up to $260,000 and 200,000,000 Lebanese pounds per day at the Airport Road branch.

(5) The Al Mabarat Association, whose founder was designated a SDT as discussed above, and the Lebanese Arab Touristic Company, a company owned by the Al Mabarat Association, were exempted from signing CTSs for cash transactions up to $55,000 per day and $22,000 per day, respectively, at the Airport Road branch.

(6) Al-Aytam, another organization founded by Fadlallah, was exempted from signing CTSs for cash transactions up to $50,000 per day at the Airport Road branch.

(7) The Al-Shahid Foundation, which OFAC designated as a SDGT pursuant to Executive Order 13224 on July 24, 2007, see 72 Fed. Reg. 60715, was exempted from signing CTSs

---

[4] As of September 1, 2003, approximately $132,000.

for cash transactions up to $100,000 per day at the Airport Road branch.

        h.    On October 16, 2006, the LCB Anti-Money Laundering Special Committee discussed, among other things, recent OFAC designations of LCB clients the Yousser Company and Hussein Chami (Husayn al-Shami). Committee members were directed to take the OFAC listing seriously and to avoid implicating the bank with irregular situations with U.S. banking institutions. However, LCB continued to maintain banking relationships with the Yousser Company and al-Shami.

        i.    When FinCEN identified LCB as an entity of primary money laundering concern in the 311 Action, it noted that exchange houses with accounts at LCB were used by Ayman Joumaa to launder hundreds of millions of dollars in proceeds of narcotics trafficking. As described by FinCEN, exchanges and companies related to Joumaa originated over $66 million in wire transfers from Lebanese banks since January 2006, with approximately one-half of the wire transfers and approximately 94% of the funds originating from LCB, indicating that LCB is the favored bank for these Joumaa-related entities, particularly for illicit banking activity.

        48.    LCB also had substantial banking relationships with the Hassan Ayash Exchange and the Ellissa Exchange. LCB

maintained these relationships, despite substantial violations of LCB's anti-money laundering and compliance policies.

a.    The Ellissa Exchange, the Hassan Ayash Exchange, and their principals held accounts with LCB through LCB's branch in Verdun, Beirut.  The Ellissa Exchange was introduced to LCB as a client through the Hassan Ayash Exchange.

b.    A 2006 LCB customer due diligence report noted that the Ellissa Exchange and its principals were implicated in smuggling cash out of Africa through several channels, including cash smuggling on flights from Ghana to Beirut.  The report further noted that LCB had limited "know your customer" files for these clients and that another Lebanese bank had closed its accounts with the Ellissa Exchange.  The report described large cash deposits into accounts of the exchange's owners, transactions inconsistent with the nature and purpose of the accounts, and the exchange's failures to supply information about the nature and purpose of transactions.

c.    As a result of this 2006 due diligence report, the LCB Anti-Money Laundering Special Committee directed Ahmad Safa to ensure that the Ellissa Exchange accounts complied with LCB reporting and diligence requirements.  Despite this direction, however, the Ellissa Exchange accounts continued to operate with inadequate diligence and reporting.

d.   In approximately 2006, at Ahmad Safa's direction, the Hassan Ayash Exchange became LCB's primary source of foreign currencies, in particular U.S. dollars.   Prior to Safa's intervention, LCB had maintained a diversified source of foreign currencies.

49.   Between approximately January 2007 and approximately February 10, 2011, approximately $229,872,953 was transferred from accounts at LCB to United States car buyers for buying and shipping used cars.

50.   LCB transferred these funds knowing that the funds represented the proceeds of illegal activities; that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds; and to promote those illegal activities; and that this money laundering scheme benefitted Hizballah.

51.   In or about September 2011, SBGL completed its acquisition of certain assets and liabilities of LCB.   The asset acquisition was for the total consideration of approximately $580,000,000.00 (the "Purchase Price"), subject to certain adjustments. $150,000,000 of the Purchase Price was held in escrow in another Lebanese financial institution (the "Escrow Institution").

52. On or about August 15, 2012, the United States seized $150,000,000 from the U.S. correspondent accounts of the Escrow Institution as property to be regarded pursuant to Title 18, United States Code, Section 981(k), as traceable to the assets of LCB.

**E.   Hassan Ayash Exchange Company**

53. The Hassan Ayash Exchange Company is a money exchange based in Beirut, Lebanon. The Hassan Ayash Exchange is owned and controlled by Mahmoud Hassan Ayash ("Hassan Ayash") and his son, Hassan Mahmoud Ayash. The exchange's principal office is located adjacent to the Caesar Park Hotel in Beirut, which is owned by Ayman Joumaa.

54. Hassan Ayash and the Hassan Ayash Exchange Company knowingly facilitate bulk cash transfers and money laundering by, among others, Ayman Joumaa and Joumaa's narcotics trafficking and money laundering network.

55. Hassan Ayash has stated that he has family ties to Hizballah, including Secretary General Hassan Nasrallah, the leader of Hizballah. Hassan Ayash has further stated that his connections to important people in Lebanon help him provide services for clients of the Hassan Ayash Exchange. Hassan Ayash requires that an existing client of the Hassan Ayash Exchange Company vouch for a prospective client before the prospective

client can establish an account with the exchange to transfer large amounts of money.

56. Wire transfers originating from the Hassan Ayash Exchange Company totaling approximately $141,522,091 were sent to United States accounts for the purpose of purchasing or shipping cars between in or about January 2007 and in or about January 2011.

57. The Hassan Ayash Exchange Company originated these wire transfers with knowledge that the funds were the proceeds of illegal activities and that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds, and to promote those illegal activities; and that this money laundering scheme benefitted Hizballah.

**F.    The Ellissa Exchange, Ellissa Shipping Company, and Ellissa Car Parc in Cotonou**

58. The Ellissa Holding Company owns or controls approximately nine companies in Lebanon, Benin and the DRC, including the Ellissa Exchange, a money exchange based in Sarafand, Lebanon; Ellissa Group SA, which owns a car park in Cotonou, Benin, for receiving and selling used cars imported to the Cotonou port; and Ellissa Shipping, which is principally engaged in shipping used cars to Benin through the Cotonou port.

The Ellissa Holding Company is principally owned and controlled by Jamal Mohamad Kharoubi and Ali Mohammed Kharroubi.

59. The Ellissa Holding Company and its subsidiaries knowingly facilitate bulk cash transfers and money laundering by, among others, Ayman Joumaa and Joumaa's narcotics trafficking and money laundering network.

60. Wire transfers originating from the Ellissa Exchange totaling approximately $61,747,524 were sent to United States accounts for the purpose of purchasing or shipping cars between in or about January 2007 and in or about January 2011.

61. The Ellissa Holding Company originated these wire transfers with knowledge that the funds were the proceeds of illegal activities, that the transfers were in furtherance of a scheme intended to conceal and disguise the true source, nature, ownership, and control of those proceeds, and to promote those illegal activities; and that this money laundering scheme benefitted Hizballah.

## G. Transfers from Ayash, Ellissa and Others to the United States to Buy and Ship Used Cars

62. Between in or about January 2007 and in or about January 2011, the Ayash Exchange and the Ellissa Exchange originated approximately $203,269,615 or more in wire transfers (the "Exchange Funds") from accounts held at LCB, Federal Bank, BLOM, and MEAB (collectively, the "Lebanese Banks") to bank

accounts in the United States for the purchase or shipping of used cars.

63. Account holders other than Hassan Ayash Exchange and Ellissa Exchange initiated wire transfers totaling at least approximately $126,281,969 (the "Non-Exchange Funds") to bank accounts in the United States for the purchase or shipping of used cars. Some of the originators for these Non-Exchange Funds are discussed below, see ¶ 77.

64. The following table summarizes the Exchange Funds and Non-Exchange Funds that were wired to the Lebanese Banks and then further wired to correspondent bank accounts in the United States, including in the Southern District of New York:

| Bank | Exchange Funds | Non-Exchange Funds | Total |
|---|---|---|---|
| Lebanese Canadian Bank | $170,848,679 | $59,024,274 | $229,872,953 |
| BLOM Bank | $27,717,176 | $65,468,173 | $93,185,349 |
| Middle East and Africa Bank | $1,913,625 | $1,506,477 | $3,420,102 |
| Federal Bank of Lebanon | $2,790,135 | $283,045 | $3,073,180 |
| TOTAL | $203,269,615 | $126,281,969 | $329,551,584 |

H.    Salhab Family of Companies

65. Between 2008 and 2010, used cars valued collectively at over $1 billion were shipped from the United

States to Benin, including hundreds of millions' worth of used cars purchased with funds from the Lebanese Banks.

66.   The Salhab Companies are owned, operated, or controlled by Oussama Salhab or his relatives and associates. STE Nomeco SARL, a Salhab Company, owns and operates used car lots in Benin; STE Marco SARL, another Salhab Company, is a transportation company operating between Togo and Ghana; the Salhab Travel Agency operates in West Africa; and Cybamar Swiss is a shipping company frequently used by the car buyers who received the Exchange Funds and Non-Exchange Funds transferred from the Lebanese Banks, as described above (collectively, the "Salhab Companies"). Cybamar Swiss is headquartered in Redford, Michigan, with affiliated companies based in Europe.

67.   Oussama Salhab was born in the Bekaa Valley, Lebanon and is believed to currently reside in Togo and Lebanon. Salhab is a Hizballah operative. On or about November 22, 2009, Salhab flew into the Detroit Metropolitan Airport on a flight from Beirut, Lebanon. During an interview with a U.S. Customs and Border Protection ("CBP") officer, Salhab stated that he was traveling to the United States for business on behalf of Cybamar Swiss. He had on his person a business card identifying Salhab as the President of STE Marco SARL. During a border inspection of a fingerprint-encrypted laptop Salhab carried with him, CBP

officers found, among other things, images of Hizballah Secretary General Hassan Nasrallah; audio of the Hizballah anthem; images of Hizballah militants stomping on an Israeli flag; and movie files of executions, hangings, torture, and beheadings. Salhab claimed that the images were placed on his computer by an employee, Houssam Mehana. Salhab was allowed to withdraw his application for admission into the United States, and departed the country. As described in more detail below, Oussama Salhab is heavily involved in the used car business in Benin and Togo and controls a network of money couriers who have transported millions of dollars in cash from West Africa to Lebanon, and who have traveled to the United States to transport cash and to purchase used cars for shipment to West Africa.

I.    **The Link Between U.S. Car Buyers and the Salhab West African Bulk Money Courier Network**

68.    In addition to hundreds of millions of dollars wired into the United States by LCB, the Hassan Ayash Exchange, and the Ellissa Group to buy used cars, money was also brought into the United States by multiple individuals involved in the trade-based money laundering scheme. Some of these individuals transported cash, while other used pre-funded U.S. bank accounts created with money transferred from overseas. These individuals' entries into the United States were facilitated by other members of the conspiracy, particularly members of the Salhab family.

42

69. For example, on January 5, 2009, Mouhsen Ali Yassine, a Lebanese citizen residing in Togo, Africa, was stopped and interviewed by CBP officers while trying to enter the United States at Boston Logan International Airport. When questioned, Yassine acknowledged his and his family's membership in Hizballah. He carried with him a business card for the Salhab Travel Agency in Togo. The SIM card from his cellular telephone was discovered hidden in his shoe. He was determined to be inadmissible and processed for expedited removal.

70. Yassine, along with nine other Lebanese individuals, most of whom were from Togo, Africa, who attempted to enter the United States around the same time period all listed Fadi Salhab as their point of contact when applying for a non-immigrant visa to enter the United States.

71. Between approximately 2003 and 2011, at least 34 individuals who transported cash as couriers from Togo to Ghana (discussed further below, see ¶¶ 68-74) also applied for non-immigrant visas for admission to the United States. Most identified their employment as car traders or car buyers, and some identified U.S. car buyers who received overseas wires from the Hassan Ayash Exchange, the Ellissa Exchange, and LCB as their points of contact while in the U.S., including five who identified Fadi Salhab as their point of contact.

**J.  Movement of Hundreds of Millions of Dollars from West Africa to Lebanon**

72.  At least hundreds of millions of dollars in U.S. currency are transported annually from Benin and other West African countries to Lebanon by money couriers, hawaladars, and currency brokers.  These U.S. dollars include the proceeds of car sales from the Benin car parks, along with the proceeds of narcotics trafficking, money laundering proceeds, and other crimes.  A significant portion of this money moves through courier and security networks controlled by Hizballah or individuals affiliated with Hizballah.  The proceeds of the car sales help to conceal and disguise the true source, nature, ownership, and control of the narcotics proceeds.

73.  Cars shipped to car parks in Cotonou, including to Ellissa, were typically sold to buyers from West African nations, especially Nigeria.  The buyers typically paid in local currencies.  Currency generated from these car sales that was to be transported to Lebanon were first converted to U.S. dollars or Euros, often using black market currency exchanges.  These black markets rely on U.S. dollar and Euro proceeds of narcotics trafficking.  Exchange houses and money courier networks, including Ellissa, utilized these black markets, among other reasons, to avoid bank transaction reporting and bank transaction fees.  Accordingly, proceeds of car sales in West Africa

44

transported to Lebanon included U.S. dollars and Euros derived from narcotics trafficking and transactions to launder those narcotics proceeds.

74. Money couriers also transport millions of dollars from Benin on commercial air flights. Couriers travel on these flights and carry the undeclared cash with them in order to evade detection. For example, on December 9, 2010, three individuals who had traveled on a flight from Benin were arrested at Charles De Gaulle International Airport in Paris, France. The three were en route to Beirut, Lebanon. They were discovered to be carrying over $6.5 million in United States currency and €48,500. These funds were not declared. One of the individuals was carrying a business card for Ellissa Megastore, Ellissa's car lot in Cotonou, Benin.

75. Cash is also commonly transported out of Benin through the airport in Accra, Ghana, approximately 210 miles from Cotonou, Benin. The route from Cotonou to Accra passes through Togo and its capital, Lome, on the Ghana border. The Ghanaian Customs, Excise, and Preventive Services recorded approximately $1.2 billion in declared United States currency imported across the Lome border crossing in 2007 and 2008. Approximately $845 million of this was declared by Lebanese nationals.

76. From Accra, the cash is often flown to Beirut. Hizballah security facilitates the receipt of cash flown into the Beirut International Airport. For example, money couriers are sometimes instructed over the public address system to deplane first, and are escorted to private rooms in the airport where the cash would be received.

77. A network of couriers linked to Oussama Salhab, other members of the Salhab family, and related companies, together declared over $97 million in U.S. currency couriered over the Togo/Ghana border in 2007 and 2008, along with over €22,494,463.

78. Moreover, some of these same couriers applied for non-immigrant visas to enter the United States in order to purchase used cars, and listed a member of the Salhab family or other related individuals as their point of contact. See ¶ 63, supra.

79. Oussama Salhab and at least four other individuals provided a phone number for STE Marco SARL (the "STE Marco Phone Number") to Ghanaian authorities in connection with transporting currency across the Togo/Ghana border in 2007 and 2008. Together, Salhab and these four couriers declared a total of approximately $7,922,950, along with approximately €2,667,600. At least 38 couriers, including Houssam Mehanna, provided either

an office number or a mobile phone number for the Salhab Travel Agency to Ghanaian authorities in connection with transporting currency across the Togo/Ghana border in 2007 and 2008. These 38 couriers declared a total of approximately $77,178,683, along with €16,013,808. Hassan Chokr (discussed further below), an associate of Maroun Saade and Oussama Salhab, declared a total of $12,552,400, along with €3,813,055, that he transported across the Togo/Ghana in 2007 and 2008.

80.   Oussama Salhab has offered free airline tickets from Ghana to Beirut, Lebanon, for individuals willing to courier bulk cash from West Africa to Lebanon.

81.   Money couriers transporting cash across the Togo/Ghana border are sometimes detained and their cash loads seized by law enforcement if couriers attempt to smuggle the cash without declaring it or otherwise in violation of post-October 2008 restrictions on currency imports.[5]   Maroun Saade would pay bribes to release money couriers and others detained by law enforcement.   For example, on March 15, 2009, Mehanna Houssam, Oussama Salhab's employee, was arrested by Togolese law enforcement.   In exchange for a payment, Saade arranged for Houssam's release.

-----

[5]   Effective October 20, 2008, currency with a value greater than $10,000 could only be transferred through Ghana through a bank or other authorized dealer.

82. On July 21, 2010, Oussama Salhab and his employee Wissam Damen were stopped by Togolese law enforcement before driving across the Togo-Ghana border. Salhab and Damen had approximately $798,150 and €311,910 in a concealed compartment in their car. Salhab advised Togolese law enforcement that he was part owner of a shipping company called Marco, the cash was from the sale of cars shipped to Togo, and he and Damen were transporting the cash to Ghana and then to Lebanon. Salhab paid Maroun Saade for Saade to obtain Salhab's and Damen's release from custody.

83. As described above, in 2007 and 2008, Hassan Chokr transported approximately $12,552,400 and €3,813,055, together with British pounds and Swiss francs, across the Togo/Ghana border. Chokr is a Hizballah weapons dealer who reports to senior Hizballah members in Lebanon. For example, Maroun Saade invited Chokr to Accra, Ghana, to attend a November 2010, meeting with three individuals working at the direction of the DEA as confidential sources ("CS-1," "CS-2," and "CS-3") with whom Saade was negotiating narcotics and arms deals. Chokr attended the meeting with his son-in-law, Alwar Pouryan, where they discussed supplying weapons to the CSs. Saade identified Chokr to CS-1 as being from Hizballah, and Pouryan as someone who sold weapons to Hizballah. Chokr has also described Pouryan as someone who

supplied Hizballah with weapons when Hizballah could not procure
them from other sources.

84.    In an email Chokr sent to Pouryan in approximately
November 2009, Chokr referred Pouryan to a certain money exchange
house located in the United Arab Emirates and instructed Pouryan
to reference "Mr Oussama Salhab (Hassan Exhange [sic] [C]ompany
Lebanon)."

## K.    Used Car Buyers in the U.S. Receive Wire Transfers for Buying and Shipping Used Cars as Part of the Money Laundering Scheme

85.    As described in more detail below, certain used
car buyers in the United States (collectively the "Car Buyers")
have received wire transfers from the Elissa Exchange and the
Hassan Ayash Exchange via the Lebanese Banks for the purpose of
buying and shipping used cars.  The businesses of these Car
Buyers typically have little or no property or assets other than
bank accounts that are used to receive wires from overseas to buy
cars, and to purchase used cars at auction.  These cars are then
transported to shipping ports, where they are shipped to West
Africa.  The Car Buyers typically do not have offices, car lots,
or an inventory of used cars other than cars that are in transit
to the ports.  Some of the Car Buyers purchase cars for their own
account, but others simply retain a fee of a few hundred dollars
for each car that they buy.

86. The Car Buyers also received wire transfers for the purpose of buying and shipping used cars from other account holders at the Lebanese Banks ("Additional Transferors"), including the OFAC-designated Phenicia Shipping (Offshore); Ali Salhab and Yasmin Shipping & Trading; Fadi Star and its owners, Mohammad Hammoud and Fadi Hammoud; Fakih for General Trade, Khodor Fakih, and Ali Fakih; and Youssef Nehme.

a. In wire transfer instructions for wires from Phenecia Shipping (Offshore), a telephone number for the Ellissa Exchange is provided. From approximately January 2007 through early 2011, Phenecia Shipping wired approximately $12,406,212 to the U.S. relating to buying and shipping cars.

b. In wire transfer instructions for wires from Yasmin Shipping & Trading, Ali Salhab's name appears next to Yasmin Shipping & Trading's. Ali Salhab is believed to be a relative of Ousamma Salhab's. From approximately January 2007 through early 2011, Ali Salhab and Yasmin Shipping & Trading wired approximately $10,305,512 to the U.S. relating to buying and shipping cars.

c. Khodor Fakih is a Hizballah member from Kafra, Lebanon, who now works in the car business in Cotonou, Benin. Khodor Fakih and Ali Fakih are believed to own and control Fakih for General Trade. From approximately January 2007

through early 2011, Khodor Fakih, Ali Fakih, and Fakih for General Trade wired approximately $2,589,325 to the U.S. relating to buying and shipping cars.

      d.    Fadi Hassan Hammoud and Mohammad Hassan Hammoud own and operate Fadi Star, a shipping company in Cotonou, Benin. Mohammad Hammoud is a Hizballah supporter from Kafra, Lebanon, and has done business with Khodor Fakih. From approximately January 2007 through early 2011, Fadi Star, Mohammad Hassan Hammoud, and Fadi Hassan Hammoud wired approximately $11,382,906 to the U.S. relating to buying and shipping cars.

      e.    Deeb Atieh is also a Hizballah member from Kafra, Lebanon. Deeb Atieh, Mohammad Deeb Atieh, and Fakih Atieh are believed to own and control M/S Universal Motors. From approximately January 2007 through early 2011, the Atiehs and M/S Universal Motors wired approximately $2,657,307 to the U.S. relating to buying and shipping cars.

      f.    Youssef Sobhi Nehme is a close associate of Ali Kharroubi and self-proclaimed supporter of Hizballah. From approximately January 2007 through early 2011, Nehme wired approximately $21,832,344 to the U.S. relating to buying and shipping cars.

g.    Mohamad Manana is believed to be a Hizballah member and an associate of Maroun Saade.    From approximately January 2007 through early 2011, Mohamed Manana and Moustapha Manana wired approximately $2,444,527 to the U.S. relating to buying and shipping cars.

87.    The chart below sets forth Car Buyers, wire originators or initiators who sent transfers to these Car Buyers during the Wire Transfer Period, the number of wires sent by those originators, and the total amount of such transfers.    The chart includes only wire transfers for which records indicate a connection to the purchase, sale, shipment, or otherwise related transaction regarding used cars in the United States.

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| A & J Auto Sales Inc. Lansing, MI | Hassan Ayash Exchange | 54 | $4,495,293 |
| | Ellissa Exchange | 6 | $374,454 |
| | Yasmin Shipping & Trading | 3 | $249,635 |
| | Phenicia Shipping | 2 | $57,961 |
| | Others | 128 | $5,571,301 |
| Total: | | 193 | $10,748,644 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Ace Auto Leasing Inc. Tulsa, OK | Hassan Ayash Exchange | 4 | $418,641 |
| | Mohamad Hassan Hammoud | 42 | $5,101,035 |
| | Fadi Hammoud | 5 | $454,300 |
| | Fadi Star | 43 | $5,030,006 |
| | Khodor Fakih | 6 | $688,974 |
| | Ali Fakih | 4 | $289,704 |
| | Fakih for General Trade | 11 | $694,266 |
| | Others | 104 | $7,564,257 |
| Total: | | 219 | $20,241,183 |
| ARZ Export LLC Columbia, MD | Ellissa Exchange | 4 | $215,446 |
| | Ellissa Group | 23 | $1,327,474 |
| | Mohamad Hassan Hammoud | 6 | $231,154 |
| | Ali Kharoubi | 1 | $84,968 |
| | Others | 9 | $298,005 |
| Total: | | | $2,157,047 |
| Auto Care LLC d/b/a Golden Eagle Motors Vernon, CT | Hassan Ayash Exchange | 15 | $887,012 |
| | Mohamad Hassan Hammoud | 1 | $16,945 |
| | Others | 20 | $1,194,151 |
| Total: | | 44 | $2,206,078 |
| Auto Rama Inc. Detroit, MI | Hassan Ayash Exchange | 8 | $298,562 |
| | Ellissa Exchange | 2 | $142,828 |
| | Ellissa Group | 6 | $255,319 |
| | Others | 61 | $1,859,802 |
| Total: | | 77 | $2,556,511 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Baaklini North America Inc. Fairburn, GA | Oussama Salhab | 8 | $629,427 |
| | Others | 28 | $846,705 |
| Total: | | 36 | $1,476,132 |
| Bassam G. Hanna d/b/a Cary Auto Sales Cary, NC | Hassan Ayash Exchange | 1 | $49,880 |
| | Others | 2 | $122,883 |
| Total: | | | $172,672 |
| Car UZD and Mid Overseas Inc. d/b/a Car UZD Miami, FL | Ellissa Exchange | 6 | $478,810 |
| | Jamal Kharoubi | 20 | $2,079,597 |
| | Ellissa Group | 1 | $49,777 |
| | Others | 231 | $19,626,097 |
| Total: | | 258 | $22,234,281 |
| Cary Auto Sales Inc. Cary, NC | Hassan Ayash Exchange | 7 | $419,299 |
| | Others | 105 | $3,669,314 |
| Total: | | 112 | $4,088,613 |
| Cedar Exports Auto Sales Mt. Juliet, TN | Hassan Ayash Exchange | 13 | $1,196,346 |
| | Ali Salhab | 3 | $232,054 |
| | Mohamad Hassan Hammoud | 8 | $878,289 |
| | Fadi Hammoud | 2 | $199,600 |
| | Fadi Star | 2 | $199,745 |
| | Others | 98 | $3,673,303 |
| Total: | | 126 | $6,379,337 |
| Eagle Auto Sales Inc. Dearborn Heights, MI | Ellissa Exchange | 1 | $41,855 |
| | Mohamad Hassan Hammoud | 31 | $2,794,220 |
| | Others | 24 | $1,164,698 |
| Total: | | 56 | $4,000,773 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Edya Export Import Inc. Holly Hill, FL | Hassan Ayash Exchange | 14 | $1,145,540 |
| | Oussama Salhab | 17 | $1,679,051 |
| | Others | 17 | $317,145 |
| Total: | | 48 | $3,141,736 |
| EZ Auto Export LLC New Britain, CT | Ellissa Exchange | 1 | $92,418 |
| | Ali Salhab | 5 | $194,341 |
| | Yasmin Shipping & Trading | 5 | $230,821 |
| | Fadi Star | 7 | $593,180 |
| | Others | 36 | $1,969,924 |
| Total: | | 54 | $3,080,684 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Ezedine Brothers LLC Hartford, CT | Hassan Ayash Exchange | 9 | $444,080 |
| | Ellissa Exchange | 1 | $24,930 |
| | Khodor Fakih | 1 | $99,818 |
| | Fadi Star | 16 | $1,076,597 |
| | Mohamad Hassan Hammoud | 6 | $389,009 |
| | Phenicia Shipping | 1 | $31,808 |
| | Ellissa Group | 4 | $157,409 |
| | Ali Salhab | 1 | $49,923 |
| | Yasmin Shipping & Trading | 1 | $23,912 |
| | Others | 63 | $2,532,728 |
| Total: | | 103 | $4,830,214 |
| Global Auto LLC South Windsor, CT | Hassan Ayash Exchange | 17 | $1,234,008 |
| | Ellissa Exchange | 1 | $34,918 |
| | Ellissa Group | 8 | $318,384 |
| | Mohamad Hassan Hammoud | 19 | $2,030,506 |
| | Fadi Star | 60 | $5,868,008 |
| | Fadi Hammoud | 5 | $393,400 |
| | Oussama Salhab | 1 | $74,943 |
| | Ali Salhab | 4 | $238,726 |
| | Others | 124 | $7,788,910 |
| Total: | | 239 | $17,981,803 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Global Shipping Services Detroit, MI | Hassan Ayash Exchange | 36 | $4,315,811 |
| | Ellissa Exchange | 5 | $102,058 |
| | Oussama Salhab | 2 | $210,525 |
| | STE Nomeco | 10 | $400,359 |
| | STE Marco | 3 | $571,334 |
| | Yasmin Shipping & Trading | 2 | $120,208 |
| | Mohamad Hassan Hammoud | 2 | $138,379 |
| | Fadi Star | 7 | $521,435 |
| | Youssef Nehme | 1 | $32,253 |
| | Imad Zbib | 2 | $21,429 |
| | Others | 75 | $2,936,206 |
| Total: | | 145 | $9,369,997 |
| H & D Export, Import Inc. Detroit, MI | Ellissa Exchange | 1 | $89,868 |
| | Mohamad Manana | 2 | $199,936 |
| | Moustapha Manana | 1 | $149,968 |
| | Ellissa Group | 1 | $199,600 |
| | Others | 42 | $3,602,571 |
| Total: | | 47 | $4,241,943 |
| HH Automotive Inc. Detroit, MI | Ellissa Exchange | 1 | $204,700 |
| | Youssef Nehme | 5 | $708,688 |
| | M/S Universal Motors Co. | 2 | $89,815 |
| | Deeb Atieh | 2 | $139,815 |
| | Others | 8 | $271,161 |
| Total: | | 18 | $1,414,179 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Hijazi General Trading LLC Burtonsville, MD | Hassan Ayash Exchange | 11 | $371,257 |
| | Ellissa Exchange | 6 | $181,561 |
| | Oussama Salhab | 3 | $215,563 |
| | Ellissa Group | 11 | $586,649 |
| | Phenicia Shipping | 2 | $38,130 |
| | United Auto Enterprize | 1 | $30,000 |
| | Others | 165 | $5,727,093 |
| Total: | | 193 | $7,150,253 |
| Jean Y. Chedid Trading Est d/b/a Jean Y. Chedid Dartmouth, MA | Hassan Ayash Exchange | 2 | $199,680 |
| | Ellissa Exchange | 1 | $149,775 |
| | Youssef Nehme | 55 | $8,236,087 |
| | Others | 14 | $1,390,030 |
| Total: | | 72 | $9,975,572 |
| Kamal Al Khawand Dayton, OH | Ellissa Exchange | 1 | $99,818 |
| | Youssef Nehme | 11 | $1,148,358 |
| | Phenicia Shipping | 6 | $599,124 |
| | Others | 19 | $722,196 |
| Total: | | 54 | $3,355,982 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Kassab Auto Dealer LLC North Arlington, NJ | Hassan Ayash Exchange | 2 | $69,780 |
| | Ellissa Exchange | 1 | $30,968 |
| | Mohamad Deeb Atieh | 1 | $99,950 |
| | Deeb Atieh | 1 | $49,925 |
| | Fadi Hammoud | 1 | $99,850 |
| | Mohamad Hassan Hammoud | 7 | $424,353 |
| | M/S Universal Motors | 5 | $524,590 |
| | Khodor Fakih | 1 | $69,798 |
| | Ali Mohamad Fakih | 1 | $24,839 |
| | M/S Fakih for General Trade | 1 | $49,945 |
| | Fadi Star | 44 | $2,891,825 |
| | Others | 69 | $3,782,815 |
| Total: | | 150 | $9,116,281 |
| Mansour Brothers Auto Trading Inc. Tampa, FL | Ellissa Group | 7 | $543,880 |
| | Youssef Nehme | 3 | $299,441 |
| | Mohamad Hassan Hammoud | 1 | $99,786 |
| | Others | 29 | $2,300,780 |
| Total: | | 40 | $3,243,869 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| MGM Global Trading LLC South Windsor, CT | Hassan Ayash Exchange | 51 | $5,826,171 |
| | Ellissa Exchange | 1 | $99,772 |
| | Mohamad Hassan Hammoud | 34 | $3,149,542 |
| | Fadi Hammoud | 4 | $344,525 |
| | Fadi Star | 75 | $6,906,387 |
| | Ellissa Group | 4 | $324,429 |
| | M/S Fakih for General Trade | 2 | $126,709 |
| | Khodor Fakih | 1 | $49,938 |
| | Yasmin Shipping and Trading | 2 | $349,508 |
| | Ali Salhab | 2 | $349,536 |
| | Others | 176 | $15,886,958 |
| Total: | | 352 | **$33,413,475** |
| Myles Auto Sales New Bradford, MA | Hassan Ayash Exchange | 2 | $149,569 |
| | Ellissa Exchange | 3 | $149,561 |
| | Mohamad Deeb Atieh | 1 | $200,000 |
| | Ellissa Group | 4 | $289,042 |
| | Mohamad Hassan Hammoud | 3 | $249,466 |
| | Deeb Atieh | 11 | $1,009,032 |
| | M/S Universal Motors Co. | 4 | $144,750 |
| | Others | 49 | $2,626,566 |
| Total: | | 77 | $4,862,986 |
| Poliproject Inc. d/b/a Fouad Autotrade St. Lawrence, MA | Hassan Ayash Exchange | 48 | $8,931,410 |
| | Mohamad Hassan Hammoud | 16 | $2,165,885 |
| | Others | 27 | $4,750,986 |
| Total: | | 91 | $15,848,281 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| Safari Enterprises LLC, Sahari Motors Orlando, FL | Hassan Ayash Exchange | 24 | $1,279,431 |
| | Ellissa Exchange | 8 | $368,706 |
| | Ellissa Group | 2 | $37,102 |
| | Ali Fakih | 5 | $348,850 |
| | Mohamad Hassan Hammoud | 1 | $39,895 |
| | Yasmin Shipping & Trading | 2 | $99,741 |
| | Fadi Star | 7 | $346,297 |
| | Ali Salhab | 4 | $274,493 |
| | Others | 49 | $2,342,546 |
| Total: | | 102 | $5,137,061 |
| United Auto Enterprize Inc. Redford, MI | Hassan Ayash Exchange | 2 | $249,880 |
| | Oussama Salhab | 17 | $1,518,022 |
| | Cross Continents Lines SAL | 1 | $49,972 |
| | Yasmin Shipping & Trading | 2 | $139,733 |
| | Imad Zbib | 1 | $48,805 |
| | Mohamad Hassan Hammoud | 2 | $55,737 |
| | Bilal Hassan Salhab | 1 | $27,000 |
| | Others | 8 | $307,194 |
| Total: | | 34 | $2,396,343 |

| U.S. Car Buyer | Wire Originator | # | Amount |
|---|---|---|---|
| United Quality Auto Sales Inc., Detroit, MI | Hassan Ayash Exchange | 1 | $214,237 |
| | Ellissa Exchange | 5 | $664,103 |
| | Youssef Nehme | 31 | $5,661,437 |
| | Ellissa Group | 3 | $284,493 |
| | Deeb Atieh | 3 | $159,770 |
| | M/S Universal Motors Co. | 1 | $39,915 |
| | Others | 29 | $1,901,167 |
| Total: | | 73 | $8,925,122 |
| World Auto Sales LLC, Birmingham, AL | Hassan Ayash Exchange | 2 | $99,715 |
| | Ellissa Exchange | 1 | $219,558 |
| | Mohamad Hassan Hammoud | 22 | $2,791,829 |
| | Fadi Star | 29 | $2,974,780 |
| | Others | 436 | $17,978,260 |
| Total: | | 490 | $24,064,172 |
| Aggregate: | | | $247,822,334 |

## V.   CLAIMS FOR FORFEITURE

### First Claim for Forfeiture -- Proceeds Traceable to Violations of IEEPA
### (18 U.S.C. § 981(a)(1)(c))

88.   Paragraphs 1 through 87 of this Amended Complaint are repeated and realleged as if fully set forth herein.

89.   Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity'

(as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

90. Under Section 1956(c)(7), the term "specified unlawful activity" includes, among other things, violations of "section 206 (relating to penalties) of the International Emergency Economic Powers Act [50 U.S.C. § 1705]." Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

91. In addition, Title 18, United States Code, Section 984 provides in relevant part that:

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals —

>> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

>> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

> (2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the

forfeiture shall be subject to forfeiture
under this section.

(b) No action pursuant to this section to
forfeit property not traceable directly to
the offense that is the basis for the
forfeiture may be commenced more than 1 year
from the date of the offense.

92. Accordingly, the Defendant Properties are subject
to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), up to the
amount of the proceeds traceable to the IEEPA violations alleged
in this Amended Complaint, in an amount to be determined but not
less than $247,822,334.

**Second Claim for Forfeiture -- Property Involved In and
Traceable to Promotional Money Laundering and Conspiracy
(18 U.S.C. § 981(a)(1)(A))**

93. Paragraphs 1 through 87 of this Amended Complaint
are repeated and realleged as if fully set forth herein

94. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny
property, real or personal, involved in a transaction in
violation of section 1956 [or] 1957 . . . of [Title 18, relating
to money laundering offenses], or any property traceable to such
property," is subject to forfeiture.

95. Pursuant to Title 18, United States Code, Section
1956, commonly known as the "money laundering" statute, a crime
is committed by a person who:

(a)(1) . . . knowing that the property
involved in a financial transaction
represents the proceeds of some form of

> unlawful activity, conducts or attempts to
> conduct such a financial transaction which in
> fact involves the proceeds of specified
> unlawful activity –
>
>> (A)(i) with the intent to promote the
>> carrying on of specified unlawful
>> activity . . .

shall be guilty of a crime.

96.   As noted above, the term "specified unlawful activity," as defined in Section 1956, includes violations of IEEPA.  The term "specified unlawful activity" further includes the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States.

97.   In addition, the term "financial transaction" is defined in 18 U.S.C. § 1956(c)(4), and includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ."

98.   Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

99. The Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) as they constitute property involved in, or property traceable to such property, financial transactions involving the proceeds of specified unlawful activity, namely the IEEPA and narcotics trafficking offenses described above, with such transactions intended to promote such specified unlawful activity and carried out with knowledge that the property represented the proceeds of illegal activity, and a conspiracy to undertake such transactions. These transactions included, but are not limited to the wire transfers received by the Car Buyers. The Defendant Entities, as entities, were involved in and facilitated these transactions.

**Third Claim for Forfeiture -- Property Involved In and Traceable to Concealment Money Laundering and Conspiracy (18 U.S.C. § 981(a)(1)(A))**

100. Paragraphs 1 through 87 of this Amended Complaint are repeated and realleged as if fully set forth herein.

101. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

102. Pursuant to Title 18, United States Code, Section 1956, commonly known as the "money laundering" statute, a crime is committed by a person who:

> (a)(1) . . . knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity - . . .
>
> > (B) knowing that the transaction is designed in whole or in part -
> >
> > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . .

shall be guilty of a crime.

103. Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

104. The Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) as they constitute property involved in, or property traceable to such property, financial transactions involving the proceeds of specified unlawful activity, namely the IEEPA and narcotics trafficking offenses described above, with these transactions

having been designed in whole and in part to conceal and disguise the nature, source, ownership, and control of these funds, and a conspiracy to undertake such transactions. These transactions included, but are not limited to the wire transfers received by the Car Buyers. The Defendant Entities, as entities, were involved in and facilitated these transactions.

## Fourth Claim for Forfeiture -- Property Involved In and Traceable to International Money Laundering and Conspiracy (18 U.S.C. § 981(a)(1)(A))

105. Paragraphs 1 through 87 of this Amended Complaint are repeated and realleged as if fully set forth herein.

106. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

107. Pursuant to Title 18, United States Code, Section 1956, a crime is committed by a person who:

> (a)(2) . . . transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States –

<div style="margin-left: 2em;">

(A) with the intent to promote the
carrying on of specified unlawful
activity . . . .

</div>

shall be guilty of a crime.

108. Title 18, United States Code, Section 1956(h)
further provides that "[a]ny person who conspires to commit any
offense defined in this section or section 1957 shall be subject
to the same penalties as those prescribed for the offense the
commission of which was the object of the conspiracy."

109. The Defendant Properties are subject to forfeiture
pursuant to Title 18, United States Code, Section 981(a)(1)(A) as
they constitute property involved in, or property traceable to
such property, transfers and the transmission of monetary
instruments and funds (1) from inside the United States to
outside the United States and (2) from outside the United States
to inside the United States with these transfers and transmission
having been intended to promote specified unlawful activity,
namely the IEEPA and narcotics trafficking offenses described
above, and a conspiracy to undertake such transfers. These
transactions included, but are not limited to the wire transfers
received by the Car Buyers. The Defendant Entities, as entities,
were involved in and facilitated these transactions.

**Fifth Claim for Forfeiture -- Property Involved In and
Traceable to Bulk Money Laundering and Conspiracy
(18 U.S.C. § 981(a)(1)(A))**

110. Paragraphs 1 through 87 of this Amended Complaint are repeated and realleged as if fully set forth herein.

111. Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction in violation of section 1956 [or] 1957 . . . of [Title 18, relating to money laundering offenses], or any property traceable to such property," is subject to forfeiture.

112. Title 18, United States Code, Section 1957 provides that: "Whoever, [with such offense under this section taking place in the United States] knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity," shall guilty of a crime.

113. Title 18, United States Code, Section 1956(h) further provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

114. "Monetary transactions" is defined in 18 U.S.C. § 1957(f)(1) as the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce of funds . . . by,

through, or to a financial institution . . . . including any transaction that would be a financial transaction under section 1956(c)(4)(B) of this title . . . ."

115. "Criminally derived property" is defined in 18 U.S.C. § 1957(f)(2) as "any property constituting, or derived from, proceeds obtained from a criminal offense."

116. "Specified unlawful activity" is defined in 18 U.S.C. § 1957(f)(3) as having the same meaning as that term has in 18 U.S.C. § 1956. As noted above, the term "specified unlawful activity," as defined in Section 1956, includes violations of IEEPA and narcotics trafficking offenses.

117. The Defendant Properties are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property involved in, or property traceable to such property, monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, namely the IEEPA and narcotics trafficking offenses described above, and a conspiracy to engage in such transactions. These transactions included, but are not limited to the wire transfers received by the Car Buyers. The Defendant Entities, as entities, were involved in and facilitated these transactions.

## VI.  CIVIL MONEY LAUNDERING PENALTIES

118.  Paragraphs 1 through 87 of this Amended Complaint are repeated and realleged as if fully set forth herein.

119.  Pursuant to Title 18, United States Code, Section 1956(b), "[w]hoever conducts or attempts to conduct a transaction described in subsection (a)(1) or (a)(3), or section 1957, or a transportation, transmission, or transfer described in subsection (a)(2), is liable to the United States for a civil penalty of not more than the greater of -- (A) the value of the property, funds, or monetary instruments involved in the transaction; or (B) $10,000."

120.  Accordingly, the Defendant Entities are liable to the Government for a sum of money representing the amount of property, funds, or monetary instruments involved in the money laundering offenses described above, in an amount that is no less than $229,872,953 for LCB; $141,522,091 for the Hassan Ayash Exchange Company; $61,747,524 for Ellissa Holding, including the Ellissa Exchange; and an amount to be determined but not less than $50,000,000 for the Cybamar Companies.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Properties and that all persons having an interest in the Defendant Properties be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Properties to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with costs and disbursements in this action.

Dated: New York, New York
       October 26, 2012

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____

Sharon Cohen Levin
Michael D. Lockard
Jason H. Cowley
Alexander J. Wilson
Assistant United States Attorneys
One St. Andrew's Plaza
New York, New York 10007
(212) 637-1060/2193/2479/2453

# VERIFICATION

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                 :
SOUTHERN DISTRICT OF NEW YORK )

CHRISTOPHER MILLER, being duly sworn, deposes and says

that he is a Special Agent with the Drug Enforcement

Administration ("DEA"); that he has read the foregoing amended

complaint and knows the contents thereof; and that the same is

true to the best of his knowledge, information and belief.

The sources of deponent's information and the grounds

of his belief are his personal involvement in the investigation,

and conversations with and documents prepared by law enforcement

officers and others.

_____
CHRISTOPHER MILLER
Special Agent
Drug Enforcement Administration

Sworn to before me this
26th day of October 2012

_____
Notary Public

MICHAEL DENNIS LOCKARD
Notary Public, State of New York
No. 02LO6124541 Kings
Qualified in New York County
Commission Expires March 28, 20 15

# SCHEDULE A

## I. USED CAR BUYERS AND THEIR ASSETS

1. **A & J Auto Sales Inc., Lansing, MI**

   a.   account number 1852318300, held in the name of A & J
        Auto Sales Inc., at Comerica Bank, Detroit, MI, and all
        funds traceable thereto;

2. **HH Automotive Inc., Detroit, MI**

   a.   account number 7913961236, held in the name of HH
        Automotive Inc., at Fifth Third Bank, Cincinnati, OH,
        and all funds traceable thereto;

   b.   account number 771360245, held in the name of HH
        Automotive Inc., at JPMorgan Chase Bank, Tampa, FL, and
        all funds traceable thereto;

3. **Myles Auto Sales, New Bradford, MA**

   a.   account number 68500026114, held in the name of Myles
        Auto Sales, at Sovereign Bank, Reading, PA, and all
        funds traceable thereto;

   b.   account number 9496873999, held in the name of Myles
        Auto Sales, at Bank of America NA, Richmond, VA, and
        all funds traceable thereto;

4. **United Quality Auto Sales Inc., Detroit, MI**

   a.   account number 1851548741, held in the name of United
        Quality Auto Sales Inc., at Comerica Bank, Detroit, MI,
        and all funds traceable thereto;

## II. CYBAMAR SWISS GMBH LLC AND ADDITIONAL ACCOUNTS

   a.   account number 1852078466, held in the name of Cybamar
        Swiss GMBH LLC, at Comerica Bank, Detroit, MI, and all
        funds traceable thereto;

   b.   account number 985914906, held in the name of Cybamar
        Swiss GMBH LLC, at PNC Bank, Pittsburgh, PA, and all
        funds traceable thereto.

   c.   account number 177717592000, held in the name of
        Cybamar Swiss GMBH, at Credit Suisse AG, and all funds
        traceable thereto.

d. account number 076705931001, held in the name of Cybamar Swiss GMBH, at Credit Suisse AG, and all funds traceable thereto.

e. account number 076705932000, held in the name of Cybamar Swiss GMBH, at Credit Suisse AG, and all funds traceable thereto.

### III. LEBANESE CANADIAN BANK ASSETS

a. $150,000,000 seized pursuant to seizure warrants issued on August 15, 2012, and currently held in the United States Seized Asset Depository Fund;

b. United States Dollar account, ID # 16071, held in the name of Lebanese Canadian Bank, at Middle East and Africa Bank, SAL, Beirut, Lebanon, and all funds traceable thereto;

c. Lebanese Pound account, ID # 16071, held in the name of Lebanese Canadian Bank, at Middle East and Africa Bank, SAL, Beirut, Lebanon, and all funds traceable thereto;

d. account number 662830, held in the name of Lebanese Canadian Bank, at EFG Private Bank Limited, London, United Kingdom, and all funds traceable thereto;

### IV. HASSAN AYASH EXCHANGE COMPANY ASSETS

a. Approximately $700,000 held in account numbered 958164493 at J.P. Morgan Chase, N.A, and presently blocked pursuant to the January 26, 2011 designation of the Hassan Ayash Exchange by OFAC.

### V. ELLISSA HOLDING ASSETS

a. Approximately 350 cars consigned to Ellissa Holding located at various locations in the United States and presently blocked pursuant to the January 26, 2011 designation of Ellissa Holding by OFAC.

# Exhibit C

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
FILED
IN OPEN COURT

NOV  3 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **(UNDER SEAL)** |
| | ) | |
| v. | ) | CRIMINAL NO. 1:11-CR-560 |
| | ) | |
| | ) | Count 1 -   21 U.S.C. §§ 959(a), 960, 963 |
| AYMAN JOUMAA, | ) | (Conspiracy to Distribute Five |
| also known as "Junior," | ) | Kilograms or More of Cocaine |
| | ) | Knowing and Intending that it |
| Defendant. | ) | will be Unlawfully Imported |
| | ) | into the United States) |
| | ) | |
| | ) | Count 2 -   18 U.S.C. § 1956(h) |
| | ) | (Conspiracy to Commit Money |
| | ) | Laundering) |

Forfeiture -   18 USC § 853, 970
(Criminal Forfeiture)

### INDICTMENT

NOVEMBER 2011 TERM - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### Background

At all times relevant to this Indictment:

1.      On or about January 26, 2011, the United States Department of the Treasury's

Office of Foreign Asset Control (OFAC) designated the defendant, along with other individuals

and entities, as Specially Designated Narcotics Traffickers pursuant to the Foreign Narcotics

Kingpin Designation Act.

2.      This designation by OFAC was based on, among other things, the defendant's

coordination of the transportation , distribution, and sale of multi-ton shipments of cocaine from

South America and the laundering of hundreds of millions of dollars of proceeds from the sale of cocaine in Europe and the Middle East.

3.      The defendant's coordination of money laundering activities occurred in the United States, Lebanon, Benin, Panama, Colombia, the Democratic of Congo, and elsewhere.

4.      Los Zetas Mexican drug cartel is a violent drug trafficking organization that controls drug smuggling corridors from Mexico to the United States, often through massacre attacks, including the 2011 massacre at the Monterey Casino in Nuevo Leon, Mexico.

5.      Colombia is responsible for the production of 90% of the cocaine that is imported into the United States.  The cocaine that leaves Colombia is sent along the Central American corridor to Guatemala, Honduras, and Mexico, for eventual shipment to the United States.

6.      The laundering of drug related proceeds is a critical step in a conspiracy to distribute cocaine for unlawful importation into the United States.  The laundering of drug proceeds allows foreign drug traffickers to remain undetected so that they can continue to distribute cocaine and other drugs for importation into the United States.  The laundered drug proceeds that are returned to the drug traffickers in Colombia and other countries allow the drug trafficking conspiracy to continue by funding further drug production and distribution aimed at importing future drug shipments to the United States.

2

## COUNT 1

(Conspiracy to Distribute Five Kilograms or More of Cocaine Knowing and Intending that it would be Unlawfully Imported into the United States)

THE GRAND JURY FURTHER CHARGES THAT:

From in or about 2004 and continuing thereafter up to and including the date of the filing of this Indictment, the exact dates being unknown to the Grand Jury, in Colombia, Lebanon, Panama, and elsewhere, the defendant, AYMAN JOUMAA, also known as "Junior," and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree to commit the following offense against the United States: to knowingly and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, knowing and intending that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 959(a).

The allegations in paragraphs 1 through 6 of this Indictment are incorporated herein by reference.

### Manners and Means of the Conspiracy

The defendant and his co-conspirators used the following manners and means, among others, in furtherance of the conspiracy:

7.    It was part of the conspiracy that the defendant and his co-conspirators coordinated the shipment of at least tens of thousands of kilograms of cocaine from Colombia, through Central America and Mexico, to the United States, including but not limited to 85,000 kilograms of cocaine shipped from Colombia for sale to Los Zetas drug cartel from in and around

3

2005 through in and around 2007.

8.      It was further a part of the conspiracy that the defendant and his co-conspirators laundered at least hundreds of millions of dollars in proceeds of illegal drug sales in the United States and elsewhere, including but not limited to an amount in excess of $250 million in drug related proceeds representing cocaine sales in the United States, Mexico, Central America, and Europe, which the defendant laundered from in and around 1997 through in and around September 2010.

9.      It was further a part of the conspiracy that the defendant and others, known and unknown to the grand jury, coordinated the shipment of multi-thousand kilogram quantities of cocaine from Colombia to Guatemala, Honduras, and Mexico for sale to Los Zetas drug cartel in Mexico. The ultimate destination for this cocaine was the United States.

10.      It was further part of the conspiracy that the defendant would arrange for the laundering of drug-related proceeds from Mexico, Europe (predominantly Spain), and West Africa to Colombia. The defendant's co-conspirators would contact the defendant via email, Blackberry PIN, or telephone in order to arrange for the delivery of drug related proceeds to members of the defendant's organization. The defendant and members of his organization would then launder these proceeds and return them to the cocaine suppliers in Colombia. The defendant would charge a fee of between 8% and 14% for the laundering of these proceeds. These drug proceeds received by the defendant and members of his organization were in the form of United States currency and represented proceeds from the sale of cocaine in the United States.

11.      It was further part of the conspiracy that the defendant and his co-conspirators

4

would receive bulk deliveries of United States currency. These deliveries of bulk cash, which represented proceeds of the sale of cocaine in the United States, were made in Mexico City, Mexico. Once the drug proceeds were delivered to the defendant and his co-conspirators, the laundered proceeds would be paid out in Venezuela or Colombia. Payment in Venezuela was in the form of Bolivars. Payment in Colombia was in the form of Colombian pesos. The defendant would launder these funds and make payment within 1 to 5 days from the date of delivery of the United States currency in Mexico. During the course of the conspiracy, the defendant typically picked up between $2 and 4 million at a time in Mexico City.

12.     It was further part of the conspiracy that the defendant and his co-conspirators would pick up drug-related proceeds in Mexico, Europe, and West Africa. Further, the defendant and his co-conspirators would pick up United States currency in Mexico City, Mexico. The defendant would then launder these proceeds and repay them to drug traffickers in Colombia and Venezuela. The United States currency laundered by the defendant represented the proceeds of the sale of cocaine shipped from Colombia to Guatemala, Honduras, and Mexico, for sale to the Los Zetas trafficking organization in Mexico. The ultimate destination of the cocaine shipped to Los Zetas drug cartel was the United States.

(In violation of  Title 21, United States Code, Section 963).

5

<u>COUNT 2</u>

(Conspiracy to Commit Money Laundering)

THE GRAND JURY FURTHER CHARGES THAT:

From in or about 2004 and continuing thereafter up to and including the date of the filing

of this Indictment, in the United States, Colombia, Lebanon, Panama, and elsewhere, the

defendant, AYMAN JOUMAA, and others known and unknown to the Grand Jury, did

knowingly and intentionally combine, conspire, confederate, and agree to conduct financial

transactions involving the proceeds of a specified unlawful activity, to wit, the manufacture,

importation, sale, and distribution of a controlled substance, which financial transactions

involving interstate and international commerce were designed in whole and in part to conceal

and disguise the nature, location, source, ownership, and control of the proceeds of a specified

unlawful activity, to wit, the manufacture, importation, sale, and distribution of a controlled

substance, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(I).

The allegations in paragraphs 1 through 12 of this Indictment are incorporated herein by

reference.

(In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and (h)).

6

## FORFEITURE NOTICE

The defendant, if convicted of the violation alleged in Count 1 of this Indictment, shall forfeit to the United States pursuant to Title 21, United States Code, Section 853(a), any property constituting, or derived from, any proceeds each defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. This property includes, but is not limited to $850,000,000 in United States currency, representing proceeds that the defendant obtained in the course of the conspiracy alleged in Count 1 of this Indictment.

If convicted of the money laundering conspiracy charged in Count 2 of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property, including but not limited to $850,000,000 in United States currency, representing proceeds that the defendant obtained in the course of the conspiracy alleged in Count 2 of this Indictment.

(Pursuant to Title 21, United States Code, Section 853 and Title 18, United States Code, Section 982(a)(1)).

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
Foreperson

Neil H. MacBride
United States Attorney

By: _____
Michael P. Ben'Ary
Assistant United States Attorney

7