UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GHAZI ABU NAHL,
    *et al.*,

           Plaintiffs,

     v.

GEORGES ZARD ABOU JAOUDE,
    *et al.*,

           Defendants,

     and

LEBANESE CANADIAN BANK,

           Nominal Defendant.

15 Civ. 9755 (LGS)

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
LEAVE TO FILE SECOND AMENDED COMPLAINT**

Defendants have engaged in misconduct expressly prohibited by the International Convention for the Suppression of the Financing of Terrorism ("Terrorist Financing Convention"). Defendants' objections to the exercise of Alien Tort Statute ("ATS") jurisdiction over Plaintiffs' tort claim based on that misconduct cannot withstand scrutiny.

## A.      Plaintiffs' Claim Is Not Preempted.

Defendants principally argue that Plaintiffs' ATS claim is preempted because the Anti-Terrorism Act, 18 U.S.C. § 2331, *et. seq.*, creates a private right of action for U.S. but not foreign plaintiffs. The Second Circuit's decision in *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), shows why they are wrong. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), did not overrule *Kadic*.

In *Kadic*, plaintiffs brought a genocide claim under the ATS. The court considered whether the claim was preempted by the Genocide Convention Implementation Act, 18 U.S.C. § 1091, *et. seq.*, based on language stating that the statute "shall not 'be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding[.]'" *Kadic*, 70 F.3d at 242 (quoting 18 U.S.C. § 1092). The court rejected preemption, explaining that "the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the Alien Tort Act." *Id.*; *see also id.* at n.6 ("Genocide Convention Implementation Act was not intended to abrogate civil causes of action"); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 177-83, 187 (2d Cir. 2009) (exercising ATS jurisdiction over medical experimentation claim, despite domestic regulations on subject that did not confer private right of action). Similarly here, Congress's decision not to create a private remedy for foreign plaintiffs under the Anti-Terrorism Act "does not imply that a private remedy is not already available" under the ATS.

Defendants' preemption argument is further belied by *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). The *Almog* court exercised ATS jurisdiction over tort claims by

foreign nationals based, *inter alia*, on the Terrorist Financing Convention.  The court recognized that the Anti-Terrorism Act authorized *U.S.* nationals to sue for terrorism damages, but held that this did not preclude its exercise of ATS jurisdiction over terrorism claims by *foreign* plaintiffs. *Id*. at 285; *accord In re Chiquita Brands Int'l*, 792 F. Supp. 2d 1301, 1314 (S.D. Fla. 2011) ("[i]n passing the [Anti-Terrorism Act], Congress simply provided a statutory cause of action for U.S. nationals; there is no indication in the statute or its legislative history that Congress intended to foreclose claims by *non-U.S.* nationals arising under a different statute"), *rev'd on other grounds*, 760 F.3d 1185 (11th Cir. 2014).

*Jesner* did not overrule these cases.  First, a majority of the Supreme Court did not join the sections of the plurality opinion—sections II.A.2 and II.B.2—that addressed Anti-Terrorism Act preemption.  *See* 138 S. Ct. at 1393 (sections II.A.2 and II.B.2 reflect opinion of Justices Kennedy, Roberts and Thomas only); *see also id.* at 1408, 1412 (reflecting that Justices Alito and Gorsuch did *not* join in sections II.A.2 and II.B.2).  The opinion of a three-judge plurality cannot overturn established Second Circuit precedent like *Kadic*.  *See*, *e.g.*, *United States v. Rybicki*, 354 F.3d 124, 131 (2d Cir. 2003) (rule that "has not been adopted by the Supreme Court as a whole" does not overrule pre-existing authority).  Indeed, the fact that only three justices joined the opinion sections on which Defendants rely suggests that a majority *rejected* the plurality view.

Second, the portion of *Jesner* that Defendants quote at page 2 of their opposition concerning the Terrorist Financing Convention likewise is from section II.A.2 of the plurality opinion.  Once again, that section did not command majority support.

Finally, the issue in *Jesner* was ATS jurisdiction over foreign corporations.  That is irrelevant here because Defendants are individuals.  Indeed, the three-judge *Jesner* plurality itself emphasized that, although ATS claims against foreign corporations should be deemed preempted

by the Anti-Terrorism Act, an ATS plaintiff "still can sue *the individual corporate employees* responsible for a violation of international law[.]" 138 S. Ct. at 1405 (emphasis added). Even the plurality, therefore, did not conclude that ATS claims against *natural persons* are preempted.[1]

**B.      Plaintiffs Can Sue for Civil Damages.**

Defendants next argue that Plaintiffs' claim is barred because the Terrorist Financing Convention requires nations to impose criminal but not civil sanctions on individuals engaged in terrorist financing. Opp. at 4. Defendants cite no authority for their assertion that civil remedies must be mandated by an international convention in order for courts to exercise ATS jurisdiction. And, as with preemption, the Second Circuit's decision in *Kadic* shows why they are wrong.

Similar to the Terrorist Financing Convention, the Genocide Convention at issue in *Kadic* provides that persons guilty of genocide "shall be punished," but does not require nations to impose civil liability on perpetrators. *Kadic*, 70 F.3d at 241 (citing The Convention on the Prevention and Punishment of the Crime of Genocide, art. IV, 78 U.N.T.S. 277). The court nonetheless held that there was ATS jurisdiction over plaintiffs' genocide-based claim for civil damages. 70 F.3d at 242. The court explained that, although jurisdiction to adjudicate international law offenses "is usually exercised by application of criminal law, international law also permits states to establish appropriate civil remedies . . . such as tort actions authorized by the Alien Tort Act." *Id*. at 240.

---

[1] More generally, the ATS does not require a statutory cause of action. Indeed, ATS jurisdiction is only meaningful where, as here, there is *no* statutory cause of action, because courts already have *federal question* jurisdiction when a cause of action is created by federal statute. The Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), made this very point. The *Sosa* defendant argued that, under the ATS, "there could be no claim for relief without a further statute expressly authorizing causes of action." *Id*. at 714. The court disagreed, explaining that it would have been "strange" for Congress to "vest federal courts expressly with jurisdiction to entertain civil causes of action brought by aliens alleging violations of the law of nations, but to no effect whatever until the Congress should take further action." *Id*. at 719. The court concluded that ATS claims arise under common law (*id*. at 724) and that no further "legislation conferring a right of action is needed" for a plaintiff to assert an ATS claim. *Id*. at 723.

The same logic applies here.  Like the Genocide Convention, the Terrorist Financing Convention reflects established international law norms.  The ATS confers jurisdiction to adjudicate claims for civil damages based on tortious violation of those norms.  The fact that the Terrorist Financing Convention does not *mandate* this civil tort remedy is irrelevant, and follows from the general rule that "international law . . . leave[s] remedial questions to States[.]"  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 147 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013).

*Almog* is again on point.  The court there exercised ATS jurisdiction based in part on the Terrorist Financing Convention, even though the Convention does not require nations to hold perpetrators civilly liable.  471 F. Supp. 2d at 280-85.  The same result should obtain here.

## C.   State Action Is Not Required.

*Kadic* and *Almog* further show why there is no state action requirement in this case.  The *Kadic* court stated that, as a general rule, the "law of nations, as understood in the modern era" does *not* "confine[] its reach to state action."  *Kadic*, 70 F.3d at 239.  Whether or not state action is required under the ATS must be determined case-by-case, based on whether the specific international-law norm at issue applies to all persons, or to state actors only.  State action is unnecessary where the offense is "capable of being committed by non-state actors."  *Id*. at 240.

*Kadic* considered ATS claims based on genocide, as well as war crimes and torture/ summary execution.  The court held that state action was not required as to the genocide and war crimes claims because the relevant international-law proscriptions applied both to state actors *and* to private individuals.  Under the Geneva Conventions, for example, "*all 'parties'* to a conflict" are obligated to obey the laws of war.  *Id*. at 243 (emphasis added).  By contrast, the court held that state action *was* required with respect to the torture/summary execution claim because "torture and summary execution . . . are proscribed by international law *only when committed by state*

*officials or under color of law*." *Id.* (emphasis added) (citing torture definition under Declaration of Torture as act "inflicted by or at the instigation of a *public official*" (emphasis added)).

The Terrorist Financing Convention is like the genocide and war crimes conventions and unlike the torture convention. It proscribes terror financing by "*[a]ny person*"—not just by state actors. Terrorist Financing Convention Art. 2(1) (emphasis added). Indeed, the whole point of the Convention is to prohibit terror financing by *non*-state actors like financial institutions and their agents, drug traffickers, and purported "charities." *See id.* Preamble. The *Almog* court thus correctly held that "the Financing Convention [does not] require state action." *Almog*, 471 F. Supp. 2d at 293 (citing *Kadic*, 70 F.3d at 243).[2]

Moreover, even if there were a state-action requirement, it would be satisfied here because the proposed Second Amended Complaint ("SAC") alleges that the Lebanese government is a "front" for Hezbollah, *i.e.*, that Hezbollah is effectively indistinguishable from the Lebanese state. SAC ¶ 26. By financing Hezbollah terror attacks, Defendants effectively financed terror attacks by and in concert with a state actor. That meets any state-action mandate. *See Kadic*, 70 F.3d at 245 (state action requirement satisfied where defendant acted in concert with state officials).

**D.    The Conduct at Issue Violates Established International Law Norms.**

Defendants dispute that the Terrorist Financing Convention reflects established international-law norms because a number of countries have declared that they do not regard terrorism to include resistance to foreign occupation (Opp. at 4-5 n.3). Like Defendants' other arguments, this position lacks merit.

---

[2] The cases Defendants cite (Opp. at 7) do not support their position that state action is required here. They involve torture, arbitrary detention, summary execution, or discriminatory expropriation. Unlike the proscription of terror financing, which applies to "[a]ny person" (Financing Conv. Art. 2(1)), the proscriptions against torture, arbitrary detention, summary execution and discriminatory expropriation apply to state actors *only*. *E.g.*, *Kadic*, 70 F.3d at 243.

Defendants' torts include financing terror attacks on Syrian civilians during the Syrian civil war.  *See* SAC ¶¶ 73, 74, 82 (citing, *inter alia*, declarations of Michael Rubin and Matthew Levitt). Such attacks on Syrian civilians by a Lebanese terror group cannot viably be deemed resistance to foreign occupation under any definition.  The statements that Defendants cite do not detract from the fact that there is a clear international consensus proscribing the *specific conduct* at issue here.

The court in *Almog* rejected defendant's reliance on the very Terrorist Financing Convention declarations and reservations cited by Defendants here because the conduct at issue in that case was expressly proscribed by the Convention and did not fall within the purview of those declarations.  *See Almog*, 471 F. Supp. 2d at 282.  This Court should likewise reject Defendants' reliance on irrelevant reservations or declarations concerning resistance to foreign occupation.

The *Almog* court also considered and rejected the broader argument Defendants advance that "terrorism" is insufficiently defined under international law.  The court explained that when a case involves conduct that is expressly proscribed by the Terrorist Financing Convention, "there is no need to resolve any definitional disputes as to the scope of the word 'terrorism.'"  471 F. Supp. 2d at 280.  In that circumstance, "the pertinent issue . . . is only whether the acts as alleged . . . violate a norm of international law, however labeled."  *Id*.  The court concluded that it could exercise ATS jurisdiction in the case at bar because, "regardless of whether there is universal agreement as to the precise scope of the word 'terrorism,' the conduct involved here is specifically condemned in the Conventions on which the court relies."  *Id*. at 281.

The same is true in this case.  Accordingly, the Court should exercise ATS jurisdiction.

Defendants' reliance on *Chiquita* is unfounded.  The claim there involved "generalized terrorism" committed by Columbian paramilitary groups against left-wing guerillas and their sympathizers.  *Chiquita*, 792 F. Supp. 2d  at 1317.  The court concluded that there was no international

consensus prohibiting such "generalized terrorism." *Id*. at 1319.

This case, by contrast, does not involve "generalized terrorism." Rather, like *Almog*, it concerns acts that are expressly and precisely prohibited by the Terrorist Financing Convention. The court in *Chiquita* itself distinguished *Almog* based on the fact that *Almog* concerned conduct specifically proscribed by the Terrorist Financing Convention rather than "terrorism in general." *Id.* at 1321. So too here.

Defendants' reliance on *Chiquita* also misses the mark because the terror attacks here "have included widespread, systematic attacks that constitute crimes against humanity." SAC ¶ 8. Whether or not there is an international consensus concerning terrorism, there clearly *is* such a consensus prohibiting crimes against humanity. *Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 213 (2d Cir. 2016). Where, as here, terror attacks on civilians rise to the level of crimes against humanity, it is thus even more clear that the terror-financing proscription set forth in Terrorist Financing Convention reflects an established norm of international law.

Finally, Defendants' reliance on *Chiquita* is unfounded because the claim there arose when only 111 countries—58% of the international community—had ratified the Terrorist Financing Convention. The court determined that this 58% did not constitute the "overwhelming majority" necessary to establish an international consensus under the ATS. 792 F. Supp. 2d at 1319.

By contrast, 173 countries—almost 90%—had ratified the Terrorist Financing Convention by the time conduct relevant to this case occurred. SAC ¶ 3. That indisputably satisfies the "overwhelming majority" requirement. *See* Pls. Opening Br. at 4 (ECF No. 96); *see also Kadic*, 70 F.3d at 241 (relying on genocide convention "ratified by more than 120 nations").[3]

---

[3] Like *Chiquita*, the other cases relied on by Defendants (Opp. at 6-7) concern only generalized terrorism, and/or claims arising before the April 2002 effective date of the Convention (or its ratification by an overwhelming majority of nations). *See*, *e.g.*, *Saperstein v. Palestinian Auth.*, 2006 WL 3804718, *3, *8 (S.D. Fla. Dec. 22, 2006) (claim

E.     *In Pari Delicto* **Does Not Apply.**

Defendants finally contend, incorrectly, that Plaintiff's claim are barred by *in pari delicto*. It is questionable whether *in pari delicto* applies to claims based on international law.  But even if it did, Defendants are officers and directors—*i.e.*, insiders—of LCB.  SAC ¶¶ 14-16.  "[I]n pari delicto does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, or in some other way control the corporation."  *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 400 (S.D.N.Y. 2011)  (citation and internal quotation marks omitted); *accord Walker, Truesdell, Roth & Assocs. v. GlobeOp Fin. Servs. LLC*, 993 N.Y.S.2d 647, 2013 WL 8597474, *10 (N.Y. Sup. Ct. 2013) (citing "unexceptional proposition" that "the *in pari delicto* doctrine bars litigation by a corporation against third parties and *not against the officers or agents whose wrongdoing has been imputed to the corporation*" (emphasis added)).

## Conclusion

The proposed SAC satisfies each requirement for the exercise of ATS jurisdiction described  in controlling case law.  Accordingly, Plaintiffs' motion for leave to file the SAC should be granted.

---

arose on February 18, 2002, before Convention effective date, and involved generic murder of innocent person during armed conflict rather than conduct expressly proscribed by international conventions); *United States v. Yousef*, 327 F.3d 56, 78 (2d Cir. 2003) (non-ATS case, plus claim arose in 1993, before Convention effective date); *O'Neil v. Al Rajhi Bank*, 714 F.3d 118, 125 (2d Cir. 2013) (no well-defined norm against terrorism existed "as of September 11, 2001"—*i.e.*, prior to Convention effective date); *Barboza v. Drummond Co.*, 2007 WL 8025825, *11 (S.D. Fla. July 17, 2007) (claim arose on February 19, 2001, before Convention effective date, plus court declined to exercise ATS jurisdiction because *"[u]nlike the plaintiffs in Almog, Plaintiffs here have asserted only claims of terrorism in general, not acts of terrorism as specifically defined in a recognized norm of customary international law."* (emphasis added)).

Dated:  July 31, 2018                                      Respectfully submitted,

                                                            s/ Dennis B. Auerbach
                                                           _____
                                                           Dennis B. Auerbach
                                                           Anthony Herman
                                                           Andrew E. Siegel
                                                           COVINGTON & BURLING LLP
                                                           One CityCenter, 850 Tenth Street
                                                           Washington, DC 20001
                                                           (202) 662-5226

                                                           *Counsel for Plaintiffs*