UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                 :
GHAZI ABU NAHL, et al.,                :
                       Plaintiff,    :
                                   :
           -against-              :
                                   :
GEORGES ZARD ABOU JAOUDE, et al.,   :
                      Defendants. :
------------------------------------------------------------ X

15 Civ. 9755 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

       Plaintiffs Ghazi Abu Nahl and Nest Investments Holding Lebanon SAL filed this action,

individually and on behalf of Lebanese Canadian Bank ("LCB"), against 10 foreign individuals

and businesses,[1] asserting claims under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and

state common law (the "Previous Complaint").  The Previous Complaint alleged that Plaintiffs,

who are shareholders in LCB, were harmed by Defendant's "aiding and abetting" of terrorism;

Defendants allegedly laundered money on behalf of Hizballah through United States

correspondent banks and used car dealerships, culminating in LCB's forfeiture of $102 million to

the United States.  The Previous Complaint was dismissed "because Plaintiffs were not injured

by the tort in violation of international law -- which they identif[ed] as Hizballah's 'attacks

targeting civilians . . . prohibited under customary international law' -- but rather by Defendants'

money laundering in aid of Hizballah's violation."  *Nahl v. Jaoude* (*Nahl I*), No. 15 Civ. 9755,

2018 WL 2994391, at *4 (S.D.N.Y. June 14, 2018) (alteration in original).  However, *Nahl I*

---

[1] The Defendants named in the Previous Complaint are: Georges Zard Abou Jaoude; Mohamed
Hamdoun; Ahmad Safa; Oussama Salhab; Cybamar Swiss GMBH, LLC; Ayman Saied Joumaa;
Mahmoud Hassan Ayash; Hassan Ayash Exchange Company; Ellissa Holding Company and
Nominal Defendant LCB.

"express[d] no view as to whether money laundering to aid terrorism is itself a tort in violation of international law that is actionable by those injured by the money laundering and not by the terrorism." 2018 WL 2994391, at *5 n.3.

Plaintiffs move for leave to file a Second Amended Verified Complaint (the "Proposed Complaint"), asserting a violation of the ATS on the basis that "[w]ilfully financing terror attacks on civilians contravenes established, well-defined norms of international law," and "LCB suffered a substantial loss as a direct result of Defendants' acts to finance Hizballah's terror attacks on civilians," and asserting state law claims. For the following reasons, Plaintiffs' motion to replead is granted in substantial part.

## I.    BACKGROUND

Familiarity with the procedural history and the Previous Complaint is assumed. *See id.*, 2018 WL 2994391, at *1–3. Except as otherwise stated, the following alleged facts are taken from the Proposed Complaint and documents integral to it, and are assumed to be true only for the purpose of this motion. *See Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018).

### A.    The Parties

Plaintiffs are a Jordanian businessman and a Lebanese holding corporation. They own a 24% stake in LCB. LCB, which is both a plaintiff and nominal defendant in this action, is a corporate entity based in Lebanon. LCB was forced into liquidation as a result of its managers' money laundering. At its peak, LCB had assets of approximately $5 billion, but now has less than $400 million. Defendant Abou Jaoude is the former Chairman and General Manager of LCB, who served as the Chair of LCB's Anti-Money Laundering Committee. Defendant Hamdoun is the former Deputy General Manager of LCB and served as the Vice Chair of LCB's

Anti-Money Laundering Committee. Abou Jaoude and Hamdoun own, or control entities that own, 76% of LCB. They used LCB to orchestrate the money laundering scheme that resulted in multiple U.S. government investigations and the eventual collapse of LCB. Defendant Safa is the former Assistant General Manager responsible for overseeing all LCB branches, and directed LCB's day-to-day money laundering operations. In 2010, Safa left LCB to serve on the Central Bank of Lebanon's Banking Control Commission, which regulates financial institutions. These Defendants exert influence over the Central Bank of Lebanon, which turned a "blind eye" to their scheme, failed to punish their wrongdoing and has its own ties to Hizballah.

The following Defendants have not appeared. Oussama Salhab is a Hizballah operative who controls a network of money couriers based principally in West Africa. Ayman Saied Joumaa directs an international drug trafficking and money laundering network that sells multi-ton shipments of South American cocaine to West Africa, substantially for Hizballah's benefit. Joumaa is designated by the U.S. Department of Treasury as a Drug Kingpin and works with Mexican drug cartels. Hassan Ayash is a Hizballah operative who facilitates bulk cash transfers and money laundering for Joumaa.[2]

### B. Factual Background

In 2002, Algeria granted Plaintiffs a banking license, which Plaintiffs used to found Trust Bank Algeria ("TBA"). In 2005, as TBA looked for a strategic partner to increase capital, Abou Jaoude approached Abu Nahl about the possibility of LCB investing in TBA. To help fund the transaction, Abou Jaoude proposed a separate transaction in which he would sell a minority stake

---

[2] Unlike the Previous Complaint, the Proposed Complaint no longer names corporate entities (other than nominal Defendant LCB) as Defendants, presumably because Plaintiffs have no viable ATS claim against such entities. *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018) ("[A]bsent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations.").

of LCB to Plaintiffs. Plaintiffs entered into a series of transactions between 2005 and 2007, acquiring 24% of LCB for approximately $57 million.

During these negotiations, Plaintiffs were unaware that Abou Jaoude and Hamdoun wanted control of TBA to further a money laundering scheme to benefit Hizballah and enrich themselves. In short, the money laundering operation worked as follows. Abou Joude, Hamdoun and Safa used LCB to wire large amounts of U.S. dollars to used car buyers throughout the United States. The money moved through correspondent accounts in five New York banks: New York Mellon, Standard Chartered, Wells Fargo, JPMorgan Chase and Mashreq. Typically, the amount of each wire transfer was tens of thousands of dollars, and some of the car purchasers in the United States received hundreds of such transfers. Between 2007 and 2011, LCB made over 3,500 such wire transfers to 30 car purchasers in twelve states -- Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma and Tennessee -- totaling almost $250 million. After receiving wire transfers, the car purchasers bought used cars in the states where they operated and shipped them to West Africa.

Once the cars arrived in West Africa, Joumaa and Salhab's networks, which owned and operated used car lots in West Africa, purchased the cars using bulk currency generated from narcotics sales in Europe and Africa. After the cars were resold in West Africa, Salhab's money couriers moved the proceeds by land or air from West Africa to Lebanon. Upon arrival in Lebanon, Hizballah operatives provided security to ensure the money reached LCB.[3] Couriers deposited most of the cash into LCB or other entities controlled by Defendants, which

_____

[3] Information in this paragraph is taken from the Department of Treasury Finding, the Forfeiture Complaint and a criminal indictment of Joumaa, all of which are appended to the Proposed Complaint. *See Cohen*, 897 F.3d at 80.

circumvented the Central Bank of Lebanon's disclosure requirements for cash deposits greater than $10,000.  The money laundering operation deposited at least $200 million in cash per year into LCB, allowing Hizballah to funnel the proceeds of narcotics sales and other illicit operations into the legitimate banking sector.  Hizballah used this money to fund violations of international law, which included, among other things, acting as Syrian president Bashar al-Assad's "muscle," and conducting terror attacks against, and summary executions of, civilians during the Syrian Civil War.  Throughout the relevant period, Plaintiffs attempted to implement better corporate governance at LCB to prevent money laundering, but were thwarted by Abou Jaoude and Hamdoun, who controlled LCB.

  **C.**  **The Forfeiture Action**

In September 2011, LCB sold certain of its assets and liabilities to another Lebanese Bank, Société Générale de Banque au Liban S.A.L. ("SGBL"), for $580 million.  SGBL placed $150 million of the purchase price in another Lebanese financial institution (the "Escrow Institution").  Also in 2011, the U.S. Department of Treasury's Financial Crimes Enforcement Network issued a Treasury Finding that identified LCB as a financial institution of primary money laundering concern, stating that Abou Joude and Hamdoun were the scheme's architects and had "frequent -- in some cases even daily -- communication" with drug trafficking and money laundering networks.  In August of 2012, the United States seized $150 million from the U.S. correspondent accounts of the Escrow Institution as money "traceable to the assets of LCB."  The U.S. Attorney for the Southern District of New York then filed a civil forfeiture

complaint against LCB.  In 2013, Abou Joude and Hamdoun, as trustees responsible for LCB's liquidation, settled the forfeiture action with the U.S. on behalf of LCB for $102 million.

## II.    LEGAL STANDARDS

### A.    Leave to Amend

"Leave to amend should be 'freely give[n] . . . when justice so requires,' but should generally be denied in instances of futility [or] undue delay . . . ." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (some internal quotation marks omitted) (quoting Fed. R. Civ. P. 15(a)(2)).  "A proposed amendment to a complaint is futile when it could not withstand a motion to dismiss." *F5 Capital v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017).  To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Choi v. Tower Research Capital LLC*, 890 F.3d 60, 65 (2d Cir. 2018).  In reviewing a motion for leave to amend, a court accepts as true all factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Kim v. Kimm*, 884 F.3d 98, 102–03 (2d Cir. 2018).  In adjudicating a motion for leave to amend, "A complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *See Cohen*, 897 F.3d at 80.

### B.    ATS

The ATS confers district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  A defendant may be liable for conduct that is "either a direct violation of the law of nations or the aiding and abetting of another's violation of the law of nations." *Balintulo v.*

*Ford Motor Co.*, 796 F.3d 160, 166 (2d Cir. 2015); *accord Licci by Licci v. Lebanese Canadian Bank, SAL* (*Licci II*), 834 F.3d 201, 213 (2d Cir. 2016).

> To state an ATS claim, a plaintiff must show:
>
> (1) the complaint pleads a violation of the law of nations; (2) the presumption against the extraterritorial application of the ATS, announced by the Supreme Court in *Kiobel II* [*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013) ], does not bar the claim; (3) customary international law recognizes the asserted liability of a defendant; and (4) the theory of liability alleged by plaintiffs (i.e., aiding and abetting, conspiracy) is recognized by customary international law or "the law of nations."

*Balintulo*, 796 F.3d at 165–66 (alterations and internal quotation marks omitted) (quoting *Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 (2d Cir. 2014)).  With respect to the third requirement, the Supreme Court recently held that ATS claims are viable against only foreign individuals, not foreign corporations.  *See Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018).[4]

## III.  Discussion

For the reasons below, leave to replead the ATS claim is granted with respect to Abou Jaoude, Hamdoun and Safa, but Plaintiffs shall not name Salhab, Joumaa and Ayash as Defendants.  Leave to amend is denied with respect to the state law causes of action, because Plaintiffs initiated this suit outside of the statute of limitations.

### A.  ATS Liability

Defendants argue that the Proposed Complaint fails to state a claim under the ATS for three reasons.  First, the ATS claim is preempted by the Anti-Terrorism Act, 18 U.S.C. § 2331,

---

[4] Defendants raise no arguments with respect to the theory of liability, presumably because all the Defendants are being sued as primary tortfeasers (i.e., the people who financed terrorist activities) rather than on any theory of secondary liability, such as aiding and abetting, which was the theory of liability in the Previous Complaint.

*et. seq.* (the "ATA"). Second, "[m]oney-laundering to finance terrorism is not a tort in violation of international law . . . [because] there is no 'specific, universal, and obligatory' international norm against it." Third, the Proposed Complaint does not satisfy the ATS's "state action requirement." For the following reasons, those arguments are unpersuasive.

### 1. Preemption

The ATA does not preempt ATS claims by foreign defendants for money laundering to finance terrorism. In assessing preemption, "we come armed with the 'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). Courts find preemption only where Congressional intent to preempt is "clear and manifest" or "there is an "irreconcilable statutory conflict." *Id.*; *see also Garfield v. Ocwen Loan Servicing, LLC*, 811 F.3d 86, 89 (2d Cir. 2016) ("[T]he only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.").

The ATA creates a private right of action for American, but not foreign, plaintiffs. *See* 18 U.S.C. § 2333(a) ("Any national of the United States injured . . . by reason of an act of international terrorism . . . may sue . . . ."). Nothing in the ATA or its legislative history suggests that the ATA intended to foreclose actions by foreign plaintiffs under the ATS. "[T]he legislative decision not to create a new private remedy [in a separate statute] does not imply that a private remedy is not already available under the Alien Tort Act." *Kadic v. Karadžić*, 70 F.3d 232, 242 (2d Cir. 1995); *see also Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012) ("Since we affirm the dismissal of the ATS claims for lack of jurisdiction, we do not address the issue of preemption, although we note that neither the plain language nor the legislative history of the

TVPRA references the ATS."); *Lev v. Arab Bank, PLC*, No. 08 Civ. 3251, 2010 WL 623636, at *3 (E.D.N.Y. Jan. 29, 2010) ("That Congress in the ATA has provided civil and criminal remedies to American nationals for overseas terrorist acts does not signal that Congress intended to foreclose the rights of aliens to sue civilly under the ATS for violations of the law of nations for similar types of conduct."). The ATA and ATS are reconcilable; the ATA provides a private right of action to domestic plaintiffs for damages caused by financing terrorism, while the ATS provides a parallel cause of action to foreign plaintiffs.

The crux of Defendants' argument is that *Jesner* demands the conclusion that the ATA preempts the ATS; for two reasons, it does not. First, the portions of *Jesner* Defendants cite (i.e., sections II.A.2 and II.B.2) reflect the views of only three Justices. *See* 138 S. Ct. 1393. Unlike the precedents above, the *Jesner* plurality's discussion of preemption is not binding. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) ("[B]ecause the test set forth by the *Morales* plurality has not been adopted by the Supreme Court as a whole, we are not required to apply it."). Second, to the extent that the *Jesner* plurality -- which focused on ATS jurisdiction over foreign corporations for money laundering on behalf of terrorists -- is relevant, it does not suggest that the ATA preempts the ATS; to the contrary, the *Jesner* plurality stated, "It has not been shown that corporate liability under the ATS is essential to serve the goals of the statute. . . . [P]laintiffs *still can sue the individual corporate employees* responsible for a violation of international law under the ATS." 138 S. Ct. at 1405 (emphasis added). The plurality therefore did not contemplate that the ATA forecloses ATS claims against individuals who launder money to finance terrorists.

### 2. Violation of the Law of Nations

In analyzing the first ATS requirement -- a violation of the law of nations -- courts apply

a two-part test.  First, the plaintiff must demonstrate that the alleged violation is "of a norm that is specific, universal, and obligatory."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004); *accord Jesner*, 138 S. Ct. at 1399.  Second, "it must be determined . . . whether allowing th[e] case to proceed under the ATS is a proper exercise of judicial discretion, or instead whether caution requires the political branches to grant specific authority . . . ."  *Jesner*, 138 S. Ct. at 1399 (citing *Sosa*, 542 U.S. at 732–33).

Defendants argue that the proposed ATS claim does not allege an actionable violation of international law for two reasons.  First, engaging in the two-part *Sosa* analysis is improper, because *Jesner* prevents courts from applying the ATS to any "new" causes of action under international law.  Second, even if it is proper to engage in the *Sosa* analysis, the Proposed Complaint does not support ATS liability because it is not sufficiently specific, universal and obligatory.  For the reasons below, these arguments are inapposite.

### a.  *Jesner*

Defendants first argue that *Jesner* effectively overruled the two-part test annunciated in *Sosa*.  In *Jesner*, three Justices expressed a desire to overrule *Sosa* and limit ATS liability to the three international law violations common in 1789 when the ATS was passed -- "violation of safe conducts, infringement of the rights of ambassadors, and piracy," *Jesner*, 138 S. Ct. at 1397 (quoting *Sosa*, 542 U.S. at 724–25).  *See id.* at 1408 (Thomas, J., concurring) ("Courts should not be in the business of creating new causes of action under the Alien Tort Statute . . . ."); *id.* at 1409 (Alito, J., concurring in part and in judgment) ("I am not certain that Sosa was correctly decided."); *id.* at 1413 ("I harbor serious doubts about *Sosa*'s suggestion.") (Gorsuch, J., concurring in part and in judgment).  However, the *Jesner* plurality declined to decide this issue:

> [T]here is an argument that a proper application of *Sosa* would preclude courts
> from ever recognizing any new causes of action under the ATS.  But the Court

> need not resolve that question in this case. Either way, absent further action from Congress it would be inappropriate for courts to extend ATS liability to foreign corporations.

*Jesner*, 138 S. Ct. at 1403. The *Jesner* plurality reaffirmed only that "courts must exercise 'great caution' before recognizing new forms of liability under the ATS." 138 S. Ct. at 1403 (2018) (quoting *Sosa*, 542 U.S. at 728).

While the Supreme Court has narrowed the ability of the ATS to redress modern violations of international law -- *see Jesner*, 138 S. Ct. at 1407 (holding that the ATS does not apply to foreign corporations), *Kiobel II*, 569 U.S. 124 (holding that the presumption against extraterritoriality bars ATS claims for violations of international law occurring entirely outside the United States) -- *Sosa* remains binding law. This Opinion therefore assumes that "[t]he statute means what it says," *Dahda v. United States*, 138 S. Ct. 1491, 1498 (2018) (referencing the federal wiretap statute), and analyzes whether laundering money to fund Hizballah's terror attacks on civilians constitutes a "tort . . . committed in violation of the law of nations" under *Sosa*'s framework. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal quotation marks omitted) ("[I]n any statutory construction case, we start, of course, with the statutory text, and proceed from the understanding that unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.").

### b.  Violation of a Specific, Universal and Obligatory Norm

Defendants argue that the proposed ATS claim does not satisfy the *Sosa* requirement of alleging a violation of a "norm that is specific, universal, and obligatory." *Sosa*, 542 U.S. at 732.

The Proposed Complaint, which alleges money laundering and financing terrorist attacks on civilians, satisfies this requirement.

To state an ATS claim, Plaintiffs must "ground[] their claims arising under international law in a norm that was universally accepted at the time of the events giving rise to the injuries alleged." *Viet. Ass'n for Victims of Agent Orange v. Dow Chem. Co*., 517 F.3d 104, 123 (2d Cir. 2008); *accord Velez*, 693 F.3d at 318. The proposed ATS claim is based on the International Convention for the Suppression of the Financing of Terrorism (the "Terrorism Financing Convention"), *see* G.A. Res. 54/109 (Dec. 9, 1999), which makes it an offense to provide funds to a group with knowledge and/or intent that such funds will be used to engage in terror attacks on civilians, *id.*, at 2.

"Although all treaties ratified by more than one State provide some evidence of the custom and practice of nations, 'a treaty will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles.'" *Kiobel v. Royal Dutch Petroleum Co*. (*Kiobel I*), 621 F.3d 111, 137 (2d Cir. 2010) (emphasis and internal quotation marks); *accord Velez*, 693 F.3d at 319.

During Defendants' alleged scheme to fund Hizballah's terror attacks on civilians, an "overwhelming majority" -- approximately 80% -- of the world's nations were party to the Terrorism Financing Convention.[5] The Terrorism Financing Convention states, "the financing of

---

[5] In 2010, approximately 178 of 223 nations were parties to the Convention. *See* U.N. Treaty Collection, *International Convention for the Suppression of the Financing of Terrorism*, https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-11&chapter=18 (last visited Nov. 6, 2018); Bureau of Intelligence & Research, U.S. Dep't of State, *Independent S tates in the World* (2011), https://web.archive.org/web/20110318141427/http://www.state.gov/s/i nr/rls/4250.htm (last visited Nov. 13, 2018).

terrorism is a matter of grave concern to the *international community as a whole*."  Terrorism

Financing Convention, Preamble (emphasis added).  The Terrorism Financing Convention

constitutes a norm that is sufficiently "universal" to sustain an ATS claim.  *Sosa*, 542 U.S. at

732; *see Abdullahi v. Pfizer, Inc.*, 562 F.3d 185 (2d Cir. 2009) (holding that a treaty banning

non-consensual medical experimentation on human beings was sufficiently universal to state an

ATS claim where it was ratified by "over 160 States"); *Almog v. Arab Bank, PLC*, 471 F. Supp.

2d 257, 277, 284 (E.D.N.Y. 2007) (holding that a violation of the Terrorism Financing

Convention, which had been signed by "over 130 countries" by 2007, was "sufficiently specific

and well-defined to be recognized as a claim under the ATS"); *see also United States v. Ahmed*,

94 F. Supp. 3d 394, 415 (E.D.N.Y. 2015) (stating that "providing material assistance to

designated [Foreign Terrorist Organizations] . . . is against the law of nations").

 Other international conventions reinforce the conclusion that the conduct alleged in the

Proposed Complaint violates universal norms of international law.  *See, e.g.*, Council on Europe

Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime; U.N.

Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Art. 5; U.N.

Convention against Transnational Organized Crime, Art. 7.  Likewise, thirty-five countries --

including the United States -- have created the Financial Action Task Force "to protect the global

financial system against money laundering, terrorist financing and the financing of proliferation

of weapons of mass destruction."  Fin. Action Task Force, *Report: Financing of Terrorist*

*Organization Islamic State and the Levant (ISIL)* (2015).

 Defendants make three arguments as to why -- despite these agreements reflecting an

international consensus -- "there is no 'specific, universal, and obligatory" international norm

against laundering money in order to finance Hizballah's terror attacks on Syrian civilians. None are persuasive.

### i. Civil Damages

Defendants argue that "the [Terrorist] Financing Convention does not reflect an international-law consensus to impose civil liability on individuals," and "an international-law consensus that certain conduct violates *criminal* law does not imply a similar consensus that there should be parallel civil liability." *See* Terrorism Financing Convention, at 5.1, 5.2 (requiring that parties, "in accordance with its domestic legal principles," enact "criminal, civil or administrative" liability for violating individuals and entities).

This argument fails. International law jurisdiction is "usually exercised by application of criminal law," but "international law also permits states to establish appropriate civil remedies, such as the tort actions authorized by the Alien Tort Act." *Kadic*, 70 F.3d at 240 (citation omitted); *see also Kiobel I*, 621 F.3d at 146–47 (first alteration in original) (stating that "[u]nlike U.S. domestic law, 'international law does not maintain [a] kind of hermetic seal between criminal and civil law,'" and that "international law . . . leave[s] remedial questions to States"). Whether the Terrorism Financing Convention mandates that nations enact civil remedies is irrelevant; rather, it is dispositive that the Terrorism Financing Convention creates a "specific, universal and obligatory" norm of international law, for which the ATS provides a civil remedy. *See, e.g.*, *Kadic*, 70 F.3d at 241–42 (holding that the Convention on the Prevention and Punishment of the Crime of Genocide, which states that "persons committing genocide . . . shall be punished," but does not require parties to impose civil liability, was sufficient to sustain an ATS claim); *Licci II*, 834 F.3d at 213 (holding that "[g]enocide, crimes against humanity, and

14

war crimes certainly constitute violations of the law of nations under customary international law" capable of supporting an ATS claim).

### ii. Well-Defined

Defendants argue that the Terrorism Financing Convention's criminal proscription is not sufficiently well-defined to support an ATS claim for two reasons. First, Defendants point to the "confusing pack of over 104 reservations and declarations" made by parties to the Terrorism Financing Convention, especially those that "relate to whether certain actions should be regarded as legitimate conflict." *See, e.g.*, Jordan ("Jordan does not consider acts of national armed struggle and fighting foreign occupation in the exercise of people's right to self-determ[in]ation as terrorist acts within the context of paragraph 1(b) of article 2 of the Convention.")

This argument fails, because the specific conduct of Hizballah alleged in the Proposed Complaint -- i.e., Hizballah's "integral role in the continued violence the Assad regime is inflicting on the Syrian population," including, for example, "summary executions of civilians" -- falls within the behavior criminalized by the Terrorism Financing Convention and outside of the ambit of the reservations and declarations. The Terrorism Financing Convention defines "terrorism" to include:

> [A]ct[s] intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

Terrorism Financing Convention, at 2.1(b). Attacks on Syrian civilians meet this definition, and do not constitute "acts of national armed struggle and fighting foreign occupation." Accordingly, even considering the declarations and reservations, the Terrorism Financing Convention criminalizes Defendants' alleged conduct.

Second, Defendants argue that the Terrorism Financing Convention cannot sustain an ATS claim because the "ostensible underlying norm" -- i.e., "terrorism" -- is not sufficiently well-defined to support ATS liability. In advancing this argument, Defendants cite *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013), which held that "Plaintiffs fail to allege the third element necessary to plead a violation of the ATS because no universal norm against 'terrorism' existed under customary international law (i.e., the 'law of nations') as of September 11, 2001." In that opinion, the court noted:

> We regrettably are no closer now . . . to an international consensus on the definition of terrorism or even its proscription . . . . [T]here continues to be strenuous disagreement among States about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliché that "one man's terrorist is another man's freedom fighter."

*Id.* (first alteration in original) (internal quotation marks omitted) (quoting *United States v. Yousef*, 327 F.3d 56, 106–08 (2d Cir. 2003)).

This argument fails for three reasons. First, whether the "underlying norm" of "terrorism" is well-defined is irrelevant; by abstracting up to the level of "terrorism," Defendants obfuscate the precise issue -- whether a scheme to finance Hizballah's atrocities in the Syrian Civil War constitutes a sufficiently well-defined violation of the Terrorism Financing Convention to sustain an ATS claim. *See Almog*, 471 F. Supp. 2d at 280 ("[I]n this case, there is no need to resolve any definitional disputes as to the scope of the word 'terrorism,' for the Conventions expressing the international norm provide their own specific descriptions of the conduct condemned. Although the Conventions refer to such acts as 'terrorism,' the pertinent issue here is only whether the acts as alleged by plaintiffs violate a norm of international law, however labeled."). Because Defendants allegedly engaged in a money laundering scheme to finance Hizballah attacks intended to "cause death or serious bodily injury" to Syrian civilians,

Plaintiffs have stated a valid ATS claim predicated on the norm articulated in the Terrorism Financing Convention -- regardless of whether Hizballah's actions are given the "terrorism" moniker.[6]

Second, to the extent that the underlying norm of "terrorism" must be well-defined, *Licci II* suggests that it is. In *Licci II*, the Second Circuit held that money laundering -- also committed by LCB in support of Hizballah -- provided a sufficient basis for an ATS claim brought by the victims of rocket attacks in Israel, because the plaintiffs adequately pleaded that the defendants "aid[ed] and abet[ed]" "[g]enocide, crimes against humanity, and war crimes [which] certainly constitute violations of the law of nations . . . ." 834 F.3d at 213 (citing *Kadic*, 70 F.3d at 236; and then citing *Sosa*, 542 U.S. at 762 (Breyer, J., concurring in part and in judgment)). This holding illustrates that terrorism -- at least under the rubric of crimes against humanity and war crimes -- can form the basis for a valid ATS claim.

Third, in *In re Terrorist Attacks*, the Second Circuit carefully circumscribed its holding's temporal reach, stating, "no universal norm against 'terrorism' existed under customary international law (i.e., the 'law of nations') *as of September 11, 2001*." 714 F.3d at 125 (emphasis added). Given that the ATS is pegged to a moving target -- i.e., international law norms that are "specific, universal, and obligatory" at the time of the alleged tort -- it is possible that, as the "War on Terror" has stretched on, the norm of "terrorism" has crystalized. That approximately 178 nations were parties to the Terrorism Financing Convention by 2010 -- compared to just 43 on September 11, 2001, and 190 in 2018 -- suggests that this is the case.

---

[6] With respect to the definitional issue, the State Department's designation of Hizballah as a terrorist organization is a compelling point of departure. *See* Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (October 8, 1997).

### 3. State Action

Defendants argue that Plaintiffs' ATS claim fails because they do not allege that state actors committed the relevant tort. This argument is unpersuasive. As stated by the Second Circuit in 1995:

> We do not agree that the law of nations, as understood in the modern era, confines its reach to state action. Instead, we hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals.

*Kadic*, 70 F.3d at 239. "ATS claims may sometimes be brought against private actors, and not only state officials, when the tortious activities violate norms of 'universal concern' that are recognized to extend to the conduct of private parties -- for example, slavery, genocide, and war crimes." *Abdullahi* 562 F.3d at 173 (citation omitted); *accord Swarna v. Al-Awadi*, No. 06 Civ. 4880, 2011 WL 1873356, at *2 (S.D.N.Y. May 12, 2011). Even when an international norm is not of "universal concern," plaintiffs can sue under the ATS, if they allege that the tort was committed "under color of law" -- in that the non-state defendant "[a]ct[ed] in concert with a foreign state." *Kadic*, 70 F.3d at 240, 245; *see Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42, 52 (2d Cir. 2014).

The Proposed Complaint is sufficient for two reasons. First, as discussed above, the Terrorism Financing Convention constitutes sufficient proof that Defendants' alleged conduct violates norms of universal concern, and the Convention expressly extends these norms to "[a]ny person" who commits the proscribed conduct, Terrorism Financing Convention, at 2(1). As the Convention does not define "person," the word is construed to have its ordinary meaning, *see*, *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018) (stating that where a term "is not defined in the statute . . . we give the term its ordinary meaning"), which includes non-state

actors.  Second, the Proposed Complaint alleges that Defendants operated "in concert" with a

foreign state, i.e., the Central Bank of Lebanon, which allegedly turned a "blind eye" to LCB's

scheme, "frustrated Plaintiffs' ability to obtain redress in Lebanon" and has its own ties to

Hizballah.[7]

**B.** *In Pari Delicto*

Defendants argue that LCB -- in this derivative action brought on behalf of LCB by two

of its shareholders -- cannot maintain a suit because the Proposed Complaint alleges that "LCB

was itself the perpetrator -- not a victim -- of the ostensible international law violations."  This

argument is unpersuasive.  Under the doctrine of *in pari delicto*:

> a private action for damages [] may be barred on the grounds of the plaintiff's
> own culpability only where (1) as a direct result of his own actions, the plaintiff
> bears at least substantially equal responsibility for the violations he seeks to
> redress, and (2) preclusion of suit would not significantly interfere with the
> effective enforcement of the [relevant substantive] laws and protection of the . . .
> public.

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310–11 (1985) (holding that the *in*

*pari delicto* defense did not bar a securities fraud damages action against corporate insiders by

investors who engaged in insider trading); *accord Republic of Iraq v. ABB AG*, 768 F.3d 145,

167 (2d Cir. 2014) (characterizing the second prong as "whether recognition of the *in pari*

*delicto* defense to a federal statutory cause of action would comport with the purposes of the

statute").  Courts may "appl[y] the *in pari delicto* doctrine at the pleadings stage" when "the

outcome is plain on the face of the pleadings."  *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d

54, 65 (2d Cir. 2013).

---

[7] Pursuant to Federal Rule of Evidence 201(b), the Court takes judicial notice of the fact that the
Central Bank of Lebanon (Banque du Liban) is an instrumentality of the Lebanese Republic.

The "significant interference" prong of the *Bateman* test creates an exception to *in pari delicto* for the precise situation at hand -- shareholder derivative suits on behalf of corporations that engaged in malfeasance may proceed against the corporation's fiduciaries who orchestrated the malfeasance.  *See, e.g.*, *Teras Int'l Corp. v. Gimbel*, No. 13 Civ. 6788, 2014 WL 7177972, at *10 (S.D.N.Y. Dec. 17, 2014) (internal quotation marks omitted) ("Claims against insiders for their acts as corporate fiduciaries are not barred by *in pari delicto*, because it would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense."); *see also United States v. Hatfield*, No. 06 Cr. 550, 2015 WL 13385926, at *6 (E.D.N.Y. Mar. 27, 2015).

> The rationale for this "insider exception" to the *in pari delicto* doctrine is simple: a corporate insider, whose wrongdoing is typically imputed to the corporation, should not be permitted to use that wrongdoing as a shield to prevent *the corporation* from recovering against him.  Thus, while the doctrine precludes a company from suing a third party for aiding the fraud of its insiders, it does not prevent the company from suing the insiders themselves.

*Id.* (emphasis added) (citation, emphasis and internal quotation marks omitted).  Otherwise, *in pari delicto* "would prevent, in nearly every instance, a corporation from being able to hold its fraudulent insiders accountable."  *Id.* at *6.

LCB's ATS claim against corporate insiders triggers the exception to *in pari delicto*.  Together, Defendants Abou Jaoude and Hamdoun own, or control entities that own, 76% of LCB.  Defendant Safa was the Assistant General Manager overseeing all LCB branches and directed its day-to-day money laundering operations.

However, *in pari delicto* precludes a viable claim by LCB against the Defendants who are not corporate insiders -- Salhab, Joumaa and Ayash.  *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 611 F. App'x 34, 37 (2d Cir. 2015) (summary order) ("[A] corporation that engages in malfeasance cannot sue outside accountants who negligently failed to detect or prevent that

malfeasance."); *Hatfield*, 2015 WL 13385926, at *6 ("[T]he doctrine precludes a company from suing a third party for aiding the fraud of its insiders[;] it does not prevent the company from suing the insiders themselves.").  Leave to amend is denied with respect to Salhab, Joumaa and Ayash.

### C.     Certain Reserved Arguments

*Nahl I* dismissed the Previous Complaint without prejudice to Defendants' arguments that had been made in support of the motion to dismiss but were not addressed in that opinion. 2018 WL 2994391, at *5 n.4.  Some of those arguments -- which bear directly on the proper parties and claims in the Proposed Complaint -- are addressed below.  For the following reasons, these arguments provide no reason to deny leave to replead the ATS claim, but leave to replead the state law claims is denied.

#### 1. Indispensable Parties

Defendants argued that this case cannot proceed without SGBL and the Central Bank of Lebanon.  This argument does not make the filing of the Proposed Complaint futile.

#### a. Applicable Law

Rule 12(b)(7) allows a party to move to dismiss for "failure to join a party under Rule 19."  Rule 19 "sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party."  *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000); *accord Spencer Stuart Human Res. Consultancy (Shanghai) Co. v. Am. Indus. Acquisition Corp.*, No. 17 Civ. 2195, 2017 WL 4570791, at *2 (S.D.N.Y. Oct. 12, 2017).

First, the court determines if the absent party is "necessary" under Rule 19(a).  *See Viacom*, 212 F.3d at 724; *accord Murphy v. Morlitz*, No. 15 Civ. 7256, 2017 WL 4221472, at *3 (S.D.N.Y. Sept. 21, 2017).  Rule 19(a) states under the heading "Required Party" that "[a] person

who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i)    as a practical matter impair or impede the person's ability to protect the interest; or
>> (ii)   leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Second, the court determines if the absent party is "indispensable" -- i.e., whether its absence requires dismissal of the action. *Viacom*, 212 F.3d at 724. Only if the absent party qualifies as necessary and cannot be joined must the court decide "whether, in equity and good conscience, the action should proceed" or be dismissed. Fed. R. Civ. P. 19(b); *see Viacom*, 212 F.3d at 725.

"In meeting its burden under Rule 12(b)(7), the moving party may present, and the court may consider, evidence outside of the pleadings." *Voronina v. Scores Holding Co., Inc*., No. 16 Civ. 2477, 2017 WL 74731, at *1 n.2 (S.D.N.Y. Jan. 5, 2017) (alteration omitted); *see also Garner v. Behrman Bros. IV*, 260 F. Supp. 3d 369, 372 n.1 (S.D.N.Y. 2017); 5C Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1359 (4th ed. 2018) (collecting cases) ("To discharge this burden, it may be necessary to present affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence. . . . The district judge is not limited to the pleadings."). "Federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder and, in general, dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result." *Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*, 795 F.3d 351, 357 (2d Cir. 2015); *accord Slinin v. Shnaider*, No. 15 Civ. 9674, 2017 WL 464426, at *7 (S.D.N.Y. Feb. 2, 2017).

### b. SGBL

The settlement agreement between LCB and the United States makes clear that "LCB, as part of the settlement set forth herein, shall forfeit to the United States for disposition according to law all of LCB's right, title, and interest in the Seized Funds," which totaled $102 million. It was therefore LCB -- not SGBL -- that forfeited money, and LCB remains a viable corporation in Lebanon. LCB's shareholders lost money as a result of the enforcement action; SGBL actually received $60 million as a result of the forfeiture agreement. Accordingly, it appears that SGBL is not even a necessary party -- let alone an indispensable party -- to this action, which seeks to recover monies that LCB forfeited to the United States.

Defendants argue that, in selling substantially all of its assets to SGBL, LCB transferred its right to sue on its own behalf and, as a result, that there can be no derivative suit. *See BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A*., 247 F. Supp. 3d 377, 409 (S.D.N.Y. 2017) ("[A] plaintiff who asserts a derivative cause of action must establish the existence of a cause of action in the party whose rights are sought to be enforced. A cause of action cannot be derived from a source in which it does not exist."). In the asset sale, LCB transferred "all rights, titles and interests of the Seller in and to the Properties, assets, and rights of every nature, kind and description . . . as at the Completion Date." LCB used the cash from the SGBL asset sale to pay the $102 million settlement with the federal government -- cash that would have been paid out to LCB shareholders in the absence of the forfeiture. LCB did not convey to SGBL the right to the very proceeds of the asset sale in the asset sale agreement; put differently, LCB is suing for an injury incurred after its sale of "all rights, titles, and interests . . . *as at the Completion Date*" to SGBL. The right to sue for that injury was therefore not transferred. LCB's shareholders were injured when LCB was forced to pay $102 million from

the asset sale to compensate the United States for LCB's past money laundering. SGBL has no

interest in the claim asserted in this action.

### c. Central Bank

Defendants argued that the Central Bank of Lebanon is an indispensable party to this

action, and that it cannot be joined because it enjoys sovereign immunity. *See, e.g.*, *Republic of*

*Philippines v. Pimentel*, 553 U.S. 851, 867 (2008) ("A case may not proceed when a required-

entity sovereign is not amenable to suit."). The Central Bank is neither a necessary nor an

indispensable party.

The allegations in the Proposed Complaint that the Central Bank turned a "blind eye" to

LCB's money laundering and "frustrated Plaintiffs' ability to obtain redress in Lebanon" do not

make the Central Bank a necessary party. The Proposed Complaint does not purport to sue or

seek recovery from the Central Bank as a joint tortfeasor, and -- even if it did -- "[i]t has long

been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single

lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990); *accord Certain Underwriters at*

*Lloyd's London v. Art Crating, Inc.*, No. 12 Civ. 5078, 2014 WL 123488, at *12 (E.D.N.Y. Jan.

10, 2014). Complete relief can be afforded in the Central Bank's absence, and the Central

Bank's rights will not be impaired by the outcome of the action. Defendants argue that the

Central Bank has an interest in this action because the Proposed Complaint disparages its

conduct. That argument is not persuasive as it does meet Rule 19's definition of a necessary

party.

### 2. Corporate ATS Plaintiffs

Defendants argued that *Jesner*'s holding that corporations cannot be sued under the ATS,

*see* 138 S. Ct. at 1407, necessarily implies that they also cannot sue under the ATS. This

argument is unpersuasive. Both the Supreme Court's opinion in *Jesner* and the Second Circuit's opinion in *Kiobel I* focused exclusively on whether a corporation can be an ATS defendant, not a plaintiff. Courts are instructed to determine only if "customary international law recognizes the asserted liability of a *defendant*." *Balintulo*, 796 F.3d at 165 (alterations in original). The one Second Circuit decision to address the issue concluded that alien corporations can sue under the ATS. *See Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421, 425 (2d Cir. 1987) ("All of these [ATS] requirements are met in the instant case. Appellants are aliens; they are Liberian corporations."), *rev'd on other grounds*, 488 U.S. 428 (1989).

Common sense dictates the same result. Piracy is one of Blackstone's three paradigmatic violations of customary international law for which the ATS provides a remedy. *See Sosa*, 542 U.S. at 724. Shipping companies historically have been the quintessential victims of piracy. *See Moxon v. The Fanny*, 17 F. Cas. 942, 943 (No. 9,895) (D. Pa. 1793) (stating that the ATS provided jurisdiction over a suit by the owners of a British ship against the French privateer who hijacked it); *see also* An Act for the Better Regulation of the Affairs of the East India Company, and of the British Possessions in India, and for Establishing a Court of Judicature for the More Speedy and Effectual Trial of Persons Accused of Offences Committed in the East Indes 1784, 59 Geo. 3 s 2 c 25, s35; An Act to Protect the Commerce of the United States, and Punish the Crime of Piracy, ch. 77, § 5, 3 Stat. 510 (1819). And shipping companies are the quintessential victims of piracy today. *See United States v. Ali*, 718 F.3d 929, 932 (D.C. Cir. 2013) ("Pirate attacks have become increasingly daring, as well as commonplace, with pirates targeting large commercial vessels in transit, hijacking these ships, and ransoming the crews."); World Bank, *The Pirates of Somalia: Ending the Threat, Rebuilding a Nation* 93–95 (2013) (stating that Somali pirates negotiate directly with shipping companies and estimating that shipping

companies made 153 ransom payments between 2005 and 2012 amounting to $385 million). It would be anomalous to bar the prototypical victims of the classic ATS tort from suing under the ATS. The corporate identity of Plaintiff LCB is not an impediment to repleading the ATS claim.

### 3. Common Law Claims

The Proposed Complaint includes state common law claims for breach of fiduciary duty and abuse of control. Leave to include these claims in an amended complaint is denied as they are time barred.

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015). Under New York law, [8] a claim to recover damages for injury to property is subject to a three-year statute of limitations. N.Y. C.P.L.R. § 214(4); see also *ITT Corp. v. Lee*, 663 F. App'x 80, 85 (2d Cir. 2016) (summary order) (applying New York three-year limitations period to fiduciary duty claim). Both proposed state law claims seek money damages arising from Defendants' alleged money laundering and providing funds for civilian terrorist attacks. Plaintiffs learned about this conduct -- at the latest -- in January 2011, when the Treasury Department exposed the scheme, which "came as a shock to Abu Nahl and the Nest Group." Plaintiffs did not file this suit until December of 2015. Leave to amend is therefore denied with respect to the state law claims.

---

[8] This Opinion applies New York law, because Defendants assume that it applies and Plaintiffs raise no alternative. *See, e.g.*, *Roberts v. Capital One, N.A.*, 719 F. App'x 33, 35 n.2 (2d Cir. 2017) (summary order) ("[W]e assume that New York contract law applies in light of the parties' citations to New York caselaw, as well as their failure to assert that the district court erred in applying New York law."); *Fischkoff v. Iovance Biotherapeutics, Inc.*, No. 17 Civ. 5041 , 2018 WL 5074659, at *3 n.2 (S.D.N.Y. Oct. 17, 2018) ("The parties' briefs assume that New York law applies to Fischkoff's defamation claim. Accordingly, we apply New York law.").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for leave to amend is GRANTED with respect to the ATS claim, except that the Proposed Complaint shall not name Defendants Salhab, Joumaa and Ayash.  Plaintiffs' motion for leave to amend is DENIED as to the common law claims.  Plaintiffs shall file the Second Amended Complaint, as provided in this Opinion, by December 20, 2018.  The Clerk of Court is requested to close the motion at Dkt. 95.

Dated: December 12, 2018
         New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE