UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GHAZI ABU NAHL and NEST INVESTMENTS
HOLDING LEBANON SAL, on behalf of
LEBANESE CANADIAN BANK,

        Plaintiffs,

      v.

GEORGES ZARD ABOU JAOUDE, MOHAMED
HAMDOUN, and AHMAD SAFA,

        Defendants,

     and

LEBANESE CANADIAN BANK,

        Nominal Defendant.

---

15 Civ. 9755 (LGS)

**SECOND AMENDED
VERIFIED COMPLAINT**

DEMAND FOR JURY TRIAL

## NATURE OF ACTION

1.     This case involves an international money laundering scheme perpetrated by Defendants Georges Zard Abou Jaoude ("Abou Jaoude"), Mohamed Hamdoun ("Hamdoun"), Ahmad Safa ("Safa") and others.  As the United States Government has determined, Defendants used United States accounts and entities to launder funds for international narcoterrorists, including Hezbollah.  A central purpose of the scheme was to finance Hezbollah terror attacks on civilians and other acts of terrorism and crimes against humanity—attacks that have been documented by recognized Hezbollah experts.  Defendants' misconduct resulted in substantial damage to Lebanese Canadian Bank ("LCB" or the "Bank"), an entity controlled by Abou Jaoude, Hamdoun and Safa.  Plaintiffs—LCB shareholders—sue derivatively to recover the damages suffered by the Bank (and by themselves as shareholders) as a result of Defendants' scheme.

2.     Willfully financing terror attacks on civilians contravenes established, well-defined norms of international law and thus violates the law of nations within the meaning of the Alien Tort Statute, 28 U.S.C. § 1350.

3.     In 1999, the United Nations General Assembly promulgated the International Convention for the Suppression of the Financing of Terrorism ("Terrorist Financing Convention").  The Convention went into effect on April 10, 2002.  An overwhelming majority of countries are parties to the Terrorist Financing Convention, and the overwhelming majority of states also were parties at the time of the misconduct at issue in this case.  Under the Terrorist Financing Convention, it is an offense to provide funds to a group with the knowledge and/or intent that such funds will be used, in whole or in part, to engage in terror attacks on civilians.

4.      International organizations agree that the Terrorist Financing Convention reflects established international-law norms.  For example, the International Monetary Fund has referred to "legally binding international norms" prohibiting terrorist financing, "such as those contained in . . . the International Convention for the Suppression of the Financing of Terrorism."  International Monetary Fund, *Suppressing the Financing of Terrorism: A Handbook for Legislative Drafting*, at 1 (2003), https://www.imf.org/external/pubs/nft/2003/SFTH/pdf/SFTH.pdf.  Terror financing is specifically proscribed by a U.N. Security Council resolution, further showing that the Convention's prohibition of terrorist financing constitutes an established norm of international law. *Creation of Counter Terrorism Committee*, U.N. Doc. S/Res/1373, ¶ 1 (Sept. 28, 2001).

5.      Defendants have violated the law of nations.  As recognized by the U.S. Government, they have financed Hezbollah terror attacks on civilians by laundering funds through the United States, including through banks in New York.  Hezbollah has been designated by the United States Department of State as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act.  *See* 62 Fed. Reg. 52,650 (Oct. 8, 1997).  According to a White House national security official, "Hizballah, originally formed as a violent union of Iranian-backed extremists in Lebanon, has terrorized the Middle East and the world since its inception thirty-five years ago." *See* Thomas Bossert, "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah" (Oct. 10, 2017), *available at* https://www.whitehouse.gov/articles/time-mobilize-global-response-terrorist-group-lebanese-hizballah; *see also* U.S. Dep't Treasury, "Treasury Targets Hizballah for Supporting the Assad Regime" (Aug. 10,

2012), *available at* https://www.treasury.gov/press-center/press-releases/ Pages/tg1676.aspx.  Defendants have knowingly and purposefully financed Hezbollah terror attacks on civilians documented by the U.S. Government and others by means of the scheme at issue in this case.

6.      Specifically, Defendants orchestrated a scheme by which LCB wired funds into and out of accounts in New York to support Hezbollah attacks.  The details of the money laundering scheme were described in three separate enforcement actions by the U.S. Government:  findings by the U.S. Treasury Department that LCB was engaged in money laundering activities ("Treasury Finding"); a civil forfeiture complaint filed by the U.S. Attorney's Office for the Southern District of New York ("Civil Forfeiture Complaint"); and a criminal indictment obtained by the U.S. Attorney's Office for the Eastern District of Virginia ("Criminal Indictment") (collectively, "the U.S. government actions").  These documents are annexed to this Second Amended Verified Complaint as Exhibits A-C.

7.      In brief, Defendants' money laundering scheme worked as follows. First, money flowing through LCB was routed through New York banks and used to purchase used cars in the United States.  Second, the cars were then shipped to West Africa, where they were sold.  Third, proceeds from narcotics sales in Europe and elsewhere were mixed with the money received from the sale of the cars, then the newly laundered drug money was reintroduced into the legitimate banking sector through LCB. Finally, some of the laundered funds were sent back to the United States to purchase more cars and continue the cycle, while other funds were siphoned from the Bank to support Hezbollah, including through an entity called the Yousser Company, which the

4

U.S. Treasury Department Office of Foreign Assets Control has described as "Hizballah's unofficial treasurer, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks." Hezbollah, in turn, used laundered monies to fund its terrorist agenda. *See generally* Civil Forfeiture Complaint.

8.      Hezbollah's terror attacks on civilians are notorious and well-documented, including in declarations filed in this case by recognized Hezbollah experts Dr. Michael Rubin and Dr. Matthew Levitt that provide specifics concerning some of those attacks. *See, e.g.*, Declaration of Michael Rubin in Opposition to Defendants' Motion to Dismiss First Amended Complaint ¶ 7 (ECF No. 76); Declaration of Matthew Levitt in Opposition to Defendants' Motion to Dismiss First Amended Complaint ¶ 7 (ECF No. 75). Hezbollah's terror attacks on civilians have included widespread, systematic attacks that constitute crimes against humanity.

9.      As recognized by the U.S. Government and Hezbollah experts, the funds laundered by Defendants have enabled Hezbollah to commit terror attacks on civilians. Defendants operated the money laundering scheme with the knowledge and intent that the laundered funds provided to Hezbollah would enable it to carry out such attacks. Defendants' scheme thus violates the law of nations.

10.      LCB suffered a substantial loss as a direct result of Defendants' acts to finance Hezbollah's terror attacks on civilians and other crimes against humanity and terrorist acts through the money laundering scheme documented by the U.S. Government and others. In particular, in 2013 LCB was required to forfeit $102 million of Bank funds in settlement of the claims asserted in the Civil Forfeiture Complaint,

effectively constituting the proceeds from a sale of LCB assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme. In announcing the settlement, Drug Enforcement Agency head Michele Leonhart stated that the settlement "addresses the role the Lebanese Canadian Bank played in facilitating illicit money movement from the United States to West Africa to Hizballah-controlled money laundering channels," while Manhattan U.S. Attorney Preet Bharara stated that the settlement "shows that banks laundering money for terrorists and narco-traffickers will face consequences for their actions, wherever they may be located."

## PARTIES

### A. **Plaintiffs**

11.      Plaintiff Ghazi Abu Nahl ("Abu Nahl") is a Jordanian businessman and Group Chairman of Nest Investments (Holdings) Ltd. ("Nest Investments"). Born in Barbara, Palestine and with only a basic high school education, Abu Nahl built his businesses from the ground up. He became one of the first entrepreneurs to sell insurance policies in the region. Nest Investments owns and operates a number of businesses (collectively, the "Nest Group"), primarily in the insurance and reinsurance industries, in the Middle East and North Africa ("MENA") region. Abu Nahl directly acquired a 1.36% stake in LCB.

12.      Plaintiff Nest Investments Holding Lebanon SAL is a corporate entity incorporated under the laws of Lebanon with its principal place of business in Beirut, Lebanon. Nest Investments Holding Lebanon SAL acquired a 12.5% stake in LCB. Nest Investments Holding Lebanon SAL, in turn, is principally (99%) owned by

Abu Nahl. Nest Investments and Abu Nahl, together with other affiliates and associates, owned a combined 24% stake in LCB.

**B. Defendants**

13.    Nominal Defendant LCB is a corporate entity based in Beirut, Lebanon. LCB previously operated as a bank, offering personal and corporate banking services with branches throughout Lebanon. At its peak, LCB was the eighth largest bank in Lebanon, with assets worth more than $5 billion. LCB is currently in liquidation. In 2011, when it was forced into liquidation because of the managers' unlawful money laundering activities, LCB was worth in the range of $800 million. As a result of the liquidation and subsequent sale of substantially all of the Bank's assets triggered by the money laundering scheme, the net proceeds from the sale of the Bank's assets will be less than $400 million. LCB remains an extant corporate entity in Lebanon, despite the sale of Bank assets.

14.    Defendant Georges Zard Abou Jaoude is the former Chairman and General Manager of LCB. He formerly served as the Chair of LCB's Anti-Money Laundering Committee. Abou Jaoude directed the affairs of the international money laundering scheme that ultimately resulted in multiple U.S. government investigations and the collapse of LCB. Through his interlocking board and management positions in LCB, Abou Jaoude directed both the money laundering operation and efforts to conceal the scheme from Plaintiffs and from U.S. and other law enforcement officers and regulators. In spite of his participation in the money laundering scheme, Abou Jaoude remains active in the Lebanese banking sector and apparently in good standing with the Central Bank of Lebanon. With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full

7

extent of his participation in the illicit money laundering scheme and further damage Plaintiffs.

15.     Defendant Mohamed Hamdoun is the former Deputy General Manager of LCB and served on LCB's Executive Board.  He served as the Vice Chair of LCB's Anti-Money Laundering Committee.  Together with Abou Jaoude, Hamdoun directed the money laundering scheme detailed in this Complaint.  Through his interlocking board and management positions in LCB, Hamdoun directed both the money laundering operation and efforts to conceal the scheme from Plaintiffs and from U.S. and other law enforcement and regulators.  In spite of his participation in the money laundering scheme, Hamdoun remains active in the Lebanese banking sector and is apparently in good standing with the Central Bank of Lebanon.  With the tacit approval of the Central Bank of Lebanon, he is currently acting as one of LCB's liquidators, putting him in a position to conceal the full extent of his participation in the illicit money laundering activities and further damage the Plaintiffs.

16.     Defendant Ahmad Safa is the former Assistant General Manager responsible for overseeing all LCB branches.  He reported directly to Abou Jaoude and functioned as Hamdoun's operational enforcer at the Bank.  Through his managerial and operational roles at LCB, Safa organized and directed the day-to-day money laundering activities run through LCB.  In or around 2010, Safa left the Bank and assumed a position as a Member on the Banking Control Commission, an arm of the Central Bank of Lebanon responsible for supervising and auditing banks, brokerage houses, and other financial institutions.  In March 2015, Safa was reappointed to the Banking Control Commission.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1350 (the Alien Tort Statute).

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the actions and omissions giving rise to the claims herein complained of occurred in this District.

19.     This Court has personal jurisdiction over Defendants because Plaintiffs' claims are based, *inter alia*, on Defendants' purposeful acts to coordinate their money laundering scheme through banks in New York.  In particular, Defendants, through their control of LCB, repeatedly caused funds to be transferred by wire through LCB correspondent accounts in New York; such transfers formed an essential part of Defendants' scheme; and such transfers were purposefully and deliberately routed through various banks in this district for the purpose of purchasing used cars in Michigan and otherwise advancing the laundering scheme described in this action.  The Treasury Finding specifically states that Abou Jaoude, Hamdoun, and the managers of key LCB branches "are in frequent—in some cases even daily—communication with the various members of the . . . drug trafficking and money laundering network, and they personally process transactions on the network's behalf."

20.     While the parties to this action are foreign, the very purpose of the Alien Tort Statute is to provide a federal forum to adjudicate claims by aliens to redress torts committed in violation of the law of nations, where, as here, such torts have a nexus to the United States.  Defendants' torts here—the U.S. Government-documented laundering of funds to finance Hezbollah terror attacks on civilians—were conducted

through the use of New York banks and Michigan used car dealers, and those torts thus touch and concern the United States.

21.     Adjudication of Plaintiffs' claims in the United States is especially appropriate here because the claims cannot be fairly adjudicated in Lebanon. Hezbollah's strong influence over the Lebanese government is well-documented.  For example, *Newsweek* magazine reported last year that "Hezbollah is seizing the [Lebanese] state's institutions one by one . . . Slowly but surely, [Hezbollah] is clearing its own path towards full control of Lebanon's government."  According to Faysal Itani, a senior fellow and counter-terrorism expert at the Atlantic Council in Washington, D.C., "I do not see [Hezbollah] as separate from the Lebanese government."  Lebanon's justice minister resigned in 2016, citing what he called Hezbollah's "domination" of the country's government.  According to a White House national security official, "[f]or decades, this terrorist organization [Hezbollah] has tried to disguise its murderous intentions under the guise of political legitimacy."  *See* "It's time to Mobilize a Global Response to the Terrorist Group Lebanese Hizballah," (Oct. 10, 2017), *available at* https://www.whitehouse.gov/articles/time-mobilize-global-response-terrorist-group-lebanese-hizballah.  The White House national security official further noted that "[t]oday, Hizballah and its political allies hold half of the seats in Lebanon's Cabinet and nearly half of the seats in its National Assembly," while concluding that "[t]he same Hizballah officials responsible for its political apparatus oversee its terrorist planning." *Id.*; *accord* Tony Badran, *Lebanon Is Another Name for Hezbollah*, Found. Def. Democracy (July 26, 2017), http://www.defenddemocracy.org/media-hit/lebanon-is-another-name-for-hezbollah ("Hezbollah, of course, controls the Lebanese government

. . . The Lebanese state, in other words, is worse than a joke.  It's a front . . . ."); *see also* Rubin Decl. ¶ 21 ("Hezbollah, a U.S.-designated terrorist group, dominates the political infrastructure of Lebanon.  This includes the Lebanese judiciary.  The group has significant influence over judicial decisions and has demonstrated an ability to derail open judicial inquiry into itself and its members.  At present, it is impossible for allegations against Hezbollah to be decided impartially in Lebanon."); Levitt Decl. ¶ 17 ("Hezbollah's influence in the Lebanese government extends well into the country's judicial system").

22.     The State Department has specifically recognized that the Lebanese judiciary has long been subject to Hezbollah pressure, finding that "[t]he Constitution provides for an independent judiciary; however, in practice, it was subject to political pressure . . . Lebanese and Palestinian militias, particularly Hizballah, retained significant influence over much of the country." *2004 Country Reports on Human Rights Practices: Lebanon*, U.S. Dep't State (Feb. 28, 2005).  Lebanon's Ministry of Justice exercises significant control over the country's judiciary.  As a result, the Lebanese judiciary lacks judicial independence from the political branches of government, which are, in turn, dominated by Hezbollah.

23.     Due to Hezbollah's power in Lebanon, Lebanese courts do not provide an adequate forum to adjudicate Plaintiffs' claims, which are based on a money laundering scheme to benefit Hezbollah.  Put simply, a system dominated by Hezbollah cannot be expected fairly to adjudicate claims based on a wide-ranging international scheme whose very purpose is to launder funds to support Hezbollah's terrorist activities.

24.     Plaintiffs' inability to obtain relief in Lebanon is exacerbated by the fact that political corruption and bribery is notorious in that country.  According to Transparency International's Corruption Perceptions Index, Lebanon is more corrupt than over 135 other countries, including Brazil, Russia, Iran, and Kazakhstan.

25.     Corruption has specifically stood in the way of Plaintiffs obtaining redress in Lebanon for injuries resulting from Defendants' laundering scheme.  As explained more fully below, the Central Bank of Lebanon exerts substantial control over the banking sector in the country.  For example, only the Central Bank may lift the country's Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing, including money laundering.  Plaintiffs have repeatedly raised issues concerning LCB with the Central Bank of Lebanon, but the Central Bank has turned a blind eye to these issues.  Because the Central Bank must authorize prosecutors to investigate and develop evidence of money laundering under Lebanese rules, the Central Bank's refusal to authorize such investigation has frustrated Plaintiffs' ability to obtain redress in Lebanon, despite good-faith efforts to do so beginning in or about February 2011.  Hamdoun has claimed to have a close personal relationship with the Central Bank officials and, on information and belief, has used this relationship to cause the Central Bank to turn a blind eye to Defendants' money laundering scheme.

## FACTUAL ALLEGATIONS

### A.  History of the Nest Group and Abu Nahl

26.     Nest Investments (Holdings) Ltd. is a group company established in 1989 by Abu Nahl, a Jordanian businessman with over 45 years' experience in the highly regulated insurance sector.  Under Abu Nahl's leadership, Nest Investments

(Holdings) Ltd. and its affiliated companies expanded their operations to 23 countries in North America, Europe, Africa, the Middle East, Asia, and Australia.

27.     Abu Nahl was born in Palestine in 1946.  In 1962, Abu Nahl's father borrowed money to send Abu Nahl to high school in Egypt.  Worried about the toll this sacrifice would take on his father and the rest of his family, Abu Nahl returned to Palestine after 40 days and returned the money intended for his schooling to his father. Abu Nahl then moved to Qatar in 1964 to find work.  Soon, he heard about a concept that, at the time, was foreign in the Persian Gulf region:  insurance.  He began selling insurance policies.  After his initial success in the insurance industry, Abu Nahl arranged a meeting with the Emir of Qatar to discuss the importance of insurance.  Soon, Qatar required all automobile owners to carry insurance on their cars.  Abu Nahl was the founder of one of the first Persian Gulf insurance companies.

28.     The Nest Group owns and operates a number of insurance and reinsurance companies.  The Nest Group also owns investments in real estate and other industries.  The group employs around 6,000 people worldwide.

29.     Abu Nahl also currently serves as Director of the World Trade Centers Association, a non-profit organization that partners with commercial property developers, economic development agencies, and international businesses to promote trade and investment in more than 90 countries around the world.  Abu Nahl's involvement with the World Trade Centers Association began around 1995.  When he was elected Chair of the organization in 2008, he quickly applied his corporate governance expertise to establish systems and proper controls throughout the organization to improve its functioning and services.  The Association is now more

transparent and applies worldwide standards on corporate governance, including risk
management, internal auditing, transparency, high-level financial reporting, and
independent board elections.

**B.   Nest Group's Initial Involvement with LCB**

30.     In 2000, the Nest Group expanded its insurance operations into
Algeria, establishing Trust Algeria Insurance and Reinsurance.  Impressed with the Nest
Group's successful establishment of insurance operations, the Algerian authorities asked
the Company to establish a bank in the country.  In 2002, Algeria granted the Nest Group
a banking license and the Company founded Trust Bank Algeria ("TBA") in Algiers.

31.     The Algerian banking sector is highly regulated, with the Algerian
Central Bank tightly controlling which banks may operate and who may own or control
shares in banks in the country.  The banking sector is heavily dominated by state-owned
banking operations.  Because private banks are rare in Algeria, the Nest Group's Algerian
banking license and its control and operation of TBA are both unusual and highly coveted
by other companies seeking access to the Algerian banking sector.  When TBA was
established by the Nest Group in 2002, other banking operations were actively seeking
investment opportunities in entities with Algerian banking licenses because of the
promise of substantial profits.  Expansion into the Algerian banking sector was difficult,
however, because of the scarcity of private enterprises with banking licenses.

32.     In 2005, three years after TBA's founding, the Algerian Central
Bank required all banks in the country to increase their capital.  In part because the Nest
Group wanted to diversify its investment risk, it began looking for other investors in
TBA.  Abu Nahl and the Nest Group were particularly interested in partnering with an
investor who could offer additional banking experience and expertise.

33.    During this search for a strategic banking partner, Abu Nahl and the Nest Group had discussions with several different banking organizations, including LCB.  In 2005, Defendant Abou Jaoude approached Abu Nahl to discuss his interest in organizing an investment in TBA by LCB.

34.    At the time, Abou Jaoude was under considerable personal financial strain.  He had accumulated at least $15 million in private debt with multiple banks in Lebanon and elsewhere.  As a result, he lacked the necessary capital to simply purchase a stake in TBA.  To help fund the acquisition of TBA, Abou Jaoude proposed a separate transaction under which he would sell Nest Investments and Abu Nahl, together with other affiliates and associates, a minority stake in LCB.

35.    At the time, Abou Jaoude's proposal seemed attractive.  Among other things, members of the Nest Group consulted banking almanacs, which listed LCB as one of the top ten banks in Lebanon.  In addition, the Nest Group at the time believed that the banking expertise of Abou Jaoude and LCB would be beneficial to the operations of TBA.

36.    Nest Investments and Abu Nahl, together with other affiliates and associates, acquired a 24-percent stake in LCB through a series of transactions between late 2005 and late 2007.  In exchange for this minority, non-controlling share of the Bank, they paid LCB a total of more than $57 million.  The last of these transactions was completed in 2007.

## C.  Defendants' Money Laundering Scheme

### a.  The Structure of Defendants' Laundering Scheme

37.    When Abu Nahl was initially negotiating with Abou Jaoude to acquire a stake in LCB, he did not know that Abou Jaoude had an ulterior motive for

15

wanting the deals to advance:  Abou Jaoude and Hamdoun wanted control of TBA to further a money laundering scheme to benefit Hezbollah and to enrich themselves at LCB's expense.

       38.     Abou Jaoude and Hamdoun engaged in this money laundering scheme in concert with Ayman Saied Joumaa ("Joumaa"), who has been designated by the U.S. Department of Treasury as a Drug Kingpin under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908.  According to the Treasury Department, Joumaa controls and directs an international network of traffickers and launderers that transports, distributes, and sells multi-ton shipments of South American cocaine to West Africa.  Joumaa has operated his network in substantial part for the benefit of Hezbollah.  According to the Under Secretary for Terrorism and Financial Intelligence, "[t]he Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah."

       39.     Joumaa, sometimes identified by his alias "Junior," is a dual Lebanese and Colombian citizen.  According to the Criminal Indictment, Joumaa led a drug trafficking network that spanned from South America to Africa and stretched up into both the United States and Europe.  Operations in Lebanon, West Africa, Panama, and Colombia formed the backbone of Joumaa's trafficking network.

       40.     According to the Criminal Indictment, Joumaa and his organization played a dual role in the drug trafficking operation.  First, Joumaa coordinated the shipment of narcotics, tens of thousands of kilograms of cocaine, from Colombia through Central America and Mexico, to the United States.  Second, beginning

around 1997 through at least 2010, he helped coordinate the laundering of hundreds of

millions of dollars in proceeds from drug sales in the United States, Europe

(predominantly Spain), Mexico, and Central America.  Joumaa reportedly charged a fee

of between 8 and 14 percent for laundering the proceeds of international drug sales.

According to the Under Secretary for Terrorism and Financial Intelligence, "[t]he Joumaa

network is a sophisticated multi-national money laundering ring, which launders the

proceeds of drug trafficking for the benefit of criminals and the terrorist group

Hizballah."

   41. Oussama Salhab is a Hezbollah operative who ran an international

network of money couriers centered in West Africa, as described in both the Treasury

Department Finding and the Civil Forfeiture Complaint.  According to those documents,

Salhab's couriers transport currency in bulk through West Africa to Lebanon, as well as

into the United States.  The money transported by Salhab's couriers included the

proceeds of illegal drug sales in Europe, particularly Spain, destined for laundering by

Joumaa's organization.

   42. Around the mid-2000s, much of Joumaa's drug trafficking

operation and Salhab's money courier network in Africa was centered in Benin, Togo,

and the Democratic Republic of the Congo.  Upon information and belief, Joumaa and

Salhab were interested in expanding their operations into Northern Africa because of its

proximity to Europe and especially Spain, where many of the proceeds of illegal

narcotics sales were generated.

   43. Algeria was a prime candidate into which Joumaa and Salhab

wished to expand their narcoterrorism network.  As discussed below, Abou Jaoude and

Hamdoun had established secretive banking operations in Gambia and Congo which, upon information and belief, they used to advance their laundering scheme. Adding operations in Algeria would further benefit the scheme.

44.     The port in Algiers, where TBA is headquartered, is one of the busiest in Algeria, with heavy cargo and tanker traffic to and from Europe and elsewhere, and frequent passenger ferry service to and from France and Spain.

45.     Moreover, a majority of the proceeds received by the drug trafficking ring operated by Joumaa from drug sales in Europe was generated in Spain, making Algeria a convenient access point for receiving and laundering those illicit proceeds. Laundering of the drug proceeds was a key element in the overall scheme.

46.     In addition to their money laundering scheme, when they were negotiating the LCB deal in 2005 and 2006, Abou Jaoude and Hamdoun also planned to use LCB and TBA to siphon off money for their personal use. With at least $15 million in private debt with multiple banks in Lebanon and elsewhere, Abou Jaoude had a pressing need to increase his own access to capital to satisfy his debts. In addition to supporting Hezbollah, Abou Jaoude hoped through the money laundering scheme to increase the amount of capital flowing through banks under his control, making it easier to siphon off funds for personal use without detection.

47.     Abou Jaoude and Hamdoun actively concealed their scheme to use the banks to facilitate an international money laundering operation for the benefit of themselves and Hezbollah at (and after) the time that Plaintiffs were induced to invest in LCB.

48.     The plan hatched by Abou Jaoude and Hamdoun was simple: using their control over the banks, they would establish systems to allow money to be laundered efficiently and without detection.  Once those systems were in place, Joumaa would begin laundering drug proceeds from Europe and Africa and, as detailed in the Criminal Indictment, would take a percentage fee for laundering the money.  Salhab's operation, as described in the Civil Forfeiture Complaint, would provide transportation services for the goods and money involved in the scheme.  Hezbollah would benefit from the scheme through, *inter alia*, the ability to use laundered funds to finance its terror attacks on civilians and other acts of terrorism and crimes against humanity.  Abou Jaoude, Hamdoun, and Safa in turn would profit from the increased flow of money through the banks which would, among other things, enable them to siphon off more money for their own personal use.

49.     On November 30, 2006, Joumaa opened a bank account at LCB to commence the money laundering operations.

### b.  Defendants Use the U.S. Financial System to Advance Their Laundering Scheme

50.     As part of the money laundering scheme, Abou Jaoude, Hamdoun, and Safa continuously and repeatedly used LCB to wire substantial amounts of U.S. currency to used car buyers throughout the United States.  These wire transfers passed through correspondent banks in New York.  To conduct these transfers, LCB maintained correspondent banking relationships with the Bank of New York Mellon, Standard Chartered Bank, Wells Fargo Bank, JPMorgan Chase Bank, and Mashreq Bank in New York.  Defendants caused LCB to utilize these correspondent relationship to further the scheme.

51.    According to the Civil Forfeiture Complaint, Joumaa and the individuals and entities associated with his organization originated approximately $62 million in wire transfers through LCB between 2006 and 2011.  Mahmoud Hassan Ayash, a Hezbollah operative who facilitates bulk cash transfers and money laundering for Joumaa and other narcoterrorists, and the individuals and entities associated with his organization originated at least $32 million in wire transfers through LCB between 2006 and 2011.  Salhab and the individuals and entities associated with his organization originated at least $7.5 million in wire transfers through LCB between 2006 and 2011.

52.    As described in greater detail in the Civil Forfeiture Complaint, the wire transfers typically were for tens of thousands of dollars each, with some U.S. car buyers receiving a handful of wire transfers between 2007 and 2011, and others receiving hundreds of transfers.  For example, during that time period, MGM Global Trading, LLC in South Windsor, Connecticut received 353 wire transfers totaling almost $33.5 million and World Auto Sales, LLC in Birmingham, Alabama received 490 wire transfers totaling over $24 million.  Together, between 2007 and 2011, 30 used car purchasers in Alabama, Connecticut, Florida, Georgia, Maryland, Massachusetts, Michigan, New Jersey, North Carolina, Ohio, Oklahoma, and Tennessee received over 3,500 wire transfers totaling nearly $250 million.

53.    Among the used car purchasers that received wire transfers was United Auto Enterprize, Inc., which, according to corporate records maintained by the Michigan Department of Licensing and Regulatory Affairs was registered on March 21, 2007 by Rola Salhab.  Upon information and belief, Rola Salhab is related to Oussama Salhab.

54.     On February 2, 2007, Fadi Salhab, who is a member of Oussama Salhab's family, registered an entity called Cybamar Swiss Gmbh, LLC with the Michigan Department of Licensing and Regulatory Affairs.  On January 28, 2008, another member of the Salhab family, Dina Salhab, registered another affiliated company, Cybamar USA, LLC, with the Michigan Department of Licensing and Regulatory Affairs.  Cybamar Swiss and Cybamar USA share the same registered address in Redford, Michigan.

55.     According to the Treasury Finding and the Civil Forfeiture Complaint, the car buyers in the United States would use the money wired through LCB and correspondent banks in New York to purchase used cars.  These used cars were then shipped to various ports in West Africa, including in Benin and Togo.  Cybamar Swiss, a shipping company, was frequently used to transport the cars to West Africa.

56.     According to the Treasury Finding and Civil Forfeiture Complaint, after the cars arrived in West Africa, Joumaa and Salhab's networks purchased them using, at least in part, bulk currency generated from narcotics sales in Europe (primarily Spain) and Africa.  For example, as detailed in the Civil Forfeiture Complaint, Salhab owned and controlled STE Nomeco SARL, which owned and operated used car lots in Benin.  The used cars shipped from the United States were purchased in these and other used car lots using proceeds from Joumaa's international drug trafficking ring.

57.     According to the Civil Forfeiture Complaint, once the cars were sold, Salhab's money courier network transported the currency overland or by air from West Africa to Lebanon.  When the currency arrived in Lebanon, it was deposited either in LCB accounts, or with the Hassan Ayash Exchange or the Ellissa Exchange, entities

that, according to the United States government, have helped (1) connect and facilitate the money laundering scheme between Joumaa and Bank managers, including Defendants, and (2) coordinate wire transfers through the Bank to the United States for the purpose of laundering drug proceeds, by purchasing used cars in the United States and shipping them to West Africa.

### c. Defendants Cause LCB to Turn a Blind Eye to Money Laundering and Narcoterrorism

58.     LCB maintained substantial banking relationships with both the Hassan Ayash Exchange and the Ellissa Exchange.  LCB maintained these and other relationships at the direction of Abou Jaoude and Hamdoun and in spite of mounting evidence of the Ayash and Ellissa Exchanges' involvement in narcoterrorism and money laundering.  Indeed, given concerns about potential money laundering activity, at least one other Lebanese bank had refused to continue doing business with the Ellissa Exchange.

59.     According to the Civil Forfeiture Complaint, an internal LCB customer due diligence report found that the Ellissa Exchange and its principals were involved in smuggling bulk currency out of Africa, including through flights from Ghana to Beirut.  The report also noted that the Bank had limited and incomplete "Know Your Customer" files for the Ellissa Exchange.  In particular, the due diligence report highlighted large cash deposits into LCB accounts held by the Ellissa Exchange principals, transactions inconsistent with the nature and purpose of those accounts, and the Ellissa Exchange's failure to provide information about the nature and purpose of the suspicious transactions.  Upon information and belief, Abou Jaoude, Hamdoun, and Safa

concealed the due diligence report and directed other Bank employees to ignore substantial violations of LCB's anti-money laundering and compliance policies.

60.     LCB policy required disclosure of the source of funds of any cash deposit greater than $10,000. For each such cash deposit, this information was supposed to be recorded on a Cash Transaction Slip ("CTS"). LCB was then required to file each CTS with the Central Bank of Lebanon.

61.     As detailed in the Civil Forfeiture Complaint, Safa granted exceptions to certain LCB clients to allow them to deposit more than $10,000 in cash without filing a CTS. A number of the clients Safa exempted from the CTS policy had ties to Hezbollah and had been named as money launderers and terrorists by the United States government. As detailed in the Civil Forfeiture Complaint:

a.     Safa exempted the Yousser Company, an LCB client, from the CTS policy, allowing it to deposit up to $50,000 per week in cash at LCB's Nabatieh branch and up to $60,000 per day in cash at LCB's Airport Road branch without disclosing the source of the funds.

b.     Safa also exempted the Farah Company for Tourism, a subsidiary of the Yousser Company, from the CTS policy. The Farah Company for Tourism was allowed to deposit around $33,000 per week at the Nabatieh branch without disclosing the source of the funds.

c.     Safa exempted two of the owners of the Yousser Company, Hussein Ali Mohamed Chami (sometimes called Husayn al-Shami) and Wahid Mahmoud Sbeity, from the CTS policy. Al-Shami and Sbeity were allowed to deposit up to $30,000 per week in cash at the Nabatieh branch without disclosing the source of the funds. Al-

Shami and two other Yousser Company directors were also allowed to deposit a total of $332,000 per day in cash at the Airport Road Branch without disclosing the source of the funds.

62.     The U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") is empowered under various Executive Orders to name individuals and organizations as Specially Designated Global Terrorists if it finds they have or are likely to commit terrorist acts, or they provide support or associate with terrorists or terrorist organizations.  Various U.S. sanctions apply to individuals and organizations that OFAC names Specially Designated Global Terrorists.  In 2006, OFAC named the Yousser Company a Specially Designated Global Terrorist organization.  OFAC has described the Yousser Company and another entity as "Hizballah's unofficial treasurer, holding and investing its assets and serving as intermediaries between the terrorist group and mainstream banks."  OFAC has also named Al-Shami as a Specially Designated Global Terrorist.

63.     Defendant Safa's direction that LCB grant exemptions to the Yousser Company and affiliates facilitated their ability to conduct financial transactions on Hezbollah's behalf through LCB, despite the imposition of U.S. sanctions.

64.     Taken together, Safa, at the direction of Abou Jaoude and Hamdoun, permitted government-identified terrorists and terrorist organizations to deposit at least $200 million in cash per year without disclosing the source of the funds. The money laundering operation, largely run through Joumaa and Salhab's organizations, used these exceptions to funnel the proceeds of illegal narcotics sales and other illicit operations into the legitimate banking sector.

24

65.     Abou Jaoude and Hamdoun used LCB operations in West Africa, including Prime Bank Gambia, to help facilitate their money laundering scheme.  They intentionally kept LCB operations in the region shrouded in secrecy to hide their illicit activities.  They also intentionally did not implement proper compliance and control measures in LCB West African operations in order to conceal their money laundering scheme.

### D.  Defendants' Use of the Money Laundering Scheme to Advance Hezbollah's Terror Attacks on Civilians

66.     Hezbollah was formed in Lebanon in around 1982.  It has been designated as a terrorist organization under the U.S. Terrorism Sanctions Regulations, 60 Fed. Reg. 5079 (Jan. 23, 1997), the Foreign Terrorist Organizations Sanctions Regulations, 62 Fed. Reg. 52,650 (Oct. 8, 1997), the Global Terrorism Sanctions Regulations, 67 Fed. Reg. 12,633 (Mar. 19, 2002), and the Iran and Syria Nonproliferation Act, 72 Fed. Reg. 20,158 (Apr. 23, 2007).

67.     As set forth in the Treasury Finding, Hezbollah "derived financial support from the criminal activities" of the money laundering network at issue in this case and LCB managers were "complicit in the network's money laundering activities."

68.     During the period relevant to this action, Hezbollah—directly or through surrogates—maintained bank accounts at various LCB branches in Lebanon. Defendants operated LCB in a manner to permit Hezbollah to use these accounts for money transfers, including to fund its terrorist activities.  Specifically, Defendants directed LCB to ignore various requirements that would have prohibited LCB from conducting fund transfers on behalf of Hezbollah.  Moreover, according to the Civil Forfeiture Complaint, (1) Joumaa used Hezbollah couriers to transport currency in bulk

and (2) Salhab routinely paid Hezbollah a fee to provide security for currency transport operations, particularly when the currency was transported through the Beirut International Airport.

69.    According to Hezbollah experts, including Dr. Matthew Levitt and Dr. Michael Rubin, Hezbollah has plotted and/or committed numerous terror attacks on civilians in multiple countries during the period relevant to this action.  *See, e.g.*, Rubin Decl. ¶ 7; Levitt Decl. ¶ 7.  As just one example among others, Dr. Levitt and Dr. Rubin explain that Hezbollah has been actively involved in the Syrian civil war, which began in early 2011, serving as a mercenary force for both Syrian President Bashar al-Assad and Iran's Islamic Revolutionary Guard Corps.  Hezbollah has acted as "muscle" for Syrian President Bashar al-Assad's regime and has repeatedly engaged in terror attacks on civilians, including, for example, by conducting summary executions of civilians.  *See* Rubin Decl. ¶ 7; *see also* Levitt Decl. ¶ 7.

70.    In August 2012, the U.S. Treasury Department blacklisted Hezbollah, already on the Department's terrorism list, for providing support to the Assad regime during the Syrian civil war, where civilians have been repeatedly targeted. Treasury emphasized the organization's "integral role in the continued violence the Assad regime is inflicting on the Syrian population."

71.    According to the U.S. Government and Hezbollah experts Dr. Matthew Levitt and Dr. Michael Rubin, Hezbollah has required funds and financial services to plan, prepare for, and carry out its attacks on civilians and other terrorist attacks and crimes against humanity.  *See, e.g.*, Levitt Decl. ¶¶ 8-13; *see also* Hizballah International Financing Prevention Act of 2015, Pub. L. No. 114-102, 129 Stat. 2205.

Indeed, according to Dr. Levitt, Hezbollah relies heavily on international money laundering and drug trafficking to support such terror attacks. Levitt Decl. ¶¶ 8-13. Defendants knew that Hezbollah had this need and purposefully caused LCB to provide financial support to Hezbollah as described herein. Hezbollah has used such financial support to further its terror attacks on civilians and other acts of terrorism and crimes against humanity. *Id.*

72. Defendants' intent to support Hezbollah terror attacks is further established by the fact that Hezbollah is subject to strict economic sanctions imposed by the United States. Such sanctions are intended to prevent Hezbollah from conducting banking activities, and thereby limit its ability to carry out terrorist attacks and other crimes against humanity. *Id.* During the period relevant hereto, however, LCB did not recognize or enforce the sanctions imposed by the United States, with Defendants directing LCB and its officers and employees not to enforce these sanctions. They did so to permit the conduct of transactions benefitting Hezbollah through the Bank and thus to facilitate the funding of Hezbollah's terrorist activities.

### E. The Terrorist Financing Convention

73. The United Nations adopted the Terrorist Financing Convention in 1999 and it took effect in April 2002. The Terrorist Financing Convention recognizes international norms prohibiting the financing of attacks on civilian populations. As a consequence of the well-recognized nature of these norms, adoption has been rapid. As of December 31, 2010, more than 170 countries were parties to the Convention; and as of the date of this Second Amended Complaint, 188 countries are parties. The Terrorist Financing Convention thus sets forth norms of international law that are recognized by the overwhelming majority of nations.

74.     International organizations agree that the Convention reflects established international-law norms.  For example, the International Monetary Fund has referred to "legally binding international norms" prohibiting terrorist financing, "such as those contained in . . . the International Convention for the Suppression of the Financing of Terrorism."  International Monetary Fund, *Suppressing the Financing of Terrorism: A Handbook for Legislative Drafting*, at 1 (2003), https://www.imf.org/external/pubs/nft/ 2003/SFTH/pdf/SFTH.pdf.  Terror financing is also specifically proscribed by a U.N. Security Council resolution addressing the issue, further showing that the Convention's prohibition of terrorist financing constitutes an established norm of international law.  *See Creation of Counter Terrorism Committee*, U.N. Doc. S/Res/1373, ¶ 1 (Sept. 28, 2001). The Security Council resolution provides, *inter alia*, that States "shall (a) Prevent and suppress the financing of terrorist acts; [and] (b) Criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist acts."  International law scholars concur that terror financing violates the law of nations.  *See*, *e.g.*, Anthony Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law*, 48 Harv. Int'l L.J. 121, 179-86 (2007).

75.     The Terrorist Financing Convention imposes legal obligations on parties to enact implementing laws and regulations.  *See* art. 4.  The United States, among other nations, has done so.  *See* Suppression of the Financing of Terrorism Convention Implementation Act of 2002, Pub. L. No. 107-197, tit. II, § 202(a).

76.     The Terrorist Financing Convention sets forth specific, well-defined proscriptions against providing financial assistance to groups with the knowledge and/or intent that such funds will be used, *inter alia,* to carry out terror attacks on civilians.  Article 2.1(b) provides that:

> "Any Person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part . . . to carry out . . . [an] act intended to cause death or serious bodily injury to a civilian . . . when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

77.     The norms contained in the Terrorist Financing Convention are matters of mutual concern among nations.  Indeed, the Preamble to the Convention specifically states that "the financing of terrorism is a matter of grave concern to the international community *as a whole,*" requiring collective action for the "maintenance of international peace and security."  (Emphasis added.)

78.     Defendants have violated norms of international law recognized by the Terrorist Financing Convention by laundering funds for Hezbollah, with the knowledge and intent that such funds would be used, in whole or in part, to perpetrate terror attacks on civilians.  As recognized by Hezbollah experts, such attacks have included attacks in multiple countries (*see, e.g.*, Rubin Decl. ¶ 7; Levitt Decl. ¶ 7), and the purpose of such attacks has been to intimidate civilian populations (*e.g.*, by acting as muscle against civilians in Syrian regions that have opposed the Assad regime, *see* Rubin Decl. ¶ 7), and/or to compel government action,

79.     Defendants' laundering of funds to finance the Hezbollah terror attacks on civilians documented by the U.S. Government and by Hezbollah experts were

tortious acts that violated the law of nations.  LCB and its shareholders were injured by those tortious acts.

80.    Other sources of international law confirm that Defendants' conduct violated the law of nations.  *See, e.g.*, Council on Europe, Convention on Laundering, Search, Seizure and Confiscation of the Property from Crime, art. 6, *opened for signature* Nov. 8, 1990 (money laundering); U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, art. 5, *adopted* Feb. 20, 1990 (proceeds of drug trafficking); U.N. Convention Against Transnational Organized Crime, art. 7, *adopted* Nov. 3, 2005 (money laundering).

81.    In addition, more than thirty-five countries, including the United States, are members of the Financial Action Task Force which protects the global financial system against money laundering, terrorist financing and the financing of proliferation of weapons of mass destruction.

### F.   The Lebanese Central Bank's Involvement in Defendants' Scheme

82.    The Lebanese banking sector is one of the most financially active in the Middle East, and also one of the least transparent.  Lebanon has a strict Bank Secrecy Act that allows account holders to conduct their affairs with essentially no scrutiny.  In the Bureau of International Narcotics and Law Enforcement Affairs' 2014 International Narcotics Control Strategy Report, the U.S. Department of State stated that "Lebanon faces significant money laundering and terrorism financing challenges," particularly given the "substantial influx of remittances from expatriate[s]" into the country and the involvement of many Lebanese abroad in "underground finance and trade-based money laundering (TBML) activities," like the used car scheme operated through LCB.

30

83.     Other countries in the Middle East and North Africa region have raised similar concerns about money laundering and terrorism financing in Lebanon. A 2009 report by the Middle East and North Africa Financial Action Task Force ("MENAFATF"), a voluntary organization of nation states in the region, said Lebanon had a "special susceptibility" to money laundering and terrorism financing and had failed to issue "all legal instruments needed to comply with the main requirements stated in the 40 Recommendations and 9 Special Recommendations [from the Financial Action Task Force] for [Anti-Money Laundering and Combating Financing of Terrorism]."

84.     In particular, the MENAFATF report noted that Lebanon did not require financial institutions "to report any transaction suspected to be related to terrorism financing crimes," nor were such institutions required to report "suspicious transactions attempts." The report concluded that "from the practical aspect, the competency and efficiency of [financial institutions] in reporting is not up to the level required or appropriate, in light of the numerous reporting cases by banks, and its low number or even absence on part of the remaining institutions."

85.     Ultimately, the MENAFATF report rated Lebanon on its compliance with 49 international recommendations to combat money laundering and terrorism financing. In the report, Lebanon's regional neighbors found the country only partially compliant or not at all compliant with 26 of the 49 recommendations.

86.     The Central Bank of Lebanon exerts substantial control over the banking sector in the country. For example, the Central Bank lifts the Bank Secrecy Act to allow prosecutors to investigate allegations of wrongdoing only at its direction.

Hamdoun has claimed to have a close personal relationship with the Governor of the Central Bank of Lebanon.

87.     Over the years, Plaintiffs repeatedly attempted to raise the lack of internal controls at LCB with the Central Bank of Lebanon.  For example, in a letter dated February 7, 2011 to the Banking Control Commission of Lebanon, which is administered by the Central Bank, Abu Nahl emphasized Nest's concerns about "the non-compliance of the Executive Management of [LCB] with the applicable laws, regulations and circulars . . . ."

88.     Despite Plaintiffs' repeated efforts, the Central Bank of Lebanon turned a blind eye to the compliance problems at LCB.  Upon information and belief, the Central Bank of Lebanon was aware that LCB was being used by Abou Jaoude and Hamdoun to launder funds derived from narcoterror operations, but took no action in part because of the Central Bank's relationship with Hamdoun.

89.     The finding by the U.S. government that LCB was engaged in substantial money laundering activity, however, finally forced the Central Bank of Lebanon to act.  In an effort to shield the broader Lebanese banking sector from further scrutiny by U.S. authorities, the Central Bank of Lebanon pressured LCB into a rapid liquidation and a sale of substantially all assets and liabilities to another Lebanese bank.  As a result, the LCB issue was swept under the rug.  According to a New York Times report in the aftermath of LCB's collapse, the Central Bank of Lebanon official responsible for overseeing the liquidation process has ties to Hezbollah.

90.     Although the Central Bank of Lebanon forced LCB out of business, it has continued to turn a blind eye to the broader issues of money laundering

and terrorist financing that are pervasive in the Lebanese banking sector.  Tellingly, the

Central Bank of Lebanon has failed to hold accountable even the very LCB managers

whom the Treasury Finding stated were complicit in the money laundering operation run

through LCB.

91.     No apparent effort has been made by the Central Bank of Lebanon

to pursue the serious issues raised in the U.S. government's filings or to address any of

the failings in bank supervision that they imply.

92.     The Central Bank of Lebanon had the ability to veto the

appointment of Abou Jaoude and Hamdoun as liquidators to oversee the dissolution of

the Bank, but failed to do so, effectively accepting their appointment.  Serving as

liquidators put Abou Jaoude and Hamdoun in a position to further cover up their illicit

activity and to maximize their own personal gains.

93.     As referenced above, in or around 2010, Defendant Safa assumed a

position in the Central Bank of Lebanon.  Despite the public disclosure of Safa's role in

the money laundering scheme, he continues to serve as a Member of the Banking Control

Commission.

94.     Upon information and belief, as also referenced above, Abou

Jaoude and Hamdoun, with the approval of the Central Bank of Lebanon, are preparing to

open a new bank in Lebanon.

## G.  U.S. Government Action on the Money Laundering Scheme

95.     On February 10, 2011, the U.S. Department of Treasury's

Financial Crimes Enforcement Network ("FinCEN") issued the Treasury Finding, which

identified LCB as a financial institution of primary money laundering concern and

Hezbollah's derivation of financial support from the operation of the criminal network

described herein.  Under authority granted by the USA PATRIOT Act, the Secretary of the Treasury can designate banks and other financial institutions as presenting primary money laundering concern if the Secretary concludes the bank meets a variety of factors that suggest it is involved in money laundering.  Once a bank is so designated, U.S. financial institutions must take certain measures against the designated bank in order to disrupt potential money laundering activity.  The Treasury Finding outlined the key components of the money laundering network run through LCB and the roles of various international drug traffickers and Hezbollah operatives, including Defendants named in this action.  It also, among other things, directed U.S. banks to sever their correspondent banking relationships with LCB.

96.    Abou Jaoude and Hamdoun are directly identified as key players in the money laundering network run through LCB.  The Treasury Finding states that "the [United States Government] has information indicating that a minority owner of the bank, who concurrently serves as General Manager [Abou Jaoude], his deputy [Hamdoun], and the managers of key branches are in frequent—in some cases even daily— communication with the various members of the . . . drug trafficking and money laundering network, and they personally process transactions on the network's behalf."

97.    In December 2011, the United States Attorney for the Southern District of New York filed the Civil Forfeiture Complaint, which it amended on October 26, 2012, against LCB and various other defendants.  The Civil Forfeiture Complaint outlined in much greater detail the money laundering scheme initially described in the Treasury Finding.

98.     In addition to the Treasury Finding and Civil Forfeiture Complaint, the Office of the U.S. Attorney for the Eastern District of Virginia also investigated the criminal network and LCB's role in the scheme that laundered the illicit proceeds of that network.  After the Treasury Finding, the U.S. Attorney for the Eastern District of Virginia obtained the Criminal Indictment of Joumaa in late 2011.

## H.  Plaintiffs' Efforts to Introduce Principles of Corporate Responsibility and Compliance into LCB

### a.  Plaintiffs Learn of Defendants' Use of LCB to Further Narcoterrorism

99.     Only as a result of the U.S. Government's investigations into LCB did Plaintiffs come to realize that Abou Jaoude, Hamdoun and Safa were surreptitiously using the Bank to further the international narcoterrorism operation described above and to line their own pockets.

100.     Prior to the acquisition of a minority interest in LCB by Plaintiffs, Abou Jaoude and Hamdoun actively misled Plaintiffs about the state of compliance efforts at the Bank.  Based on Abou Jaoude and Hamdoun's representations, Plaintiffs believed that LCB had robust compliance programs in place that met international standards and industry best practices.  After acquiring a minority stake in LCB, however, Plaintiffs realized that internal controls and compliance measures at the Bank were woefully inadequate and, in some cases, entirely non-existent.

101.     Having made their investment, Plaintiffs decided to try to use their considerable expertise in good corporate governance and compliance to strengthen such programs at the Bank.  On June 28, 2007, Abu Nahl joined the LCB board of directors as representative of Nest Investments Holding Lebanon SAL.  Including Abu Nahl, Nest

Group representatives held 3 of the 10 LCB board seats.  (The remaining board seats were under the control of Abou Jaoude and Hamdoun.)

102.    After joining the board, Abu Nahl quickly realized that LCB's compliance programs were not as strong as Plaintiffs had been led to believe and were, in some cases, nonexistent.  Having already made their investment in LCB, Plaintiffs set about trying to strengthen the Bank's compliance.  They believed that their decades of experience developing and implementing good corporate governance and compliance programs in their many businesses would strengthen LCB's operations and position the Bank for strong, responsible growth.

### b.  Defendants Impair the Plaintiffs' Efforts to Promote Corporate Governance and Compliance

103.    Almost immediately after the transaction closed, however, Plaintiffs encountered difficulties extracting information from and strengthening compliance efforts in LCB.  On June 18, 2007, for example, the Bank's Chief Financial Officer, Charles Skaff, issued a cursory memorandum on the financial status of the Bank. Given both its lack of substance and lack of sufficient information, the memorandum raised immediate red flags for Plaintiffs.

104.    One day after receiving the financial memorandum, on June 19, 2007, Plaintiffs sent Abou Jaoude a lengthy letter with a list of questions regarding the substance of the report and the financial status of the Bank.  In particular, they asked for clarification on LCB's decision-making process and policies.  Abou Jaoude did not respond to the letter.

105.    On June 22, 2007, Abu Nahl followed up with a second letter to Abou Jaoude, copying Hamdoun, requesting additional information on LCB's budget.

Among other things, Abu Nahl noted that LCB's budget lacked proper documentation, that many items were not included in the budget, and that funds were improperly reallocated without following the appropriate decision-making process or maintaining adequate documentation. Abou Jaoude did not respond to Abu Nahl's follow-up letter.

106.    On June 25, 2007, LCB's Internal Audit Division audited the compliance unit. The audit noted that a number of accounts at the Bank were unusually active, with large incoming and outgoing transfers. The audit also noted that many of these accounts had unusual movement of funds between accounts.

107.    On August 13, 2007, the Internal Audit Division sent a report directly to Abou Jaoude raising direct and specific concerns about troubling account activity. The report stated, in part:

> "Upon our review and general monitoring over some accounts, we [have] come across a group of customers showing continuous and considerable movements of funds, which according to our examination should be reviewed and be subject to further investigations by the compliance unit . . . . [W]e therefore address to your attention as head of the [Anti-Money Laundering] committee our memo in which we reveal some deficiencies and banking concept breaching, together with a list of customers' names to which these transactions are related for your quick review.

> Types of deficiencies can be summarized by the following:

> 1. Many of these deficiencies have been traced over saving time deposit accounts in which they are being used as current accounts.
> 2. The total amount of transactions between reviewed accounts has reached within 18 months a total of USD 5,000 Million.
> 3. Large amounts are being withdrawn and paid cash to different parties.
> 4. A clear link was noticed between 115 IDs existing and operating in different branches.
> 5. Although the big volume of movement noticed over these accounts, yet the accounts show [] very low balances (below USD 5,000) reflecting the fact that accounts are being used [on a] transitory basis for funds transfer[s].

6. Accounts are originally opened for Domicilated bills were used for funds transfers with large amounts.
7. Commissions and bank profitability are limited comparing the volume and number of transactions executed.
8. We noticed, some accounts were opened to be used as transitory account[s] for a short period of time. (Vehicle Accounts)
9. Large amounts of cash withdrawal transactions were made to the favor of different parties, to be paid later on cash to the same beneficiary. Noticing that such transactions are being done from different accounts to the order of one specific party which rises up different question marks."

108. In the August 2007 audit report sent to Abou Jaoude, the internal auditors noted they had previously raised these concerns with and given a list of suspect accounts to the compliance department, but the compliance department had failed to take action. The internal auditors also recommended that Abou Jaoude take certain specific corrective actions, including implementing better monitoring software and installing compliance officers at all branches to monitor suspicious activity. Abou Jaoude sent a cursory reply on August 17, 2007 asking for more detail, but he never implemented the recommendations.

### c. Plaintiffs Push for the Creation of an Audit Committee

109. Increasingly concerned about the financial performance and compliance of LCB, Plaintiffs requested that LCB create an Audit Committee. As evidenced by their subsequent inaction, Abou Jaoude and Hamdoun had no intention of executing recommendations or responding to the concerns raised by the Audit Committee and Plaintiffs. Indeed, the Audit Committee appeared to be created only as a means to mollify and distract Plaintiffs. It was not even included on a list of Bank management committees prepared in 2009.

110. In further effort to improve governance of the Bank, Sh. Nasser Bin Ali Bin Saud Al Thani ("Sh. Nasser"), an associate of Plaintiffs, was appointed to the

Audit Committee. Not knowing that Abou Jaoude and Hamdoun had no intention of following the recommendations of the Audit Committee, Sh. Nasser and other Plaintiff representatives diligently set about trying to understand and improve internal controls and compliance measures at LCB. Plaintiffs asked one of their best compliance experts, Loizos-Andreas Hajiloizos ("Hajiloizos"), to work with the LCB Audit Committee to evaluate and suggest improvements for Bank compliance operations. Hajiloizos was named the Committee's General Secretary, responsible for preparing Committee documents and reports and recording the minutes of Committee meetings.

111.    On June 9, 2008, the LCB Audit Committee held its first meeting in Beirut. The four members of the Audit Committee—Sh. Nasser, Makarem Makari, Raymond Diab, and Albert Azar—attended. Hajiloizos was also present.

112.    At its first meeting, the Audit Committee agreed that LCB should host a meeting of all senior Bank staff to discuss the role of the Audit Committee and Internal Audits, and the importance of compliance. As recorded in the minutes of the meeting, the Audit Committee hoped that "the top management of the Bank," including Abou Jaoude and Hamdoun, would "present the General Inspector and his team to show the support of the [Board of Directors] to the [Internal Audit Department]." But Abou Jaoude and Hamdoun had no intention of supporting the Internal Audit Department.

113.    Abou Jaoude and Hamdoun refused to arrange a meeting with top LCB management to discuss the role and importance of the Internal Audit Department. At a meeting nearly six months after the first Audit Committee meeting, on December 5, 2008, the Audit Committee discussed Abou Jaoude and Hamdoun's refusal to permit such a meeting. The Audit Committee minutes reflect this discussion: "The [Audit

Committee] members cannot understand the reason behind the unwillingness of the top management of the bank [] to hold a meeting with all the managers of the Bank to discuss the Internal Audit Department Charter and any other Internal Audit issues that they may have. Sh. Nasser & [Hajiloizos] to discuss the above with the management of the Bank."

114.   At an LCB Board of Directors meeting on July 2, 2009, Sh. Nasser and Hajiloizos again asked Abou Jaoude and Hamdoun to arrange a meeting of all Bank managers to discuss the role of the Internal Audit Department. According to Audit Committee minutes, "the idea was not accepted in a positive manner; thus the meeting was never organised or held."

115.   At its July 2, 2009 meeting, the Audit Committee learned that LCB's Anti-Money Laundering Compliance Officer had resigned some eight months earlier—in October 2008—and had not been replaced. The Audit Committee found this lapse "to be unacceptable and in violation of corporate governance and best practices." In December 2009, the Compliance Manager had still not been replaced, prompting the Audit Committee to send a memorandum to the Human Resources Manager asking that a replacement be named immediately.

116.   Plaintiff representatives on the Audit Committee worked to implement other measures to improve compliance and ensure LCB adhered to industry best practices. For example, the Audit Committee recommended LCB's external auditors be rotated on a regular basis. The Bank had been using the same auditing firm for at least 15 years. But Abou Jaoude and Hamdoun did not agree to rotate the audit firm. The Audit Committee also recommended that the Internal Audit Department report directly to

the Audit Committee, and not to Abou Jaoude, the General Manager.  At Abou Jaoude

and Hamdoun's direction, LCB did not implement this change to the reporting lines.

### d. Defendants Continue to Ignore the Plaintiffs' Compliance Concerns

117.    As the years passed, Plaintiffs, the Audit Committee, and the

Internal Audit Department continued to sound alarms about inadequate internal controls.

But their concerns continued to fall on deaf ears.  In February 2010, the Internal Audit

Division conducted another review of the Anti-Money Laundering compliance unit and

found compliance efforts had not improved.  In particular, the internal audit found "no

evidence that proper and permanent control [was] being performed over some accounts

witnessing frequent flow of large funds transfers."  The internal audit also noted that the

"compliance unit [had] 5,775 pending alerts cases during a period of one month

(December, 2009)" and that branch managers, upon information and belief at Abou

Jaoude and Hamdoun's direction, were not prioritizing resolving the backlog of alerts.

118.    The February 2010 internal audit also found that LCB managers

continued to ignore compliance and reporting requirements for large cash transactions.

The report noted that "the Compliance Unit does not generate on a daily basis [a]

consolidated physical cash report that aggregates all cash deposits done by a single client,

[on] the same day, and in multiple accounts totaling more than $10,000."  Abou Jaoude,

Hamdoun, and Safa directed the Compliance Unit not to generate such daily cash reports.

119.    Finally, the February 2010 internal audit noted that LCB managers

were ignoring Know Your Customer monitoring and reporting requirements.  Industry

and international best practices, as well as laws and regulations in most countries,

including Lebanon, require financial institutions to establish certain procedures to verify

the identity of customers in order to combat money laundering and other financial crimes. These procedures are known as "Know Your Customer" requirements. The February 2010 audit found bank managers were turning a blind eye to cash and transfer activities that were inconsistent with certain clients' Know Your Customer forms. Abou Jaoude, Hamdoun, and Safa instructed branches to ignore the Know Your Customer form requirements for certain customers.

120.   Abou Jaoude and Hamdoun both served on LCB's five-member Anti-Money Laundering ("AML") Committee. The committee existed essentially in name only. In 2007, when Plaintiff representatives on the Audit Committee were trying to determine the extent of LCB's compliance shortcomings, they raised concerns about various suspicious accounts. In 2009, in a memorandum to the Human Resources Manager, Plaintiffs noted that the AML Committee was dormant and recommended its activation.

121.   Throughout this period, at every turn, Abou Jaoude and Hamdoun took steps designed to frustrate the efforts of the Audit Committee and Plaintiffs to implement better corporate governance measures. For example, Abou Jaoude and Hamdoun consolidated control over hiring, firing, and promotion decisions, allowing them to place persons under their control in positions critical to operating and concealing the money laundering scheme. A 2010 Audit report on the Human Resources department highlighted this consolidation of control: "Theoretically, the Human Resources Department is fulfilling its responsibilities, as we noticed that job descriptions are documented, evaluation process is implemented, appraisal report is being filed on yearly

basis and procedures are being handled; but <u>practically</u>, the department is superseded since a long time by the Senior Management Power and Directives."

**I.    Tabadul, the Plaintiffs' Increasing Concern over Governance and <u>Compliance, and Abou Jaoude and Hamdoun's Personal Slush Funds</u>**

122.    Over time, it became increasingly difficult for Plaintiffs to extract information about LCB from Abou Jaoude and Hamdoun.  Moreover, due to staunch resistance from Abou Jaoude and Hamdoun, Plaintiffs' efforts to strengthen compliance and corporate governance at the Bank had largely failed to achieve positive results.

123.    Plaintiffs later uncovered one reason why Abou Jaoude and Hamdoun had stonewalled the Plaintiffs' compliance efforts:  the Bank managers had been directing illegal operations through a subsidiary of LCB in the United Arab Emirates called Tabadul Shares and Bonds LLC ("Tabadul").  As described below, Abou Jaoude and Hamdoun actively concealed Tabadul's operations from Plaintiffs and used the subsidiary to engage in improper self-dealing.  In addition to supporting Hezbollah, looting LCB assets through such self-dealing was a central objective of Abou Jaoude and Hamdoun for engaging in the scheme described herein.

124.    On October 18, 2006, shortly after Plaintiffs' initial investment into LCB, Abou Jaoude founded Tabadul.  Tabadul is a brokerage firm in the United Arab Emirates with offices in Dubai and Abu Dhabi.  It began operations in 2007. Tabadul was owned and funded by LCB but controlled by Abou Jaoude.  Over time, LCB continued to invest in Tabadul. LCB increased the capital of Tabadul several times, including in November 2006, January 2007, and January 2008.

125.    As with LCB, Abu Nahl sought to obtain detailed budgets regarding Tabadul.  At a board meeting on July 14, 2010, Abu Nahl voiced his concerns

over the lack of a detailed budget for Tabadul.  Only later would Plaintiffs learn their efforts had been unsuccessful because Abou Jaoude and Hamdoun were actively working to frustrate them.

126.    Abou Jaoude and Hamdoun intentionally hid information about Tabadul's operations from Plaintiffs and from public disclosure.  On June 6, 2010, Sh. Nasser sent Abou Jaoude a letter requesting, on behalf of the Audit Committee, more detailed information on the LCB investment in Tabadul.  Abou Jaoude sent a cursory reply stating the Internal Audit Department had all the information on Tabadul that it needed.  But, the Internal Audit Department had not been supplied with <u>any</u> information on the Tabadul investment since it performed an audit in January 2008.  The UAE regulatory authority expressed these and other concerns, including deceit, failure to meet licensing conditions, and commingling of funds.  Its concerns were so pronounced that it imposed a cessation of business on Tabadul, which was extended multiple times because of Tabadul's failure to cure its violations.

127.    In 2009, at least five Tabadul employees resigned, including its Internal Auditor, who lamented Tabadul's lack of commitment to abide by licensing conditions.  Others remarked that "difficulties and problems faced by the administration were not new, but were present from the day the company began trading from the Lebanese Canadian Bank side, which acted somewhat irresponsibly."

128.    In addition to concealing information about Tabadul's operations and unlawful activities, Abou Jaoude and Hamdoun also concealed information regarding several suspicious LCB subsidiaries in West Africa.  In November 2009, the LCB Chief Risk Officer, who had only been appointed at the insistence of Plaintiffs, raised concerns

to the LCB Risk Committee about an LCB presence in Gambia called Prime Bank Gambia. According to the minutes of that meeting, the Chief Risk Officer stated that "LCB has a presence in Gambia with thirty employees and until today there are no reporting lines, only the finance manager knows about it and nobody else receives any information on their business. No fixed asset has been purchased as part of the investment. Very soon they will need re-capitalisation since the currency fluctuations are eating up their initial capital." The Chief Risk Officer further noted that "[t]he situation [with Prime Bank Gambia] is about to be repeated with the Kinshasa-Congo investment."

129.    The head of LCB's Internal Audit Department further noted in June 2010 that the department continued to have no visibility into Prime Bank Gambia or other West African operations, including in Congo. The secrecy surrounding these operations persisted at Abou Jaoude and Hamdoun's direction, even though LCB's Chief Risk Officer had raised red flags about the operations nearly nine months prior.

130.    Undeterred, Plaintiffs continued to press Abou Jaoude and Hamdoun for information about the operations of LCB and its subsidiaries, including Tabadul. It also continued to try to implement compliance measures and internal controls.

131.    Plaintiffs eventually realized that Abou Jaoude and Hamdoun were using these subsidiaries to funnel assets from LCB to line their own pockets. For example, Abou Jaoude and Hamdoun used sham loans to funnel assets from LCB to Tabadul. On or about May 1, 2008, LCB and Tabadul entered into a Revolving Subordinated Loan Agreement under which LCB agreed to extend a $20 million line of

revolving credit to Tabadul.  Abou Jaoude signed the loan agreement on behalf of <u>both</u> LCB <u>and</u> Tabadul.  Hamdoun also signed on behalf of LCB.

132.    Abou Jaoude and Hamdoun also used Tabadul to make sham loans.  Tabadul made numerous suspicious loans to various individuals in the United Arab Emirates. When Plaintiffs began investigating these loans, many of the individuals who supposedly received loans said they had never even heard of Tabadul. They certainly had not opened accounts with or received loans from Tabadul.  Upon information and belief, Abou Jaoude and Hamdoun directed or made these loans in the names of unsuspecting third parties and took the money for their own benefit.

133.    Abou Jaoude and Hamdoun's wrongdoing was not limited to siphoning off assets through Tabadul.  Expenses increased noticeably, and Abou Jaoude admitted this was partially because of bonuses that he paid to himself and his associates. Additionally, in 2008, Abou Jaoude had an outstanding $12 million loan from LCB.  All banks in Lebanon are required to file what is known as a 152 Report with the Central Bank of Lebanon disclosing loans made to staff, directors, and shareholders.  At its meeting on December 5, 2008, the Audit Committee noted:

> "The loans to staff, directors and shareholders were not approved since it contained errors and was [not] transparent . . . The [Internal Audit Department] was requested to prepare a new transparent report with all the details and to compare this to the 152 report sen[t] to Central Bank of Lebanon since . . . the chairman of the bank [Abou Jaoude] has a $12 million loan with a $2 million collateral and it was not included in the 152 report to the central bank."

134.    Despite the fact that the Central Bank of Lebanon routinely had auditors on site at LCB who were ostensibly monitoring reporting and compliance, the

Central Bank of Lebanon either failed to discover this egregious reporting failure or turned a blind eye to it.

135.    At Abou Jaoude and Hamdoun's direction, LCB also failed to follow proper procedures for credit approvals of investments.  At the November 2009 Risk Committee meeting, the Chief Risk Officer explained:

> "[T]here is no procedure followed for the credit approvals of investments taken by the Bank and this is considered as high risk. The Chairman [Abou Jaoude] ($900k) and the GM [Hamdoun] ($750k) of the Bank seem to have money limits but they have never been followed. There do not seem to be a proper investment policy in the following fields:
>
> a)  Affiliates
> b)  Subsidiaries
> c)  Bonds
> d)  Stocks
> e)  CD
> f)  Funds"

136.    In response to these concerns, the Risk Committee (at the insistence of Sh. Nasser and Hajiloizos) requested that the Bank's Chief Risk Officer prepare draft investment policies and procedures for the Bank to ensure accountability and compliance.  Abou Jaoude and Hamdoun ultimately thwarted the implementation of investment policies and procedures.

### J.  Aftermath of the Money Laundering Scheme

137.    Plaintiffs' efforts to improve compliance at LCB were frustrated by continuing opposition led by Abou Jaoude and Hamdoun, who together own or control entities that own approximately 76% of the Bank.  At the time they made these efforts, Plaintiffs believed that Abou Jaoude and Hamdoun's refusal to implement better compliance measures stemmed from incompetence or a nonchalant attitude toward good corporate governance, not rampant criminality.

138.    That all changed beginning in 2011, when the U.S. Government publicly exposed Defendants' international narcoterrorism and money laundering scheme.  This exposure came as a shock to Plaintiffs.  Only then did they begin to understand the real reason that Abou Jaoude and Hamdoun had frustrated their attempts to increase transparency and internal controls at the Bank:  because their efforts posed a grave threat to the narcoterrorism and money laundering scheme to benefit Hezbollah that was exposed by the United States and, as part and parcel of that scheme, Abou Jaoude's and Hamdoun's efforts to loot LCB assets for their personal benefit.  While their concerns with the lack of internal controls at LCB and with Abou Jaoude and Hamdoun's stonewalling had grown over time, it was not until the filing of the Civil Forfeiture Complaint that Plaintiffs began to realize the full extent of Abou Jaoude and Hamdoun's wrongdoing.

139.    On June 25, 2013, Abou Jaoude and Hamdoun, acting as trustees responsible for LCB's liquidation, settled the civil forfeiture suit with the Office of the U.S. Attorney for the Southern District of New York.  In order to quickly cast the spotlight off their own illicit conduct, Abou Jaoude and Hamdoun forfeited $102 million of LCB's money to settle the U.S. government action.

140.    Despite Plaintiffs' lack of knowledge of or participation in the money laundering activities at LCB, and their repeated attempts to impose and improve money laundering controls following their minority investment in LCB, the U.S. government has denied entry visas to Abu Nahl, his family members and a number of employees of Nest Investments or other Nest Group companies.  The U.S. government

did so because of Plaintiffs' investments in, and affiliation with, LCB.  This constitutes additional injury suffered by Plaintiffs as a result of Defendants' scheme.

## DERIVATIVE STANDING

141.    Plaintiffs bring certain of their claims derivatively in the right and for the benefit of LCB to redress injuries suffered by LCB as a direct result of Defendants' misconduct.  LCB is named as a nominal defendant solely in a derivative capacity.

142.    Plaintiffs will adequately and fairly represent the interests of LCB and its shareholders in enforcing and prosecuting LCB's rights.

143.    Plaintiffs were owners of LCB shares at all times relevant to the Defendants' wrongful course of conduct in respect of derivative actions alleged herein. Plaintiffs maintain an interest in LCB through their status as beneficiaries of the corporation in liquidation.

144.    Under the Lebanese Commercial Code, where a corporation by its inertia has failed to bring an action against directors of the corporation, shareholders may bring the action.

145.    LCB has not brought any action against Defendants for the conduct alleged herein.  Therefore, Plaintiffs may bring this action on behalf of LCB.

146.    At the time that this action was commenced, LCB was in liquidation.  Abou Jaoude and Hamdoun were serving as the sole Trustees of LCB in liquidation.

147.    As a result of the facts set forth herein, Plaintiffs did not make a demand upon the Bank or its Trustees to institute this action against the Defendants. Such a demand, to the extent required, would have been a futile and useless act because

49

the Trustees are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

148.   To the extent Lebanese law applies, it authorizes a shareholder to assert a derivative action seeking damages on a corporation's behalf to the extent of that shareholder's ownership interest in the corporation.

## FIRST CAUSE OF ACTION (DERIVATIVE)
### Violation of the Law of Nations

149.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

150.   During the time period relevant to this case, Hezbollah has sought to conduct and has conducted terror attacks targeting civilians.  Defendants had actual knowledge that Hezbollah is a violent terrorist organization, which, as recognized by the U.S. government and others, had carried out numerous attacks targeting civilians and which planned and intended to carry out additional such attacks.

151.   At all relevant times, Defendants had actual knowledge that Hezbollah required funds and financial services in order to plan, prepare for and carry out terror attacks on civilians, and that providing funds and financial services to Hezbollah would enable and enhance Hezbollah's ability to engage in such attacks.  Defendants were also aware that the United States had imposed sanctions intended to prevent Hezbollah from conducting banking activities, including wire transfers, and thereby limit its ability to operate and to carry out terrorist attacks.

152.   Despite this knowledge, Defendants willfully and unlawfully caused LCB to launder funds for and to provide funds and financial services to Hezbollah or its surrogates, knowing and intending that these acts would enable and enhance

Hezbollah's ability to kill or seriously injure civilians by engaging in terror attacks to intimidate civilian populations, including widespread, systematic attacks that constitute crimes against humanity.  Hezbollah has engaged in terror attacks on civilians not only to intimidate the civilian populations, but also, in some cases, in an effort to compel government action.

153.    Defendants knowingly and intentionally relied on the U.S. banking system to finance Hezbollah's violations of the law of nations.  Such financing of Hezbollah terror attacks on civilians constitutes a violation of the law of nations as reflected by the Terrorist Financing Convention and has a clear nexus to the United States.

154.    Defendants had actual knowledge that providing banking services to or on behalf of Hezbollah was not permitted under U.S. law and would subject LCB's assets to forfeiture by the U.S. government.

155.    The United States filed the Civil Forfeiture Complaint based, *inter alia*, on LCB's actions to assist Hezbollah.  LCB forfeited $102 million to the United States to settle the Civil Forfeiture Complaint.  These funds were forfeited in satisfaction of claims by the U.S. government against LCB's property, claims against LCB arising from the money laundering scheme, and claims against Defendants and others based on their conduct as board members and managers of LCB.  The $102 million effectively constituted the proceeds from a sale of Bank assets that had been placed in escrow, and which the Bank and its shareholders would have received but for Defendants' scheme.

156.    As noted above, following the forfeiture, the U.S. Attorney for the Southern District of New York stated that the $102 million paid by LCB "shows that

banks laundering money for terrorists and narco-traffickers will face consequences for their actions, wherever they may be located."  The Administrator of the Drug Enforcement Administration stated that the $102 million paid by LCB "is significant and addresses the role the Lebanese Canadian Bank played in facilitating illicit money movement from the United States to West Africa to Hizballah-controlled money laundering channels."

157.    LCB suffered $102-million loss as a proximate result of Defendants' misuse of the Bank to violate the law of nations.

158.    Defendants are liable to LCB for the damages they inflicted on the Bank through their violations of the law of nations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award them such damages and compensation, including punitive damages, interest, attorneys' fees, costs and such other relief as this Court may deem just.  An award of punitive damages is appropriate because Defendants' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, and malicious.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  December 20, 2018                COVINGTON & BURLING LLP

                                          _s/ Anthony Herman_____
                                         Anthony Herman
                                         Christian Pistilli
                                         Dennis Auerbach
                                         Andrew Siegel
                                         One CityCenter
                                         850 Tenth Street, NW
                                         Washington, D.C. 20001
                                         Tel: (202) 662-6000
                                         Email: aherman@cov.com
                                         cpistilli@cov.com
                                         dauerbach@cov.com
                                         asiegel@cov.com
                                         *Attorneys for Plaintiffs*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Ghazi Abu Nahl, declare under penalty of perjury under the laws of the United States of America that the factual averments set forth in the foregoing Verified Second Amended Complaint are true and correct, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true and correct.

Subscribed to by the Plaintiff on this 19 day of December, 2018.

_____

Ghazi Abu Nahl